UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

THE HON. DAVID O. CARTER, JUDGE PRESIDING

MATTEL INC.,                          )
                                      )
                    Plaintiff,        )
                                      )
         vs.                          ) No. CV 04-9049-DOC
                                      )
MGA ENTERTAINMENT, INC.,              )
                                      )
                    Defendant.        )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

THURSDAY, SEPTEMBER 2, 2010

6:30


Maria Beesley-Dellaneve, RPR, CSR 9132
Official Federal Reporter
Ronald Reagan Federal Building, room 1-053
411 West 4th Street
Santa Ana, California 92701
(714) 564-9259

Page 2

1    **APPEARANCES OF COUNSEL:**

2    **FOR THE PLAINTIFF:**  QUINN EMANUEL URQUHART OLVER & HEDGES
                             BY:  MICHAEL ZELLER, ESQ.
3                            and  JOHN QUINN, ESQ.
                             865 S. FIGUEROA
4                            10TH FLOOR
                             LOS ANGELES, CALIFORNIA 90017
5                            (213)443-3000

6
     FOR THE DEFENDANTS:  ORRICK, HERRINGTON & SUTCLIFFE
7                            BY:  ANNETTE HURST, ESQ.
                             405 HOWARD STREET
8                            SAN FRANCISCO, CALIFORNIA 94105
                             (415)773-5700
9

10
     FOR THE DEFENDANTS:  ORRICK HERRINGTON & SUTCLIFFE
11                           BY:  THOMAS MCCONVILLE, ESQ.
                             4 PARK PLAZA
12                           SUITE 1600
                             IRVINE, CALIFORNIA 92614
13                            (949)567-6700

14

15
     FOR THE MOVANT IGWT GROUP: ORRICK HERRINGTON & SUTCLIFFE
16                           BY:  WILLIAM MOLINSKI, ESQ.
                             777 SOUTH FIGUEROA STREET
17                           SUITE 3200
                             LOS ANGELES, CALIFORNIA 90017
18                           (213)629-2020

19

20

21

22

23

24

25

```
 1            SANTA ANA, CALIFORNIA; THURSDAY, SEPTEMBER 2, 2010

 2                           -OOO-

 3            THE COURT:  On the record.  The parties are here --

 4    strike that.  Counsel are here on behalf of Mattel and MGA.

 5            And counsel, you have informed the Court you have

 6    reached a series of agreements on some discovery matters.  Could

 7    you state those, please?

 8            MS. HURST:  Yes.  On what docket number is that?

 9            MR. MCCONVILLE:  Docket 8454.

10            THE COURT:  Document 8454.

11            MS. HURST:  Mattel has provided us with narrowed

12    requests and we have agreed to those.

13            THE COURT:  Mattel has provided once again what?

14            MS. HURST:  Narrowed document requests, and we have

15    agreed to those.

16            THE COURT:  Stipulated to?  I don't have a copy of

17    those.  Could I have a copy of those?

18            MS. HURST:  I only have one that's been marked up.

19            MR. ZELLER:  We'll provide another copy, Your Honor.

20            THE COURT:  Thanks.  Just provide a copy in case there

21    is a disagreement.

22            Stipulated, Mattel and MGA?

23            MS. HURST:  Yes.

24            MR. ZELLER:  Yes, Your Honor.

25            THE COURT:  Next?
```

1          **MR. MCCONVILLE:**  There was an agreement, Your Honor,

2     with regard to MGA's motion for protective order.  I'm sorry.  MGA

3     Mexico's motion for protective order.  Those were dockets 8465 and

4     8466.  And we have agreement -- reached an agreement on those

5     matters.

6          **THE COURT:**  What is the agreement?

7          **MR. MCCONVILLE:**  We will provide a witness for a day and

8     a half.

9          **THE COURT:**  When?

10         **MR. MCCONVILLE:**  We don't have a date yet, Your Honor.

11         **THE COURT:**  Who?

12         **MR. MCCONVILLE:**  I don't know who the witness is going

13    to be.  It's a 30(B)(6) topic.

14         **MS. HURST:**  What else do we have?  John wants to argue

15    about interrogatories again.  So that one we didn't resolve.

16         **THE COURT:**  We have a list.

17         **MS. HURST:**  We'll submit on the objections to order 98.

18    It was only that one document that we thought was privileged.  We

19    don't need argument on that.

20         **THE COURT:**  Acceptable to Mattel?

21         **MR. ZELLER:**  Yes.

22         **THE COURT:**  You identified certain document numbers.  So

23    I may repeat some things in just a moment as I go down my list.

24         **MS. HURST:**  That one on order 98, that was 8246.  That

25    was submitted on the papers.

1          MR. ZELLER:  I have a copy of the narrowed requests,

2    Your Honor.

3          THE COURT:  Do you want me just to have the clerk xerox

4    those off?

5          MR. ZELLER:  I have extra copies.

6          THE COURT:  Thank you.  Is this the first time MGA has

7    seen this?

8          MR. MCCONVILLE:  No, sir.  They provided them to us.

9          THE COURT:  Is this agreed to by the parties?

10         MS. HURST:  Yes.

11         MR. MCCONVILLE:  It is.

12         THE COURT:  Excellent.  I appreciate your attention.  My

13   record -- how would you like me to refer to this?  Simply docket

14   number 39 through 49 of Mattel's fifth set of requests for

15   documents?

16         MR. MCCONVILLE:  That's fine.

17         THE COURT:  That acceptable?

18         MR. ZELLER:  That is.

19         THE COURT:  How does that match up with our prior

20   discussion?  In other words, how did we refer to this last

21   evening?

22         MR. ZELLER:  We did refer to them as requests 39 to 49.

23   And we may not have referred to them in their full title on the

24   record.

25         THE COURT:  How do we refer to them so we have the

1   circuit able to link together a discussion last night?  You all

2   know what we're talking about.  The reviewing Court is going to

3   have a very difficult time tracing that back.

4           We refer to them --

5           **MS. HURST:**  Docket 8454.

6           **MR. MCCONVILLE:**  And it was document request related to

7   Mattel employees.

8           **THE COURT:**  Document request related to Mattel

9   employees.  That's a simple designation.

10          **MR. MCCONVILLE:**  There are some outstanding motions.  I

11  think there is --

12          **THE COURT:**  We have got a list.

13          **MR. MCCONVILLE:**  Yeah.  I think --

14          **THE COURT:**  I just want to know what you have resolved

15  before I started taking your arguments this evening.

16          **MS. HURST:**  That's everything.

17          **THE COURT:**  Okay.  Let me go get my list in chambers

18  then and start checking some things off.  I'm going to distribute

19  a tentative to you.  Remember, it's just a tentative.  I would

20  like you to read that, and you can argue it at your leisure

21  tonight.

22      (Brief pause in proceedings)

23          **THE COURT:**  We're on the record.  And counsel, the first

24  motion we're going to take up this evening concerns Mattel's

25  motion to compel responses to its third phase 2 interrogatories.

Page 7

1          And I think the best way to proceed --

2          **MS. HURST:**  We did that last night, I believe.

3          **THE COURT:**  We're going to do it again, interrogatory by

4    interrogatory.

5          Number one, identify any claim or actual security

6    interest or related to Bratz' intellectual property.

7          So my first question is, your RICO claim alleges that

8    MGA obstructed justice by burdening its assets in order to avoid

9    the phase 1 jury verdict.

10         Shouldn't this interrogatory be bounded in time to

11   events that postdate the start of phase one trial?

12         **MR. QUINN:**  Yes.

13         **THE COURT:**  How are your claims, security interest,

14   relevant?

15         **MR. QUINN:**  Schemes to obstruct the judicial process and

16   thwart the verdict and the Court orders relating to that, conceal

17   assets, which is conceal the -- to transfer ill-gotten gains; make

18   them difficult to trace.

19         **THE COURT:**  Given that this request could be, and I

20   emphasize, could be considered subterfuge for the benefit of your

21   now state court action, why shouldn't I impose a protective order

22   to prevent disclosure of this information outside this litigation?

23         **MR. QUINN:**  Your Honor, I think if it's relevant in this

24   case, if it's related to two cases, that is not a reason for

25   limiting its use to one case.

Page 8

1          THE COURT:  MGA?

2          MS. HURST:  Your Honor, on that last point we were right

3    in here the other evening and the Court unequivocally stated that

4    materials in this case should not be used to file new lawsuits.

5    And the Court ordered an in camera session to examine Mr. Corey on

6    that very point.  And now they have taken the materials from this

7    lawsuit and gone and filed that state court proceeding.

8          They are already in contempt of the protective order on

9    this.  And they filed that proceeding after the Court stood up

10   here the other night and said that.

11         THE COURT:  Mattel?

12         MR. QUINN:  Your Honor, it is my understanding that --

13   and I do recall the Court expressing concerns about Mexico.  And

14   obviously there is a protective order that's in place in this

15   case.  But that protective order has not been violated any more

16   than -- MGA filed a public counterclaim in this case that included

17   attorneys-eyes-only information.  And I think they were entitled

18   to do that.  If they learn something in discovery that causes them

19   to believe they have some claims, they have an obligation to

20   pursue those claims.

21         THE COURT:  MGA?

22         MS. HURST:  Your Honor, the security interest thing is

23   completely irrelevant.

24         THE COURT:  Are you in agreement once again, so I have a

25   clear record, on interrogatories number two, three, four, five,

1   six and seven, that they will be held in abeyance pending the

2   expert discovery cut-off pursuant to our discussion last evening?

3            MS. HURST:  Yes, Your Honor.

4            MR. QUINN:  Yes, Your Honor.

5            THE COURT:  Interrogatory numbers 12 and 13 --

6            MR. QUINN:  Can I say just one thing, Your Honor, that

7   we learned in deposition today that's relevant?  We took the

8   deposition of MGA's CFO today.  We were told last night that they

9   simply do not have the information that permits them to make a

10  calculation of investment costs, etcetera, on a product by product

11  basis.

12            The CFO testified this afternoon that, in fact, he's

13  recently, within the last six months, done that; that they have

14  that information and they can do those calculations.  I was

15  surprised given what we heard last night.

16            MS. HURST:  That is a complete mischaracterization of

17  what was said last night and in the deposition today.

18            THE COURT:  So we have a transcript, obviously.  We can

19  convert it so I can read it by tomorrow?

20            MR. QUINN:  Yes.

21            THE COURT:  Bring it to court.

22            MR. QUINN:  We will.

23            MS. HURST:  Before we wait for that, Your Honor, I would

24  like to say that what I said last night is that historical

25  information is not kept on a product line profitability basis.

Page 10

1    And what the witness testified to today was that he had recently

2    performed an analysis in an attempt to estimate costs associated

3    with product lines other than Bratz.

4         THE COURT:  How much time we take is up to both of you.

5    I can read it, and I'll read it tomorrow.

6         MS. HURST:  And then we produced the document and it

7    didn't say a word about Bratz on it.  And it said nothing about

8    historical profitability.  And it said expenses were allocated on

9    a basis of percentage of revenues, which is exactly the

10   calculation we discussed last night that both sides' experts will

11   be making in the future.

12        THE COURT:  Thank you.

13        Interrogatory number 12 and 13 asks, "state on the

14   yearly basis the total number of your employees who perform any

15   work related to Bratz in 2004 and each year since then."

16        I'm struggling with the words "related to."  Does that

17   include licensing or multiple media work for Bratz like television

18   commercials?

19        MR. QUINN:  I would say yes, Your Honor, if they're

20   engaged in work on those products.

21        THE COURT:  Is this relevant outside of your claim that

22   MGA abandoned the Bratz brand after the phase 1 verdict?

23        MR. QUINN:  Broadly speaking, no.  That's what it's

24   relevant to, what we have alleged to be a scheme to obstruct the

25   judicial process, thwart the verdict and the Court's orders.

1        **THE COURT:**  Why can't you limit this to one year before

2   and one year after the phase 1 jury verdict?

3        **MR. QUINN:**  Your Honor, I think under our theory we need

4   to show a baseline.  We need to show what was being -- what sort

5   of MGA resources, human resources, were being devoted to Bratz in

6   its heyday, as it were, and then afterwards.

7        So, I would say sometime a year before the start of the

8   phase 1 trial and one year after the phase 1 trial would be

9   adequate as it relates to Bratz.  That's interrogatory number 12.

10       Moxie, which is the subject of interrogatory number 13,

11  didn't even come out until nine months or more after the

12  conclusion of the phase 1 trial.

13       **THE COURT:**  MGA?

14       **MS. HURST:**  So, Your Honor, on Bratz, if you grant the

15  request, then in effect what we're going to have to do is go back

16  to the beginning of time.  Because they're trying to make a false

17  comparison.  They're going to try to compare 2004 when the thing

18  was enjoying a billion dollars of sales to 2009 when it was under

19  an injunction.  And then the only way we're going to be able to

20  rebut that is to go back to the beginning of time, 2001, when they

21  were just launching the product and compare that to 2009.

22       So, in effect, if you grant this interrogatory, the

23  burden associated with that is going to be enormous, because it's

24  going to be a false comparison.  It's for a constructive trust

25  claim that doesn't even exist anymore.  And it's going to have a

Page 12

1   heavy amount of burden associated with it.

2           We have to go back now through the company's records for

3   every year the product's been on the market and hundreds,

4   thousands of employees, and try to figure out who was working on

5   this.

6           **THE COURT:**  Anything else?  One more round if you care.

7           **MR. QUINN:**  I submit on that, Your Honor.

8           **THE COURT:**  Counsel?

9           **MS. HURST:**  Submitted.

10          **THE COURT:**  Interrogatory number 10 and 11, I want MGA

11  to describe to me, Ms. Hurst, past and present, product lines of

12  the Bratz and Moxie lines from 2004 to present.

13          **MS. HURST:**  For Moxie, Your Honor?

14          **THE COURT:**  For Bratz and Moxie lines.

15          **MS. HURST:**  Your Honor, Moxie came out in 2009, and

16  there are four dolls in the line, and there have been at least two

17  seasons each year since then as well as certain accessories.

18          Your Honor, Bratz, since 2004, would be an enormous

19  number of SKU's, but I think we already produced a SKU report for

20  all of Bratz' products ever in transaction with the trapezoid

21  packaging stuff, Your Honor.  So, I think on 11 we can point to

22  documents that have already been produced.

23          On 10, we can do 10.  We can produce a SKU report and

24  give them 10.

25          **MR. QUINN:**  Your Honor, that sounds great on 10.  On 11,

1    if they're invoking the procedure under rule 33D, option to

2    produce business records, we would request that they actually

3    comply with that rule and specifically identify the documents that

4    they say they produced from which these answers can be derived.

5            **MS. HURST:**  That's fine.  We have no problem with that.

6    It's the exhibits to the Pembleton deposition.

7            **THE COURT:**  Okay.  Agreed?

8            **MS. HURST:**  Agreed.

9            **MR. QUINN:**  Agreed.

10           **THE COURT:**  Agreed.  Okay.

11           I want to move to Mattel's motion to compel regarding

12    first phase second interrogatory.  And I want to go through that

13    interrogatory by interrogatory again.  Those were the four we

14    discussed last night and I want to clear it up.

15           Number one, identify all payments you have made directly

16    or indirectly to shareholders since January 1, 2004.  First, I'm

17    not going to spend too much longer at least on that and indicate

18    to you the Court is simply denying this interrogatory.  It's

19    marginally relevant to the claims as modified by the order on the

20    motion to dismiss.

21           The only standing claims concern one fraction of the

22    mail fraud and wire fraud scheme alleged by Mattel.  It is

23    obviously the scheme itself and the act and execution of the

24    scheme, but this evidence doesn't meaningfully fall into either

25    category.  And the burden of this interrogatory is tremendous.

1    The motion is denied as to this interrogatory.  There is no

2    further comment the Court is going to accept.  It already did it

3    last evening.

4           Interrogatory number two is a request to identify all

5    payments you have made directly or indirectly to creditors or

6    lenders including, but not limited to, Omni 808 since January 1,

7    2004.  And to the extent that this interrogatory concerns payments

8    to Omni, it's duplicative of requests for production that I have

9    already compelled.

10          And to the extent it extends to any creditor or lender,

11   it's unduly burdensome or irrelevant.  And I'm going to indicate

12   this evening, and you'll get this in written form over the

13   weekend, I'm denying -- the motion is denied as to interrogatory

14   number two.

15          Concerning interrogatory number three, it's a request to

16   identify all payments you have made directly or indirectly into

17   the Larian family member -- or to any Larian family member or

18   affiliates since January 1, 2004.  I think this interrogatory,

19   once again, is duplicative of requests for production to the

20   extent it concerns shareholder distributions from Wachovia credit

21   facility.  And I'm personally aware of those requests for

22   productions since I compelled them.

23          The interrogatory is otherwise irrelevant and unduly

24   burdensome since MGA is a family-owned company and the interplay

25   between MGA funds and Larian funds opens up a door of endless

1    discovery.

2            Once again, I want to hear from you on that.  I know

3    your concern.  I wanted you to create your record, but I'm

4    prepared to rule against you.  That's just tentatively.

5            Mr. Quinn?

6            **MR. QUINN:**  I'll submit on that.

7            **MS. HURST:**  Submitted.

8            **THE COURT:**  The motion is denied as to interrogatory

9    number three.

10           Interrogatory number five, to the extent unidentified in

11   response to interrogatory number one through four, it requests an

12   identification of all payments you have made of more than $50,000

13   directly or indirectly to anyone since January 1, 2006.  Now, if

14   you move back the date to January 1, 2009, after the phase 1 trial

15   and you increase the amount to a larger number, I'm going to

16   consider that.

17           **MR. QUINN:**  January 1, 2009, is fine, Your Honor, and

18   $100,000.

19           **THE COURT:**  Fair enough.  Let me hear from MGA.  I think

20   it was your suggestion --

21           **MS. HURST:**  No.  I vociferously objected to this one.

22   It's irrelevant, and it's trying to get behind whether we had

23   compliance with the monitor order.  It's going to get into all

24   that stuff with Mr. Fraioli.  That's what this is, because that's

25   specifically what the monitor order said.  If it's a payment in

Page 16

1    excess of $50,000, you have to come for permission.  It's going to

2    be all about getting behind the monitor order.

3              **THE COURT:**  Mattel?

4              **MR. QUINN:**  Submitted, Your Honor.

5              **THE COURT:**  Okay.  MGA.

6              **MS. HURST:**  Submitted.

7              **THE COURT:**  All right.  I'll go back and consider that

8    later this evening after you leave.

9              Interrogatory number nine requires MGA to describe all

10   amounts that could have been subject to deletion.  I already

11   informed Mattel that this was too broad and Mattel could set forth

12   a procedure that MGA could comply with to respond to this

13   interrogatory.  So I would like you to identify the exact way that

14   MGA would go about investigating this interrogatory.  And that

15   process should take no more than an hour or two.  Otherwise, I'm

16   going to deny it.

17             You want to consult amongst yourselves?

18             **MR. QUINN:**  Right.  We do have a proposed limitation to

19   his interrogatory number nine.  It presently says -- refers to

20   relevance as the subject matter of spoliated documents.  We

21   propose to limit that to documents relating to Mattel or Bratz.

22   So be specific in that regard, Mattel or Bratz.  And also add a

23   date limitation since the filing of this lawsuit, which is

24   April 27, 2004.

25             And also, Your Honor, we would add the concept of

d4d8ab85-a742-4451-a570-f1528798d121

1    intentionality.  So intentional destruction, modifications,

2    spoliation of documents relating to Mattel or Bratz since the

3    filing of this lawsuit.

4              THE COURT:  How long will it take you to draft that

5    tonight?

6              MR. QUINN:  That will take us five minutes.

7              THE COURT:  Okay.  I'll wait.

8              MR. QUINN:  We'll have this typed up across the street.

9    They will deliver it.  That will take a little longer than five

10   minutes.

11             THE COURT:  You want to go on?

12             MR. QUINN:  We will go on.  That's our proposal.

13             THE COURT:  I'll give you the first opportunity.  The

14   last part of that proposal is this wouldn't take more than an hour

15   or two.

16             MR. QUINN:  I would think there aren't so many

17   intentionally spoliated documents relating to Mattel or Bratz

18   since the filing of this lawsuit that it would take them a long

19   time to figure that out.

20             MS. HURST:  Can we have argument on that limitation now,

21   Your Honor, or wait?

22             THE COURT:  Certainly.

23             MS. HURST:  It's still proving a negative.  It's still

24   the same problem we started with.

25             THE COURT:  I just want a good record in case I deny

Page 18

1    that -- I want you to draft that document so the circuit can see

2    that you limited it, and if the circuit believes the Court is

3    unreasonable, then they have a written document.  Okay?  That

4    protects the record.

5           Concerning the motion to compel documents regarding

6    former Mattel employees, I had asked MGA to submit documents for

7    in camera review, and I'm prepared to deny Mattel's discovery into

8    these documents which are privileged.

9           Any other comment, counsel?  Review those.

10          **MS. HURST:**  No.  Submitted.

11          **MR. QUINN:**  No, Your Honor.

12          **THE COURT:**  The 30(B)(6) concerning Mattel's motion to

13   comply with 30(B)(6) testimony, I think only one --

14          **MS. HURST:**  Which one is that, Your Honor?

15          **THE COURT:**  Your 30(B)(6) testimony, it was Mattel's --

16   it was Mattel's motion to comply -- I'm sorry, to compel 30(B)(6)

17   testimony.  We discussed it last evening.

18          **MS. HURST:**  On 622 and 25?

19          **THE COURT:**  It was -- I think only topic 25 remained.

20   That's my memory.

21          **MS. HURST:**  Yes.

22          **THE COURT:**  This topic relates to what you referred to

23   as the Laredo guy, and I drew a blank until there was a further

24   description.  This was the e-mail about the border, etcetera.

25          I'm going to deny the motion on this topic.  I find the

Page 19

1    topic duplicative of existing discovery into this topic, including

2    discovery from MGA about its activities in Mexico.  And that

3    resolves this motion.

4            Now, I can't do what I attempted to do last evening

5    concerning Mattel's motion to compel Machado to responsive

6    documents.  I need Machado's counsel present.  In other words, I

7    need Machado representing or here to hand down that motion.  But

8    I'm going to give you a preview.  I certainly want Machado's

9    counsel here, but last evening I indicated that -- well, we need

10   Machado's attorney present.  There is no reason to discuss this,

11   this evening, without them being present.

12           So how is the most expeditious way to get here?  I can

13   send out an order to be here tomorrow.  Do you have a phone number

14   for him?

15           MR. MOLINSKI:  I spoke to Mr. Cody earlier and he said

16   he could be here tomorrow.

17           THE COURT:  Thank you.  I have only two questions on

18   Mattel's motion to confirm pendency of Bratz' trade secret claims.

19   The first time this motion was filed, Mattel did not request to

20   amend its pleading.  It merely requested that the Court confirm

21   that the existing pleading included Bratz' trade secret claims.

22           Why does Mattel now request a formal amendment?

23           MR. QUINN:  Your Honor, it was really out of an

24   abundance of caution.  We ourselves thought, understood that the

25   Bratz' trade secret claims were part of the pleading.  But out of

d4d8ab85-a742-4451-a570-f1528798d121

1    an abundance of caution in case there was a different view, we

2    requested leave to amend.

3         **THE COURT:**  MGA?

4         **MS. HURST:**  Your Honor, they never sued Carter Bryant on

5    their trade secret claim.  They didn't file a trade secret claim

6    against Carter Bryant in their initial pleading.  It was really

7    clear that this was not part of the pleading.  And so they had to

8    request leave to amend, because the legal theory was not part of

9    the pleading, as the Court previously held.

10        **THE COURT:**  Any other comment by either counsel

11   concerning the first question?

12        **MR. QUINN:**  No, Your Honor.

13        **MS. HURST:**  No, Your Honor.

14        **THE COURT:**  If I do allow the amendment or conform the

15   pendency of the claims, what should the procedure be for allowing

16   MGA to respond to the pleading?  Can they move to dismiss within a

17   specified time frame, or do we just address for the first time in

18   summary judgment?

19        **MS. HURST:**  Can we just deem it all denied and whatever

20   affirmative defenses we have already pled to apply?  And if we

21   have any other affirmative defenses, we'll -- I don't want to file

22   a motion to dismiss and a motion for summary judgment.  So, a

23   motion for summary judgment is fine with us.

24        **MR. QUINN:**  I think that's a sensible solution.

25        **THE COURT:**  Agreed to by Mattel?

Page 21

1          **MR. QUINN:**  Indeed.

2          **THE COURT:**  Agreed to by MGA?

3          **MS. HURST:**  Subject to our objection that it should not

4    be amended, of course, yes.

5          May I make one more point of argument on this motion?

6          **THE COURT:**  Please.

7          **MS. HURST:**  Your Honor, one of the principal problems

8    apart from everything else that we have with this, is that the way

9    they have now drafted this, it's unclear what the legal theory of

10   trade secret misappropriation is.  Is it that Carter Bryant

11   created Bratz himself while he was subject to some legal

12   obligation to Mattel in their definition of proprietary, and it's

13   all circular and therefore it was their trade secret, and

14   therefore he misappropriated it?  Or is it some completely

15   different theory that somehow Mattel already had a preexisting

16   trade secret named Bratz and Carter Bryant somehow got access to

17   that created by somebody else, and took it over to MGA?

18         It is completely uncertain which of those two theories

19   would operate with respect to this now.  And Your Honor, with all

20   due respect, that's a big difference.

21         **MR. QUINN:**  It's the first.

22         **THE COURT:**  State what the first is.

23         **MR. QUINN:**  That Carter Bryant came up with some trade

24   secrets while he was employed by Mattel.  Under our view of our

25   inventions agreement, those were Mattel's trade secrets.

                                                                 Page 22

1                **THE COURT:**  That was my understanding from phase 1 also.

2   That's never varied, it's never changed.

3                **MS. HURST:**  Okay.

4                **THE COURT:**  That allay your concerns?

5                **MS. HURST:**  As long as that's stipulated that that other

6   theory is excluded, yes.

7                **THE COURT:**  Well, it's not excluded.  He is not pursuing

8   it.  Courts exclude things.

9                **MS. HURST:**  Understood, Your Honor.

10               **MR. QUINN:**  And Mr. Zeller corrected me.  It's not

11  necessarily simply the agreement which is the source of Mattel's

12  ownership claim.

13               **THE COURT:**  Which theory?

14               **MR. QUINN:**  Mattel's ownership of the trade secrets.

15  When I stated it, Your Honor, I referred only to Mr. Bryant's

16  employment agreement.

17               **THE COURT:**  You understand what he is saying?

18               **MS. HURST:**  It sounds like they're trying to keep both

19  theories in.

20               **THE COURT:**  Sounds to me like that too.  Why don't you

21  two talk, consult.

22               **MR. QUINN:**  Can I yield the floor to Mr. Zeller, Your

23  Honor?

24               **THE COURT:**  Certainly.

25               **MR. QUINN:**  I yield the floor.

1        MR. MOLINSKI:  Mr. Cody said he could be here at noon,

2   Your Honor, tomorrow.

3        THE COURT:  Ten.  Can he be here at 10?

4        MR. QUINN:  If I can yield the floor to Mr. Zeller.

5        MR. MOLINSKI:  He will be here at 10, Your Honor.

6        THE COURT:  Mr. Zeller.

7        MR. ZELLER:  No, it's not changing the trade secret.

8   The trade secret is the same thing.  It is the bundle of

9   confidential information that Carter Bryant created pertaining to

10  this doll Bratz and the related accessories and the like for

11  Bratz.  All I was pointing out to Mr. Quinn is that he had said

12  that ownership by Mattel of that bundle of rights was under the

13  inventions agreement.

14        That is one source of Mattel's ownership.  That is all.

15  It is not that somehow there are other trade secrets that we're

16  asserting ownership of as part of what we're calling the Bratz

17  related trade secrets.

18        MS. HURST:  More weasel words.  I have no idea what that

19  means.  It still sounds like they're trying to hold both theories

20  open.

21        THE COURT:  Those are weasel words.  I didn't understand

22  what you said either.  I'm sure the jury will.  Which theory?

23        MR. ZELLER:  It's the same theory.  It's only one

24  theory.  But it is what Carter Bryant created.  Part of this Bratz

25  project are the trade secrets.  It's that Mattel's ownership of

Page  24

1    them is by more than one source of law.  That's all.

2            There is an inventions agreement.  There are statutory

3    rights that Mattel has.  So there are other legal doctrines by

4    which Mattel can own those same trade secrets.  That's it.

5            **THE COURT:**  What we're going to do is we're going to

6    come back again.  We have other business to attend to.  And we

7    have still things on the way over.  So 10:30, 11:00, 11:30, or 12.

8    When do you want to meet again?

9            **MR. QUINN:**  Can we take the earliest of those, Your

10   Honor?

11           **THE COURT:**  As long as you are ready.  As long as we're

12   not waiting for documents, we'll try at 10:30.

13       (Brief pause in proceedings)

14           **THE COURT:**  Back on the record.  And all counsel are

15   present.

16           First I'm going to hear arguments on the tentative.  I

17   asked two questions earlier.  I know that present counsel wishes

18   that you weren't saddled with the decisions of former counsel, but

19   my basic concern is that MGA's former counsel, the Skadden firm,

20   repeatedly represented that the trade secret misappropriation

21   claims formed the basis of the phase 2 issues.  So I would like to

22   hear from counsel and I don't care who I start with.

23           **MS. HURST:**  Your Honor, that's fine.  I'll go first

24   since the tentative is against us.

25           Your Honor, I think Skadden was simply objecting that it

Page 25

1   was not properly included as part of phase 1.  It wasn't an

2   agreement as to the scope of the pleadings which, since Carter

3   Bryant had not been sued on the trade secret claims ever, either

4   in the initial pleading or in the counterclaims, it simply hadn't

5   been pled.

6          But, Your Honor I understand the Court's concern.  The

7   Court also quotes in the tentative a statement that I made in

8   connection with the deposition that was based on recently served

9   interrogatories.  It's true that they served interrogatories for

10  the first time in phase 2 trying to add this into the case.  And

11  ever since then we have been fighting about it.

12         Your Honor, my main concern remains as expressed

13  earlier, that the proposed amendment or motion to confirm or

14  whatever you want to call it, still leaves unclear exactly what is

15  the legal theory that they're pursuing.  And they haven't

16  disclaimed a legal theory based on somehow Carter Bryant took

17  Bratz from somebody else at Mattel.  And we have never conducted

18  discovery on such a theory.  And it's 10 years later now.  So it

19  really does make a difference and they didn't preserve evidence in

20  the meantime either, Your Honor.

21         So with all that said, I'll submit.

22         **THE COURT:**  Counsel on behalf of Mattel.

23         **MR. QUINN:**  We'll say it again, Your Honor, in case we

24  were not clear.  Trade secrets are the product of Carter Bryant's

25  work while employed by Mattel.  We are not asserting any trade

1    secret claim relating to Bratz related trade secrets created by

2    anyone else at Mattel other than Carter Bryant.

3              **THE COURT:**  Okay.

4              **MR. QUINN:**  On that basis we'll submit.

5              **THE COURT:**  Counsel for MGA.

6              **MS. HURST:**  Submitted, Your Honor.

7              **THE COURT:**  Mattel?

8              **MR. QUINN:**  Submitted, Your Honor.

9              **THE COURT:**  All right.  Then let's hear argument on

10   MGA's motion to compel the resumed testimony of Bob Eckert on the

11   licensing e-mail.  In this e-mail Mr. Eckert sent an e-mail asking

12   one of his subordinates whether he should "kill" a licensing

13   agreement that MGA entered into with one of the Mattel's

14   licensees.

15             I ordered Mattel to produce a witness as to the contents

16   and circumstances of the e-mail and Mattel designated Mr. Eckert

17   for that issue.  What I'm concerned with is the extent of Mr.

18   Eckert's preparation on this topic, and that's why I want argument

19   to focus on that.

20             I'm tentatively inclined to deny the request since the

21   e-mail is of marginal relevance and Mr. Eckert has already been

22   asked to deliver testimony as to that issue, but I'm really not

23   quite certain so I'm inviting argument on it.  I don't care who

24   starts.

25             **MR. ZELLER:**  Thank you, Your Honor.  One point I would

Page 27

1    make is that the Bob Eckert e-mail actually had to do with whether

2    or not Mattel should go forward with one of its own licensing

3    deals.  It was not talking about an MGA license.

4          Mr. Eckert testified quite clearly as to the question

5    that was posed by the Court's order, which was, what is Mattel's

6    practice on this?  He answered that question.  He, in fact, also

7    had plenty more to say on it, which was never asked of him, by the

8    way, such as what goes into the considerations that when Mattel

9    makes these decisions as to whether or not it considers there to

10   be some sort of conflict of interest to have one of its own

11   licensees also in a license with MGA.

12         Instead, Ms. Hurst asked about a whole range of other

13   kinds of e-mails that were clearly not part of the scope of the

14   Court's order, the briefing, or anything else.  And it's really on

15   that basis where an argument was made about so-called preparation.

16         But to be -- to put the finest point on it, Your Honor,

17   Mr. Eckert testified knowledgeably based upon not only his own

18   knowledge from Mattel but also from talking to other people as he

19   testified to, to confirm it, what Mattel's practice is in this

20   regard.  He answered the question.

21         MGA really is a classic case of perhaps MGA didn't like

22   the answer but the fact is he answered the question.  And it was

23   clearly within also what the Court -- the options the Court

24   presented in terms of resolving this issue.  I also, of course, do

25   agree with the tentative, that this is at best marginal.

Page 28

1    Mattel has now put on the table, through its CEO,

2  evidence of what its practice is.  MGA really hasn't tied this to

3  anything that's part of their claims, part of their defenses.  And

4  really on that basis, Your Honor, I think having Mr. Eckert come

5  back I think will be pointless, but certainly MGA had the

6  opportunity to ask him any questions that they wanted, and I think

7  the Court saw from the transcript they roam pretty far in that

8  area.

9    **THE COURT:**  Bratz?

10    **MS. HURST:**  Your Honor, the e-mail -- first of all,

11  there is a specific allegation in MGA's original complaint that

12  MGA engaged in unfair competition through intimidation of

13  licensees or prospective licensees of MGA.  And we have an e-mail

14  where they discuss whether they're going to kill a deal with an

15  MGA licensee, which is directly pertinent to that allegation.

16    Mr. Eckert's investigation of that e-mail was the

17  following:  He went and asked did we, in fact, proceed with the

18  deal or not.  End of story.  He didn't ask why Mandana Sadigh told

19  Ellen Brothers there was a policy against doing such deals.  He

20  didn't address why Mandana Sadigh was representing that Neil

21  Friedman, the president of Mattel brands, had such a policy.

22    He didn't talk to Mandana Sadigh at all.  He didn't talk

23  to Neil Friedman at all.  And he didn't do any follow-up based on

24  such conversations to find out why the president of Mattel brands

25  and a senior vice president of strategic planning, who's held many

d4d8ab85-a742-4451-a570-f1528798d121

Page 29

1    other positions, Ms. Sadigh, both apparently believed there was a

2    policy within Mattel that we don't do business with Bratz

3    licensees.

4           It's directly relevant.  And what did Mr. Eckert do?  It

5    was a whitewash.  He went and asked one question, did we do this

6    deal or didn't we?  Yes, oh we did, okay, that's it.  And that was

7    an inadequate investigation.

8           Your Honor, additionally we have moved to compel on the

9    licensing documents related to this, but it's not just related to

10   this.  It was also related to any claim for a reasonable royalty

11   that Mattel might make in this case.  If they're going claim for

12   reasonable royalty in lieu of injunctive relief or constructive

13   trust or whatever, then they have to produce all their licensing

14   agreements.

15          And they have consistently refused to do this.  And they

16   cannot come in here with a claim, a royalty claim, having refused

17   to produce the other licensing agreements.  And Mr. Eckert made no

18   investigation as to whether licenses had been terminated, refused

19   for renewal, or otherwise retaliatory actions had been taken

20   against Mattel licensees for doing business with MGA.  He made no

21   investigation of any of that.

22          Your Honor, finally, the Court had indicated from the

23   outset of the case that MGA would be entitled to depose Mr. Eckert

24   for an equivalent amount of time as Mr. Larian in their respective

25   personal capacities.  We have had a number of important issues

Page 30

1    arise with respect to Mr. Eckert since his last deposition, and

2    we're about half a day short on that rule.

3            For example, with respect to Mr. Eckert, we now know,

4    after he claimed he didn't remember anything about the Bratz

5    brief, that he was the one who actually commissioned it.  And that

6    we have found out since the last session of Mr. Eckert's

7    deposition.  We have found out that he had discussions with people

8    about it.  We haven't had an opportunity to examine him about any

9    of that, Your Honor.

10           So I would ask that the Court order him back, prepare it

11   on topic nine, and for half a day in his personal capacity on

12   these important issues related to the Bratz brief and other

13   documents, and that the licensing documents be ordered compelled

14   both because they're relevant directly to MGA's unfair competition

15   claims and because they're directly relevant to Mattel's damages

16   claims.

17           They cannot come in here with a reasonable royalty claim

18   without producing their licenses.

19           **THE COURT:**  Mattel?

20           **MR. ZELLER:**  First, Your Honor, MGA mischaracterizes Mr.

21   Eckert's preparation.

22           **THE COURT:**  Just a moment.

23           Would you assemble the criminal jurors for just a

24   moment.

25           Counsel, I'm sorry.  Mattel.

1          **MR. ZELLER:**  Thank you.  Mr. Eckert -- and the Court

2    has, I believe, the evidence before it -- Mr. Eckert testified

3    that, in fact, he prepared well beyond what MGA has characterized.

4    He talked to that of licensing.  It was something of course he has

5    dealt with in his own business.  He also looked at MGA

6    information, which by the way, MGA has essentially the same policy

7    as Mattel.  So this is hardly a nefarious practice I think as MGA

8    tries to portray it.

9          Number two, the preparation that Mr. Eckert undertook

10   was directly what it is that the Court said was the pertinent

11   question:  What was Mattel's practice in communicating with its

12   license, actual or potential licensees of MGA?  That is what Mr.

13   Eckert prepared to.

14         The other items that MGA is complaining about such as

15   certain instances are not within the scope of that and was quite

16   clear.  And in fact, in many respects what MGA is doing here, and

17   I think we have shown this at some length in our brief, is really

18   reconsideration of the Court's first decision here; the Court's

19   order that led to the option of producing Mr. Eckert on this

20   particular subject, or we could have produced a 30(B)(6) witness.

21         And we obviously took the option that the Court granted

22   us.  This is simply a rehash of those same arguments and plain

23   violation of the Court's admonition that there should be no

24   reargument and no reconsideration.

25         Insofar as the additional argument here, which as I

Page 32

1    understand it is basically MGA's position that Mattel should be

2    compelled to produce all of its licensing agreements, certainly in

3    light of the fact that we have now been here, of course, several

4    nights, Your Honor, talking about how discovery needs to be

5    narrow, tailored, focused and on target, the idea that MGA is

6    coming in here now and saying that Mattel should have to produce

7    all of its licensing agreements without any kind of limitation,

8    and apparently without even a proper request is really, I think,

9    fairly remarkable.

10         To the extent that MGA believes it's entitled to this

11   kind of discovery, then it needs to go through the same process

12   that we're going through in order to obtain discovery.  The idea

13   that they have carte blanche just really is not consistent, I

14   don't think at all, with the tenor of what we have been doing here

15   and working to accomplish the last several nights.

16         The last point that she made was a matter of equivalent

17   time.  I don't think the Court meant it minute by minute.  And

18   also, of course, I will note that -- and this has been the

19   findings of discovery masters along the way -- that Mr. Larian and

20   his counsel have wasted certainly the equivalent of half a day

21   during the course of these depositions.  There are findings to

22   that effect with respect to the conduct of Mr. Larian but, of

23   course, one can simply see it, as the Court has seen some of these

24   transcripts.  So I think to talk about minute by minute, Mr.

25   Larian has been sitting longer is because frankly he is less

1    cooperative.

2            **THE COURT:**  Counsel, on behalf of MGA.

3            **MS. HURST:**  Your Honor, to say that someone could

4    prepare to testify regarding a company's practice without asking

5    the people who implemented the practice as reflected on a document

6    why they did it and whether they understood there to be such a

7    policy is honestly absurd.  It is a whitewash.  Well, here I have

8    a document confronting me with exactly what MGA's allegation is,

9    so I'm going to ignore that and I'm going to go talk to somebody

10   else to confirm what I already believe.

11           That's what the witness testified.  It was ridiculous.

12   And there have been requests for license agreements.  And we have

13   repeatedly made them.  And we have been litigating this issue

14   since early this year.  This is not -- I mean, we have tried to

15   raise the issue repeatedly on the license agreement, and I don't

16   hear them saying they're not going to seek a reasonable royalty.

17   Unless they're going to say we're not going to seek a reasonable

18   royalty, then they have to produce their fashion doll licenses;

19   their in-licenses and their out-licenses, their comparable brand

20   licenses.  Otherwise, there is not going to be any fair way to

21   evaluate a claim for reasonable royalty in addition to which this

22   is directly relevant to an allegation in the pleading.  It has

23   been requested.

24           With respect to wasting time or being evasive in

25   depositions, you know, Mr. Eckert is the one who claimed he

Page 34

1    couldn't remember the circumstances under which he had seen the

2    Bratz brief.  And then we learned that he was the one who had, in

3    fact, commissioned the document; had written an e-mail summarizing

4    its points for the corporate strategic plan and again, put that in

5    the corporate strategy plan a year later in September 1, 2005.

6            All those are documents produced late and testimony

7    produced late after they had been hiding the source of this Bratz

8    brief for years.  Years they've been hiding it.  Now what are they

9    doing?  Now they're telling us the only other human being who was

10   a witness to the conversation in which this document was

11   commissioned, and that's Mr. Bosick, is too sick to show up for a

12   deposition.  He got some kind of mystery illness and he's not

13   going to be there.

14           So we have one witness who claims he doesn't, another

15   witness with a mystery illness.  And Mr. Eckert does a whitewash

16   investigation on this licensing thing where he doesn't even talk

17   to the people whose names are on the e-mail that we finally

18   tortured out of him after multiple motions to compel.

19           Your Honor, good cause definitely exists to continue

20   this deposition.

21           THE COURT:  Okay.  MGA's motion to compel the originals

22   of the Bryant employment agreement is certainly not in dispute

23   between the parties that MGA is entitled to the originals of the

24   agreement and that Bryant entered into with MGA.  Like Judge Trott

25   said, that agreement lies at the center of this case.  This

Page 35

1    dispute really is about the extent of Mattel's production and how

2    can I, as a Court, measure that.

3              What do you want me to do as far as MGA is concerned?

4         **MS. HURST:**  Your Honor, we want an order compelling the

5    production of the originals and a requirement that Mattel certify

6    and explain, if it cannot do so, what happened to them.

7         **THE COURT:**  Mattel?

8         **MR. ZELLER:**  Your Honor, that's a completely different

9    motion from what is presented here.  As MGA has literally known

10   for years since the beginning of this lawsuit, Mattel does not

11   have the original of the Carter Bryant agreement.  There isn't,

12   frankly, much of a controversy over that.  Mr. Bryant acknowledges

13   it was his signature.  There was no dispute about it until I guess

14   now with the entry of the Orrick firm.

15             But what we have is we have the best available copy.

16   And we had made that available to MGA years ago and its counsel.

17   It was requested again.  We have since -- and I think this goes

18   back to July 30 in which we sent letters, e-mails to MGA saying

19   this is available.  Come over and look at it.  We have received no

20   response from MGA on this.  Instead, what we have is this

21   continued litigation over it, wasting the Court's time, frankly.

22             We have made the document available to MGA.  They're

23   welcome to come over and see it any time that they choose but at

24   this point this is simply, frankly, a waste of the Court's time.

25         **THE COURT:**  Why can't an affidavit be signed under

1   penalty of perjury by Mr. Eckert that the original has been

2   misplaced or lost?

3        **MR. ZELLER:**  Well, I think certainly we can have a

4   corporate designee do that.  I don't know if Mr. Eckert is the

5   appropriate person but we can absolutely have a designee do that.

6        **THE COURT:**  I'm not sure I would be satisfied with a

7   designee.

8        Now the question is, if I make an order compelling

9   production with those representations, this Court doesn't want to

10  be drawn into the lawsuit once again by counsel then getting in

11  front of the jury, which I counseled Mattel on the other night,

12  and making the claim did you disobey this Court's order.  I'm not

13  going to put myself in the middle of that lawsuit in that regard.

14  By the same token, there has to be some attestation.  And I'm not

15  certain -- well, I'm not inclined to grant an order compelling.

16       What is MGA's next thought?

17       **MS. HURST:**  Your Honor, two points.  First of all, I

18  have deposed their 30(B)(6) witness on this subject of the Carter

19  Bryant agreements who testified that he cannot say whether the

20  document, in its form as it's been produced in this litigation, is

21  a duplicate or not.  We have got two serious best evidence rule

22  issues here.

23       One, what did this thing look like when Carter Bryant

24  signed it?  Was it a blurry fax copy?  The thing that we have now

25  and nobody can hardly read including Judge Trott?

1          **THE COURT:**  Just a moment.  Has Carter Bryant been

2     deposed?

3          **MS. HURST:**  Eons ago.

4          **THE COURT:**  Why hasn't he been deposed and asked that

5     question, is this the best copy and was it in this condition when

6     you signed it?

7          I don't understand the ruckus of the parties.  In fact,

8     I was always curious why Carter Bryant never testified in phase 1.

9          **MR. ZELLER:**  He did, Your Honor.  Mr. Bryant came and

10    testified live.

11         **MS. HURST:**  That was a condition of their settlement

12    with him, that they get him there in person.

13         **THE COURT:**  Now, why can't that be done quickly with

14    Carter Bryant?

15         **MS. HURST:**  I understand it, Your Honor, he can't be

16    reached.  They've been trying to subpoena him in connection with

17    the New York action.  We can't find him.

18         **THE COURT:**  Does anybody know where he is, his location?

19    Mattel?

20         **MR. ZELLER:**  It is absolutely news to me, Your Honor,

21    that Ms. Hurst is saying that he can't be located.  MGA said they

22    knew where he was.

23         **THE COURT:**  Do you know?

24         **MR. ZELLER:**  I don't.  MGA said that they did.

25         **THE COURT:**  I understand that.  Do you know where Carter

Page 38

1    Bryant is?

2              **MR. ZELLER:**  I do not.

3              **THE COURT:**  Mr. Quinn?

4              **MR. QUINN:**  No, Your Honor.  If I may inquire of the

5    Court.  Does the Court realize that he, in his deposition, was

6    shown his agreement?

7              **THE COURT:**  I was.  And I think he had stated that he

8    had no better copy.  But still that's -- you have to realize how

9    silly Mattel is going to look in front of the jury when you can't

10   keep track of records and this is the Court record.  I mean, it's

11   what Judge Trott was inquiring about.  So I leave that to you, but

12   MGA is going to have a field day with that.

13             And obviously I think MGA is entitled to compare what is

14   supposedly this blurred copy with the original.  And if you don't

15   have it, I just need the confidence that it's not there and that's

16   the state of the evidence.

17             **MS. HURST:**  Your Honor, if I may.  There is also the

18   issue of what happened to it.  There's never been any explanation

19   of this under penalty of perjury.  And I had a 30(B)(6) witness,

20   Mr. Kaye, who is the head of human resources.  He is responsible

21   for the human resources records and I asked him what happened to

22   it and he didn't know.  I have tried everything to get this

23   information.  I understand the Court's concern about drawing the

24   Court into it.

25             **THE COURT:**  Thank you, counsel.  If you would like to

Page 39

1    step back and take your materials with you.

2          And counsel in the criminal matter, if you would like to

3    be seated and step forward.

4       (Brief pause in proceedings)

5          **THE COURT:**  Counsel on behalf of MGA or Mattel, if you

6    would like to continue your argument.

7          **MS. HURST:**  So, Your Honor, there is a good faith/bad

8    faith element in connection with the best evidence rule.  And I

9    have tried every which way to find out what happened to the

10   original of this document including --

11         **THE COURT:**  I can't help you with the answers being

12   given to you.  I can bring people into court to testify.  But I'm

13   hearing that from both sides.  Your frustration is with the

14   answers being given.  So I'm going to address you as I did

15   Mr. Quinn other evening.

16         Mr. Quinn's argument didn't make any sense to me because

17   in the real world, from his position, he ought to know that he has

18   got MGA in a very difficult position with that discussion that we

19   had.  You have Mattel in a very difficult position.  Now, they

20   can't keep track of their own records.  They don't have an

21   original.  I mean, the strong inference is that they're hiding it.

22         So, what would you like me to do?  Order to compel?  No.

23   Produce more witnesses in that regard?  Certainly.

24         **MS. HURST:**  I'd like an issue finding this document has

25   been ordered to compel under any numerous number of --

Page 40

1        **THE COURT:**  I'm not ready to do that yet.

2        Now, your next suggestion?  And if you are running out

3   of suggestions, you are not going to have a favorable ruling.

4        **MS. HURST:**  A fully prepared 30(B)(6) witness, Mr. Kaye,

5   to come back and be prepared to explain what it looked like in its

6   original form and what happened to it.

7        **THE COURT:**  Granted.  Thank you.  It's granted.  End of

8   discussion.  When is that going to take place?

9        **MS. HURST:**  I believe that's already scheduled.

10       **THE COURT:**  Well, when?

11       **MS. HURST:**  I believe it's the 20th that that's

12  scheduled for.

13       **THE COURT:**  Okay.  Thank you.  All right.

14       Did the parties reach a stipulation as to both MGA

15  Mexico's motions for protective orders or just one of those

16  motions?

17       **MR. QUINN:**  Both motions, Your Honor.

18       **THE COURT:**  Both motions, counsel?

19       **MR. MCCONVILLE:**  Yes, Your Honor.

20       **THE COURT:**  So that's off the table.

21       **MR. MCCONVILLE:**  Yes, sir.

22       **THE COURT:**  As to MGA's motion to compel on topic 11,

23  this topic seeks testimony regarding a complete explanation of the

24  precise circumstances in which Mattel acquired all of the

25  information concerning MGA and/or MGA's products found in exhibits

Page 41

1    attached to the deposition notice.  These are the same issues that

2    now form the heart of MGA's counterclaims and reply.

3              Is there any reason why I shouldn't hold this in

4    abeyance?

5              **MS. HURST:**  Yes, Your Honor.

6              **THE COURT:**  Why?

7              **MS. HURST:**  These were long before we ever knew about

8    the allegations of the counterclaims and reply as part of our

9    unclean hands defense.  There is no reason to hold this in

10   abeyance.  We gave specific notice of what we wanted the

11   information about in the attachment to the notice.  It's not

12   overbroad or unknown what they needed to do to prepare.

13             And Mr. Story made no reasonable effort to do it.  He

14   just went around and repeated transcripts where people had said

15   they don't know or don't remember.  The whole point of having the

16   30(B)(6) was so he would go behind that prior lack of

17   recollection, get all the information available to the

18   organization and give an answer this time.

19             Instead, what he did was just repeat everybody's same "I

20   don't know" by reading their transcript.  That wasn't adequate.

21   We gave him the documents.  They could go and ask people, make

22   them search their e-mails.

23             Mr. Totzke up in Canada.  He writes an e-mail.  I just

24   got all this information.  He is right in the middle of Hong Kong

25   toy fair.  He's gotten it from somebody.  He has to go back and

Page 42

1    look at his e-mails, refresh his recollection and give an answer.

2    That's what the 30(B)(6) process was for.  And it was completely

3    evaded here, Your Honor.

4         It's relevant to the unclean hands defense whatever

5    happens with the counterclaims and reply.  We served this notice a

6    long time before we ever knew about Mr. Villasenor and his group's

7    practices of using false credentials and sneaking into showrooms

8    which, by the way, was confirmed by Mr. Turetzky today again in

9    deposition, that this went all the way up to Mr. Bousquette who

10   they needed to get cover from when they wanted to stop doing this

11   because he was going to be unhappy that they weren't getting the

12   information anymore.

13        So putting that aside, these documents were already

14   relevant, important.  And, Your Honor, whatever the Court does on

15   the counterclaims and reply, this is already in the case.

16        **THE COURT:**  Mattel?

17        **MR. QUINN:**  Your Honor, Mr. Story has been deposed for

18   many days.  After the fact on any of these 30(B)(6) depositions,

19   it's always possible to say you could have done this, you could

20   have done that.  There are these documents you didn't look at;

21   there are these documents you didn't look at.  If that's going to

22   be the test, we're never going to get to the end of this

23   particular hole in the ground.

24        Mr. Story went out and interviewed people.  He talked to

25   the percipient people involved in the underlying events.  He

d4d8ab85-a742-4451-a570-f1528798d121

Page 43

1    didn't have to do an investigation and review documents to do what

2    he did.  He was adequately prepared.

3         We're stuck as a corporation with his testimony on the

4    positions taken and the state of his knowledge.  But this is

5    something that can always be second-guessed.  They can always find

6    something else that they will claim that he should have done.

7         **THE COURT:**  MGA?

8         **MS. HURST:**  Mr. Story has been a 30(B)(6) witness for

9    many days because he choose to do so.  They recently produced his

10   last performance evaluation wherein he wrote that he was a good

11   30(B)(6) witness and that was one of the bases on which he should

12   be evaluated favorably and bonused by the company.

13        So I don't think we can hear any poor mouth from

14   Mr. Story in how long he served as a 30(B)(6) witness.

15        Let me give the Court another example.  Mr. Story went

16   and asked Carey Plunkett where she got some of the information.

17   She says from catalogs.  Now, this carefully scripted interview

18   has no follow-up question, "Where did you get the catalogs?"

19   Because the answer to that would have been, "With my false

20   credentials that I used to go into the competitor's showroom and

21   trick them into sending them to me."

22        This was all carefully scripted.  This testimony took

23   place before we knew about Mr. Villasenor in all this, and it is

24   shocking when you look at the transcript, Your Honor, how

25   carefully every one of these interviews was scripted in advance so

Page 44

1    that they didn't get the investigation that should have been

2    disclosed in that deposition about what was going on in that

3    market intelligence group.  It's a travesty.

4            THE COURT:  Okay.  Mattel?

5            MR. QUINN:  Your Honor, I wish I could say we carefully

6    scripted this.  I haven't found a way to do that with witnesses.

7    When I figure out how to do that, I may be better at it, but we

8    prepared them as best we can, Your Honor.

9            THE COURT:  All right.  Then what time -- I'm going to

10   send you home in a few moments -- what time would you like to

11   reconvene tomorrow?  Let's say 3:00 o'clock.  I'm going to have my

12   hands full with this jury tomorrow morning.

13           MS. HURST:  Your Honor, we had Mr. Cody ordered to come

14   at 10:00 a.m.

15           THE COURT:  We're going to call him and call him off

16   until 3:00.  It's becoming apparent to me this evening that I have

17   problems with this jury and there is no reason for you for sit

18   around.  Good night.

19           MR. QUINN:  May I raise an issue?

20           THE COURT:  I'm leaving now.  See you tomorrow.

21           MR. QUINN:  This is a personal scheduling issue.

22           THE COURT:  Good night.  3:00 o'clock.  Good night.

23               (Whereupon the proceedings were adjourned at 11:10

24   p.m.)

25

Page 45

1

2                                    -oOo-

3

4                                 CERTIFICATE

5

6           I hereby certify that pursuant to Section 753, Title 28,

7    United States Code, the foregoing is a true and correct transcript

8    of the stenographically reported proceedings held in the

9    above-entitled matter.

10

11   Date:  SEPTEMBER 8, 2010

12

13

14   MARIA DELLANEVE, U.S. COURT REPORTER
     CSR NO. 9132

15

16

17

18

19

20

21

22

23

24

25