1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

MATTEL, INC.,
                    Plaintiff,
        vs.
                                    CV-04-9049-DOC
MGA ENTERTAINMENT, INC.,
                    Defendant.
        --------------------------

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

March 4, 2010

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

2

```
1    APPEARANCES OF COUNSEL:

2    For the Plaintiff:

3    JOHN QUINN
     MICHAEL ZELLER
4    QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
     865 Figueroa Street, 10th Floor
5    Los Angeles, CA  90017
     (213) 443-3180
6

7    For the Defendant:

8    ANNETTE HURST
     ORRICK, HERRINGTON & SUTCLIFFE LLP
9    The Orrick Building
     405 Howard Street
10   San Francisco, CA  94105
     (415) 773-4585
11

12   THOMAS MCCONVILLE

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    SANTA ANA, CALIFORNIA; THURSDAY, MARCH 4, 2010; 9:00 P.M.

2              THE COURT:  I would like to take MGA's objection

3    to Discovery Matter Order No. 90 first.  Would that be

4    acceptable?

5              MS. HURST:  Yes, Your Honor.

6              THE COURT:  And who is going to be my primary

7    arguer?  Mr. Quinn are you, sir?

8              MR. QUINN:  I am.

9              THE COURT:  First is this tentative suggestion

10   that there are some Seventh Amendment concerns.  First, I'm

11   disinclined but not precluding argument to credit any

12   finding reached by Judge Larson at the prior order to show

13   cause hearing because the issue of conduct, action, and

14   intent are now elements of Mattel's operative complaint.

15   Therefore, tentatively -- or at least initially, I don't see

16   how determinations about who acted and why they acted are

17   factual determinations that could be removed from the jury's

18   consideration.

19              Second, if this Court conducts an in-camera

20   hearing and I determine that the prerequisites for crime

21   fraud have been satisfied, then Mattel has basically

22   achieved the factual findings it needs to prevail as a

23   matter of law, and I'm a little concerned about Mattel then

24   coming back if I issue such a ruling for discovery purposes

25   and then making a claim that that's dispositive.

4

```
 1              So, if I do, it appears to me that it would be for
 2    discovery purposes only, and I am inclined to exclude these
 3    findings from jury consideration.  I think that the
 4    remaining issues concerning this Order No. 90 can be
 5    addressed if you argue based on the tentative.  I think that
 6    there are a few categories of requests for admission, and
 7    the tentative identifies them.  So I would appreciate you
 8    categorizing your analysis accordingly, or if you think that
 9    the categories are inaccurate or misleading, then I want you
10    to explain why.
11              I don't really care who argues first, so who would
12    like to start.
13              MS. HURST:  It was our motion, Your Honor.
14              THE COURT:  Okay.
15              MS. HURST:  Your Honor, I will address myself to
16    the six questions in the tentative if I understood Your
17    Honor correctly.
18              THE COURT:  Please.
19              MS. HURST:  Your Honor, the first question in the
20    tentative:  Can the RFAs be constrained to include only
21    those legal conclusions formed independently of counsels'
22    advice?  Your Honor, that's exactly what we would
23    respectfully submit should happen here.  If that happens,
24    there will only be very few left that can't be answered
25    without implicating the attorney/client privilege, and those
```

1    would be the ones where the fact of a communication would

2    confirm -- potentially confirm a disclosure of the contents

3    of the advice, the activities addresses in the Court's

4    strict process, so respectfully we would respect that is

5    exactly -- the Court's question in Item 1 is exactly what

6    should happen here.

7              THE COURT:  Okay.

8              MS. HURST:  Your Honor, with respect to Questions

9    2 and 3, the questions regarding the crime-fraud exception,

10   in order to reach the first step under Zolin, we did cite

11   cases who believe that the Court cannot consider the

12   privileged communications in reaching -- even in making that

13   initial first-step determination.  That's what the Ninth

14   Circuit -- it says it in Zolin actually, and the Ninth

15   Circuit reiterated that under de la Jara.  That first-step

16   determination can only be made with respect to nonprivileged

17   information.

18              The nonprivileged facts here are that the document

19   was withheld, that there was a description based on a

20   privilege log that was served by outside counsel, and that

21   the document was later produced by counsel.  There is

22   nothing in the nonprivileged facts which points in any way

23   to Mr. Larian or to MGA.  All of the conduct in the

24   nonprivileged facts is lawyer conduct.  To be sure, MGA may

25   well be responsible for the conduct of its attorneys.  If

1    they are acting as its agents and that's the consequences in

2    litigation, then MGA is in a position of deciding whether it

3    will assert reliance on counsel and waiving as a result, but

4    that is the correct step of the analysis, not use of

5    privileged information to apply crime-fraud.

6           If the Court concludes that there is a problem

7    with what counsel did and that should be imputed to MGA,

8    then at that point MGA decides, okay, do I want to defend by

9    relying on advice of counsel and waive, or do I want to

10   suffer any imputation?  The nonprivileged facts here only

11   relate to the conduct of counsel.  They don't point to any

12   conduct of the client.

13          In fact, I think it's clear that trial counsel has

14   an obligation to make privileged determinations.  As an

15   officer of the court, it's an important thing that trial

16   counsel have an independent obligation to do.  That's a Rule

17   11 and a Rule 37 certification by counsel when that

18   privilege log is served, and while those events may be

19   imputed to the client -- that the consequences of those

20   decisions may be imputed to the client, there is nothing

21   about those decisions which necessarily -- or even in this

22   case without the in-camera materials -- would point to any

23   communications with the client concerning that decision.

24          So, with respect to 2 and 3, respectfully we

25   submit that under Zolin and de la Jara where no privileged

1   information can be considered with respect to the first step

2   there is no nonprivileged information here which would

3   provide a basis even for an in-camera review, let alone the

4   second step where the MGA parties would be entitled to rebut

5   any -- in the Court's consideration of a prima facie

6   showing.

7           Your Honor, that brings us to Item 4 I believe.

8   Your Honor, the Court has suggested that the Holmgren case

9   might apply to these circumstances to allow for an exception

10  to a peer opinion work product.  Your Honor, Holmgren is

11  distinguishable here because in that case the work product

12  was the work product of an insurance adjuster, and the work

13  product itself was not all bound up with attorney/client

14  communications.

15          Here the work product is by definition bound up

16  with attorney/client communications and inseparable

17  therefrom.  Accordingly, the more apposite authority is the

18  decision of the Supreme Court of California in the Cosco

19  Wholesale Corporation versus Superior Court case at 47 Cal.

20  4th 725.  In that case, Your Honor, the Court held that the

21  opinion work product of counsel, not an insurance adjuster,

22  was bound up with the underlying facts and couldn't be

23  separated therefrom.  Therefore, work product exceptions

24  would not apply.

25          Your Honor, respectfully, that's the result that

1    can be reached here as well, and that's without regard to

2    the fact that Holmgren, the -- the rule in Holmgren is the

3    subject of a significant Circuit split, and respectfully, in

4    our view, it is wrongfully decided, and argument that we

5    would preserve.

6            No other exception to the work product doctrine

7    would apply here.  The only other possible exception I

8    believe would be the one the Court has already identified,

9    crime-fraud, and for the same reasons that I have already

10   stated, Your Honor, you can't get to even Part 1 of the

11   Zolin test when you'll consider here only the nonprivileged

12   facts.

13           Your Honor, Question 5 is directed to the issue of

14   -- if you're asked to say what's the present conclusion

15   about whether it's privileged or not, does that force a

16   disclosure of the underlying communication?  The answer to

17   that is, yes, it is a situation where the fact of the

18   communication because the communication itself has already

19   been disclosed reveals the substance of communication.

20           In fact, that is a position that was taken by

21   Mattel in the Moore deposition when Mr. Moore was asked

22   similar questions about what are the facts, and he and

23   counsel asserted, well, if I just confirm yes or no on this,

24   that's going to disclose the substance of the communication.

25   I don't believe we appealed on any of those, Your Honor.

1              With respect to Question 6, Your Honor, can the

2    assertion of privilege or work product apply to the

3    remaining RFAs, Your Honor, the reason we have applied in an

4    abundance of caution their concern over attorney/client

5    privilege and work product is that outside counsel were

6    responsible for producing documents and maintaining the

7    database of produced documents, so the only way the client

8    could know what has been produced and what hasn't been

9    produced would be to go through a laborious -- either go

10   through a laborious comparison process where counsel

11   represents here is the entire universe to the client, and

12   then the client goes and looks at its material and makes a

13   comparison and confirms, or counsel would be happy to make

14   an offer of proof or an assertion in this regard if we don't

15   have to deal with any kind of a privilege disclosure that

16   would be implicated by the RFA by forcing the client to

17   answer with respect to information that counsel possesses

18   and is willing to make of a certification in the form of a

19   discovery response or something a long those lines

20   basically.

21             We have nothing to hide on that point in terms of

22   whether everything has been produced or not we're happy to

23   say with respect to that.  We just want to make sure we're

24   not doing it in any way that could be construed.

25             Your Honor, there is something I would like to add

1    to my questions.  I'm not sure whether I can do so without

2    implicating the attorney/client privilege.  It's a fact

3    about when the document was initially provided to outside

4    counsel.  I am inclined to believe that's not privileged,

5    but in an abundance of caution, I don't want to disclose

6    that to the Court under circumstances where it could be

7    construed as a waiver, but I think it would be material to

8    the Court's consideration of this matter, and I will leave

9    it to the Court's wisdom to determine whether it wishes to

10   order disclosure or have an in-camera hearing on that point

11   under the circumstances.

12              THE COURT:  Okay.

13              MS. HURST:  I think that's it for me, Your Honor.

14              THE COURT:  Thank you very much.

15              Mr. Quinn.

16              MR. QUINN:  Thank you, Your Honor.

17              I also will address the Court's six questions in

18   the order set forth in the tentative, but just initially

19   preliminarily, there is one point which I think affects the

20   consideration of all six points, and that's the issue of

21   whether this e-mail -- the O'Connor-Larian e-mail -- is

22   privileged.  There are references in the tentative decision

23   to that being the issue here.  The tentative says at page 8,

24   lines 4 to 5:  "At issue here and indeed the subject of the

25   RFAs is whether the O'Conner-Larian communication is

1   privileged."

2          With respect, I submit that there is no dispute

3   that that document is not privileged.  It is not privileged.

4   The Orrick Herrington Firm voluntarily produced that

5   document.  They are not here telling the Court that that's a

6   privileged communication.  Judge Larson in the hearing on

7   the order to show cause said that is not a privileged

8   communication.

9          So what we are talking about here is RFAs directed

10  to issues concerning a communication which everybody agrees

11  now is not privileged.  For a long time, it was carried on a

12  privileged log.  It didn't show up on a privileged log until

13  January 2008 I believe within months of the start of the

14  first trial.  We fought very hard to try to get -- since

15  there were no lawyers' name on the e-mail, we fought very

16  hard to get a review of that.

17         Representations were made to Judge Larson both in

18  writing, a certification, and by counsel to the Court saying

19  we have personally reviewed the document, and it is

20  privileged.  We never saw that document until after the

21  first trial was over, after the verdict.  Then the document

22  was produced, and it's now agreed that it's not privileged,

23  so that is the state of play that we are at here.

24         Turning now to the specific question of whether

25  the RFAs directed to the MGA parties can be constrained to

1    include only legal conclusions formed independent of

2    counsels' advice, with respect, Your Honor, we believe the

3    answer to that is no.  It is commonplace for request for

4    admissions to address issues which necessarily require the

5    input and legal analysis of counsel.

6         If I can just give the Court an example, for

7    example, if there was a dispute concerning acquisition, a

8    merger, and an RFA were sent saying admit that all corporate

9    requirements were satisfied in order to effectuate the

10   merger, I don't think anyone would consider or think of

11   objecting to that as calling for privileged communications.

12        Yet to answer that RFA, it would require

13   consideration of the corporation's code of the state of

14   incorporation, the charter of the corporation, the bylaws,

15   the resolutions.  In other words, instinct in responding to

16   that RFA would be -- a legal analysis would have to be made.

17   Responding to an RFA does require disclosure of privileged

18   communication merely because the answer is made in

19   conjunction with counsel in that type of response to a

20   question like that.

21        This is not a situation, Your Honor, where the RFAs

22   request communications with counsel.  Now, for example, if

23   an RFA were sent saying admit that your lawyers told you

24   that all corporate formalities had not been complied with to

25   effectuate the merger.  That on its face is different.  It

1    calls for a privileged communication, but we don't have any

2    RFAs that are like that.

3         In the tentative, Your Honor, there was one issue

4    the Court raised about RFA No. 21 about what -- where there

5    was an issue about -- this is on page nine.  The RFA says

6    "Admit that MGA stated prior to August 21, 2009, that the

7    portion of the document attached as Exhibit 1 containing the

8    e-mail exchange reflects legal advice."

9         The tentative suggests that is requested, an

10   admission concerning what MGA said to its counsel.  I

11   submit, Your Honor, that's not what was intended, and that's

12   not a logical reading of the RFA since MGA has declined to

13   include its attorneys.  To interpret it that way really

14   requires -- you are asking an admission about what people

15   said to themselves.

16        What we had in mind and what we believe the RFA

17   addresses is the issue of representations that were made to

18   others, to us and to Judge Larson, not to their lawyers.  We

19   submitted to the Court that clarifying RFA.  I believe it

20   was submitted at the Court's request in-camera.  So this is

21   not a situation where you have RFAs, request for admissions,

22   that request admissions concerning what lawyers said to

23   clients.

24        I think that answers also -- the same analysis I

25   believe applies to the second issue the Court raises.  To

1    the extent that the RFAs are directed to the MGA parties and

2    seek prior legal conclusions informed in conjunction with

3    counsel, does the crime-fraud exception apply?

4           Again, I don't think -- for the reasons I stated,

5    we don't have to carve out the question about whether

6    lawyers were involved in reaching legal conclusions that

7    would be reflective in an answer to an RFA.  Those aren't

8    privileged, but -- and I will cite the crime-fraud exception

9    discussion to the end, Your Honor.  We submit that the

10   crime-fraud exception does apply here.

11          There has been ample showing of nonprivileged

12   evidence which supports a good-faith belief that there was a

13   crime for fraud.  We have the sequence of events.  The

14   document does not appear -- although there are years of

15   litigation -- and this is a document that was covered by a

16   document request going back a couple of years earlier -- it

17   does not even appear on a privilege log until January 2008.

18   We have representations made to specifically to the Court

19   that the document has been reviewed and that it is

20   privileged.

21          Then we have only after a very convoluted process

22   before the discovery master where finally they are ordered

23   to submit the stacks of documents in-camera that suddenly

24   it's produced.  No claim of privilege is made regarding that

25   document.  I think the very sequence of events raises some

1  grounds for suspicion here.

2          We also have the finding that -- the comments by

3  Judge Larson that Mr. Larian committed perjury on the stand

4  concerning issues regarding legal advice, but, again, I will

5  return to the crime-fraud issue at the end.

6          The third issue, to the extent the RFAs are

7  directed to the content of statements made to counsel, does

8  the crime-fraud exception apply?  Yes, it does apply, and I

9  guess I might as well leap into that here, Your Honor.  We

10  have two crime-frauds here.  First, we have the wrongful

11  withholding of the document itself, and, second, we have the

12  content of the document, which relates to a false story

13  about creation of Bratz and made and devised in support of a

14  scheme to steal Bratz, to steal Mattel property, and then to

15  continue to conceal the fact that they have stolen Mattel

16  property.

17          In support of that, in our RICO claim, we have

18  predicate acts of  obstruction of justice, perjury, larceny,

19  criminal copyright infringement.  There is ample reason to

20  believe that there is a good-faith basis for concluding that

21  the crime-fraud exception does apply here.

22          The Court raises the issue about whether there is a

23  substantial need in this case if it is a work product

24  issue -- again, we don't see a work product issue, but, Your

25  Honor, we are alleging as part of the RICO enterprise acts

 1   of obstruction of justice.  We have to explore intent.  If

 2   we can't get into intent and ask questions like these RFAs

 3   are directed to as to what they understood, why things were

 4   done, what were the circumstances, then we are blocked

 5   essentially really from pursuing that claim, and we are

 6   faced with -- it's a sword and shield situation.

 7            On the one hand, we are being told that they

 8   defend against the obstruction of justice claim by saying

 9   that this was -- it's privileged, and it's work product.  On

10   the other hand, they use that as a shield.  They won't

11   permit any discovery.  They seek to block any discovery that

12   would permit us to get behind that claim.

13            I think, Your Honor, given the nature of our RICO

14   predicate acts and the claims that are being made here, we

15   have shown a compelling need that even if this is attorney

16   work product we're entitled to get it.  They have put the

17   conduct of counsel at issue here.  They point to counsel and

18   say it was counsel, not us.  Ms. Hurst just said that.

19            At the hearing before Judge Larson, there was a

20   submission that was made.  The Court has it.  We don't have

21   it.  It was made in-camera by previous counsel explaining

22   how this happened.  Judge Larson on the record did say that

23   this wasn't something that was simply done by counsel.  He

24   said that this document was designated as privileged based

25   on directions from Mr. Larian.

1          MS. HURST:  Your Honor, I have to object to the

2     disclosure of Judge Larson's in-camera hearing statements in

3     the open portion of the record.  Those were compelled

4     disclosures of attorney/client privilege and attorney work

5     product information.  They should not be further disclosed

6     in open court.

7          THE COURT:  Thank you, Counsel.

8          Please continue.

9          MR. QUINN:  Judge Larson said what he said, and

10    his comments don't point at counsel.  He had issued the OSC

11    to counsel saying he was concerned about the conduct of

12    members of the Bar, and what he said was he was satisfied as

13    far as counsel was concerned they had acted in a good-faith

14    belief.  Judge Larson did not exonerate MGA.  So we have

15    this unusual situation here where MGA is pointing the finger

16    at counsel, but there is evidence in the record, comments in

17    the record, that suggest to the contrary, suggest

18    involvement by MGA.

19          Turning now to the fourth issue:  To the extent

20    the RFAs are directed to legal conclusions formed solely by

21    former counsel, does either (a) a showing of need pursuant

22    to Holmgren or (b) an exception to the work product doctrine

23    apply?  I think I have covered that, Your Honor.  Counsels'

24    actions have been put directly at issue by MGA by pointing

25    the finger at counsel.

1           Question 5:  To the extent the RFAs are directed

2    to present applications of law to facts about whether the

3    O'Connor-Larian document is or is not privileged work

4    product and/or reflective of a legal conclusion, since the

5    attorney/client privilege extends to protect the fact of a

6    communication being privileged and not just the content --

7    Your Honor, every privilege log identifies documents as

8    being privileged, so it can't be the case that it's

9    privileged -- the fact that a document is privileged.  We

10   have been able to find no authority and we have not seen any

11   authority cited to the Court saying that the fact that a

12   document is privileged is itself privileged, but, again, I

13   revert to my opening comments, Your Honor.  There really is

14   not an issue on that.  It's undisputed and agreed on by

15   everybody that that e-mail is not a privileged

16   communication.

17           Finally, the sixth question:  On what grounds can

18   any assertion of privilege or work product doctrine apply to

19   the remaining RFAs; e.g., whether all versions of the

20   O'Connor-Larian e-mail have been produced?  None, Your

21   Honor.  I don't think there is any basis for the balance of

22   those as to factual questions about whether they have all

23   been privileged and the like.

24           I am happy to respond to any questions, Your

25   Honor.

```
 1              THE COURT:  Maybe tomorrow.  I want to move on to
 2    another issue.
 3              Concerning Mr. Larian, do we have a resume date or
 4    another date for the resumption of Mr. Larian's deposition?
 5              MS. HURST:  Not yet, Your Honor.
 6              THE COURT:  Okay.  Can you tell me where we are
 7    concerning MGA and MGA Mexico's 30(b)(6) witnesses?  I don't
 8    need to hear the general grievances one again, but can you
 9    tell me where you think we are scheduling these 30(b)(6)s
10    briefly?
11              MS. HURST:  With respect to the Mexico -- I
12    believe that is being worked out.  With respect to the MGA
13    30(b)(6), we received the prioritized list of topics from
14    Mr. Zeller.  We are now analyzing that and trying to figure
15    out how to respond to it and how we should proceed.  That
16    has been the subject of ongoing discussions and
17    negotiations.
18              THE COURT:  I have ordered supplemental briefing
19    on MGA's objection to Recommendation No. 5 of the electronic
20    special discovery master's January 21, 2010, report and
21    recommendation.  Where are we on that briefing?
22              MS. HURST:  Your Honor, we have been working very
23    diligently.  This has required us to consult with several
24    law firms who were prior counsel and also with several
25    vendors to reconstruct some events of which we don't have
```

1    personal knowledge so that we could fairly answer the
2    questions for the Court.  We have been working literally
3    around the clock in doing that.
4            Frankly, Your Honor, our efforts have been
5    hampered to some degree because some of those prior firms
6    are represented by counsel in connection with their dealings
7    with MGA, and that slows the process down a bit.  I believe
8    we are very close to having all of the information that we
9    need, but, Your Honor, if we could have a few more days
10   before we have to file our submission on that, we would
11   appreciate it.
12           THE COURT:  Concerning MGA's request made to this
13   Court for the production of documents identified during the
14   Ekhart deposition, I thought that the only way to resolve
15   this issue was to either have you meet and confer or have
16   Eckart come back and identify with specificity the
17   documents, and I thought I made that very clear when I sent
18   out a very brief directed memo or opinion.  Has either
19   occurred?
20           MS. HURST:  Yes.  Mr. Quinn and I have been
21   meeting and conferring at length on that subject.  I think
22   it's fair to say that we are very close to what I believe
23   will be an agreement.
24           THE COURT:  Now, I want to summarize without being
25   facetious at all what I have just heard.  No resume date yet

SHARON SEFFENS, U.S. COURT REPORTER

1   for the Larian deposition.  Nothing specific in terms of a

2   resolution concerning Ekhart, although I appreciate the hard

3   work.  I know you have been working hard, but as far as an

4   actual concrete methodology or dates, I don't see the

5   resolution of this issue this evening.

6           MS. HURST:  Your Honor --

7           THE COURT:  I am unclear concerning the 30(b)(6)

8   witnesses and what was just said.  I know you are working

9   around the clock, but the parties don't seem to have made

10  much progress as far as those issues are concerned, although

11  you may have, and if you need a little bit of additional

12  time, I can certainly give that.

13          Now, I am going to continue on because I am going

14  to ask those questions again tomorrow afternoon of each of

15  you, so you don't have to give me any further explanation

16  this evening.  You're going to be hearing from me very soon

17  concerning the remaining discovery disputes.  Obviously

18  there was a great volume of documents submitted for my

19  in-camera review, and I think we are almost done.  So, first

20  of all, I want to thank you for your diligence and a little

21  bit of patience on our part.  We will keep up with you,

22  believe me.

23          I want to take up the issue concerning the Moore

24  deposition and Mattel's objections to the discovery master's

25  ruling.  First of all, I have a few questions concerning

1    this deposition.  It should be the second tentative that you

2    received.  Then I want to open up for argument concerning

3    the Moore deposition.  I may have additional questions

4    concerning Discovery Matter Order No. 90.  For tonight's

5    session, that's good enough for the present time for me to

6    reflect upon until tomorrow.

7             First, what authority in this Circuit or any other

8    protects as privileged the ideas generated as a result of a

9    client's conversation with an attorney?

10            Second, how can Mattel satisfy its obligation to

11   establish the privilege here?  Specifically, how can Mattel

12   show that any beliefs formed by Moore about these copyright

13   registrations were the exclusive product of conversations

14   with Quinn-Emanuel?

15            Third, the question is -- may be self-answering --

16   and, that is, when Mr. Moore's deposition resume?

17            All right, who would like to argue this matter

18   first?

19            MR. QUINN:  I would, Your Honor.

20            THE COURT:  Please.

21            THE COURT:  As to the first question the Court

22   posed, I believe the Shelton versus American Motors case

23   addresses the issue.

24            THE COURT:  That's the case you rely upon?

25            MR. QUINN:  Yes, that's one.  There are --

```
 1              THE COURT:  I know.  I can have more, but I am
 2    just looking for the case that you are going to hang it all
 3    out there on.  Shelton?
 4              MR. QUINN:  Well, Shelton.  There is also
 5    Cleveland versus General Electric in the Tenth Circuit.
 6    That's the answer to the Court's first question.
 7              THE COURT:  Thank you.
 8              MR. QUINN:  The second question as to foundation,
 9    we are prepared -- Mr. Moore is here.  I know it's late, but
10    we are prepared to establish that foundation with Mr. Moore,
11    place him on the stand.  What makes this situation -- the
12    Court in the tentative recognized the similarity of some of
13    the issues with respect to this motion and those with
14    respect to the order we have just been discussing.
15              I think what makes this situation different, Your
16    Honor, is that Mr. Moore is the in-house lawyer.  He is a
17    full-time attorney.  Whereas, with an RFA, you can propound
18    that and get -- bind a party.  They're obligated to respond
19    to it, and that binds a party for all purposes.  Mr. Moore
20    can't necessarily bind a party.  It's not like an RFA
21    whereas that is dispositive.  There may be other employees
22    who have different accounts.  He can only testify as to his
23    own beliefs or understanding or what he knows.
24              Just by way of an offer of proof, Your Honor, Mr.
25    Moore would testify that these registrations were prepared
```

SHARON SEFFENS, U.S. COURT REPORTER

1    by Quinn-Emanuel lawyers, were sent to him.  He arranged to

2    have them executed in-house, and he doesn't have any

3    understanding or know anything about them except what he was

4    told by Quinn-Emanuel lawyers.

5            In his deposition, he at one point -- and I just

6    want to disclose this to the Court -- said that he thought

7    the registrations were prepared by a paralegal in-house who

8    worked for him at Mattel.  Later on in his deposition, he

9    says they were prepared by Quinn-Emanuel lawyers.  I will

10   represent to the Court if called to testify that's what he

11   would say.  The only information he has concerning them is

12   based on communications he had with outside litigation

13   counsel and in fact those registration statements were

14   prepared as the cover letter transmitting them from

15   Quinn-Emanuel to the Copyright Office states -- prepared in

16   connection with this litigation.

17           It's a different issue than the RFAs.  It's a

18   deposition as to an individual who is a lawyer about what he

19   knows on the subject.  He is saying the only thing I know

20   about that is based on my communications with my outside

21   litigation counsel.  This happens midstream in the

22   litigation.

23           As to the Court's third question, the date for a

24   resumed Moore deposition, I will have to defer to my

25   colleague, Mr. Zeller on that.

```
 1                 THE COURT:  Well, go ask him.

 2                 (Plaintiff's counsel conferring.)

 3                 MR. QUINN:  Your Honor, we have proposed dates to

 4      MGA, and, as you know, we are working pretty cooperatively

 5      in scheduling things.  We are waiting for them to get back

 6      to us on the resumption of that deposition, which of those

 7      dates work.  Bear in mind, there are a number of moving part

 8      here, and we are trying to accommodate a lot of deponents.

 9      Some of them are third-party --

10                 THE COURT:  I'm not being facetious.  I understand

11      that.  I just put a big zero so far by the answer.  In other

12      words, I don't know.  I will ask that again tomorrow

13      afternoon.  Thank you very much.

14                 Counsel.

15                 MS. HURST:  I think it's only fair for counsel

16      from Mattel that I take responsibility for the big zero.  I

17      was out three days last week with a very high fever and

18      vomiting, but as far as -- it's not their fault.  I was out

19      for three days.

20                 THE COURT:  Okay.  That's fine.  We'll worry about

21      it tomorrow.  I don't mind one, and I know how hard

22      everybody is working.  I heard you were sick last week, so

23      let's put that off to the side.  We will see how you are

24      doing tomorrow.

25                 MS. HURST:  It's just not fair to hold them
```

1    responsible.

2            THE COURT:  I'm not.  I'm just asking.  I am just

3    putting checkmarks down about what dates we have for what so

4    far.  Remember, I am putting pressure on Mattel now to start

5    filing.  By the same token, I am looking at what remains

6    and -- well, let's finish off this motion.  Let me hear your

7    argument.

8            MS. HURST:  On the issue of scheduling the Larian

9    deposition, since the Court indicated that would be Court

10   supervised, we thought we would seek further guidance from

11   the Court on -- if I recall correctly, the Court was going

12   to be out for a couple of weeks at the end of March, so that

13   was an additional moving part that we needed to accommodate.

14           THE COURT:  Well, I wasn't present at the last

15   depo.  I had the special master there, so I am not sure why

16   that couldn't be accomplished.

17           MS. HURST:  Okay.  We just didn't know if Court

18   supervised meant --

19           THE COURT:  Let's do that with a special master.

20           MS. HURST:  All right.  Thank you, Your Honor.

21           Section 409 of the Copyright Act requires a party

22   filing a Copyright Act application to disclose whether the

23   work claimed in the application is based on a creative piece

24   of work.  The language is mandatory, and the preparatory

25   sentence of Section 409 says, "The application shall

```
 1    include."  If you look at the application itself, it's
 2    declaratory.  It says, "Identify this information."
 3              Why is this important?  It's important for at
 4    least three or four different reasons, which I will
 5    summarize for the Court.  There is a lot of history here,
 6    and I am just getting fully up to speed on it finally
 7    myself.
 8              First, it's Mattel's contention in its claim of
 9    ownership of copyright -- which, by the way, that's a
10    legally operative act, and it's a piece of property.  It's
11    like a deed.  It's like the surveyor walked out around the
12    boundary, took the measurements, and wrote them down in the
13    deed and said this is what we own.  That's what that
14    copyright registration is.
15              If it is the case that Bratz was based on Toon
16    Teens -- and that's their contention -- then only the new
17    material would be protected by that copyright registration,
18    and the old material would be barred by the statute of
19    limitations because Mattel has conceded they investigated
20    the question of whether Bratz infringes Toon Teens in 2002
21    and concluded that it did not and chose not to take action.
22              So, one, why is this important?  Because if they
23    are playing a game here and they really do intend to assert
24    it's somehow based on Toon Teens, that they haven't
25    disclosed in their registration, that's a problem because if
```

1    it is based on Toon Teens, there is a big statute of

2    limitations issue here.

3            Your Honor, in the Phase I trial, Judge Larson

4    acknowledged that.  He said we're not going to have Toon

5    Teens involved in this, but then what happened was that Lily

6    Martinez who created Toon Teens was Mattel's client

7    representative.  When she testified in the Phase I trial,

8    she testified about Toon Teens.  Exhibits depicting Toon

9    Teens were put into evidence, and she got up in front of the

10   jury and drew them.

11           Now, if we are going to see all of that again here

12   in this Phase II copyright infringement predicate act, or if

13   we are going to have some suggestion that Bratz is a trade

14   secret misappropriation because it was based on Toon Teens,

15   then, first of all, those propositions are belied by the

16   failure to identify it as preexisting material on which it's

17   based, and if they're not going to claim that, then we are

18   entitled to a binding admission on it.  We are entitled to

19   have them be bound that it's not based on Toon Teens.  In

20   other words, they have got to take a position on this once

21   and for all, and this is the right way to make them take a

22   position because this is a piece of property.  It's a

23   legally operative act.  The law requires the disclosures to

24   be made, and they are material to a number of issues in the

25   case.

1          Now, why else is this relevant?  Because Toon

2    Teens is the only thing Mattel ever created that even

3    arguably looks anything like Bratz, and they killed it.

4    They chose not to exploit it.  Now, Mr. Ekhart testified in

5    his deposition that one of the ways that Mattel was harmed

6    by Carter Bryant with respect to Bratz was that they lost

7    the opportunity to exploit Bratz themselves.  If it were

8    based on Toon Teens and that was something they chose not to

9    exploit, it would clearly undermine a lost opportunity, so

10   it's relevant there.

11         Finally, Your Honor, one of the predicate acts

12   here is fraud on the Copyright Office by MGA.  If Mattel

13   knowingly chose not to disclose that this was based on

14   preexisting material with the knowledge and belief that it

15   was, then, Your Honor, that's a measure of conduct that can

16   also be considered by the jury with respect to MGA's filing

17   of copyright registration.

18         Now, I will be happy to live with the proposition

19   that I put forth to the Court when I was up here a few

20   moments ago and exclude from my questions -- exclude

21   communications with your outside counsel.  I could add that

22   as a preface to every one of these.  Now, it might turn out

23   as Mr. Quinn has represented that Mr. Moore will then say I

24   don't know in which case I guess what we need is a 30(b)(6)

25   witness.

1          Now, Mr. Moore did testify that these were

2     prepared by a Mattel paralegal pursuant to his supervision

3     and filed at his direction.  If he says I don't know, he

4     says I don't know.  If they tell me he is just going to say

5     I don't know, if I amend all the questions that way, then

6     maybe we will just agree to have a 30(b)(6) instead, but I

7     am willing to live with the Court with what I said was the

8     right answer on this stuff because we are not trying to get

9     at Quinn-Emanuel communications.  We are trying to define a

10     piece of property, and we are trying to understand Mattel's

11     conduct with respect to that registration.

12          THE COURT:  Thank you very much.

13          I would like to -- actually before we take up what

14     I am going to refer as the Brian Wing issue, which is the

15     discovery master rulings, I was to know when is it

16     convenient for you to come back to the Court.  After your

17     arguments tonight, I want to go back and think about it, and

18     I may have additional questions tomorrow.  I want to make

19     sure that I'm fresh when I decide these.

20          Now, I know you were sick, and I forgot that, or I

21     wouldn't have had the late evening session tonight.  I knew

22     you were ill, but I just didn't compute that, so I am not

23     intending to help you suffer for that.

24          Are you available tomorrow afternoon?

25          MS. HURST:  Your Honor, Im in a prep session with

1    Mr. Petri who is being deposed on Monday and Tuesday.

2            THE COURT:  Are you available on Saturday?

3            MS. HURST:  I hate to suggest Sunday.  I do have a

4    personal obligation on Saturday.

5            THE COURT:  Well, coming back Sunday for half a

6    day because I want to be cognizant of church, et cetera --

7    well, we will work that out.

8            MS. HURST:  I am coming back Sunday anyway, but I

9    don't want to impose on anybody else.

10           THE COURT:  Let me worry about that.  I just want

11   to make sure I get some rest also and I am looking at these

12   in the day rather than the eve of the evening.  All right,

13   we won't worry about it.  In fact, probably it will be

14   better off for me if I have the weekend.

15           All right, concerning -- let me tell you my chief

16   concern about Brian Wing just so you know as a policy what

17   is behind some of my concerns in this tentative.  My chief

18   concern here is that MGA's proposed rule would hang

19   potential whistleblowers out to dry when they attempt to

20   prove a retaliation claim.

21           For example, if an employee reports discrimination

22   to his company's general counsel only to be terminated

23   immediately thereafter, why wouldn't the company be able to

24   prevent its former employee from testifying about the

25   contents of that conversation, and if so -- well, if he is

1    prevented, how can he possibly then prove a retaliation

2    claim?

3            That's the process I am going through in trying to

4    examine if these rulings not only make legal sense but some

5    common sense.  So you don't have a deep concern about that

6    when you argue this.  I don't really care which counsel

7    starts, but if you notice, I have allowed another go-around

8    this evening.  I may in the future if I have got questions,

9    but I just wanted to here your initial opening tonight, and

10   I am about an hour behind.

11           Mr. McConville, what a pleasure.

12           MR. MCCONVILLE:  With regard to the proposition

13   that if someone alleges that they have been a victim of

14   discrimination as a whistleblower, those statements that

15   that person makes -- if they make the allegation I have been

16   the victim of discrimination, that is not protected.  That's

17   involving facts that the whistleblower has made.

18           The issue that would be protected is a report is

19   made to the general counsel, and the general counsel then

20   takes actions.  So the response of the company to an

21   allegation raised by an employee is privileged because -- in

22   the context of Mr. Wing, the letter that's provided -- while

23   he is an officer of the corporation directed to the general

24   counsel of the corporation saying there are issues -- he

25   didn't address it to Isaac Larian.  He didn't address it to

```
 1   the person who runs the copy machine.  He addressed it to

 2   the person who is the legal officer of the corporation whose

 3   job it is not to protect the facts but to gather facts and

 4   to provide the company with an ability to respond in a way

 5   that's legally appropriate.

 6            So in the Court's tentative, you asked -- you

 7   know, Brian Wing didn't write this letter for the purpose of

 8   Brian Wing to get legal advice?  Well, Brian Wing when he

 9   wrote the letter was an officer of the company, directed it

10   to the general counsel of the company, who then needed to

11   conduct a privilege investigation, and as the Court quoted

12   in its tentative, "The Upjohn ruling provides as protected

13   the gathering of information from employees that is

14   necessary for the provision of legal advice."

15            So Step 1 about that letter is -- the facts --

16   whatever the facts are that Brian Wing believes that he has

17   perceived, that Brian Wing believes that he has impressions

18   of -- whatever his impressions and beliefs are, you are

19   absolutely right.  Those are not protected, and, in fact, he

20   was asked about those, and he responded to those.

21            What is protected is the information, the

22   questions, that result.  So if you are a person who says I

23   was discriminated against because I'm Irish Catholic -- I go

24   and say I was discriminated against by the Orrick firm

25   because I am Irish Catholic.  What happened to you?  Well,
```

1    I'm Irish Catholic, and I was fired.  Okay, thank you.

2            So then you ask questions.  Well, what time did

3    you show up to work?  When did you leave work?  How often

4    did you come to work?  In other words, those questions

5    reflect a legal strategy of defending against a claim that

6    someone says I was Irish Catholic, and, therefore, I was

7    fired because I was Irish Catholic.  It reflects what the

8    company is doing, gathering legal advice and advising the

9    company how to proceed.

10            So the fact that Brian Wing writes this letter

11   saying I suggest -- if the Court was us to provide it

12   in-camera, or I can hand it up now if you like or file it

13   under seal, however the Court wants to do it -- whatever he

14   believes and perceives are not protected.  The reaction the

15   company takes is what is protected, and that's where the

16   instructions follow.

17            Another point, at the time Brian Wing wrote this

18   letter, the Court-appointed receiver was in charge of MGA.

19   No decisions by the company could be made without the

20   blessing of the receiver.  So the letter comes in, and it's

21   given to the receiver who then decides we need to conduct an

22   investigation into the allegations.  That's why the

23   investigator was retained, to conduct an investigation to

24   figure out how to respond to allegations raised in the

25   letter.

1          So, again, the questions that are posed by the

2     investigator and the responses given are protected because

3     they are part of gathering information in order to render

4     legal advice.  Whatever Mr. Wing wants to say about what

5     happened while he was present, that's not MGA's position

6     that those communications -- that those questions would

7     elicit privileged communications with regard to that letter.

8          I don't know if that addresses the Court's concern

9     as it relates to that letter, but that's MGA's position, so

10    that's why we instructed with regard to the actions that

11    were taken by the investigator who is acting at the

12    direction of counsel.

13         The other issue that is raised in your tentative

14    is the issue of -- you know, we need to lay a foundation

15    with Mr. Wing before the Court can assess -- our position

16    was that the Court's tentative -- you understand that we

17    need to lay a foundation on these issues that relate to

18    licensing because we don't know what Brian Wing -- we would

19    like to establish that the only basis for Brian Wing knowing

20    what he knows is because the information comes from counsel.

21         Brian Wing at the time he was present in the

22    company was one of the highest ranking employees at the

23    company, and because of the size of the company and because

24    of the way it was managed, Brian Wing was privy to a lot of

25    legal advice and a lot of communications that stemmed from

1    lawyers.  That was when he was at the company.  He is no

2    longer at the company, and as the Court characterized, he's

3    hostile.  His interests are at odds with MGA's interests.

4    We are trying to protect MGA's interests as it relates to

5    the assertion of the attorney/client privilege.

6            The Court indicates in its tentative MGA can go

7    first.  MGA has got three hours to lay a foundation.  For

8    clarification, what we -- that's fine.  I think we can get

9    the foundation questions asked in three hours hopefully, but

10   there is a larger issue, and, that is, we haven't had any

11   time to ask any questions of Mr. Wing.  Mattel has had from

12   what I can gather nearly 30 hours of asking questions.  We

13   would ask the Court if you are going to expound on the

14   tentative as its written if you could make clear that we get

15   our three hours to lay our foundation, and we get time to

16   ask our own questions.

17           We can't foresee in the future that Brian Wing is

18   going to be available to testify, so if we are stuck with 30

19   hours of testimony by Mattel of a witness who is hostile

20   without an opportunity to provide any examination because

21   Mattel -- you know, we get three hours to lay a foundation

22   and then Mattel gets however much more time Mattel claims to

23   need to ask its questions, it really puts MGA in a very

24   difficult position in this discovery process because we

25   don't get to ask questions of a witness who is hostile who

1    is taking whatever positions he is taking.

2            So we would request to the extent this witness is

3    going to show up on Saturday and sit for questioning that we

4    be afforded an opportunity to get through the day with our

5    questions, and if there are other questions to be asked, so

6    be it, but we would like to get a first crack at Mr. Wing

7    beyond the three hours for laying foundation.

8            THE COURT:  Thank you.

9            Mr. Zeller.

10           MR. ZELLER:  There is one thing I would like to

11   clear up right now because there has been discussion on this

12   in the papers, and Mr. McConville just addressed it. I was

13   there at Mr. Wing's deposition as was Discovery Master

14   Hanson.  On the third day in the morning of that deposition

15   -- and this was repeatedly stated by MGA's counsel -- he did

16   not want to cross-examine Mr. Wing that day.  It could not

17   have been clearer.

18           He said over and over -- and you can confirm this

19   with Mr. Hanson -- that Mr. Wine was not prepared on that

20   day to ask questions of him even if we stopped at 10:00 a.m.

21   on that day.  So this idea that has been cultivated somehow

22   by MGA that they have been blocked from questioning and the

23   like simply is not correct.  There were multiple discussions

24   off the record as to how things were going to be organized,

25   and these were with the discovery master present.  In

| | |
|---|---|
| 1 | retrospect, I regret not having it stated on the record.  I |
| 2 | assumed that because the discovery master was there that |
| 3 | would make it clear enough. |
| 4 | THE COURT:  Where would tentatively at least three |
| 5 | hours commence on Saturday?  Whose offices? |
| 6 | MR. ZELLER:  I don't know that there has been -- I |
| 7 | don't know the answer to that. |
| 8 | THE COURT:  In case I want to find you Saturday. |
| 9 | MS. HURST:  Actually we were going to suggest to |
| 10 | use the Quinn-Emanuel offices because there are going to be |
| 11 | a lot of people present. |
| 12 | THE COURT:  Right over here -- |
| 13 | MS. HURST:  Over in the white building. |
| 14 | MR. ZELLER:  We're happy to do that. |
| 15 | THE COURT:  What time is it going to start |
| 16 | Saturday? |
| 17 | MR. ZELLER:  I believe it's scheduled to start at |
| 18 | 8:00 a.m. |
| 19 | MR. MCCONVILLE:  8:00 a.m. |
| 20 | THE COURT:  Is Mr. Hanson going to be present? |
| 21 | MR. ZELLER:  Yes. |
| 22 | THE COURT:  Okay.  Please continue. |
| 23 | MR. ZELLER:  I did want to address the notion that |
| 24 | somehow MGA had been denied time over the course of those |
| 25 | depositions.  It's just simply not correct. |

| | |
|---|---|
| 1 | THE COURT:  Let's get to the merits of the motion. |
| 2 | MR. ZELLER:  With respect to the merits, I submit |
| 3 | on the tentative.  I think some of Mr. McConville's |
| 4 | arguments, particularly as it pertains to the letter, I'm |
| 5 | not really in a position to respond to.  I don't know what |
| 6 | the letter says.  I do know what the record is, of course, |
| 7 | of Mr. Wing's testimony where he said -- and the Court of |
| 8 | course notes in the tentative order -- he couldn't have been |
| 9 | clearer that he wrote that letter, and when he did it, he |
| 10 | did not do it for purposes of legal advice. |
| 11 | Now, whatever else is in the content of that |
| 12 | letter I obviously don't know, and I don't think it would be |
| 13 | productive for me to address Mr. McConville's hypotheticals |
| 14 | at this point.  Certainly if any of those issues do become |
| 15 | concern when the Court reviews the letter, then I would |
| 16 | obviously be happy to address those. |
| 17 | I would ask that the Court actually move up the |
| 18 | schedule then also for the submission of the letter |
| 19 | in-camera.  I think the Court had the deadline for tomorrow |
| 20 | night at 10:00 p.m. to the extent that we are going to try |
| 21 | to dispose of that before Saturday. |
| 22 | THE COURT:  He has the letter right here.  Do you |
| 23 | have any opposition if I just take it right now? |
| 24 | MR. ZELLER:  No, I don't have any opposition. |
| 25 | THE COURT:  File a notice of lodging tomorrow. |

1   That way I have got it this evening, and I need something to

2   read before I go to sleep tonight anyway.

3           MR. ZELLER:  Certainly we concur with the Court's

4   concern  that throwing privilege over this kind of situation

5   does put whistleblowers in an attenable position because it

6   would allow the corporation in this circumstance to control

7   information and use it as a way of gagging the employee or

8   ex-employee as may be the case.  The reason of course is as

9   the rule is well-known that the privilege belongs to the

10  corporation, so the corporation would say it's the one that

11  gets to make the decision as to whether or not privilege

12  should be asserted.

13          With respect to the -- I think the only other real

14  issue here that was addressed pertains to this licensing

15  issue.  I am happy to submit on that, and we can obviously

16  see where the matter goes with further testimony by

17  Mr. Wing.  In particular, however, I didn't understand the

18  Court's tentative to say MGA was going to have three hours

19  to establish a foundation on that.  I didn't understand that

20  as being the tentative at all.

21          I'm not really sure how it would take three hours

22  to establish a foundation as to whether or not he has no

23  independent knowledge, no independent concerns, no

24  independent basis with respect to the licensing issues.

25          THE COURT:  Thank you.

1           All right, Counsel, I want to thank you.  It's

2    good enough for this evening.  I will communicate with you

3    very shortly.  Have a nice evening.  Thank you.

4                              -oOo-

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

42

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  March 5, 2010

Sharon A. Seffens        3/5/10
_____
SHARON A. SEFFENS, U.S. COURT REPORTER

SHARON SEFFENS, U.S. COURT REPORTER