1

1

2

3

4            UNITED STATES DISTRICT COURT

5            CENTRAL DISTRICT OF CALIFORNIA

6                  SOUTHERN DIVISION

7                      - - -

8     THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

9

      MATTEL, INC.,
10                      Plaintiff,
        vs.
11
                                    CV-04-9049-DOC
12    MGA ENTERTAINMENT, INC.,
                      Defendant.
13    ---------------------------

14

15                    (Volume 3)

16         REPORTER'S TRANSCRIPT OF PROCEEDINGS

17              Santa Ana, California

18               March 10, 2010

19

20
                      SHARON A. SEFFENS, RPR
21                    United States Courthouse
                      411 West 4th Street, Suite 1-1053
22                    Santa Ana, CA  92701
                      (714) 543-0870
23

24

25

```
 1   APPEARANCES OF COUNSEL:

 2   For the Plaintiff:

 3   MICHAEL ZELLER
     QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
 4   865 Figueroa Street, 10th Floor
     Los Angeles, CA  90017
 5   (213) 443-3180

 6

 7   For the Defendant:

 8   THOMAS MCCONVILLE
     ORRICK, HERRINGTON & SUTCLIFFE LLP
 9   4 Park Plaza, Suite 1600
     Irvine, CA  92614-2558
10   (949) 852-7704

11   WILLIAM A. MOLINSKI
     ORRICK, HERRINGTON & SUTCLIFFE LLP
12   777 South Figueroa Street, Suite 3200
     Los Angeles, CA  90017-5855
13   (213) 612-2256

14

15

16

17

18

19

20

21

22

23

24

25
```

1    SANTA ANA, CALIFORNIA; WEDNESDAY, MARCH 10, 2010; 6:00 P.M.

2              (The following proceedings were under seal:)

3              (End of sealed portion.)

4              THE COURT:  We are on the record in the Mattel and

5    MGA matter.

6              For Mattel's edification, Mr. Zeller, we are going

7    through these documents one by one.  That's what is taking

8    the time, page by page by page of handwritten documents.

9    Although I am going to finish that this evening with Mr.

10   Wing before we recess, my immediate concern is Maria Bashaw

11   who was promptly and was here at 6:00 this evening.

12             Ms. Bashaw, the clerk informed me that you had

13   approached her and stated that you wanted a continuance of

14   this matter so that you could retain counsel.

15             MS. BASHAW:  That's correct.

16             THE COURT:  Civil counsel or criminal counsel?

17             MS. BASHAW:  Civil at this point.

18             THE COURT:  Do you have that counsel or have you

19   contacted that counsel so I have some idea when --

20             MS. BASHAW:  I have made some phone calls.

21   Unfortunately none have been returned so far today.  I am

22   hoping by tomorrow --

23             THE COURT:  I will certainly pay you that

24   courtesy.  In the meantime while you're present, there is a

25   Motion No. 3, which is Mattel's motion to compel documents

1    from International Corporate Advisors and Maria Bashaw.

2    This is addressed to counsel, Ms. Bashaw, so you are

3    listening on this matter.

4            My concern is for the potential that this motion

5    pressures an entity and an individual to produce documents

6    they no longer possess, and there is no deposition that's

7    been noted concerning Ms. Bashaw.

8            MR. ZELLER:  That's correct.

9            THE COURT:  This is simply a motion to compel

10   documents.  So, Counsel, I want to hear arguments briefly on

11   this issue concerning this compelling of documents.  It's

12   your motion on behalf of Mattel.

13           MR. ZELLER:  We submit on the papers.  If the

14   Court has any particular questions, I'm happy to address

15   them.

16           THE COURT:  No.

17           Counsel.

18           MR. MCCONVILLE:  We submit, Your Honor.

19           THE COURT:  I am going to grant Mattel's motion.

20           Mr. Zeller, where is your proposed order on behalf

21   of Mattel?

22           MR. ZELLER:  I will track it down.  I apologize.

23   Unfortunately, the documents are enroute.

24           THE COURT:  When will they be here?

25           MR. ZELLER:  Within 20 minutes.

| | |
|---|---|
| 1 | Ms. Bashaw, if you will have a seat, please. |
| 2 | Concerning Mattel's motion to compel the |
| 3 | production of documents provided by MGA to the forensic |
| 4 | auditor, Counsel, the Court will hear argument on this |
| 5 | issue. |
| 6 | Mattel. |
| 7 | MR. ZELLER:  Yes, Your Honor.  The forensic |
| 8 | auditor I understand maintained papers that he received from |
| 9 | MGA during the course of his duties.  These are underlying |
| 10 | documents.  They included matters such as e-mails, financial |
| 11 | documents of various kinds.  Mattel is a little bit at a |
| 12 | disadvantage because it does not know the full scope of the |
| 13 | materials that the forensic auditor, Mr. Durkin, collected. |
| 14 | However, we do know of course that he did have additional |
| 15 | materials.  Some of those were attached as exhibits to his |
| 16 | report.  Others were referenced or summarized in his report. |
| 17 | The underlying documents were not attached. |
| 18 | As of the time that we had made the motion, there |
| 19 | were a number of documents that we had not received that had |
| 20 | been submitted to the forensic auditor and, in fact, a |
| 21 | number of documents that had even been attached to his |
| 22 | report MGA had not produced to us.  Over time, of course MGA |
| 23 | has produced additional documents.  Because of our inability |
| 24 | then to know exactly what information -- and I am talking |
| 25 | about business kinds of information, financial kinds of |

information, e-mails and the like -- that MGA provided to Mr. Durkin, we don't know even now whether all that has been produced.

Ms. Hurst did make a representation to Judge Larson some time ago -- I want to say it was the September time period -- that such documents would be produced, so it's really on that basis, Your Honor.  We first of all think that it's only just that we receive the same underlying materials, that we know what those materials are. MGA had already collected them.  They clearly had them available, and we know at least during those time periods that we had not received them all.

So one way that we thought that we would have transparency, that we would have completeness, is that Mr. Durkin provide to us the copies of the materials he had received -- the underlying materials from MGA, and as I understand it, he has those materials.

THE COURT:  Counsel.

MR. MCCONVILLE:  Ronald Durkin was a Court-appointed forensic auditor who had unfettered access to MGA.  He was given access to documents which he used to prepare his report.  Mattel has propounded so many document requests and crafted whatever language they want to craft that would encompass everything that Mr. Durkin could ever possibly see -- that we have provided those documents.

1    That's issue one.

2            Issue two is we have provided the documents prior

3    to that motion to compel.  I purposely was in this courtroom

4    with Your Honor when Your Honor looked up and said have

5    you -- to Mr. Zeller and said have you provided these

6    documents?  We were sitting right over there, and I said,

7    yes, we have handed them over.  Okay.

8            Then comes the motion to compel that says we have

9    not received a single one of these documents, not a single

10   one, which frankly was not accurate.  I understand

11   hyperbole.  I understand advocacy, but it was blatantly

12   wrong.  This is one of those situations where we're talking

13   about litigation over litigation, and that's what this is.

14   Move to compel, move this.  We have given them the Durkin

15   documents, and to request more -- to say we want the

16   documents that Durkin had is to say we want to redo Durkin's

17   -- we want to be the judicial officer in this case.

18           THE COURT:  Thank you.

19           Mattel's motion is denied.

20           Mattel's motion to compel the production of

21   documents referenced at the Woolard deposition, I have two

22   observations going into your arguments.  First, Mattel's

23   claim that the documents evidencing MGA's financial

24   condition and valuing the Bratz intellectual property are

25   directly relevant, this appears to be overbroad.  Surely MGA

```
 1   has already produced documents evidencing MGA's financial
 2   condition, so my question to Mattel when you argue is why
 3   aren't these additional documents redundant?
 4           Two, concerning MGA's valuation of the Bratz
 5   intellectual property, why is MGA's valuation of the Bratz
 6   intellectual property necessary in light of the fact that
 7   these issues have already been litigated in Phase I and
 8   Mattel has likely done its own valuations?
 9           So now the lectern is yours on behalf of Mattel.
10           MR. ZELLER:  Yes, Your Honor.  I actually think
11   that these questions are inner related.  In fact, most
12   recently at the deposition of the COO of MGA, there were a
13   number of documents that reflected that the COO was on that
14   reflected that during the 2007 and 2008 time period MGA had
15   created -- or had its agents, its consultants, create
16   intellectual property valuations.  These documents even put
17   a number on them, and they talk about overall intellectual
18   property value, and they also talk about Bratz intellectual
19   property value.  So there are reports that have been created
20   of some kind for or buy MGA, so we know that that those
21   documents exist because they are referenced in other
22   documents.
23           The reason why they are relevant is at least in a
24   couple of different ways.  No. 1, during the Phase I trial,
25   MGA made a number of assertions about the value of Bratz,
```

1   about its IP, and did that also in discovering in its expert

2   reports.  Unbeknownst to us at the time, there had in fact

3   been created relatively recently as of that time such

4   valuations that we were not given, so it certainly goes to

5   the issue of the credibility of these witnesses.

6         No. 2 is that it certainly was encompassed in an

7   issue that was part of Phase I, but it continues to be an

8   issue.  Of course as the Court knows, we don't know the full

9   scope of what this next trial is going to look like, so

10   there is certainly overlap there.

11         Also, I would submit that it is relevant because

12   it has -- because it pertains to the overall pattern of what

13   it is that we are alleging in terms of the theft of Bratz.

14   Bratz was stolen.  Then MGA took steps to cover it up, to

15   hide it, to diminish the value of the brand, to basically

16   suck the life out of it.  If their valuation showing that in

17   a certain period of time MGA recognized that the Bratz brand

18   was worth X hundred million dollars, whatever that number

19   turns out to be, then we have a baseline in which we can

20   compare it to what is its value now?  What are the reasons

21   for its value now?  It certainly is we think wrapped up in

22   part and parse and critical to our Phase II claims because

23   it's part of that overall pattern.

24         It, of course, also is from our perspective

25   relevant to MGA's own claims.  They assert trade dress.

1    They have asserted a number of damages claims based on

2    supposedly unfair competitive acts against Bratz.  It really

3    folds into a number of damages analyses.  It's directly

4    relevant to the pattern of the damage to Bratz that MGA has

5    caused.

6           Then in terms of why does it matter why MGA did it

7    if Mattel has done valuations?  Well, it's an admission of a

8    party or at least it has greater strength.  It's something

9    that they are going to be less able to distance themselves

10   from rather than just simply say, well, that's Mattel's

11   number.  I mean there is no question that Mattel did put a

12   number on it during the course of the Phase I discovery, but

13   it's really to me anyway another instance where we were

14   denied evidence we should have had the first time around and

15   continues to be relevant.

16          THE COURT:  Counsel.

17          MR. MCCONVILLE:  Once again, Your Honor, these are

18   documents that have been requested and produced in a number

19   of forms.  They point to documents.  They say it's a

20   document they don't have, a document they want to see.  They

21   don't answer that they already have the information.

22          To go to the point of the Bratz valuation and its

23   relevancy now, I mean, that's retrying Phase I, and we're

24   not in Phase I.  So we would submit on that argument.

25          THE COURT:  Mattel's motion is denied.  If we

1    enter into Phase I again, I'll reconsider that, so you have

2    leave to bring this back before the Court, but at this time,

3    it's denied.

4              MR. ZELLER:  Thank you.

5              THE COURT:  Mattel has a motion before the Court

6    to compel the production of documents referenced at Patrick

7    Ma's deposition.  My question is why are the MGA Hong Kong

8    financials of unique relevance in this lawsuit?

9              MR. ZELLER:  Well, there are different financials

10   that are involved.  One is that there are audited or

11   unaudited financial statements.  The Court previously had

12   said that such documents are relevant.  Of course what that

13   at least gives us is a picture of MGA Hong Kong, which is a

14   defendant in this case -- a picture of the company year by

15   year.  I think as we point out in our papers we have

16   received one year's worth, and Mr. Ma admitted that there in

17   fact were such financial reports going back to at least

18   2002.  Those are to me just baseline documents.

19             One think I would point out is that in this whole

20   context of the Eckhert documents Mattel, a publicly traded

21   company, which obviously has any amount of transparency into

22   its financial, we have had to produce at MGA's insistence of

23   thousand of pages of these financials, and for then MGA to

24   turn around and say that they shouldn't have to even give

25   their financial statements and their monthly financial

SHARON SEFFENS, U.S. COURT REPORTER

1  packages that give us some insight to what is going on in

2  the company, I think is not reciprocal.

3             THE COURT:  Thank you.

4             Counsel.

5             MR. MCCONVILLE:  Once again this is the same

6  information that we have already provided.  MGA Hong Kong

7  rolls into MGA financials.  The Court issued an order on

8  January 26, 2010, that identified the specific financial

9  information after painstaking detail with the Court over

10 multiple sessions that were reduced to an order that this

11 Court entered.  That order has been complied with.  This is

12 another way to have us go chase down information that they

13 already have.

14             THE COURT:  Mattel's motion is granted.  From this

15 point forward, I'm going to be employing sanctions.  I have

16 made my order.  Mattel's motion is now granted.

17             Mattel's motion to compel the production of

18 indemnification and fee agreements concerning its witnesses.

19             What precludes this Court from ordering MGA to

20 produce a redacted version of the fee arrangements that keep

21 out the information about payment of RICO fees?

22             MR. ZELLER:  Perhaps I'm not totaling following

23 the Court's question.  It would seem to me that if we

24 were to be -- do you mean redaction of anything that's

25 allegedly -- or claimed to be privileged or --

```
 1              THE COURT:  Yes.
 2              MR. ZELLER:  That I don't think we have an
 3   objection to.  If there is something legitimately privileged
 4   in the fee agreement, I think we have always understood that
 5   -- say, for example, it set forth strategy or product or the
 6   like -- what we're obviously interested in is knowing what
 7   are the terms of and conditions of these fee arrangements?
 8              You might have heard from us before that when we
 9   got Carter Bryant's agreement it actually was quite
10   explicit.  It basically said MGA could cut off payment
11   anytime it felt like for any reason, which obviously is from
12   our view something that is a powerful incentive for a
13   witness to shade his testimony in one way or other.  So we
14   have no objection to something that is truly privileged or
15   work product being redacted.
16              THE COURT:  I'm going to take that under
17   submission at this time.  I'm a little leery right now.  I
18   want a few more moments, but if you want to argue this
19   matter, please.
20              MR. MCCONVILLE:  No.  That's fine, Your Honor.
21              THE COURT:  All right.  Mattel's motion to compel
22   the production of Larian's deposition transcript in other
23   actions.
24              Counsel on behalf of Mattel.
25              MR. ZELLER:  We submit on that.
```

```
 1                THE COURT:  Counsel on behalf of MGA.

 2                MR. MCCONVILLE:  We submit as well.

 3                THE COURT:  The Court denies Mattel's motion.

 4                Mattel's motion to compel the responses to its

 5       fourth set of requests for production targeted at

 6       information about MGA's investments in the Bratz brand and

 7       competing Moxie Girlz brand.

 8                How is your breach of constructive trust argument

 9       cognizable as a base matter?  In other words, in light of

10       the stay, I don't understand with this stay what --

11                MR. ZELLER:  I'm not familiar with what the Court

12       means exactly about the stay, but I assume the Court means

13       because of the Ninth Circuit proceedings.

14                THE COURT:  Do you know of any other stay?

15                MR. ZELLER:  Well --

16                THE COURT:  Would you enlighten me what other stay

17       we have?

18                MR. ZELLER:  I just don't recall the Court ever

19       calling it a stay before.

20                THE COURT:  Okay.  Judge Trotts, Judge Wardlaw and

21       Judge --

22                MR. ZELLER:  Kozinski.

23                THE COURT:  The chief.  That's right.

24                MR. ZELLER:  I'm not trying to be difficult.  I'm

25       just a little surprised to have it stated that way if only
```

1    because -- we obviously need to do an amended pleading, and

2    it was our assumption that we were going to be doing our

3    amended pleading for everything.

4            Certainly to the extent there is going to be a

5    breach of constructive trust pled, it would need to be in

6    this pleading, and this is part and parcel of it, which is

7    this overall pattern that I was describing, which is that

8    MGA stole Bratz.  It milked it.  Once it saw the writing on

9    the wall, it began to devalue it so that Mattel could not

10   gain any advantage.

11           To me anyway, the bigger issue and the thing I am

12   a little bit more unclear about is to what degree we should

13   be repleading because it was certainly our intention in this

14   next amended complaint to include that as a claim.

15           THE COURT:  You are not precluded from a claim.

16   This has to do with the request for production about the MGA

17   investments.

18           Counsel, let me hear from you.

19           MR. MCCONVILLE:  We'll submit on our papers, Your

20   Honor, on it.

21           THE COURT:  I will come back to that in just a

22   moment.

23           Mattel's motion to compel production of samples of

24   all documents that it contends Mattel infringes on.  In this

25   motion, isn't it in light of the Court's order granting in

1   part and denying in part Mattel's motion to compel resumed

2   deposition of Isaac Larian -- in that order, I directed the

3   parties to bring samples of such items to the resumed Larian

4   deposition, and since I wasn't there, I'm assuming that this

5   is really moot.

6           MR. ZELLER:  That's a larger -- this is a larger

7   piece, Your Honor.  It's not just simply examples that we

8   would be able to show Mr. Larian.  MGA has made trade dress

9   claims.  They have made claims over literally thousands of

10  products.  We have not been provided all of those products.

11  It's fundamental that in order to even begin to make out a

12  trade dress claim MGA is going to have to show what the

13  products are.  They are going to have to do that for trial.

14  They are going to have do that for summary judgment.  So

15  this can't really be argued as a burden.  These are the

16  products that MGA chose to put at issue, and we are entitled

17  to see exactly what they look like.

18           Trade dress by definition and certainly as MGA is

19  emphasizing it is the overall appearance of these products.

20  We have to have the products to know what that is so a

21  comparison can be done not only in depositions but just

22  overall, so that when we get to the point of trial and if

23  MGA has any intention of pursuing these thousands of

24  products, that is something that is going to have to be

25  dealt with in detail at trial.

1          We need those products in order to know what the

2   proper comparisons are to be able to prepare our case to say

3   these are why they are not selling.  These are why they are

4   different or why there are certain similarities.  Here are

5   the reasons for the similarities.  We can't do that without

6   the products.

7          THE COURT:  Counsel.

8          MR. MCCONVILLE:  Your Honor, I know at some

9   level -- I don't want to overstate it, but I know that we

10  have made offers for Mattel to come and view our products.

11  I don't want to overstate that, but I know on some level we

12  have made an offer to review our products.

13          On the broader issue on whether we can pull these

14  products together for Mr. Larian's deposition, we will have

15  it done by the time Mr. Larian sits for his deposition.

16          THE COURT:  How much prior to his resumed

17  deposition will you have that done?  I don't have a date for

18  the resumed deposition, so I don't know what the date to set

19  for the product.

20          MR. MCCONVILLE:  I understand.

21          THE COURT:  I was asking you about that a week

22  ago, and I didn't get an answer.  That's why I was asking a

23  week ago because I couldn't decide this issue.  All right,

24  we'll come back to it, but tonight we get an answer.

25          Mattel's motion to compel production of financial

1    documents responsive to Mattel's second set of requests for

2    production.

3            Counsel, I will hear argument concerning this

4    motion.

5            MR. ZELLER:  We submit on the papers.

6            THE COURT:  Counsel.

7            MR. MCCONVILLE:  Your Honor, this is wrapped up

8    again in the Court's order of January 26, 2010, where we

9    went for days about what financial documents would be

10   produced.  The Court issued an order very expressly about

11   the financial documents that we were obligated to produce.

12   We have produced those financial documents.  The documents

13   can be called a million different things, but the

14   information that the Court has required us to produce we

15   have produced.

16           MR. ZELLER:  If I may just briefly because

17   Mr. McConville has made this argument a couple of different

18   times.

19           THE COURT:  Please.

20           MR. ZELLER:  There already of course are

21   preexisting orders requiring MGA to produce documents.  The

22   Court will notice in fact that MGA had used the January

23   order of this Court as a basis -- we think a spurious one --

24   for saying that they did not have to produce any other

25   financial discovery, and it was clearly not contemplated and

```
 1    clearly not the Court's January order that those were the
 2    only financials that were ever frozen in stone that would
 3    become relevant.
 4            We have learned about more information from
 5    depositions.  That's in fact a large part of what our
 6    motions are about.  So I don't think its right or fair that
 7    MGA should be basically saying that that order was meant to
 8    be preclusive of anything else.
 9            I would also note on the financial front there is
10    getting to be an imbalance here.  The Court is aware of the
11    litany of information that MGA wanted on the financial front
12    from Mattel, which again has far more transparency
13    financially than MGA does.  Yet they are drilling down into
14    levels of financial detail that we don't get from MGA.  I
15    don't think that's right.  I just don't think that's right
16    at all.
17            The Court will recall there was that extensive
18    list that MGA provided in connection with the Eckert
19    deposition.  The result of that is we have actually agreed
20    to produce a fair amount of those documents, but, again,
21    it's getting to this point where we are being denied basic
22    financials, even annual statement type documents, and we are
23    being forced to provide far greater financial detail.  I
24    just don't think is appropriate.
25            THE COURT:  I will hear argument concerning
```

| | |
|---|---|
| 1 | Mattel's motion to compel MGA to identify which MGA entity |
| 2 | produced documents and produce those documents that it has |
| 3 | withheld.  This is based on MGA's representation that it |
| 4 | will extract and produce documents that have not yet been |
| 5 | produced, so I'm not quite certain, although we have |
| 6 | discussed this before, where we are on that motion frankly. |
| 7 | MR. ZELLER:  Fundamentally, there are two problems |
| 8 | that we are facing.  There have been representations made -- |
| 9 | let me just step back for a moment.  For a period of time, a |
| 10 | good part of this case, MGA has produced what we will call |
| 11 | one production.  Everything was Bate stamped MGA.  There was |
| 12 | no differentiation whether it came from MGA Mexico, whether |
| 13 | it came from some other MGA entity like Hong Kong or the |
| 14 | U.S.  It was just a huge undifferentiated batch, so we could |
| 15 | not tell who the custodian was. |
| 16 | In the course of meeting and conferring with MGA |
| 17 | about that, we learned something else, because what they |
| 18 | said that they would do is they would provide the Bates |
| 19 | range of the numbers that said, okay, Nos. A through B are |
| 20 | the ones that come from MGA Mexico.  This range comes from |
| 21 | MGA U.S.  Theoretically, I think that would be fine, and |
| 22 | that would be workable. |
| 23 | What happened was is that they identified ranges |
| 24 | of documents we had never received, that we have no record |
| 25 | of ever receiving.  We engaged in endless discussions and |

```
 1   communications with MGA on this very point where we had
 2   tried to find out when did you produce this?  Can we have a
 3   copy of it?  What's your cover letter?  I mean, something to
 4   help us identify whether these documents were ever produced.
 5           We don't have them.  That's the bottom line.  They
 6   have claimed that there are ranges of documents that were
 7   produced supposedly from --
 8           THE COURT:  Could you show me an example of that
 9   if I gave you time?
10           MR. ZELLER:  Absolutely.
11           THE COURT:  Therefore, I would know without any
12   guesswork.
13           Counsel.
14           MR. MCCONVILLE:  Is it all right if Mr. Molinski
15   handles this one?
16           THE COURT:  Yes.
17           MR. MOLINSKI:  I have been quietly sitting here.
18   You had told me originally not to speak, so I appreciate it.
19           I would be happy to see examples that Mr. Zeller
20   gives us.  I think it's possible with all due respect that
21   he may be a little behind on the communications we had with
22   his firm.
23           THE COURT:  Who were you communicating with --
24           MR. MOLINSKI:  We were dealing with Scott Kidman
25   and Marshall Searcy.  They sent us a letter two weeks ago --
```

```
 1            THE COURT:  Why don't we just bring them down
 2    here.
 3            MR. MOLINSKI:  They sent us a letter a couple of
 4    weeks ago saying you gave us a list of Bates ranges.  We
 5    don't have these documents.  We went through.  We sent them
 6    a detailed letter that said that Bates range was part of the
 7    production process --
 8            THE COURT:  It's hard for me to discern whether
 9    it's taken place or not,  but it's an easy thing for me to
10    discern if I get the counsel down here who are working on
11    that matter.  I know that each of you had to farm out
12    certain areas.  Tomorrow?
13            MR. ZELLER:  Absolutely.
14            THE COURT:  8:30.  Who is in charge of this --
15            MR. ZELLER:  Probably Mr. Searcy.  Obviously I
16    will find out in the interim.  This is new information.
17            THE COURT:  Just have Searcy here at 8:30.
18            And you will be here at 8:30?
19            MR. MOLINSKI:  Yes.
20            THE COURT:  An with an example of all the products
21    that haven't been produced, and we can wade through that
22    tomorrow if we need to.
23            MR. ZELLER:  These are Bates ranges which we have
24    no corresponding production.
25            THE COURT:  Well, let's get Mr. Searcy down here
```

1     to explain that.

2              THE COURT:  There is a representation that they

3     do, and I can't quite tell, so I don't want to make a ruling

4     in the abstract.

5              MR. MOLINSKI:  We have a copy of the letter that

6     lists the explanation of those Bates ranges that we provided

7     to counsel.

8              THE COURT:  Okay.  Well, bring it with you

9     tomorrow, and we will see Mr. Searcy.

10             And you are the one who worked on this?

11             MR. MOLINSKI:  At my direction, yes.

12             THE COURT:  We are not going over another day, so

13    get the necessary people down and demonstrate this to me the

14    first thing tomorrow morning.  If there has been compliance,

15    terrific.  Let's just take it off the table.  If there

16    hasn't, then let's rectify it.  So this will be tomorrow.

17             I think your paralegal arrived, Counsel, with your

18    order.

19             MR. ZELLER:  Yes.  Also, I e-mailed a copy of the

20    proposed order to chambers.

21             THE COURT:  Can I see the order?

22             MR. ZELLER:  Unfortunately I can't print it off.

23             THE COURT:  She has it for you right there.

24             Thank you very much.  I appreciate you coming

25    down.

1        Now, Counsel, I'm going to sign this order but not

2   three days.  She wants counsel.  I think she is entitled to

3   counsel.

4        Ms. Bashaw, I want to work with you at least in

5   terms of the timing.

6        I'm going to sign an order this evening, which is

7   a motion to compel documents from International Corporate

8   Advisors and Maria Bashaw.  The order is going to read that

9   within some period of time -- and I am going to discuss that

10  with you tonight -- that International Corporate Advisors

11  shall produce all nonprivileged documents responsive to

12  Mattel's subpoena and produce a privilege log specifying

13  documents withheld on the basis of privilege or work

14  product.

15        The order reads right now three days, which I

16  think is too little a period of time, so within some period

17  of time, Maria Bashaw shall produce all nonprivileged

18  documents responsive to Mattel's subpoena and produce a

19  privilege log specifying documents withheld on the basis of

20  privilege or work product.

21        Now, if you want counsel present to discuss the

22  time period, so be it, but I would like to work with you at

23  least in that regard to try to come up with some reasonable

24  time.  If you notice so far, the parties are really

25  interested -- frankly, I don't want you to answer this.  You

1  don't have counsel.  You want counsel.  I think it might be

2  wise.

3      I think everybody is interested in your contact

4  with Mr. Samuni (phonetic), whether Mr. Samuni had any

5  personal contacts with you, if you have met him, if you have

6  seen his face, if it was phone contact, or if this was done

7  through an intermediary or just signed documents, or if

8  Mr. Samuni even exists.  So far there has not been a request

9  for a deposition in this matter, so I think the motion to

10  compel documents is the wise step on all parties' part at

11  this time.

12      Counsel hasn't returned the call, so I think that

13  ten days would be an appropriate time, not three.

14  Therefore, it would afford you the opportunity and time to

15  find counsel in this matter.  If you disagree with that,

16  please let me know, and I'll reconsider.

17      MS. BASHAW:  I agree with ten days, but I just

18  wanted to point out that I personally do not have any

19  documents, but as to ICA, I would like to wait for counsel.

20      THE COURT:  Absolutely, and I'm not inquiring of

21  that answer.  I'm trying to shut off the conversation this

22  evening.  You notice I didn't swear you on the last

23  occasion.  I'm going to say within ten days.

24      Stephanie, I am going to ask you to make copies

25  and to file this this evening.  That way we can get Ms.

1    Bashaw on her way.

2        If you remain for a moment, I will hand you a copy

3    of the order from the Court, and I will hand it to both

4    counsel in a moment.

5        Now, let me say this also.  Mattel should be very

6    sparing with its ex parte applications in this area.  It's

7    one think to pile an ex parte directed at MGA.  I think MGA

8    has the resources and familiarity with this case to respond,

9    but I don't want such tactics against nonparties.  It's not

10    acceptable so sparing.  If we have a problem, we will have

11    Ms. Bashaw in here very quickly and speak to her or her

12    counsel.  I don't think we are going to.

13        There is a motion before the Court by Mattel to

14    compel production of exhibits to the Eckhert deposition.

15        Have these exhibits been produced?

16        MR. MCCONVILLE:  I'm not familiar with the issue,

17    Your Honor.

18        THE COURT:  Who is?

19        MR. MCCONVILLE:  It would be Ms. Hurst.  I think

20    there is an issue with regard to dolls, physical exhibits.

21    Is that the issue?

22        MR. ZELLER:  That's correct.  There is.  These are

23    exhibits that were shown to Mr. Eckert.  This in fact goes

24    back to -- one of my complaints here is that these were

25    products apparently MGA has.  They are at issue in the case.

```
 1   They never showed them to us.  They spring them on
 2   Mr. Eckert at the deposition.  Then even after the
 3   deposition, we repeated asked for access to them and that
 4   has not been forthcoming.
 5            This is another example -- this is also why we
 6   think it's important that MGA be ordered to produce samples
 7   of every single thing that they have sued on.  These are
 8   their products included.  They surely must have access to
 9   them.
10            THE COURT:  I'm just going to deal for a moment
11   with the exhibits to Eckert's deposition.  I will take care
12   of the samples eventually.  I have been asking about this --
13   I think this is the second or third time.
14            MR. MCCONVILLE:  Your Honor, if I can answer.  I
15   think -- I am pretty confident what happened is we brought
16   those exhibits back to our office, and then they were taken
17   from our storage facility.  Literally, I believe the doll
18   was stolen.  We have done a doll manhunt throughout our
19   firm, and we have not been able to locate it.  I think we
20   were waiting to try and give you a different answer, but I
21   think the short answer is that the doll that was shown to
22   Mr. Eckert is now missing.
23            THE COURT:  How can we miss a doll?
24            MR. MCCONVILLE:  I don't have an explanation for
25   Your Honor other than --
```

```
 1              THE COURT:  I don't think this is a turning point
 2    in the lawsuit, but by the same token --
 3              MR. MCCONVILLE:  I think Ms. Hurst went to Chicago
 4    so she didn't have to deliver that message to you, Your
 5    Honor.
 6              I truly believe that's what happened.  I will
 7    confirm that tonight, but I think that's what happened.
 8              THE COURT:  So we have a missing doll.
 9              MR. MCCONVILLE:  Yes.
10              THE COURT:  Is it just that one exhibit?
11              MR. MCCONVILLE:  I believe that's it.
12              THE COURT:  Is this the one exhibit that is
13    causing the crisis?
14              MR. ZELLER:  I understand that there are others
15    that we have not been provided.  We provided some.  I
16    understood that there were a number of them missing.
17              THE COURT:  How do we get our hands around this
18    with some finiteness so that I don't have people just
19    chasing broad nebulous categories?  Do I make an order to
20    produce, and everybody looks at me and says that they will,
21    and then nothing happens as has been happening in this case?
22              Is it in conscious disregard or motions for
23    clarification because nobody can understand anything that
24    Judge Larson or Judge Carter writes apparently?  This is
25    going to end, and I keep saying the sanctions are on the way
```

1    now.  We have had enough time for the sillyness.  Everybody

2    got the message?  I have been very forbearing up to this

3    point as we caught up with the case, and now the nonsense

4    stops.

5            What we need is a list from you, and we need

6    people who can go on the great doll hunt and exhibit hunt.

7    So who is going to be here tomorrow for you to start tracing

8    his list if you agree that these are the items that Eckert

9    was shown?

10           There he is springing into action.

11           MR. MOLINSKI:  I'm happy to do it, Your Honor.

12           THE COURT:  There we go.  He wanted to get

13   involved.  Now, he is involved.  They are giving him a

14   voice.

15           We are going to go on a scavenger hunt tomorrow

16   and find all this stuff.  That means that unfortunately you

17   or somebody else are going up and down the freeway and to

18   the great storage house in the sky and are bringing all that

19   stuff to court because we are matching it up tomorrow, so

20   it's just a lot of wasted time on everybody's part, but we

21   will just do it by the numbers until we're done, or we will

22   know if we can't find certain exhibits.

23           MR. MCCONVILLE:  Can I ask a question on that

24   front?  The physical exhibits from the last trial, do you

25   know -- I know we talked about some things have been

1     transferred from Riverside to here.  I believe that the

2     samples that we need to show are within the custody of the

3     first set of physical exhibits from the first trial.

4               THE COURT:  If they are, then I'm not concerned.

5     You both have access to that.  We can find them for you, and

6     you can look, but that's not a with holding by MGA.

7               MR. MCCONVILLE:  No, no.  Before we go to great

8     lengths, what I think we -- again, I'm speaking from a

9     position of not knowing what those exhibits are, but what I

10    am told --

11              THE COURT:  He is going to give us a list of

12    exhibits you are concerned with.

13              MR. ZELLER:  Specifically for the Eckert

14    deposition?

15              THE COURT:  Well, that's what your motion was.

16              MR. ZELLER:  I have just sent an e-mail out, and I

17    should have it shortly.

18              THE COURT:  Great.  Let's wait tonight, and then

19    we'll know, and we can get --

20              MR. MCCONVILLE:  I will work with Mr. Zeller on

21    that.

22              THE COURT:  No, no, we will work together tonight.

23              Mattel's motion to compel MGA to provide

24    substantive answers to Mattel's first set of requests for

25    admission on MGA Mexico.  This is an issue that has been

1    spinning around the Court for quite awhile.  The issue

2    always has been whether MGA has control over Vargas,

3    Machado, and Trueba, and who has the answer to these RFAs?

4    Counsel, we had an informal discussion.  I want to formalize

5    that this evening.

6              Counsel, your arguments on behalf of Mattel.

7              MR. ZELLER:  I think that there is very little

8    question that when we started this whole process, the

9    process in which we asked for documents, evidence,

10   testimony, from Machado, Trueba, and Vargas -- this is a

11   process that has been going on literally for years.  When we

12   asked for that, discovery each of them was an employee and

13   in fact in a management capacity at MGA Mexico.

14             Multiple orders have been issued.  There has been

15   noncompliance, and in the interim -- MGA has even been

16   paying the fees of all three of them for years.  They use

17   sort of this point about how they are no longer within their

18   control to block discovery all together.  We literally have

19   a pattern of years of delay, defiance of Court orders,

20   noncompliance, until finally they're gone, and then -- you

21   know, as MGA employees, and then MGA throws up its hands and

22   says now for that reason you don't get any discovery.

23             I think that this is an instance where MGA --

24   including because of the fact that it has long paid the fees

25   for these employees and in fact still may be -- I'm not even

1    clear as to when exactly that supposedly stopped, but -- we

2    don't have evidence of what the relationship is.

3    Interestingly enough, we don't have, for example, any kind

4    of documentation -- I'm talking about an agreement of any

5    kind -- from MGA relating to Mr. Vargas.

6            The Court will recall from the in-camera

7    submission that MGA made -- it said we can't find any

8    agreement with Mr. Vargas.  Now we are looking for ones

9    relating to.  Whether that search has ever been done or

10   completed, I don't know.  That was the last information that

11   I had on it from MGA.

12           Clearly this process has gone on where Mattel has

13   been prejudiced.  I mean, there was a long period of time

14   where there was no question -- they could have answered not

15   only the RFAs, but the interrogatories, the 30(b)(6), any

16   number of discovery requests when all those people were

17   within their control.  The fact that they choice to delay

18   and not answer and wait until they left to basically then

19   use that as an excuse I think is very important here.

20           THE COURT:  Counsel.

21           MR. MCCONVILLE:  As we told the Court before,

22   these three people from whom we would like to get

23   information as it relates to Mexico -- that would be

24   Mr. Machado, Ms. Trueba, and Mr. Vargas -- are all being

25   prosecuted criminally in Mexico by Mattel.  Those three

1    people choose not to cooperate with us.  However, Mr. Vargas

2    apparently is cooperating with Mattel.

3              What do these people fear?  They fear exactly what

4    has happened to yet another former Mattel employee, a man

5    named Castilla (phonetic), who was indicted today by the

6    D.A.'s Office up in Los Angeles.  This was the man who was

7    referred by Mattel to the FBI.  The FBI didn't take the

8    case.  Today he was charged in Los Angeles by the D.A.'s

9    Office for theft of trade secrets.  These people have a real

10   and legitimate concern because of the tactics that are being

11   used to silence them.  We can't provide responses when

12   people have a real and legitimate concern about the tactics

13   that are being employed.

14             Seconds, and more practically speaking, although

15   there was a litany of delay, delay, delay, these responses I

16   believe are called the first set of requests for admissions

17   on MGA Mexico, which were served a few month ago.  Whatever

18   happened whenever these people were actually working for us

19   isn't really relevant to the analysis of whether they are

20   available now to answer these questions because they are

21   being prosecuted in Mexico by Mattel.

22             Thank you.

23             MR. ZELLER:  If I may, Your Honor, just for the

24   record formalize some of this.

25             THE COURT:  You may.

1            MR. ZELLER:  No. 1, this issue concerning

2    Mr. Vargas and the allegation that he is cooperating with

3    Mattel is not correct.  As the Court is aware, Mattel is in

4    discussions with Mr. Vargas in an effort to resolve the

5    proceedings in Mexico, but he is certainly not cooperating.

6    He is not within our control.

7            Also, a matter of great concern to us is that --

8    the Court will recall that Mattel made a motion to preclude

9    MGA from inquiring into the substance of those ongoing

10   negotiations with Mr. Vargas when it was taking the

11   deposition of Francisco Tiburcio, Mattel's counsel in

12   Mexico.  The principal concern that sparked us to bring that

13   motion was that MGA would use that information to attempt to

14   interfere with those negotiations.

15           The information we have received is that that

16   concern came to pass.  Even though the deposition transcript

17   and the information from the deposition with Mr. Tiburcio

18   was designated "Attorneys' Eyes Only," we understand that

19   Ms. Trueba called Pablo Vargas and informed him about the

20   contents of Mr. Tiburcio's testimony in an effort from our

21   perspective at least implicitly with MGA's approval and

22   probably have had to specifically involve them to interfere

23   with those negotiations.

24           In fact, I would ask the Court's guidance at this

25   point because we have asked MGA and Ms. Trueba's counsel to

```
 1    account for this, to let us know is this true what we have
 2    heard?  Is it not true?  And, moreover, to give us
 3    assurances that this is going to stop.  We have not received
 4    a response as far as I am aware.
 5              From our perspective, this is something that
 6    really interfers with the process of the Court.  It was the
 7    very fear that we had.  We do think that this is something
 8    that's either now or very shortly going to need to be
 9    addressed by the Court.  There needs to be some order that
10    precludes further interference of this kind, particularly if
11    we are going to continue to go around with this particular
12    issue because that's just not a proper purpose for that
13    testimony.  I don't think that's even defensible to say that
14    that would be a proper purpose for that discovery.
15              The other thing I would say is that in fact MGA
16    had years to get all the information it wanted from these
17    three employees.  That's the bottom line.  It had years to
18    do it.  Even now when I have been taking depositions of say,
19    for example, Mr. Brawer -- and I think there was -- the
20    other witness may come back to me -- we know that they were
21    perfectly willing to talk to others within MGA for a
22    substantial period of time.  For them now to say because
23    circumstances have changed as a result of waiting for years
24    that they should somehow benefit from what they are claiming
25    is this lack of cooperation, I don't think really is --
```

```
 1    should be given any credence.

 2              THE COURT:  Counsel.

 3              MR. MCCONVILLE:  I have nothing to add, Your

 4    Honor.

 5              THE COURT:  If you're correct about Vargas in

 6    negotiations with Mattel, the Court might tread with

 7    caution.  I understand the concern of prosecution regarding

 8    Machado and Trueba if in fact Mattel is responsible for the

 9    criminal prosecution in Mexico.  What I do not understand is

10    why Machado and Trueba will not talk to a 30(b)(6) witness

11    who represents MGA Mexico.

12              I also am not satisfied with the 30(b)(6)

13    witnesses that MGA has produced, nor the empty vessel

14    concept that has been employed, nor the adequacy of the

15    inquiry that has been made.

16              I'm going to think about this issue just a little

17    bit longer, maybe a day.  I will take it under submission,

18    and I will hand out a ruling probably this week in that

19    regard.  So let's pass on to the next motion for the time

20    being.

21              MGA's motion to compel production of drafts in

22    prior versions and the like of Mattel's purported trade

23    secret documents is the next motion the Court would like to

24    take up.

25              Counsel, your arguments.  Let's begin with MGA.
```

1          MR. MOLINSKI:  Your Honor, this goes to the

2     damages part of their claim for trade secrets.  The damage

3     theory as best we can understand from the depositions and

4     interrogatories and the responses that we have gotten is

5     that Mattel is going to assert that these documents -- every

6     single one of these documents they claim was taken was a

7     very valuable document prepared at great lengths though

8     countless hours.  Witnesses have testified at length to

9     this.

10          What we have asked as a result are all the

11     documents that go into establishing that fact, the creation

12     of these documents.  How long did it take to create them?

13     Were they the result of one person spending an hour on a

14     format of a document, which is one of the documents they

15     claim, or was it the result of a team of people who put this

16     together over countless months?  That goes directly to the

17     issue of their damage claim, and that's all we have asked

18     for, the documents which show the preparation of the trade

19     secrets.

20          THE COURT:  Counsel on behalf of the Mattel.

21          MR. ZELLER:  As I understand it, the request is

22     not limited to any such theory.  In fact, the issue has been

23     raised not by Mattel but, rather, by MGA.  It's the theory

24     that they want to pursue, that somehow the value of a trade

25     secret should be tied to how many physical hours of labor it

1    took to create.  In fact, that was Mr. Molinski's

2    overwhelming approach to these documents.

3            Nor is it correct that by any stretch of the

4    imagination has Mattel said that every one of these

5    documents is something that (a) is the subject of its trade

6    secret claim, or (b) that it was the hours or labor that

7    went into it that formed the basis of its value.  Obviously

8    any number of trade secrets are extremely valuable that have

9    nothing to do with the amount of labor.

10           So the request as far as I can ascertain is

11   overbroad and doesn't seek relevant information.  It's just

12   burdensome.  There is absolutely no reason why we should

13   have to go and find whether there were four drafts or three

14   drafts of every single one of these documents.

15           THE COURT:  How are the drafts tied to damages?

16   That's not the measure --

17           MR. MOLINSKI:  If you had a one trade secret case

18   with one document that was the trade secret, then how that

19   document was created would clearly be relevant to

20   determining whether that document had value and therefore

21   was a trade secret under the California Uniform Trade Secret

22   Act.

23           The fact that they have got dozens and dozens of

24   alleged trade secrets doesn't change that analysis.  You

25   still need to get to the value of that document.  How you

1    get to that value -- one way Courts have looked to is what

2    was the time and effort?  Was this something that was

3    prepared through great effort?  Courts have looked to that

4    as a factor in determining is it a trade secret, or is it

5    something that --

6              THE COURT:  Is this a Georgia Pacific factor?

7    What factor is this?  Where do you find that authority that

8    Courts have looked to?

9              MR. MOLINSKI:  The elements are found in the Trade

10   Secret Act, but the two measures of determining whether

11   something is a trade secret is have reasonable measures been

12   kept to keep the secret, and does it have economic value --

13             THE COURT:  I understand that, but how is the

14   measure of that value -- where do you cite to me authority

15   that the measure of that value are the hours to create that

16   trade secret?

17             MR. MOLINSKI:  I can't cite a case to you tonight.

18             THE COURT:  Can you cite any case to me ever?

19             MR. MOLINSKI:  I expect I could.

20             THE COURT:  What case?  It's a nice concept.  I'm

21   not use to measuring damages that way.  I'm not certain I

22   would instruct the jury in that regard.

23             MR. MOLINSKI:  Let me back up.  On that issue,

24   it's not the damages.  Is it valuable, and, therefore, is it

25   a trade secret?  That's one of the elements of it being a

1   trade secret.

2           THE COURT:  We will come back to that.  Let me

3   think about this.

4           MGA's motion to compel production of Mattel's

5   nondisclosure agreement with toy retailers.

6           Counsel.

7           MR. ZELLER:  Your Honor, this goes to the issue of

8   reasonable measures to protect the secrecy of information.

9   Some of the information they claim was taken is information

10  they say we obtained through sources that they don't know,

11  and it may have been we got these from retailers.  The

12  question goes to what were the efforts that they take, for

13  example, with their price list to keep that information

14  secret?

15          If, for example, Mr. Machado or Ms. Trueba, or

16  Mr. Vargas had a price list that they obtained from a

17  retailer, the question is was that a violation of some

18  confidentiality agreement for that retailer to have provided

19  that to them?  So we have asked for their nondisclosure

20  agreements with the retailers or at least a fair sampling of

21  those documents to be able to determine what steps they take

22  to protect the information and what they consider

23  confidential that they disclose to retailers.

24          THE COURT:  Mattel.

25          MR. ZELLER:  It's hard to understand how that is

1   relevant.  The standard is not whether it was kept

2   confidential for all time.  These were stolen before those

3   times.  It's hard to even understand what this theory is

4   intended to establish.  However, what I would suggest is to

5   the extent that the Court is inclined to grant that request

6   is that it be reciprocal.

7            Certainly MGA's measures are relevant to whether

8   or not the steps that Mattel took were reasonable.  We have

9   been told conflicting information from depositions about

10  what it is that MGA does and what information was obtained

11  from toy fairs or whether it obtains information from toy

12  fairs, so I think to the extent that motion is granted it

13  ought to be reciprocal.

14            THE COURT:  I am going to deny without prejudice

15  MGA's motion at this time.  It's overbroad.  That will leave

16  it to MGA to narrow it.  It will also leave it to you two to

17  discuss reciprocity, but it's overbroad.

18            MGA's motion to compel the production of eight

19  former employees' hard drives.

20            Counsel on behalf of MGA.

21            MR. MOLINSKI:  Your Honor, we are seeking the hard

22  drives of the eight individuals who they claim took trade

23  secrets from Mattel.  We would like to look at their hard

24  drives for a number of reasons -- the hard drives as they

25  existed at the time they left Mattel.

1        They have alleged -- Mattel has alleged that they

2   had gained improper access to documents just before they

3   left, that they were accessing a lot of documents they

4   wouldn't normally have accessed.  One thing that those hard

5   drives would show is that the work they were doing and the

6   documents they were accessing in their final days was part

7   and parcel of their daily regular business.  In fact, the

8   witnesses have said and even Mattel witnesses have conceded

9   that it would not have been unusual for them to have

10  accessed certain documents as part of their job.  We would

11  like to get those hard drives to show what their routine

12  was.  What documents did they have access to?

13        In addition, they have claimed that they

14  specifically targeted very valuable information to take with

15  them.  If it's the case that they were working in their

16  final weeks on documents that by any measure would be much

17  more valuable and important to a competitor, then that is

18  going to be relevant to disprove the allegation that they

19  went out of their way to try to access certain information.

20        THE COURT:  Counsel.

21        MR. ZELLER:  I disagree with some aspects of what

22  Mr. Molinski is arguing, but to put it bluntly, we have

23  always been in favor of transparency on hard drives.  The

24  Court is aware that we have fought for years to get the hard

25  drive of the most critical witness in this case and continue

1    to be stymied on it, and we have also in many circumstances

2    where there has been an agreed upon protocol or there are

3    other protections in place have in fact allowed MGA to have

4    access to images and hard drives.

5             We are the ones who have been in favor of

6    transparency on this.  MGA is the one that continues to

7    stymie the process.  We don't have hard drives from say, for

8    example, Mr. Wing.  We don't have hard drives from

9    Mr. Larian.  We only recently got the one from Mr. Brawer,

10   and MGA is really insisting and continues to insist on a

11   one-way street on this.  I think this is frankly something

12   that Judge Smith ought to be deciding and overseeing.

13            I am completely in favor and continue to be in

14   favor of complete transparency on the relevant hard drives.

15   It can be overseen by the independent forensic auditors to

16   ensure -- the forensic computer expert to ensure that there

17   is not abuse, that there is not loss of data, to ensure that

18   there is not disclosure of privileged information and the

19   like.

20            One problem that we have -- and this is somewhat

21   different -- and this gets back to the uneven playing field

22   as well -- is that MGA uses privilege and says because there

23   is privileged material on these drives you can't see it.

24   Meanwhile, that isn't the same standard that they want to

25   apply to us.  I think that this ought to be dealt with in a

1   larger context because there are a number of issues on this.

2   There are other hard drives that we have been asking for

3   that MGA is refusing to give us.  I think this is something

4   that does cry out for a protocol.

5           With respect to these eight individuals, we're

6   happy to live with something that is fair, equitable, even,

7   reciprocal, and is handled properly, but MGA just wants us

8   to give them to them so it can continue to make this one-way

9   street argument.

10          THE COURT:  Counsel.

11          MR. MOLINSKI:  Your Honor, with respect to their

12  request for hard drives, those issues are actually still

13  pending.  I have been meeting and conferring on those issues

14  with --

15          THE COURT:  I am going to deny your motion.  You

16  can come back to me with leave to rebring this motion, but

17  it's denied at this time.  I hope my message is clear.  The

18  door is closing.  You come back when I see progress on MGA's

19  side.

20          MR. MOLINSKI:  Your Honor, we have three sets of

21  requests that we just recently got from them that ask for

22  certain hard drives.  I have met and conferred over the past

23  week on what length of time would be that we would go back

24  on these hard drives to get information.

25          THE COURT:  Okay, I will retract my ruling, but I

1    want to see progress on this.  I will hold this in abeyance

2    a short time, but I am obviously not enamored with MGA's

3    efforts in this regard thus far, and I want to talk to you

4    and I want to see progress.  I will hold this in abeyance,

5    but this is the first sanction that could have handed down

6    that's devastating to you.

7                MR. MOLINSKI:  Can I inquire from counsel what are

8    the hard drives that I am --

9                THE COURT:  I will hold it in abeyance a short

10   time, but I am not going to waste Judge Smith's time.  I

11   want to see some compliance now.

12               The motion to compel competitive information

13   obtained through false pretenses.  This is MGA's motion.

14   The Court received a representation from Mattel that it will

15   search for the responsive documents.

16               Is there any reason why I shouldn't simply grant

17   MGA's request at this time?

18               MR. ZELLER:  It's certainly the Court's pleasure

19   on that.  We have searched for these documents.

20               THE COURT:  I'm granting MGA's motion.

21               MGA's motion to compel production of false reports

22   by Mattel to retailers.  I want you to check your notes, but

23   I don't have any opposition filed by Mattel in this matter,

24   so the Court is prepared to grant MGA's motion concerning

25   the motion to compel production of false reports by Mattel

1    to retailers.

2            MR. ZELLER:  May I have a brief period of time,

3    maybe tomorrow morning, to found out -- I would be surprised

4    if --

5            THE COURT:  I will hold in abeyance.

6            MGA's motion to compel production of the documents

7    related to Mattel's ownership of trade secrets.  I don't

8    have any opposition by Mattel either in that regard, so

9    check your records.  We haven't received according to our

10   records opposition, so I'm prepared to grant that, but I

11   will hold that in abeyance just so you can check your

12   records.

13           MR. ZELLER:  Thank you.

14           MR. MOLINSKI:  On that last one, we did just -- in

15   open candor, at the Storie deposition after this motion was

16   filed, we did receive certain agreements between Mattel and

17   its various subsidiaries that we think go to the issue of

18   ownership.  We are waiting for confirmation on all of that.

19   If that is all there is, we may actually have just gotten

20   the documents on that one.

21           THE COURT:  Will we know by tomorrow?

22           MR. MOLINSKI:  I can double-check on that, and we

23   will know by tomorrow.

24           THE COURT:  Okay, by tomorrow.

25           Concerning Mattel's ex parte application for order

     1    to show cause re the Court's February 12, 2010 order,

     2    counsel on behalf of Mattel.

     3            MR. ZELLER:  This is the one directed to OMNI?

     4    I'm not sure that OMNI is here.

     5            THE COURT:  Perhaps we should wait.

     6            The issues concerning the dispute on the

     7    stipulation regarding the schedule for compliance with

     8    electronic discovery special master's January 21, 2010,

     9    report and recommendation.

    10            Concerning the dispute with respect to the

    11    appropriate language of 1(D), is there any reason why the

    12    Court shouldn't grant MGA's proposed language?

    13            MR. ZELLER:  Which language?

    14            THE COURT:  1(D), MGA's proposed language.

    15            MR. ZELLER:  This with respect to the Brawer -- we

    16    will submit on that, Your Honor.

    17            THE COURT:  Counsel.

    18            MR. MOLINSKI:  We will submit on the papers, Your

    19    Honor.

    20            THE COURT:  All right.  It's granted.

    21            Concerning the dispute with respect to the

    22    appropriate language of 1(F), is there any reason why the

    23    Court shouldn't grant Mattel's proposed language with the

    24    addition that the parties shall meet and confer by Friday of

    25    this week to agree on what forensic review should be

1   conducted?

2           MR. MOLINSKI:  From our perspective, no.  That

3   would make sense.

4           MR. ZELLER:  We submit.

5           THE COURT:  Granted.

6           Concerning the dispute with respect to the

7   appropriate language of 2(E), is there any reason why the

8   Court shouldn't grant Mattel's proposed language and note

9   that if the MGA parties are overwhelmed by the scope of the

10  privilege review, you can always seek a continuance with

11  this Court that will be granted upon a showing of good

12  cause?

13          MR. MCCONVILLE:  You're talking about 2(E)?

14          THE COURT:  2(E).

15          MR. MOLINSKI:  The concern as I understood it was

16  that without knowing what the scope of the search terms it

17  could be a vast volume of documents and a presumption that

18  there would be 14 days, but so long as the Court is

19  indicating there is no such presumption and if there is a

20  vast number of documents we would have more time to review

21  it, we wouldn't object to that.

22          THE COURT:  Counsel.

23          MR. ZELLER:  We submit.

24          THE COURT:  Granted.

25          With respect to 2(F), I am inclined to grant MGA's

1    proposed language.  Was this issue of forensic analysis the

2    ArchiveOne database presented for Judge Smith's

3    consideration?

4                MR. ZELLER:  It has been.  It's a little bit more

5    complicated.  It was submitted to Judge Smith.  He appeared

6    to agree in principal, but he had wanted us to come back and

7    talk about --

8                THE COURT:  Shall I delay ruling on this, Counsel?

9                MR. ZELLER:  I think so.

10                THE COURT:  Counsel.

11                MR. MOLINSKI:  Your Honor, my understanding was

12    that this issue was not presented.  The first we saw it was

13    in the stipulated report that they want to do a spoiliation

14    review.  The concern we had on that was that if that review

15    is -- for example, was there any line of text deleted from

16    any e-mail that --

17                THE COURT:  Shall I delay ruling on this?

18                MR. MOLINSKI:  That's fine.

19                THE COURT:  I will delay it temporarily.  I may

20    have to talk to Judge Smith.

21                With respect to the appropriate language of 4(A),

22    I am going to vacate this issue as moot in light of the

23    parties' representation that supplemental briefs are going

24    to be filed on Monday, March 15.  I think Ms. Hurst

25    represented that to the Court.

SHARON SEFFENS, U.S. COURT REPORTER

```
 1              Now, orders are going to start coming out quickly
 2    now by the Court, and I will memorialize them since
 3    sometimes there has been some disagreement.  There are no
 4    motions for reconsideration.  My motions are clear, so that
 5    nonsense stops also.  Motions for clarification, no.  There
 6    is no need to clarify my orders.  Sanctions will follow from
 7    this point forward.  I am informing both parties for the
 8    second time tonight.  The third time I will simply act.
 9              Now, Mr. Wing come join me, please.
10              (The following proceedings were under seal:)
11                        *    *    *
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1

 2

 3

 4                         CERTIFICATE

 5

 6          I hereby certify that pursuant to Section 753,

 7    Title 28, United States Code, the foregoing is a true and

 8    correct transcript of the stenographically reported

 9    proceedings held in the above-entitled matter and that the

10    transcript page format is in conformance with the

11    regulations of the Judicial Conference of the United States.

12

13    Date:  March 11, 2010

14

15                         Sharon A. Seffens      3/11/10

16                         _____

17                         SHARON A. SEFFENS, U.S. COURT REPORTER

18

19

20

21

22

23

24

25
```