1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

MATTEL, INC.,
                    Plaintiff,
        vs.
                                CV-04-9049-DOC
MGA ENTERTAINMENT, INC.,
                    Defendant.
--------------------------

(Vol. 3)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

March 11, 2010


SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

1   APPEARANCES OF COUNSEL:

2   For the Plaintiff:

3

   MICHAEL ZELLER
4   MARSHALL SEARCY
   QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
5   865 Figueroa Street, 10th Floor
   Los Angeles, CA  90017
6   (213) 443-3180

7   For the Defendant:

8   THOMAS MCCONVILLE
   ORRICK, HERRINGTON & SUTCLIFFE LLP
9   4 Park Plaza, Suite 1600
   Irvine, CA  92614-2558
10  (949) 852-7704

11  WILLIAM A. MOLINSKI
   ORRICK, HERRINGTON & SUTCLIFFE LLP
12  777 South Figueroa Street, Suite 3200
   Los Angeles, CA  90017-5855
13  (213) 612-2256

14

15

16

17

18

19

20

21

22

23

24

25

1    SANTA ANA, CALIFORNIA; THURSDAY, MARCH 11, 2010; 6:00 P.M.

2              THE COURT:  First, this is a final set of orders

3    because we want to start memorializing all the things that we

4    have handed down and have that in record form for future

5    generations to gaze upon.

6              Before the Court are a subset of the pending

7    discovery disputes identified by the Court's February 12,

8    2010, order regarding discovery issues, Docket No. 7497.

9    The February 12, 2010, order identified approximately 27

10   discovery issues and/or disputes between the parties,

11   grouped in 21 categories, and ordered supplementary briefing

12   as to a subset of the issues on February 16, 2010.  The

13   Court has ruled on a number of the issues by separate

14   orders.  On March 10, 2010, the Court heard argument from

15   the parties as to those issues that remained outstanding.

16   This order addresses a subset of the presently outstanding

17   issues.

18             On the basis of the moving and opposing papers, as

19   well as the parties' oral argument, the Court hereby orders

20   as follows:

21             1.  Mattel requests the production of documents

22   provided by the MGA parties to the Court-appointed forensic

23   auditor, Mr. Ronald Durkin.  This request relates to Issue

24   No. 16 identified by the February 12, 2010, order.  The

25   request should be simplified to a request for the production

1   of categories of financial documents.  The manner in which

2   the request is presently worded requires the MGA parties to

3   not only disclose the documents but, in addition, implicitly

4   identify those documents as documents provided to the

5   forensic auditor.  Mattel has failed to demonstrate the

6   relevance of the latter discovery.  The Court therefore

7   denies this request.

8           2.  Mattel requests the production of documents

9   identified at the Woolard deposition.  The request relates

10  to Issue No. 17 identified by the February 12, 2010, order.

11  The request seeks documents that are not relevant to Phase

12  2.  Accordingly, the Court denies this request without

13  prejudice with leave for Mattel to resubmit the motion

14  following the completion of the pending Phase 1 appeal.

15          Now, there is no surprise in what I'm handing down

16  this evening.  I just want that in written form, and it is

17  not subject to a motion for clarification.  That is going to

18  be for sanctions by this Court.

19          3.  Mattel requests the production of documents

20  identified by Mr. Patrick Ma, Vice-President of Finance at

21  MGA Hong Kong, during his deposition.  The request relates

22  to Issue No. 17 identified by the February 12, 2010, order.

23  Such documents are relevant to damages.  The Court therefore

24  grants the request.

25          4.  Mattel requests the production of Isaac

1    Larian's deposition transcripts from other actions.  The

2    request relates to Issue No. 19(A) identified by the

3    February 12, 2010, order.  The MGA parties have represented

4    compliance with this request.  The Court therefore denies

5    the request.

6           5.   The MGA parties request the production of

7    Mattel's nondisclosure agreements with retailers.  The

8    request relates to Issue No. 6. identified by the

9    February 12, 2010, order.  This Court agrees with Mattel

10   that the request is temporally overbroad and, on that basis,

11   denies without prejudice the request.

12          6.   The MGA parties request the production of

13   documents "related to ownership" of trade secrets "which

14   have not yet been produced."  The request relates to Issue

15   No. 6 identified by the February 12, 2010, order.  In

16   essence, the MGA parties seek the production of all

17   documents encompassed by the request that predate

18   December 2006.  Mattel represented that it has already

19   produced all documents encompassed by the MGA parties

20   request.  With an abundance of caution, and to create a

21   standing precedent that all later-discovered documents be

22   produced by Mattel, the Court grants the request.

23          Therefore, I am affixing my signature to this

24   final order on March 11, 2010.  That requires no further

25   discussion by the parties.

1          Now, your agreement concerning the -- or lack

2    thereof -- let me see it.

3          You heard me concerning the hourly fees and

4    amounts.  What happens if Mr. Overland was paid $200,000 up

5    front?  Is that your concern?

6          MR. MCCONVILLE:  That was the issue.

7          MR. ZELLER:  And we have very specific concerns

8    about Mexico.  Remember, Annette Hurst was the one who came

9    in here trailblazing on bribery and everything else.  We

10   understand there is another law firm that has done work for

11   MGA called Esponda Zenser (phonetic), who apparently their

12   practice is to be paid very large amounts up front, and

13   one's imagination can run free from that.

14         They have not produced documents about this other

15   law firm.  I am very concerned that it is basically a cover

16   here.  By the way --

17         THE COURT:  Let me make sure I understand what you

18   are saying.  Let me repeat it back to you.  Let's see what

19   they were actually paid because we don't believe that they

20   exist.

21         MR. ZELLER:  Or that they weren't -- that that

22   money was for something other than legal fees.  That may be

23   a logical inference as well if it is a very substantial

24   upfront amount.  That's what I am concerned about.

25         THE COURT:  So that's why you want that phrase

1    included.

2              MR. ZELLER:  Correct.

3              THE COURT:  Amounts to be paid -- now, the problem

4    is what happens if this document says you are to be paid in

5    installments of $25,000 for each three-month period of time

6    that you are retained, or you are to be paid at an hourly

7    rate of $200 an hour, but that will come in a lump sum

8    payment on such and such date.  I mean, it's no different

9    than the Court ordering independent experts to be paid.

10   Oftentimes in a patent case, I will simply say to the

11   parties on a 706 when I'm retaining an expert when he hits

12   $20,000 I will notify you.  You pay the bill.  When it hits

13   $40,000, you pay the bill.

14             It seems to me isn't it enough that the

15   representation is that these are the parties?  I don't

16   understand how you feel more protected.

17             MR. ZELLER:  They are the proponents of the

18   broader language that would allow redaction.

19             THE COURT:  They would like as well the amounts

20   that would be paid in retainers?

21             MR. ZELLER:  Right.  We think in fairness -- and

22   we certainly agree with the Court's comments about what an

23   individual lawyer is paid, for example -- you know, $700 an

24   hour, whatever.  We don't care about that, but I do care --

25   and I care acutely -- because of the allegations that were

| | |
|---|---|
| 1 | made remember by MGA about bribery that we have -- Mattel |
| 2 | has produced all this by the way.  We have produced our |
| 3 | documents -- |
| 4 | THE COURT:  You are drifting away from your |
| 5 | thought.  Whenever you do that, I'm not paying my attention. |
| 6 | MR. ZELLER:  My point is we have produced these |
| 7 | documents without redaction.  Now they are going to be |
| 8 | redacting documents about retainers and other upfront |
| 9 | amounts.  If they are large enough that an inference may be |
| 10 | drawn that there was some impropriety with it, that's what I |
| 11 | want to know. |
| 12 | THE COURT:  Like funneling money? |
| 13 | MR. ZELLER:  Precisely. |
| 14 | THE COURT:  To nonexistent law firms? |
| 15 | MR. ZELLER:  No, it's not that they are |
| 16 | nonexistent.  It is what is the law firm doing? |
| 17 | THE COURT:  In other words, a million dollars is |
| 18 | given to a law firm, and you believe the kickback goes to |
| 19 | MGA? |
| 20 | MR. ZELLER:  No.  It's that MGA pays money to law |
| 21 | firms in order to have them take that money, a large amount |
| 22 | of money, and spread it around. |
| 23 | THE COURT:  I see, funnel it to other entities. |
| 24 | MR. ZELLER:  Correct. |
| 25 | THE COURT:  Unrelated to what you would perceive |

1  to be normal legal fees?

2          MR. ZELLER:  Correct, and legitimate purposes.  By

3  the way, as of record today, the only party that has been

4  shown to have engaged in bribery in Mexico is MGA.  There is

5  evidence of this now.  I think considering that MGA came in

6  here and made it an issue I am entitled to know what those

7  amounts are that are being paid into Mexico.  I think that

8  was actually quite clear from the Court's last order, but we

9  don't have it.  We do not have a single document from

10  Esponda Zenser.

11          THE COURT:  I did order the amounts awhile ago.

12  Do you recall that?

13          MR. MOLINSKI:  That's absolutely true.  We have

14  produced information on the amounts --

15          THE COURT:  What is the harm then for me to sign

16  this --

17          MR. MOLINSKI:  This is the amount to be paid --

18  the negotiated amount -- in the retainer agreement.  Our

19  concern is exactly what you said.  There are agreements that

20  are monthly, X amount per month, and that would be no

21  different than Mr. Overland be paid an hourly rate, the

22  amount of retainer paid up front.

23          THE COURT:  How many agreements are there?

24          MR. MOLINSKI:  From what I have found so far,

25  seven or eight.

| 1 | THE COURT:  Why can't I examine those in-camera to |
| 2 | see if there seems to be something inappropriate? |
| 3 | MR. MOLINSKI:  That's acceptable to us.  There is |
| 4 | no hidden funneling of money. |
| 5 | THE COURT:  Could I see those agreements? |
| 6 | MR. MOLINSKI:  Yes.  We agreed we would produce |
| 7 | them within three days. |
| 8 | THE COURT:  We are here tomorrow.  Get them to me |
| 9 | tomorrow at 8:00.  I am going to release you early, but |
| 10 | tomorrow at 8:00, I am going to start reading those.  I am |
| 11 | not waiting now.  Get them to me. |
| 12 | MR. MOLINSKI:  Your Honor, in terms of the time, |
| 13 | can I have a little later in the day? |
| 14 | THE COURT:  10:00?  12:00? |
| 15 | MR. MOLINSKI:  12:00. |
| 16 | THE COURT:  Well, you can get them by 10:00 |
| 17 | because we are just sitting around, or you can get some to |
| 18 | me so I can start reading them. |
| 19 | MR. MOLINSKI:  I can get some to you. |
| 20 | THE COURT:  Get them to me by 10:00, the ones you |
| 21 | can get, and then we are just sitting here waiting for you |
| 22 | to get the rest. |
| 23 | What else would you like to do this evening? |
| 24 | Otherwise, I am going to excuse you this evening and let you |
| 25 | go home.  Then we are right back here at 8:00 tomorrow. |

```
 1              MR. ZELLER:  What I would ask is if I could --
 2              THE COURT:  What about these Bates numbers?  We
 3    were going to start matching up because you believe these
 4    documents on Order No. -- help me.  Your representation was,
 5    Judge, we have already divulged all of the -- if they would
 6    just check our numbering system, they would find that this
 7    has been disclosed.
 8              MR. MOLINSKI:  Your Honor, I can address that
 9    issue.
10              THE COURT:  Which motion was it?
11              MR. MOLINSKI:  The motion by Mattel for --
12              MR. ZELLER:  It was for the identification of
13    documents.
14              MR. MOLINSKI:  The identification of documents
15    from MGA Mexico.
16              THE COURT:  Motion No. 12?  We have a numbering
17    system of our own that you are not aware of, so I am
18    referring to No. 12, and you wouldn't know, but No. 12
19    according to my notes -- it is Mattel's motion to compel MGA
20    to identify which MGA entity produced documents and produced
21    those it has withheld.
22              MR. MCCONVILLE:  19(E) I believe is what it is in
23    the --
24              THE COURT:  19(E).  Thank you.  I appreciate that.
25    Remember this was just one batch of produced documents that
```

1    Mattel argued last evening there was no document record.

2    There was a range, and your representation was, Judge, we

3    have given that.  If they would just look and match that up,

4    they would see that we disclosed that.

5           MR. MOLINSKI:  That's right.  What we did was --

6    they gave us a list of ranges that they said we don't have

7    documents for those ranges.  We sent them a letter saying

8    you have most of these, but for the ones that you don't, it

9    because there were false positives in the printing.  It

10   printed out garbage, and there is no document associated

11   with the number.  We didn't pull anything out.  It's just

12   the way it gets printed.  There is no document associated

13   with that Bates number.

14          THE COURT:  But your representation was that you

15   had a range of numbers for them I thought, and by 8:30

16   today, you were going to discuss that, and I have neglected

17   that, so my apologies.

18          MR. MOLINSKI:  I said we notified them of the

19   range that we actually had --

20          THE COURT:  Right now, how do we resolve that?

21          MR. MOLINSKI:  We can once again tell them that

22   this range that they have that they claim is missing is

23   because they are no documents associated with those numbers.

24          THE COURT:  Mr. Zeller.

25          MR. ZELLER:  First of all, we provided a list.

1   There is a list of what we do not have.  That has been

2   provided to MGA.  We have received -- I'm not going to

3   recount all the history, but there has been a variety of

4   conflicting representations about you have it.  It's already

5   been produced.  No, actually it doesn't exist.  What we need

6   is --

7           THE COURT:  How do we resolve that here in court

8   under my supervision?

9           MR. ZELLER:  MGA needs to be ordered within a

10  certain period of time to basically take the list of gaps

11  that we have and do one of two things:  one, either confirm

12  for each of those numbers the document does not exist or,

13  two, provide a copy of it to us.  They refuse to do the

14  second.

15          MR. MOLINSKI:  Your Honor, we have done that.

16          THE COURT:  So I just need to see now where that

17  has been done, and if it's been done, we don't need to do it

18  again.  Where will I find that?

19          MR. MOLINSKI:  We produced a CD to them two weeks

20  ago that was all of the documents that fell within this

21  range they said they don't have.

22          THE COURT:  But have you made those

23  representations that there are no documents that exist in

24  the specific ranges that counsel believe existed?

25          MR. MOLINSKI:  In the range that they produced,

```
 1   yes.  Some of what they claimed they didn't have they
 2   actually do have, and we reproduced them back to them.  Some
 3   of them that they said they don't have they have used in
 4   depositions, so we reproduced back to them what they have
 5   already, and for everything else, we said there are no
 6   documents associated with those numbers.
 7             THE COURT:  How have you said that to them?  Have
 8   you signed an attestation?  Have you just made a verbal
 9   representation?  Is it part of a letter?
10             MR. MOLINSKI:  It's in a letter.
11             THE COURT:  What establishes that record for the
12   future so that I can rely upon that?
13             MR. MOLINSKI:  It's in a letter, Your Honor.
14             THE COURT:  Could I see the letter?
15             Who is Marshall?
16             MR. SEARCY:  That's me, Your Honor.
17             THE COURT:  Excellent.
18             "Dear Marshall:
19             "I am in receipt of your letters dated
20   September 16, 2009; September 18, 2009; and September 21,
21   2009; each raising issues concerning MGA Mexico's recent
22   document production.  The following addresses each of those
23   concerns in turn:
24             "1.  Contemporaneous with this communication, I am
25   attaching two RAR files:  (i) MGA_Orrick_017.rar containing
```

```
 1    a replacement OPT file for range MGA2 0199070_MGA2 0199072;
 2    and (ii) MGA2_Orrick_021.rar containing a replacement DAT
 3    file."
 4             What disagreement do you have with that letter?
 5             MR. MARSHALL:  Your Honor, we have identified a
 6    series of gaps --
 7             THE COURT:  What dispute do you have with that
 8    range?
 9             MR. MARSHALL:  We don't have them.
10             THE COURT:  Counsel.
11             MR. MOLINSKI:  I'm sorry.  The question is?
12             THE COURT:  They say they don't have them.
13             MR. MOLINSKI:  If you look at paragraph two of
14    that letter, it says, "If you don't have it, we have
15    confirmed that it is because no document is associated with
16    those gaps."
17             THE COURT:  "The '132 gaps' you identify are
18    attributable to faulty automated processing of pages that
19    were either entirely blank or reflected irrelevant,
20    nonresponsive information" -- now, that doesn't say that
21    they don't exist.  That says that you have made a value
22    choice concerning that information.  That's a far different
23    representation to this Court than you just made.
24             MR. MOLINSKI:  Your Honor, when it was printed out
25    of the system, if there was something that was either
```

1    garbage or entirely --

2              THE COURT:  No, that's not what you say, "or

3    reflected irrelevant, nonresponsive information."

4              MR. MOLINSKI:  The irrelevant information is

5    gobbly-gook computer spitout.  It is not text it as I

6    understand it.

7              THE COURT:  Then give it to them.

8              MR. MOLINSKI:  That's fine.

9              THE COURT:  Give them gobbly-gook garbage text.

10   Give it to them.

11             MR. MOLINSKI:  Yes.

12             THE COURT:  Because there is no harm.  If it's

13   irrelevant gobbly-gook computer -- you don't make that

14   determination.  Give it to them.

15             MR. MOLINSKI:  Assuming that they still have that

16   gobbly-gook, I will give that to them.

17             THE COURT:  Well, if not, you're not in a position

18   to make this determination.  These aren't blank.  These are

19   irrelevant, nonresponsive.  Nonresponsive does not mean that

20   it's blank or gobbly-gook.  It means somebody has made a

21   determination whether it's responsive or not.  Produce it

22   for them.

23             "We extracted these superfluous ranges prior to

24   production."  That wordage is not blank, so I don't care

25   what you meant before.  Those words don't match the

```
 1   statements being made to this Court.
 2           "With respect to archived e-mail messages, as you
 3   have long been aware, MGA uses an automated archive system
 4   that transfers the data to an independent data repository
 5   that is not readily accessible" --
 6           MR. MOLINSKI:  That's a different issue.
 7           THE COURT:  -- "in the ordinary course of business
 8   and, which houses volumes of data not relevant to this
 9   litigation.  MGA Mexico has, therefore, met its
10   obligation" -- no, I deem it hasn't met its obligation at
11   this point.  You get those pages no matter what form they
12   are in -- "to produce documents as they are kept in the
13   usual course of business.  To the extent your letters seek
14   to impose obligations on MGA beyond the federal rules, we
15   are not required to do so."  This is not beyond the federal
16   rules, Counsel.  "Further, your letter makes no showing that
17   any relevant and responsive documents in the possession,
18   custody, or control of MGA Mexico have not been produced."
19   Nonsense.
20           MR. MOLINSKI:  Your Honor, if I --
21           THE COURT:  Nonsense.  "AS to the range of
22   documents that Mattel purports to have never received, we
23   are in the process of gathering information regarding the
24   dates that the identified ranges were produced.  We will
25   endeavor to provide with you specific dates by early next
```

1    week."

2             Did you ever follow up on that?

3             MR. MOLINSKI:  I did, and I have that letter here.

4             THE COURT:  Let me see that letter.

5             "Dear Marshall:

6             "Further to my letter to you dated September 23,

7    2009, which adresses Mattel's concerns regarding MGA

8    Mexico's document production of September 15, I wanted to

9    provide you with the following information we have been able

10   to collect.  As you will appreciate upon review, and

11   contrary to your assertion that MGA Mexico's 'ranges

12   cited...contain over 470,000 pages of documents that Mattel

13   has never received,' Mattel has possessed the vast amount of

14   this information for just short of two years."

15            Now, this may be true.  I don't know.

16            "MGA 3777561 through MGA 3787284 produced

17   1/15/08."  Counsel, do you have that?

18            MR. MARSHALL:  We have portions of that.  There

19   are gaps in each of these series, however.

20            THE COURT:  Therefore, you believe that somebody

21   has gone through and frankly made a decision of some type,

22   or you just don't know?

23            MR. MARSHALL:  We just don't know.

24            THE COURT:  Counsel, has somebody gone through and

25   edited any portions of this?

```
 1            MR. MOLINSKI:  Your Honor --
 2            THE COURT:  I can test that real quick with a run.
 3   I can get that run done right in front of me and see what's
 4   missing.
 5            MR. MOLINSKI:  Those were prior productions when
 6   we were not in the case.  Why there were blanks in those
 7   ranges --
 8            THE COURT:  And now it's your responsibility.  So
 9   do you know if there are blanks -- I am becoming more and
10   more distressful of this discovery process on both sides.
11   I'm not too interested in what rulings were made before.  I
12   think a lot apparently went by Judge Larson through no fault
13   of his own, but I think it's the use of a special master and
14   how that went in a sense.  I'm going to take a much more
15   active hand.
16            Well, why can't you produce that complete run?
17            MR. MOLINSKI:  Your Honor, we have no documents
18   associated with the blanks that are within those runs.
19   That's what I am saying.  We have confirmed and we are happy
20   to confirm again/
21            THE COURT:  Confirm that.  As to 1/15/08 referring
22   to 3777561 through 3787284, you have no blanks?
23            MR. MOLINSKI:  We have no documents
24   associated with any of those numbers.
25            THE COURT:  Why don't you sign a document to that
```

1    effect.  Just write down this evening that representation.

2              MR. MARSHALL:  Your Honor, if I may, this is what

3    Mr. Zeller was getting to.  We have identified the gaps

4    within these areas, and that's really what we're looking --

5              THE COURT:  If you give them the gaps, they can

6    make a good-faith determination and sign under penalty of

7    perjury that they have looked at this, and there are no

8    blanks.

9              MR. MOLINSKI:  That would be fine, Your Honor.

10   I'm happy to do that.

11             THE COURT:  I think that would simplify it, and I

12   would trust that representation because it would be under

13   penalty of prejudice.  It would bind MGA, and it would save

14   a lot of resources frankly.  You are new counsel on the

15   case.  You are starting fresh, so I don't hold you

16   responsible for the past.  I am only trying to get everybody

17   up to speed now.  So any comments I make don't discredit

18   you, or MGA, or Mattel.  We are kind of starting over again.

19             MR. MOLINSKI:  And I understand that completely.

20             THE COURT:  So when can this run be made as to

21   these different categories?  When can you make this

22   representation to me?

23             MR. MOLINSKI:  By Monday, Your Honor.

24             THE COURT:  That would be terrific.  Wouldn't that

25   resolve that issue for us?

1          MR. ZELLER:  It will, and to the extent that they

2    find -- or they're going to claim that anything in the

3    missing gaps -- we have already gave them this list, and --

4          THE COURT:  They don't claim anything.  They don't

5    retract anything.

6          MR. ZELLER:  If they are swear under penalty of

7    perjury that all of these are gaps, then that's the way it

8    is.

9          THE COURT:  They're not  position to extract

10   superfluous ranges or to -- you are in a position to

11   represent that they are entirely blank, but you're not in a

12   position to make the decision concerning what's irrelevant

13   or nonresponsive --

14         MR. MOLINSKI:  I understand that.

15         THE COURT:  -- not without my intervention.

16         MR. MOLINSKI:  What we will represent on that is

17   that there are no documents associated with those numbers.

18   What we can't say is why that is from prior counsel, and we

19   will say there just aren't.

20         THE COURT:  That's fine.  That resolves the

21   problem.  That brings up to good faith at the present time,

22   and that's the state of the record, but I have got a good

23   record about that for the future in case there's some

24   problem.  I think if we do that quickly it's going to save a

25   tremendous amount of resources.

```
1              MR. ZELLER:  And we just want closure on this.

2              THE COURT:  I think we can get it quickly.  I

3    really appreciate counsel's help on this quite frankly

4    because it's just going to get costly, laborious, and long.

5    I think you want to close this off at some point.

6              MR. MCCONVILLE:  Yes, sir.

7              THE COURT:  The ball is in your hands.

8              Now I want to talk to Mattel for a moment about

9    what I consider the most dangerous issue.  When it first

10   came to the Court, I somewhat accepted because I didn't

11   fully understand the Mexico proceedings.  If the

12   representations are true that Mattel generates this

13   litigation in good faith in Mexico, it puts the Court in a

14   Pandora box situation.

15             I am the first to rush to either party's rescue to

16   require discovery as you have seen, but with these Fifth

17   Amendment privileges and if indictments do flow and subject

18   to criminal penalty, it puts the Court in a very tenuous

19   position trying to get discovery on the civil side with

20   potential criminal prosecution on the other side.  If all of

21   this is true, it's a balancing test for the Court, and I

22   think the Fifth Amendment right has to prevail.

23             So my question to Mattel is this.  I have

24   previously thought that the testimony of a 30(b)(6) witness

25   caused this, and I was becoming increasingly concerned about
```

1    MGA's empty vessel concept.  I am going to ask MGA in a

2    moment why the empty vessel 30(b)(6) can't be educated by

3    these employees.  I expect the request to be because having

4    made representations to the 30(b)(6) that they could be used

5    in a criminal prosecution, and my question to MGA is going

6    to be how?

7              It's hearsay.  It shouldn't be admissibility in

8    Mexico or the United States, and it would seem to resolve

9    the problem that MGA quite frankly keeps bringing to the

10   Court's attention, but I am a little leery of MGA's

11   representation.  I can't think of another vehicle other than

12   the hard decision between the Fifth Amendment privilege that

13   might befall the three parties, one of which I'm not as

14   concerned with if you are dealing with him in any way,

15   Vargas, but Machado and Trueba are my two targets here.  By

16   the same token, you control that process.  That is what MGA

17   has been represented because of the unique aspects of

18   Mexico, in other words, their legal system.  I don't find

19   any fault with that.  That's the way they proceed in Mexico.

20             Is there any other alternative you can think of if

21   it comes to a Fifth Amendment decision that goes against you

22   other than a 30(b)(6) representation, which I may require

23   Mattel to come up with?

24             MR. ZELLER:  Well, first, Your Honor, as the Court

25   will recall, there was briefing on this.  There is no Fifth

1   Amendment issue already.  I mean, the record is that they

2   have a non-prosecution letter at least with respect to Mr.

3   Machado here in the United States.  There has been no threat

4   of criminal prosecution in the United States that they have

5   been able to identify --

6          THE COURT:  Now, did Machado ever respond to these

7   questions?

8          MR. ZELLER:  He came back for a deposition.  We

9   raised this I believe in our motion.

10         THE COURT:  And I ruled favorable to Mattel on

11  that.  Overland represented Machado.  Did Machado ever

12  respond?

13         MR. ZELLER:  He came back, and he invoked the

14  Fifth again, and so we as part of the most recent round of

15  motions -- I believe it's in the 25-page submission.  One of

16  the issues had to do with the continued invocation of the

17  Fifth Amendment even though the Court has already rejected

18  it.

19         Now, as I understand it -- and, you know, I don't

20  want to obviously get into an area where I am representing

21  what Mr. Overland thinks, but as I understand it, in

22  general, all the parties -- what they are looking for is an

23  order that would require Mr. Machado to testify.

24         THE COURT:  I thought I made that order.

25         MR. ZELLER:  You did, but now they want another

1    one with respect to the particular questions.

2              THE COURT:  What was unclear about my first order?

3              MR. ZELLER:  I don't know.  That's why I'm

4    hesitant to try and explain that part of it.

5              THE COURT:  Counsel.

6              MR. MCCONVILLE:  I think what happened is we had

7    the hearing.  Mr. Machado came up here in advance of the

8    deposition, so he hadn't been subject to any examination.

9    When the argument was made to the Court, what you said at

10   that time before any questions had been put to him was that

11   he could not avail himself of the Fifth, so it was sort of I

12   think in the context it was a theoretical -- you know, there

13   was no penalty facing him at that time.

14             We then left, and he invoked, so then we had a

15   ripe issue.  We literally tried to get back to you that day,

16   and we couldn't.

17             THE COURT:  Was I not here?

18             MR. MCCONVILLE:  I think you had gone.  It was an

19   afternoon, and I think you had -- I don't recall exactly.

20             THE COURT:  I accept that representation.

21             MR. MCCONVILLE:  So he went back to Mexico.

22             THE COURT:  And now it's going to be hard to get

23   him back.

24             MR. MCCONVILLE:  That's what it is looking like,

25   Your Honor.

```
 1              THE COURT:  Let's deal with Ms. Trueba.  Why can't
 2    you accomplish this with a 30(b)(6)?
 3              MR. MCCONVILLE:  It's the same issue.
 4              THE COURT:  No, it's not.  It's far different.
 5    Assuming Ms. Trueba wants to either assert the Fifth, which
 6    I have not ruled against her on but doesn't avail herself of
 7    the jurisdiction of this Court because she knows that or
 8    disobeys my direction, which is in all probably correct or
 9    true, then why do you think that she is in danger concerning
10    a 30(b)(6) witness?
11              MR. MCCONVILLE:  There are two different
12    proceedings.  It could not be used against her in the United
13    States because the compulsion would be there, so it could
14    not be used.  However, to the extent -- and I don't know how
15    the Mexican legal system works, but I am going to draw a
16    parallel to the U.S. system.
17              If a person ultimately becomes a defendant admits
18    to someone I am the person who shot J.R., that becomes an
19    admission, and that person then gets called in, and it's not
20    hearsay because it's a statement of a party opponent, and
21    it's an admission against interest, so that testimony to the
22    neighbor that I shot J.R. becomes evidence in a trial.
23              THE COURT:  Let me ask Mattel something.  As a
24    practical matter, I understand your frustration, but I want
25    to assume that we are at trial now, and you are able to get
```

1  in the fact that Machado takes the Fifth Amendment.  That's

2  devastating.  While I understand you want the information,

3  once again, at some point, I'm not certain how helpful that

4  is to you.  I don't understand -- I understand, by the way,

5  you want that information.  Of course you do.

6           MR. ZELLER:  Absolutely.

7           THE COURT:  And of course you want to know where

8  it comes from, but if I can't control of Mr. Machado, if I

9  can't get him back here, I don't know why I am continuing it

10  on and on and on, so I may make an order ordering Mr.

11  Machado due to X, Y, or Z, see if there is a further

12  compliance with that order, and if he doesn't, then MGA goes

13  at its own risk.

14           MR. ZELLER:  By the way, Mr. Machado is a party.

15  He is a named defendant.

16           THE COURT:  He is a named defendant of course.

17           Now let's take Trueba.  That's the next one.  It

18  seems to me that you are in the same position with Ms.

19  Trueba, that while you ultimately want that, if we can't

20  accomplish the impossible, that an assertion of

21  nonappearance that comes before the jury is even more

22  devastating from a tactical position.

23           The person I am becoming less interested in quite

24  frankly is Vargas.  I don't trust the negotiation process,

25  not that I don't trust you, or Mattel, or MGA, or

```
 1   Mr. McConville.  It's just I have experienced so many times,
 2   oops, we just made a settlement after the fact, so Vargas is
 3   rapidly dissipating in terms of my ability to order.  I'm
 4   going to address that with you tomorrow again.  I want to do
 5   a little bit more reflection this evening on it.
 6            This motion to compel the production of the eight
 7   former employees' hard drives, I think your position has
 8   been consistent from Mattel, you know, transparency,
 9   transparency, transparency.  In fact, it was almost comical
10   that every time a demand was made by MGA you came back and
11   said we will stipulate to that.  Just -- we're going to be
12   transparent.  Therefore, I keep looking at MGA, and I almost
13   handed down a ruling yesterday that was devastating to you.
14   I'm giving you a little bit of time but not very much.
15            How are we going to resolve these eight employees
16   right here?
17            MR. MOLINSKI:  This is our request for their eight
18   employees.
19            THE COURT:  I know that.  Why would your -- my
20   perceived noncompliance -- quite frankly, I'll make the
21   record you have been dragging your feet on this and prior
22   counsel also.
23            MR. MOLINSKI:  I can tell you on the eight
24   individuals in particular, the ones that they have asked for
25   the hard drives -- the Brawer hard drive is being produced.
```

```
 1    The Machado, Vargas, and Trueba hard drives have been
 2    searched at length, word searches, and 80,000 pages have
 3    been produced from their hard drives using very broad search
 4    terms, which I am happy to provide.
 5              THE COURT:  Have you provided that to the
 6    opposition?
 7              MR. MOLINSKI:  I don't know if we have.
 8              THE COURT:  Why don't you provide that to them now
 9    because I accept your representation that broad search
10    terms -- because I'm not going to quibble if the terms are
11    fair -- you know, I'm not quibbling with one or two more
12    search terms, but I would like the opposition to be able to
13    see those search terms and then be able to argue to the
14    Court why they don't think they are adequate or concede that
15    they are.
16              MR. MCCONVILLE:  Your Honor, the issue that --
17    this came up earlier this week about whether or not we would
18    provide search terms, and we negotiated search terms to be
19    run on those hard drives.  We actually hadn't finished the
20    Larian list, but we did complete the diskette list.  We
21    negotiated a list of terms, and that's what we did.
22              THE COURT:  But there were some additions that
23    Mattel wanted to make.
24              MR. ZELLER:  So the Court is aware because we
25    didn't talk so much about those terms -- the terms that MGA
```

```
 1    proposed -- those are the larger print ones for the
 2    Bousquette hard drive -- we agreed to every single term they
 3    wanted.  When we got down then to our list, well, that's the
 4    only thing that they would agree to with all sorts of
 5    limitations and restrictions and a variety of other things,
 6    and we had not even finished because there were other terms,
 7    but they won't even agree that the same terms applied to
 8    Matt Bousqette's hard drive should be applied to --
 9              THE COURT:  Why?
10              MR. MCCONVILLE:  Here is why.  Recall we said we
11    produced 80,000 documents.
12              THE COURT:  I don't care about the volume.  You
13    can snow people with irrelevant documents.
14              MR. MCCONVILLE:  From Matt Bousquette, that was a
15    hard drive that had never been processed in this many years
16    of litigation, so -- I know the Court is frustrated with
17    MGA, and I appreciate that.  However, Matt Bousquette's hard
18    drive -- we had two documents from the president of Mattel
19    brands until we brought it to the Court's attention.  I
20    understand that the poor victim Mattel is saying they aren't
21    getting what they need, but Matt Bousquette's hard drive
22    only came to the Court's attention because we insisted that
23    they tell us about, and then they ran a search, and we got
24    50 documents.
25              I got an e-mail from Ms. Hurst in which she said
```

1  that Matt Bousquette is currently talking about a

2  presentation that they haven't produced from 2004.  I

3  understand that the Court is frustrated with MGA.  I

4  appreciate that, but, again, if we could have a little

5  reciprocity as it comes to what happened to Matt Bousquette,

6  and why did we have to bring it to their attention to give

7  us the hard drive the week he is going to be deposed?

8          THE COURT:  I understand that.  What's not fair is

9  that each of you use a ruling or noncompliance by the other

10  party as a weapon for not producing something in the other

11  category.  This cannot be tit for tat.  This cannot be they

12  didn't give me this, so, therefore, I'm not going to give

13  them that.

14          MR. MCCONVILLE:  I understand.

15          THE COURT:  I told you we are starting afresh, but

16  it seems to me that this is now being consistent by both

17  parties, and Bousquette is a good example of Mattel's

18  noncompliance.  That is probably going to cost Mattel dearly

19  in terms of when their filing is going to take place in

20  terms of the Fourth Amendment, but it's going to cost you

21  dearly also.  I am frustrated with you, and I am equally

22  frustrated with Mattel on occasion.  This has become a

23  pattern -- the use of privilege logs inappropriately --

24  regardless of your apologies.  Bousquette, this is nonsense

25  on Mattel's part.

1          Now, nobody seems to be obeying the orders, but
2     what I am carefully doing is I am setting a record for
3     adverse inferences that are going to flow through the trial.
4     Before I impose a sanction, the Court is always cautious of
5     warning the parties.  The next place you are going to see
6     that is going to be in the documents that O'Brien is working
7     on right now that are going to come to the Court.  I am
8     working that ladder very cautiously right now, but trust me,
9     when I get up that ladder, at some point, I will have a very
10    good record because the next will be monetary, and then
11    there will be terminals.
12         So it seems to me that there is no longer good
13    reason -- I have resolved Bousquette.  I required the
14    parties to go back.  If MGA has any problems or
15    frustrations, you are going to bring that to my attention,
16    and maybe we're going back with Bousquette, but Bousquette
17    seems to me to be resolved now.
18         MR. MCCONVILLE:  There is actually that one
19    document that we would like produced before his testimony
20    takes place tomorrow.
21         THE COURT:  What document is that?
22         MR. MCCONVILLE:  It's a board of directors meeting
23    presentation prepared by Mr. Bousquette called Barbi Update
24    dated September 17, 2004, referred to in Bates N0940914.
25         THE COURT:  Okay.  Any reason why Mattel can't

 1    produce that?

 2          MR. ZELLER:  As I understand it -- we have been

 3    looking into this because it was raised.  I don't know the

 4    entire conclusion of it yet, but from what I understand,

 5    there was a presentation from that vintage that was

 6    produced.  We have produced the one that is from that time

 7    period --

 8          THE COURT:  Counsel, just reproduce it to be

 9    certain.

10          MR. ZELLER:  We can do that.

11          THE COURT:  Why don't you just reproduce it to be

12    certain.

13          MR. ZELLER:  We will reproduce it.

14          THE COURT:  It resolves the whole problem even if

15    she's got it, even if they're wrong.  It's a five-minute

16    process.

17          MR. MCCONVILLE:  The problem is Mr. Bousquette's

18    testimony as I understand it -- I'm not there -- yes, this

19    is the board presentation, but I prepared a different -- at

20    the same time I was presenting to the board, what I

21    presented -- I, Matt Bousquette -- is something called a

22    Barbi Update.  That's the series of documents that are

23    missing that are referred to in the Bates I just referred

24    to.  What we would like is the document that Matt Bousquette

25    prepared called Barbi Update for the September 17, 2004,

```
 1   board meeting.
 2           MR. ZELLER:  As I understand, that's a rather rosy
 3   characterization of his testimony.  Apparently he did look
 4   at that presentation.  He recognized aspects of it.
 5   Apparently they are drawing inferences from his testimony,
 6   but, again, I'm not there.  I'm doing this, so I don't know
 7   what the particulars are.  We have been looking --
 8           THE COURT:  I think a special master is going to
 9   tell me very quickly without any reliance on your
10   representations.  If there is any problem, I expect Robert
11   O'Brien to call me.
12           MR. ZELLER:  Okay.  Mr. O'Brien is there and can
13   deal with it.
14           THE COURT:  We are going to spend some more time
15   tonight in chambers, my law clerks and I.  We will copy
16   down --
17           Stephanie, if you would be kind enough to copy
18   this and make a copy for both Mattel and MGA.
19           Why don't you go back to your business, and I will
20   see you tomorrw at 8:30.
21           MR. MCCONVILLE:  Can I raise one last issue?  When
22   we were discussing Mr. Wing, there was one document in
23   particular that an attorney's name was not disclosed to the
24   Court during the course of Mr. Wing's discussion.  They are
25   at 6997 through 6999.  The attorneys' names are Oakes and
```

```
 1   Gronich.
 2              THE COURT:  Thank you, Counsel.  I am certain with
 3   the hundreds of thousands of documents or thousands of
 4   documents the Court -- that ruling was final.  That's the
 5   end of the discussion.  You now have your record, but I have
 6   mine also.
 7              MR. ZELLER:  May I make a personal request?
 8              THE COURT:  Sure.
 9              MR. ZELLER:  This goes back to the issue about the
10   motion for leave.  What we have decided is that we are not
11   going to be filing the ex parte in order to seek leave to
12   amend -- to push it back because of discovery.  However, I
13   would ask as a courtesy --
14              THE COURT:  You need more time to file?
15              MR. ZELLER:  I do need a week.
16              THE COURT:  That's fair enough.  If you represent
17   to me that we're not going through a request for a
18   continuance and you're ready to make the decision, I can
19   certainly grant that.  Based upon that representation now,
20   we know we are finally going to get to the RICO, who is
21   being joined, who is not being joined.  Let me use my
22   discretion.  Give me a date.
23              MR. ZELLER:  It's whatever the Monday is.  I think
24   it's due this Monday and then --
25              MR. MCCONVILLE:  The 22nd.
```

```
 1              THE COURT:  Filed by March 22.  Is that
 2   acceptable?  I don't care if it's the 23rd or the 24th.  As
 3   long as I have that representation -- we know now that you
 4   are making decisions about whether -- I want you to get a
 5   good last filing in to see if it has any ladder to it.
 6              MR. ZELLER:  If the 24th wouldn't be too much --
 7              THE COURT:  The 24th is fine.  Okay, filing by the
 8   24th -- I'm sorry, leave by the 24th.
 9              MR. ZELLER:  Right.  We're going to file a motion
10   for leave along with the proposed pleading.
11              THE COURT:  That way there can be intervention by
12   Omni if you join them.  If you're not joining Omni, it makes
13   no difference at that time.  You know I'm going to grant
14   that if you not joining Omni.  If you are joining Omni, then
15   I want Omni to be able to be heard.
16              MR. MOLINSKI:  Can I make one small personal
17   request?  I am supposed to be here tomorrow per your order
18   on the fee agreements.  I also have to get the dolls
19   together to be here Saturday.  If I get the fee agreements
20   to Mr. McConville, can I be excused tomorrow?
21              THE COURT:  Absolutely.  Let me start reading
22   those at 8:30 in the morning.  It may be voluminous reading.
23   It may be small.  I don't what it is, but I would like to
24   start reading those because I wasted a lot of your time
25   today.  The reason for that is we're going over all the
```

1    prior arguments and motions back in chambers, and as you can

2    see, we're turning out five or six -- now you are going to

3    get a whole series of orders coming down from this Court

4    very rapidly to resolve about 99 percent of these issues.

5    Quite frankly, we're still dealing with the MGA Mexico and

6    the 30(b)(6), but I think you will have a resolution fairly

7    quickly.

8            We're also trying to afford the Circuit except for

9    some of these mundane motions some kind of a reasoned

10   process, however brief, that is not only memorialized orally

11   on our record but also in some kind of written form so they

12   can refer back quickly to it as a courtesy.  That way they

13   are not searching a voluminous record.

14           Let me go to one more -- I think that's enough for

15   tonight.  I think we are getting into minutia this evening,

16   and then I can spend some time with my law clerks this

17   evening.

18           Counsel, we will see you at 8:30 tomorrow.

19           MR. MCCONVILLE:  On Monday -- there is an order

20   actually that talks about having a status conference on

21   Monday, the 15th.

22           THE COURT:  I'm going to vacate that.  I just

23   don't think that's of benefit right now.  I have got a

24   pretty good handle on the case this week.  We are going to

25   vacate the status conference for Monday.

1      MR. MOLINSKI:  For that Monday, maybe I

2  understood.  I assumed done we would do something in writing

3  that says under penalty of perjury --

4      THE COURT:  Yes, you are.  If I have that here, it

5  resolves it in five minutes.  They need to see that also and

6  have time go over whatever that representation is.

7      MR. MOLINSKI:  I understand.

8      THE COURT:  I want them to have a voice if they

9  think there is an objection, which I'm sure that there will

10  be.  So they can have a couple of minutes, but all I need is

11  that representation.  That will resolve it.  Your firm and

12  you are not making decisions about what is -- if it's blank,

13  you can make that representation, but if it's not blank, I

14  don't care if it's gobbly-gook computer code -- understood?

15      MR. MOLINSKI:  Understood.

16      THE COURT:  All right, good-night.  We will see

17  you tomorrow at 8:00.

18                          -oOo-

19

20

21

22

23

24

25

1

2

3

4                          CERTIFICATE

5

6          I hereby certify that pursuant to Section 753,

7    Title 28, United States Code, the foregoing is a true and

8    correct transcript of the stenographically reported

9    proceedings held in the above-entitled matter and that the

10   transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13   Date:  March 12, 2010

14

15                          Sharon A. Seffens        3/12/10

16                          _____

                            SHARON A. SEFFENS, U.S. COURT REPORTER
17

18

19

20

21

22

23

24

25