1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

MATTEL, INC.,
                    Plaintiff,
      vs.

                                        CV-04-9049-DOC
MGA ENTERTAINMENT, INC.,
                    Defendant.
--------------------------

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

March 13, 2010

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

2

```
 1   APPEARANCES OF COUNSEL:

 2   For the Plaintiff:

 3   JOHN QUINN
     MICHAEL ZELLER
 4   QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
     865 Figueroa Street, 10th Floor
 5   Los Angeles, CA  90017
     (213) 443-3180
 6

 7   For the Defendant:

 8   ANNETTE HURST
     ORRICK, HERRINGTON & SUTCLIFFE LLP
 9   The Orrick Building
     405 Howard Street
10   San Francisco, CA  94105
     (415) 773-4585
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   SANTA ANA, CALIFORNIA; SATURDAY, MARCH 13, 2010; 1:00 P.M.
 2               THE COURT:  Mr. Quinn and Mr. Zeller are making an
 3   appearance and Ms. Hurst.  Mr. McConville was excused.  I
 4   had excused Mr. Quinn yesterday from the proceedings, so I
 5   want to pay the same courtesy to Mr. McConville.
 6               Concerning the exhibits, I want to thank all
 7   counsel.  You were present at 7:30 and 8:00.  In fact, I
 8   think I saw one of your associates at 6:45 out here at the
 9   loading dock, and it's appreciated.
10               I have ordered what I am going to simply refer to
11   as the dolls because there has been a continuing dispute
12   which is unduly costly to the clients and burdensome for
13   counsel about the availability of these dolls to be examined
14   by one or more of the parties.  My concern is that in Phase
15   1 -- even though there was supposed to be Phase 1, 2, 2A,
16   2B, whatever, that these exhibits were returned
17   apparently -- or some of these exhibits were returned to the
18   parties.  I'm curious as to why that occurred, but it did
19   occur.  If we were going forward with future phases, it
20   seems that all of those exhibits might be held by the Court,
21   and we might have saved this concern.
22               We found the originals of the exhibits from
23   Riverside, and I think I showed that to you, Ms. Hurst, and
24   you, Mr. Zeller, the other day -- Mr. McConville.  So we
25   those exhibits, and I want to you see those, but we are
```

1    keeping them under lock and key with the Court, and we well

2    keep those.

3            In the meantime, Mattel had requested to look at

4    MGA's samples, and MGA is interested in Mattel's samples.  I

5    know informally after discussing this with each of you, but

6    I would like to get an update about what has been brought to

7    court, and let me begin with Mattel.

8            MR. ZELLER:  Yes, Your Honor.  Today we delivered

9    the tangible trial exhibits that were in Mattel's counsels'

10   custody.  That was a subset of the overall tangible trial

11   exhibits, and, in particular, the ones we had in our custody

12   were the ones that were used in connection with the

13   permanent injunction motion, so those -- we have provided

14   MGA with a list of what was in those boxes.  MGA had the

15   opportunity and did at least spot check it.  They through

16   the boxes to satisfy themselves that the list corresponded

17   to what was in the boxes, so we have delivered that.

18           Then, in addition, MGA delivered what at least it

19   professes to say are the Eckert deposition exhibits.

20           THE COURT:  With the one exception, the missing

21   doll.

22           MR. ZELLER:  Right.  That doll is missing.  What

23   they provided is what they said was an exact replica of the

24   same doll.  That's their representation.

25           THE COURT:  You have got a video of that also, and

1   you can look and compare it.

2            MR. QUINN:  I'm not sure if the dolls are visible

3   in the video.  We need to check that.

4            THE COURT:  Has anybody looked?

5            MR. QUINN:  I'm not sure if anyone has.

6            THE COURT:  That means no.  Okay.  So it's not a

7   problem so far.

8            MR. ZELLER:  All I am saying is what they

9   delivered and what they represented it is.  They said that

10  these were the Eckert deposition exhibits with the exception

11  that the Court has pointed out of the doll that was missing,

12  but then they have substituted a doll.

13            THE COURT:  Excellent.

14            Ms. Hurst.

15            MS. HURST:  Yes, we have delivered the Eckert

16  exhibits with the exception of the Madam Alexander doll.  We

17  have also delivered some of the trial exhibits that were in

18  our possession.  Late last night we realized that there were

19  others in our possession as well, and those are presently

20  unavailable in San Francisco because of the power outage.

21  We will have them here by Tuesday.

22            THE COURT:  Okay.  The representation informally

23  so I make a record of what occurred is that they are to be

24  here but Tuesday by what, 5:00?

25            MS. HURST:  Absolutely.

```
 1          THE COURT:  Say 4:00 because I want to send the
 2    court staff home at 5:00, so by no later than 4:00.  Well,
 3    then I'm very pleased and very satisfied, and I want to
 4    thank counsel.  I think this will cause a little bit more
 5    trust on each of the party's part.
 6          Now, the difficulty is going to be access.  Since
 7    I'm the senior judge here, I have kind of commandered a
 8    court, but I don't know if that's appropriate, and I don't
 9    know if my executive committee or my chief judge would
10    appreciate that, so I need that in absolute pristine
11    condition.  Don't take drinks, beverages, food, anything in
12    there.  That's just a workplace.
13          I worry about that access because that's kind of a
14    secure area of the courthouse.  So later on if you come up
15    with a different scheme, if you want more access to these,
16    tell me, and we can get a warehouse, et cetera, but in the
17    meantime, I think that some kind of bond to the clerk might
18    be appropriate, and why don't we discuss that Monday since
19    we will be getting together with Milli.  I just want to make
20    sure that there is no damage done to the courthouse premises
21    from this extraordinary effort on our part to get this here
22    and, if so, that there is no question that this comes
23    jointly out of your small bond.
24          Are there any other issues -- I had asked you to
25    have Mr. Nolan down, to request that he be here, because I
```

```
 1    didn't like the idea of serving a subpoena.  I have never
 2    met Mr. Nolan.  I wouldn't know what the gentleman looked
 3    like.  Is he here?
 4              MS. HURST:  Yes, Mr. Nolan is present.
 5              THE COURT:  Mr. Nolan, thank you very much.  I
 6    apologize.  I don't think I have ever met you, so I didn't
 7    recognize you.
 8              I reached out as a request, and I appreciate you
 9    being here.  I just don't like serving attorneys.  It has
10    the import of serving an attorney, so I will be with you in
11    a just a moment.
12              MR. NOLAN:  Thank you.
13              THE COURT:  I need to take a brief recess now to
14    transition from the criminal matters this morning to your
15    matters, so let me get a series of notes.  It will probably
16    be about 10 to 15 minutes, and then we will get started, and
17    I will explain to you how we are going to proceed because
18    the Ninth Circuit has a very interesting procedure.
19              (Recess.)
20              THE COURT:  We are back on record with Mattel and
21    Bratz.  Concerning whether the request for admission is
22    privileged information, the first issue I want to address
23    this afternoon is whether the RFAs require the disclosure of
24    privileged communications and/or attorney work product.
25    First, those RFAs that go to prior knowledge and belief as
```

SHARON SEFFENS, U.S. COURT REPORTER

1    to whether the document was privileged and/or work product

2    and/or reflective of advice tentatively should be disclosed.

3    It somewhat reminds me of the Michael Moore issue before the

4    Court.  However, the RFAs that the Court is referring to are

5    directed at both counsel and MGA and Mr. Larian.  Michael

6    Moore was directed at Mattel and not an attorney.

7            So these RFAs in no uncertain terms require the

8    disclosure of an attorney's prior beliefs, which

9    potentially -- or seemingly would be work product, and to

10   the extent that they are directed at the parties, at least

11   Mr. Larian who is not an attorney probably did not form

12   independent beliefs about the O'Connor e-mail as being

13   privileged.

14           So I would like the parties to argue those points,

15   but I'm concerned and will say to Mattel that you should not

16   rely upon a semantic equation of these RFAs -- to the RFAs

17   to seek the application of law to fact.

18           Second, these RFAs that go to present belief as to

19   whether the O'Connor e-mail was privileged seeks present

20   work product and are also distinguishable from the RFAs that

21   seek application of law to fact because the manner of

22   response has the potential to disclose a privileged fact.

23   Mattel's responsive -- that the mere fact that the

24   communication is privileged is not itself privileged.

25           When you argued to me on the last occasion, you

SHARON SEFFENS, U.S. COURT REPORTER

1   equated the information sought to the information normally

2   on a privilege log, so I have a number of questions.

3           First, if the RFA merely seeks information found

4   on a privilege log, then the RFA appears to be redundant,

5   and doesn't the Court have the discretion under Rule 26 just

6   to exclude it on those grounds?

7           Second, the argument can be made that this is

8   materially distinguishable from a privilege log scenario

9   because you here you already have the communication asking

10  MGA whether it is privileged.  It just let's you know that

11  it is a privileged communication.  So how do you distinguish

12  that under the law?

13          Third, wouldn't your standard justify MGA asking

14  you to respond to these RFAs with respect to every single

15  document you have produced in this litigation, and are they

16  entitled to know whether it's privileged if the situation

17  were reversed?

18          If after you argue that -- and maybe you want to

19  address it in the same argument.  If the RFAs do seek the

20  disclosure of privileged communications and/or work product,

21  should this Court conduct a crime-fraud hearing?  In an

22  abundance of caution not quite knowing what was going to be

23  said today, I invited Mr. Nolan to come down.

24          Under United States versus Zolin at 491 U.S. 554,

25  before engaging in an in-camera crime-fraud hearing, there

must be, quote, "a showing of factual basis adequate to support a good-faith belief by a reasonable person that an in-camera review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."

My initial concern is this.  I don't know that the mere fact that a document is withheld as privileged and later disclosed is enough to subject the attorney/client communications or the attorney work product to a crime-fraud analysis.

Mattel should keep in mind that only relevant information in documents are ordinarily listed on a privilege log.  I think Mattel in this case feels -- and the Court has now seen -- that that has not been the case. Thus, every document wrongfully withheld in any case could be relevant, so Mattel would have me review apparently all of your privilege logs to see whether any relevant document was wrongfully withheld and, if so, would that trigger a crime-fraud hearing?

It has not been established yet whether the document is or is not privileged.  Assuming it is, then I think Mattel is arguing that it's subject to a crime-fraud exception, and assuming it isn't, isn't Mattel arguing that they somehow knew that it wasn't -- that MGA did, and does MGA -- Mr. Larian's counsel's knowledge even matter?

I think the last broad question as I have been

typing and thinking about the issue before this Court is to

explain why a prima facie case does or does not exist with

respect to whether the beliefs of a prior counsel and the

communications between the MGA parties and prior counsel

were made in furtherance of a crime or a fraud.

Now, we can start in a number of ways, but I think

the most appropriate issue to address first is whether the

RFAs require the disclosure of privileged communication on

attorney/client work product.  I have heard a portion of

that argument before, but I would appreciate rehearing any

portion that you wish to make today and your arguments in

that manner.  I can start with counsel, and I'm going to

give you two opportunities each.

Mr. Quinn.

MR. QUINN:  Your Honor, this is a document that

nobody before the Court today is contending is privileged.

It's not a privileged communication.  The Orrick Firm, MGA

today, is not telling us that it's a privileged document, so

I think that issue can be taken out of the case.

THE COURT:  I think you are absolutely right, but

let's find out.

Is this document privileged or not?

MS. HURST:  Is the Court asking for my work

product on that question?

THE COURT:  No.  I will just wait for your

1    argument then.

2              Please continue, Mr. Quinn.

3              MR. QUINN:  If I'm right that this is not a

4    privileged document, that there is no dispute on that point,

5    asking questions about that document will not itself reveal

6    privileged communications.  The Court has expressed an

7    concern about whether our analysis that we have proffered

8    then would logically follow that we could propound RFAs with

9    respect to every single document on a privilege log, and

10   where does this end?

11             Your Honor, I don't think we have to go down that

12   road because this is a very special situation I think we

13   would all agree.

14             THE COURT:  So it's limiting in other words?

15   We're not setting a precedent.  It's fact specific?

16             MR. QUINN:  Exactly.  I think anybody who reads

17   this document will see this is a key piece of evidence that

18   goes right to the heart of the issue that was before the

19   jury in Phase 1.  I mean, this is not just one random

20   document.  This is a key document which was originally

21   sought in a document request back in 2005.

22             I won't repeat it, but we have given the Court the

23   recitation of the years it took before we finally got that

24   document and the multiple efforts before we finally got the

25   complete document, and we only got it well after the Phase 1

| | |
|---|---|
| 1 | verdict came in.  I submit, Your Honor, this is kind of a |
| 2 | special situation.  I mean, this doesn't open the floodgate |
| 3 | to RFAs -- addressed to every document on a privilege log. |
| 4 | Now, the Court raises the question about, well, |
| 5 | the fact it was on a privilege log -- does that then render |
| 6 | the RFA redundant?  I submit that we are entitled to be able |
| 7 | to show the jury in a very simple request for admission and |
| 8 | response this piece of evidence rather than put in a |
| 9 | privilege log up before the witness, explain to the jury |
| 10 | what it is, then explaining that it was later produced.  We |
| 11 | can save a lot of time here by just narrowing down the |
| 12 | sequence here and explaining exactly what happened. |
| 13 | That's the intent of these RFAs, and they go right |
| 14 | to the heart of aspects of the RICO claim in Phase 2, Your |
| 15 | Honor, the obstruction of justice claim, the facilitation |
| 16 | and ongoing coverup.  If there is an ongoing coverup and |
| 17 | obstruction of justice, we have given the Court authority |
| 18 | that all communications relating to that ongoing coverup |
| 19 | whether with attorneys or not cannot be privileged.  That's |
| 20 | all fair game to be examined. |
| 21 | There is another of those RFAs that asks admit |
| 22 | that your attorney told you X.  There is nothing that on the |
| 23 | face of it goes into the content of the communication |
| 24 | between the client and the lawyer, but the very treatment of |
| 25 | this document, the history of its suppression, and how it |

1    ultimately came to light go to the core of elements of the

2    RICO claim.  If we can't inquire into -- you know,

3    obstruction of justice requires intent.  If we can't go into

4    state of mind, then we are blocked inappropriately in trying

5    to prove that element, that predicate act, on which the RICO

6    claim was based.

7         We have not been able to find any authority, Your

8    Honor -- and I do not believe any has been identified to the

9    Court -- that supports the proposition that the mere fact

10    that a document or communication is asserted to be

11    privileged in fact in itself is privileged.  We have not

12    been able to find anything that supports that.

13         Just to wrap up, I think the whole treatment of

14    the document is history, what was intented, why for years

15    was this document not produced, why was only a redacted

16    version produced ultimately, and why we only got the

17    complete document after the end of the Phase 1 trial when it

18    is now conceded all around that it's not a privileged

19    document.  It goes to the heart of our claims in Phase 2.

20         In terms of the good-faith basis, we have a

21    history here.  We have Judge Larson in this context

22    indicating on the record that he thought Mr. Larian had

23    committed perjury.  We have a history of documents --

24         MS. HURST:  Your Honor, that was part of the

25    sealed proceedings.

```
 1              THE COURT:  It's not necessarily related to this
 2    document, Counsel.
 3              MR. QUINN:  Not related to this document
 4    specifically because Judge Larson didn't have that, but in
 5    terms of a good-faith basis about hiding the origins of
 6    Bratz, it's not related to this document specifically, but
 7    it was in the context of the origins of Bratz and
 8    Mr. Larian's testimony in that regard that Judge Larson
 9    indicated -- used the word "perjury" to describe
10    Mr. Larian's testimony.
11              We have the suppression of --
12              THE COURT:  Why didn't Judge Larson stop the trial
13    at that point if he was so concerned?  I ask that not
14    facetiously, and I know you can't answer that because you're
15    not Judge Larson.  That's a pretty strong statement by a
16    federal judge, and yet I am not quite certain that it has a
17    nexus to this particular document in front of the Court.
18              Your argument really is because Judge Larson made
19    that statement and other things that you believe occurred
20    that the Court should look at this in a -- it's part of a
21    pattern and part of a RICO and the obstruction of justice
22    that you're seeking, and this is a predicate act that
23    precludes you from --
24              MR. QUINN:  Yes, Your Honor.
25              THE COURT:  Two more questions.  I'm perplexed,
```

SHARON SEFFENS, U.S. COURT REPORTER

```
 1   and I will be asking later how a document of this import --
 2   at least whether it has import or not should have been made
 3   known to the party and to have been examined by a jury.
 4   This could be an absolutely innocuous statement, but the
 5   jury has the right in our system to determine what weight
 6   they give to this.
 7              Are you aware -- I am assuming you are, but I want
 8   a very clear record because I am coming late into this
 9   case -- you have in your possession the Wednesday
10   October 23, 2002, 8:39 a.m. e-mail and the 1:35 a.m. e-mail
11   on the same day; is that correct?  It's a e-mail string with
12   Bates Nos. MGA 20070266.  My belief is up to this time that
13   you have that in your possession, but I want to make
14   absolutely certain whether you do or don't.
15              MR. QUINN:  We have that document now, Your Honor.
16              THE COURT:  Trace how you obtained this document.
17   You've insinuated that this was almost like dental surgery,
18   that you had to keep extracting this.  I want you to walk me
19   through the process.  I want to hear how egregious this was
20   from your perspective.
21              MR. QUINN:  Your Honor, this document is
22   responsive to a request for production of documents which
23   was served on March 15, 2005.
24              THE COURT:  Go slowly.
25              MR. QUINN:  This is going to be a lengthy list.
```

SHARON SEFFENS, U.S. COURT REPORTER

```
 1              THE COURT:  I am going to write very slowly on my
 2    pad unless you are in a hurry.  Production of documents.
 3    What date?
 4              MR. QUINN:  The first document request was
 5    March 15, 2005.
 6              THE COURT:  Propounded by Mattel.
 7              MR. QUINN:  Yes.
 8              THE COURT:  And your Bates number?
 9              Ms. Hurst is on her feet.
10              MS. HURST:  I don't believe MGA was yet in the
11    case then.
12              THE COURT:  Counsel, I'm going to let him argue,
13    and then you will have the rest of the evening.
14              MS. HURST:  I am at a bit of a disadvantage.  I am
15    just trying to keep up here.
16              THE COURT:  Ms. Hurst, you have never been at a
17    disadvantage.  I am astounded by your ability.
18              MGA 20070266.  Now, you propounded a production of
19    documents request on March 15, 2005.  Bates number?
20              MR. QUINN:  Not for the document request itself.
21    It's not Bates numbered.
22              THE COURT:  Next.
23              MR. QUINN:  Ultimately there was an order issued
24    granting a motion to compel relating to that document
25    request.
```

SHARON SEFFENS, U.S. COURT REPORTER

```
 1              THE COURT:  Now, you know I have been -- who
 2    issued that?  Did Judge Larson issue that or Robert O'Brien?
 3              MR. QUINN:  This was Judge Infante.  There came a
 4    time when he had had enough of this, but there was a period
 5    where he was the discovery --
 6              THE COURT:  What a shame.  This is entertaining.
 7              MR. QUINN:  Granted a motion to compel.
 8              THE COURT:  What occurred after Judge Infante?
 9              MR. QUINN:  The date of that is May 15, 2007.
10              THE COURT:  Thank you.
11              MR. QUINN:  That was appealed to Judge Larson, and
12    he affirmed Judge Infante's ruling on July 2, 2007.
13              THE COURT:  Thank you.  Then what happened?
14              MR. QUINN:  In August and September of 2007, we
15    finally got privilege logs, which been part of the order
16    that Judge Infante had issued.
17              This document -- neither version of this document,
18    either the abbreviated version or the e-mail string or the
19    full e-mail string was listed on that privilege log.
20              THE COURT:  And we're going to get the abbreviated
21    version in just a moment.  I'm going to make you walk me
22    through that slowly.  Remember I have the unabbeviated
23    version now.
24              So you have got nothing on an e-mail string for
25    October 23, 2002?
```

SHARON SEFFENS, U.S. COURT REPORTER

```
 1                 MR. QUINN:  Correct.  Neither were identified on
 2      the privilege log.
 3                 THE COURT:  Thank you.  So at least from your
 4      argument and your perspective, if there was privileged, you
 5      would have expected to see it early on on the privilege log?
 6                 MR. QUINN:  Yes.
 7                 THE COURT:  So this gives rise under your
 8      suspicion that this is consciously being hidden?
 9                 MR. QUINN:  Yes.
10                 THE COURT:  Negligently being hidden?
11                 MR. QUINN:  We believe there came a point where --
12      it was not produced, and it's impossible to conclude that it
13      was negligence.
14                 THE COURT:  That sounds like a lawyer.
15                 MR. QUINN:  We believe it was intentionally
16      concealed.
17                 THE COURT:  What's next?
18                 MR. QUINN:  On January 23, 2008, MGA served
19      another privilege log.
20                 THE COURT:  MGA.
21                 MR. QUINN:  Yes, Your Honor.  Then two days later,
22      January 25, 2008 --
23                 THE COURT:  Was the October 23, 2002, e-mail
24      string or any portion set forth on the privilege log?
25                 MR. QUINN:  The January 23, 2008, privilege log
```

1  still did not include either version.

2  THE COURT:  Now you said two days later?

3  MR. QUINN:  Yes.

4  THE COURT:  On January 25, 2008?

5  MR. QUINN:  Yes.  MGA on that day produced a

6  revised January 23 privilege log, a revision to the --

7  THE COURT:  A revised January 23 privilege log?

8  MR. QUINN:  Yes.

9  THE COURT:  And on that January 25 privilege log?

10  MR. QUINN:  On that privilege log, the only

11  difference in the revised one was the addition of the full

12  e-mail -- what we now know to be the full e-mail, which was

13  now identified as a privileged document.

14  MR. QUINN:  On that same date, January 25, 2008,

15  MGA produced the incomplete e-mail string.  That is the one

16  that we had before us at the trial.

17  THE COURT:  In other words, that was actually

18  given to Mattel?

19  MR. QUINN:  Yes.

20  THE COURT:  Do you have a copy of the partial that

21  you received?

22  MR. QUINN:  Yes.

23  THE COURT:  Could I see it without going back into

24  chambers?

25  MS. HURST:  Do you have a Bates number?

1          THE COURT:  I will give you the Bates number.

2          Counsel, my question is this.  From what you now

3     know to be the excised e-mail string that was produced to

4     Mattel, was there any indication made by counsel

5     representing MGA that this was an excised portion therefore

6     alerting you that there were other portions that were

7     retained on the privilege log, or did the opposite occur,

8     and, that is, this was simply propounded to you, and you

9     believe as you are reading the excised version that this is

10    the complete document?

11         MR. QUINN:  Your Honor, we don't know if it's

12    redacted.  We don't think it's redacted.  We just think it's

13    a printout of only a portion of the e-mail string.

14         THE COURT:  How were you smart enough to recognize

15    that this just might be a portion of an e-mail string?  In

16    other words, if you handed me this document right now, the

17    way it appears -- Ms. Hurst, would you come up to the

18    lectern for just a moment.  If you hand me this document,

19    which is 3819572 -- and you weren't counsel at the time --

20    if you look at the way the document reads, the FYI is at the

21    top, so it has the appearance that I have got almost a

22    complete e-mail string; whereas, if you look at the

23    original, that FYI is here.

24         Now, if you handed me a document and I saw a big

25    blank space here, I might assume that something was missing,

```
 1   but if you hand me a document where this is all moved up on

 2   the page, it looks like I have got a complete e-mail string.

 3   In other words, this has been moved or produced in a way so

 4   that I would assume -- do you understand what I am saying, a

 5   complete e-mail string because there is no blank?  If I read

 6   down this way and saw a portion that was blank in the

 7   middle, I might assume that I am missing something.

 8           My question is why was it produced that way?  And

 9   you weren't the counsel at this time.

10           MS. HURST:  No, I was not.

11           THE COURT:  Who was?

12           MS. HURST:  It would have been Mr. Nolan.

13           THE COURT:  So my question for MGA is why was it

14   produced in that form?

15           Please continue, Counsel.

16           MR. QUINN:  If I might point out one fact about

17   both versions that may be relevant to the Court.  The name

18   in the upper left-hand corner is Diane Anderson.  I assume

19   that is the identity of the person who printed it out.  To

20   complicate matters more, we understand she is a paralegal at

21   O'Melveny & Myers, which by this time was no longer

22   representing MGA.  They had represented MGA in the past.

23           THE COURT:  I don't understand.  Does that mean a

24   paralegal at O'Melveny & Myers who at one time represented

25   MGA actually printed out this e-mail?
```

```
1              MR. QUINN:  That's --

2              THE COURT:  My argument would be if I was MGA it

3       has no nexus to Mr. Nolan's firm then.

4              MR. QUINN:  Well, apparently Mr. Nolan's firm did

5       receive the material from Diane Anderson.

6              THE COURT:  I may inquire about in-camera in a few

7       moments.

8              So Diane Anderson you believe is a paralegal

9       with --

10             MS. HURST:  O'Melveny & Myers.

11             THE COURT:  Had O'Melveny represented MGA just

12      prior to Mr. Nolan's firm?

13             MR. QUINN:  Yes.  They had represented had MGA

14      from the beginning of the case.  I believe they ceased to

15      represent MGA in approximately --

16             THE COURT:  Who was the attorney at the O'Melveny

17      & Myers Firm.

18             MR. QUINN:  The lead attorney was a Dale Ceneali.

19             THE COURT:  Is he still employed there?

20             MR. QUINN:  It's a woman, and I believe she no

21      longer is.

22             THE COURT:  Do you know where she is located?

23             MR. QUINN:  I believe she is with the New York

24      office of a law firm called Kirkland & Ellis.

25             THE COURT:  Okay.  Please continue.
```

1          MR. QUINN:  Your Honor, we thought because the

2     revised privilege log that we received on January 25 called

3     out what ultimately was -- we learned was the complete

4     e-mail, we had particulars on the privilege log of author,

5     recipient --

6          THE COURT:  I don't understand how you eventually

7     moved from the revised that you got, which looks like a

8     complete document if I was naively reading this -- how once

9     again I am going to say you were able to deduce that you

10     wanted to pursue this particular document further.

11          MR. QUINN:  Because there was that revised

12     privilege log I told you that they served two days --

13          THE COURT:  On January 25?

14          MR. QUINN:  Right, that called out a communication

15     on the same date involving individuals, none of whom were

16     lawyers -- on the face of it, it raised a question in our

17     mind why is this document on the privilege log because on

18     the privilege log there is no reference to any lawyers?

19     And, indeed, there isn't on the document as we now know.

20          THE COURT:  So this document on the privilege log

21     didn't have a reference to any lawyers?

22          MR. QUINN:  Correct.  That caused us to bring

23     another motion directed to the privilege log, which

24     basically argued why is this new document that was suddenly

25     added privileged?  We made a motion.  On February 29, 2008,

1    MGA opposed that motion and submitted a declaration of

2    Attorney Richard Zuromski.

3              THE COURT:  What firm?

4              MR. QUINN:  The Skadden-Arps Firm.  In his

5    declaration, he said that he had reviewed the subject

6    documents on the privilege log and confirmed that in fact

7    they were all privileged.

8              THE COURT:  That was on February 29?

9              MR. QUINN:  February 29.  Judge Larson heard the

10   hearing.  There was a hearing before Judge Larson on that

11   motion directed to these documents on the privilege log on

12   June 2, 2008.  At that hearing, Attorney Jose Allen, again

13   represented to the Court that he had reviewed the subject

14   documents on the privilege log and confirmed that they were

15   in fact privileged.

16             THE COURT:  What firm?

17             MR. QUINN:  Skadden-Arps.  Judge Larson issued a

18   order ruling on that motion on June 5, 2008.  He denied our

19   motion with respect to the documents on the privilege log as

20   he stated "based on MGA's counsel's representation."  That

21   was on the eve -- shortly before the Phase I trial.

22             We now skip forward to March 27, 2009, where we

23   filed a discovery motion requesting an in-camera review of

24   approximately 520 suspect -- what we regarded as suspect

25   communications on MGA's privilege log including this

1   document.

2           THE COURT:  The way the structure was set up at

3   that time I am assuming that that went to Robert O'Brien

4   first.  The ruling was made.  There were probably numerous

5   motions for clarification -- I am just kidding you -- by

6   both sides.  It finally eventually got to Judge Larson's

7   court, and what did he do with it?

8           MR. QUINN:  I think these documents actually ended

9   up in your court.

10          THE COURT:  That's right.

11          So on March 27, you requested the 500 suspect

12  documents on MGA's privilege log?

13          MR. QUINN:  We requested an in-camera review.  On

14  April 3, 2009, MGA now represented by the Orrick-Herrington

15  Firm --

16          MS. HURST:  No, we didn't come until July.

17          MR. QUINN:  I'm sorry.  On April 3, 2009, it was

18  not the Orrick Firm.  It was Ms. Glaser's firm.

19          THE COURT:  Ms. Patty Glaser had come into this at

20  that time?

21          MR. QUINN:  It was Glaser-Weil on April 3, 2009.

22  They opposed the motion.

23          THE COURT:  What were the representations -- by

24  the way, when this opposition took place on April 3 --

25  typically these rulings by the discovery master were usually

1  met with motions for clarification, et cetera.  Was this

2  April 3, 2009, back in front of Robert O'Brien, or was it in

3  front of Judge Larson?

4          MR. QUINN:  This is their opposition to our motion

5  before O'Brien, and Ms. Glaser represented MGA at that time.

6          THE COURT:  What were the representations about

7  these documents?

8          MR. QUINN:  They pointed out that MGA's prior

9  counsel had previously represented to the Court that these

10  documents were privileged, that the Court --

11          THE COURT:  That's not my question.  Was there an

12  independent representation from Ms. Glaser's firm that they

13  had done an independent review of these documents, or did

14  they simply state that they had -- were relying upon the

15  prior representation of the Skadden Firm?

16          MR. QUINN:  The latter, Your Honor.

17          On May 18, 2009, the discovery master granted

18  Mattel's motion ordering in-camera review and requiring MGA

19  to submit the documents by July 2, 2009.  That was

20  subsequently extended to August 4, 2009.  Even by the

21  extended date of August 4, MGA did not submit any documents

22  for in-camera review, but on August 21, MGA produced 95

23  documents not in-camera but in full to Mattel claiming that

24  they were not actually privileged.  One of those documents

25  was the full Larian/O'Connor e-mail string which the Court

1    has.

2              THE COURT:  So on August 21, you have now got what

3    I am going to call nonprivileged documents, 95 of them?

4              MR. QUINN:  Yes.

5              THE COURT:  And then when you get the 95

6    documents, you get what I am going to call the unedited

7    version, the full and complete version, that shows the

8    October 23, 2002, 1:25 and 12:42 a.m. --

9              MR. QUINN:  Yes.

10             THE COURT:  So then I am assuming something, and

11   correct me if I am wrong.  You then went back to the

12   document you had received from the privilege log and

13   realized that the top two conversations or e-mails which

14   were of interest to your party were not produced on the

15   edited version?

16             MR. QUINN:  That was obvious, Your Honor .

17             THE COURT:  When did the transition take place

18   from the Skadden Firm to Ms. Hurst's firm?  Can I get a

19   stipulated date?

20             MS. HURST:  In between, there was Glaser-Weil and

21   Mitchell-Silberberg from January 2009 until July 3, 2009.

22             THE COURT:  January -- what date?

23             MS. HURST:  I don't remember exactly.

24             THE COURT:  January 2009 --

25             MS. HURST:  January 2009 to July 3, 2009.

```
 1              THE COURT:  What firm?

 2              MS. HURST:  Both Glaser-Weil and

 3    Mitchell-Silberberg were in on Phase 2, Your Honor, and

 4    Skadden remained at that point for only continuing Phase I

 5    issues.  We came in on July 3.

 6              THE COURT:  Thank you.

 7              MR. QUINN:  Your Honor, I think that gets us to

 8    the point that's where we -- that is the sequence.

 9              THE COURT:  Okay.  Thank you very much.

10              Ms. Hurst.

11              MS. HURST:  Your Honor, the Court asked a lot of

12    questions in the beginning, and there was so much discussion

13    that I'm not sure I remember what the question was that the

14    Court initially said it wanted an answer.

15              THE COURT:  I wrote them down because I knew it

16    might be a far-reaching discussion.

17              MS. HURST:  Perhaps I will address a couple of the

18    points made by Mr. Quinn, and then I understand the Court

19    has a number of questions.

20              First, I just want to address any notion that this

21    document was manipulated in some way.  I am saying that I

22    have never seen any reason to believe that there was a

23    manipulation of a document here.  In the ordinary course of

24    operation of e-mails, you get a thread, and then somebody

25    replies, and that's a new document in the e-mail inbox.
```

1    Then somebody replies again, and that's another new document

2    in the e-mail inbox.

3              In the course of processing electronic data for

4    discovery purposes --

5              THE COURT:  If that is a correct summation, that

6    means as of October 23, 2002, we have a complete document.

7    This isn't a document that came into someone's possession

8    let's say -- what I am going to call halfway through, and we

9    can take a date like January -- pick a date, January, May --

10             MS. HURST:  I'm not sure I understand the

11   question.  I apologize.

12             THE COURT:  I would expect if this was an e-mail

13   string and my critical date, for instance, on a privilege

14   log was the January 23 or January 25 date -- let go back

15   to -- let's take January 23, 2008, and January 25.  Let's

16   assume that this was an ongoing e-mail string at that time,

17   which we know it's not.  I could understand the argument

18   that, you know, Judge, on January 25, we produced this

19   document, and it said January 25, 2008, so the two other and

20   most critical pieces of information from Mattel weren't on

21   this e-mail string because they came afterwards.  I would

22   anticipate that readily.

23             What I don't understand is how a document that is

24   completed on October 23, 2002, gets excised or --

25             MS. HURST:  Let me explain that.  When you are

SHARON SEFFENS, U.S. COURT REPORTER

1    processing electronic data from Outlook inboxes, what

2    happens is that they -- I am going to use sort of -- I don't

3    know, I will use a vernacular.  These e-mails live in a pst

4    file.  It's called a pst file.  It's a file with a file

5    extension dot pst.  That's a standard file format used for

6    Outlook e-mail on the personal user computer, and then on

7    the servor side, it's an ost file.

8            When those pst and ost files are extracted in the

9    ordinary course of electronic data processing in litigation,

10   multiple e-mails that are part of the same thread are

11   extracted as separate documents into the document database.

12   So each one of these that is still in existence in the pst

13   file in the user's inbox -- each separate entry that's

14   occurred during the course of this communication becomes a

15   separate document in the database.

16           So what you have is both of these exist as

17   separate documents in the document database.  The one with

18   the further exchange between Ms. O'Conner and Mr. Larian and

19   the one without it exist with separately identified track

20   document identification numbers as a result of the ordinary

21   electronic processing of the data.

22           Should I say more?  I'm not sure that that was

23   clear.

24           THE COURT:  I'm just not reacting.  I'm listening.

25           MS. HURST:  So on any thread that is still in a

1    user's inbox, when the electronic processing occurs -- and

2    it may diverge one way.  You might have a conversation to

3    use a vernacular that goes one way off a thread.  You may

4    have a conversation that goes another way off a thread.  You

5    may continue the conversation with exactly the same people.

6    Every time there is a new iteration, the way electronic data

7    is processed is it creates a new document in the document

8    database, and they are treated universally by lawyers as

9    separate documents.

10           THE COURT:  But when I printed this let's say just

11   prior to January of 2005, I could have gotten all sorts of

12   iterations.  I could have gotten this complete e-mail string

13   or just partial of this e-mail string.  Assuming I print

14   this three years later almost, is your argument that, golly,

15   Judge, these computers are so goofy that I would just get on

16   one run the whole document, but on the other run, I would

17   just get a portion of the document excising the most

18   critical portions, or, gosh, if I took a third one, I just

19   might get a page and a half?  That makes absolutely no sense

20   to me.

21           MS. HURST:  It's not a matter of excising any of

22   them.  They all exist with separate time stamps and date

23   stamps in the database as full and complete documents in and

24   of themselves.

25           THE COURT:  I'm hearing your argument.  I'm going

| | |
|---|---|
| 1 | to summarize it.  That is, it's just random that this |
| 2 | critical information was left off? |
| 3 | MS. HURST:  Absolutely not. |
| 4 | THE COURT:  What happened? |
| 5 | MS. HURST:  I can't answer that in open court. |
| 6 | THE COURT:  Well, I'm going to have an in-camera |
| 7 | hearing with you in about -- |
| 8 | MS. HURST:  I understand. |
| 9 | THE COURT:  You finish your argument because we |
| 10 | will be here quite awhile. |
| 11 | MS. HURST:  I can say unequivocally there was not |
| 12 | manipulation of some kind of that document. |
| 13 | THE COURT:  I hear your statement.  I just think |
| 14 | the jury had a right to consider it.  That's a jury |
| 15 | determination.  That's not for counsel to decide. |
| 16 | MS. HURST:  I don't disagree, and there is a |
| 17 | remedy for that, which is a Rule 60 motion.  Respectfully, |
| 18 | Your Honor, that standard could not be met here with respect |
| 19 | to this document because all of the other wealth of evidence |
| 20 | that came in regarding this very subject matter.  To wit, it |
| 21 | came in that Mr. Larian had given the interview and said |
| 22 | September.  It came in that he had changed the date to |
| 23 | October.  There were other documents produced in the |
| 24 | litigation that said -- the communication between Mr. Larian |
| 25 | and Fox Entertainment Company where they asked what do you |

1    want to say is the date for Bratz?  He wrote October for

2    legal purposes.  That was a trial exhibit.

3              Mr. Larian was examined both at length in his

4    deposition and again on cross-examination at trial about the

5    change in the date and the reasons for it, and he testified

6    at length about that.  They made all of the same concealment

7    arguments, all of the same arguments about the significance

8    of this date change and the understanding that it must have

9    reflected that they have made today.  There was a wealth of

10   evidence that came in on this point, Your Honor.

11             The RFAs require the disclosure of privileged

12   communications.  Here is a simple -- I believe this is now

13   if I recall correctly the Court's original question.  There

14   is one very simple way that we know that.  That is because

15   we offered repeatedly to add the phrase "Excluding

16   attorney/client communications."  We asked that they excise

17   counsel from the definition of MGA, and that was

18   unacceptable to Mattel.

19             There is only one reason why that's unacceptable?

20   It's because they want to get the communications.  If we

21   could exclude the communications and talk about facts known

22   or beliefs known without reference to the attorney/client

23   communications, as I said at the last hearing, Your Honor,

24   with the exception of a couple of documents, that would take

25   care of the issue for us, and we could answer the RFAs.

1          I believe I also represented to the Court with

2     respect to Mr. Moore I was willing to live with the same

3     restriction on my question.  Because they won't agree -- in

4     fact, when we met and conferred about modifying it and then

5     they submitted the in-camera list, they added lawyers to the

6     definition.  They want the attorney/client communications,

7     and that's not proper.

8          The reason it's not proper is because the proper

9     way to go about this with all due respect is to determine

10    whether MGA will put in issue its reliance on advice of

11    counsel, and then if it does, disclosure would be required,

12    but if MGA chooses not to place that in issue, then Mr.

13    Quinn has the evidence that he has.  He argues, well, I am

14    not allowed to get to their mental state if I can't get

15    these communications.

16         To the contrary, he has all the circumstantial

17    evidence that he stood here and argued is evidence of bad

18    intent.  That's all you ever have in an intent case unless

19    you have a direct statement, "I knew it was wrong."  It's

20    circumstantial evidence, and he has got it whether or not

21    MGA answers these RFAs frankly.  These RFAs don't mean a

22    hill of beans to circumstantial evidence here.  If they are

23    answered excluding the communications to counsel, he will

24    still have circumstantial evidence, and that's all he is

25    ever going to have, and we will argue at the time of summary

1    judgment about what that means.  The fact that they have

2    pled an obstruction of justice predicate act does not mean

3    that MGA now has to disclose all of its attorney/client

4    communications.

5           This is where Your Honor's reference I believe to

6    the Holmgren case in the tentative comes in.  The Holmgren

7    case suggests that actually the other side can put something

8    at issue, and that's sufficient to breach the privilege.

9    Respectfully, the Holmgren case is completely

10   distinguishable.  In that instance -- as I noted at the

11   prior hearing, it was just about an insurance adjuster's

12   evaluation of the dollar value of a case.  In this instance,

13   you can't separate the work product from the underlying

14   attorney/client communications.  By definition, a

15   determination of whether something is privileged is bound up

16   with the attorney/client communications.  The work product

17   and the attorney/client communications cannot be separated,

18   and that materially distinguishes this situation from

19   Holmgren.

20          Even assuming Holmgren is good authority -- there

21   is big Circuit split on that.  Putting that aside, as I

22   mentioned I believe, Your Honor, when you have the

23   intertwining as you do you here, the other party putting it

24   in issue then is just not enough because that's a new

25   exception to the attorney/client privilege called need, and

1    the need-based exception to the work product doctrine has

2    never applied to the attorney/client privilege.  That's just

3    an end-run around the attorney/client privilege when you

4    have it intertwined this way.  Holmgren never suggested in

5    any way that that would be the result.  It was limited to

6    work product purely.  It never suggested in any way that a

7    need-based showing would apply to the attorney/client

8    privilege.

9           So, Your Honor, I think that brings us to what

10   happened and whether just on the face of it the

11   circumstances reveal a reason to make a Step 1 Zolin

12   finding.  With all due respect, the circumstances described

13   do not sustain a basis for a Phase 1 finding -- Step 1 Zolin

14   finding.

15          Your Honor, this has been perhaps one of the most

16   hotly disputed civil litigations in Los Angeles history.  I

17   think it has been the subject --

18          THE COURT:  Oh, no, Anna Nicole Smith was.

19          MS. HURST:  I don't think a document has been

20   produced in this case without a motion to compel until we

21   came along.  The fact there was a motion to compel here that

22   resulted in the production of the document is par for the

23   course in this case, and it's not in any way, shape, or form

24   the sort of thing that would lead to an inference of some

25   kind.

1          Your Honor, the circumstances of Mr. Nolan's

2 receipt and review of the document are more properly

3 addressed in an in-camera hearing should the Court order

4 one.

5          THE COURT:  I understand that.  If I go, there I

6 will tread cautiously, maybe not in my questioning, but I

7 will certainly tread cautiously procedurally.

8          MS. HURST:  The fact that so many different

9 lawyers attested to reviewing and confirming this dispels an

10 inference, Your Honor.  I mean, honestly at this point, you

11 have a situation where you have O'Melveny & Myers who was

12 involved for many years.  You have Skadden.  You have other

13 law firms.  This is now a vast conspiracy, Your Honor, to

14 conceal this document.

15          It's not credible on the face of it that just

16 because it was once withheld and later produced there was a

17 vast conspiracy.  I think Mr. Quinn said that it is an

18 ongoing coverup of obstruction of justice, which just --

19          THE COURT:  I don't know if I would ever accept

20 that, Counsel.  I'm just willing to spend the time to trace

21 back and find out which counsel actually reviewed it and why

22 the representations were made, which counsel relied upon

23 other counsel and quite frankly were lazy.  They didn't make

24 a review for want of a better word.  I have an abundance of

25 time.

 1          MS. HURST:  As the Court knows, we did make a

 2   further review.  We did not rely on prior representations --

 3          THE COURT:  I think I complimented you on that in

 4   fact.

 5          MS. HURST:  I believe that what we have said on

 6   that before so as not to disclose anything more than should

 7   be disclosed in open court was that we made a determination

 8   that a privilege could not be sustained.  I don't want to

 9   get into a theoretical debate about whether that means the

10   document is privileged or it's not with Mr. Quinn.

11          THE COURT:  I actually complimented you.  I said I

12   was very appreciative of your firm's efforts and your

13   candidness quite frankly.

14          MS. HURST:  The fact that it was withheld and

15   later produced -- it's true that the timing was after the

16   Phase 1 trial, but there's still plenty to go in this case.

17   There is a criminal copyright predicate act.  I mean, if

18   there was a big conspiracy to conceal this document and to

19   make sure it never saw the light of day because it was going

20   to be this horrible piece of evidence, then we wouldn't be

21   standing here, and it wouldn't have been produced.  It just

22   doesn't make sense.  It doesn't hold water.  There is not

23   some ongoing coverup of obstruction of justice.  The

24   document was withheld, and it was later produced.

25          Your Honor, in fact, in many respects, it is

```
1    cumulative of what happened in Phase 1.  There was a great

2    deal of testimony and evidence on the fact that Mr. Larian

3    said September.  He explained why he said September,

4    "Because I was being cute.  It was nine months.  The

5    interviewer asked me what was the birthdate?  It was nine

6    months."

7              THE COURT:  That may very well be, but perhaps the

8    jury had the right to make that determination and not

9    counsel on a privilege log.

10             MS. HURST:  Your Honor, I think that brings us to

11   the issue of remedies frankly, which is if they want to try

12   to maintain an obstruction of justice predicate act, then

13   MGA is chargeable with the acts of its agents, which include

14   withholding the document, and if it chooses to assert a

15   reliance of counsel defense when they finally plead their

16   last pleading and if there is an answer as opposed to the

17   RICO claims going away, then at that time, they will

18   absolutely be entitled to inquire.

19             THE COURT:  Should I -- I'm relying on your wisdom

20   for a moment -- hold this proceeding in abeyance to see what

21   the pleadings are and what your response is, and, if so,

22   when could I expect that decision on your part?  In other

23   words, if advice of counsel is in fact the defense, perhaps

24   it saves a lot of inquiry.

25             By the same token, the way the case has been
```

1    moving through no fault of either party but the exhuberance
2    on the respective sides over the years -- if I did make a
3    Step 1 Zolin finding, then I have already inconvenienced
4    Mr. Nolan and maybe inconvenience another counsel, and why
5    shouldn't proceed down?

6          In other words, I have no desire, Mr. Nolan, to
7    put on the stand today.  It's not where I really prefer to
8    go.  By the same token, I'm not hesitant, so I'm placing
9    that back in your ballpark.  I don't need to continue on
10   with this if I decide to at the present time because advice
11   of counsel may place this in issue, et cetera, but the
12   really from Mattel's standpoint is that even on the advice
13   of counsel this is a predicate act, that this is what they
14   are seeking on their RICO.

15         From there perspective, what if advice of counsel
16   later you choose tactically -- why does that cut off this
17   inquiry or process?  From Mattel's standpoint, they would
18   hope that the Court would proceed down the line procedurally
19   and make findings that Mattel could use at the time of
20   trial.  I am not so naive not to understand that, but I also
21   don't know why I am waiting for your decision about advice
22   of counsel.

23         MS. HURST:  Well, with respect to this discovery
24   proceeding on a motion to compel with respect to RFAs, we
25   are not offering privileged communications as an opposition

1    to that.  I just want to make that clear, so if there is an

2    in-camera on this, then we would do that as a compelled

3    disclosure under Rule 502.  That is our position.

4            On the question of whether we should wait, Your

5    Honor, we made a substantial attack on the existing pleading

6    in our RICO -- which has never resolved, and they have

7    gotten an extraordinary amount of discovery on a wide

8    ranging number of issues, which frankly are not pled in the

9    current pleading, and now we have this thing coming, and we

10   don't know what it looks like --

11           THE COURT:  You will know by March 23.  It's

12   coming to end.

13           MS. HURST:  Right.  Then we are going to make our

14   opposition on leave to amend grounds, which will just be the

15   customary stuff, and then whatever happens they will file a

16   pleading, and then we are going to make a motion to dismiss.

17   I don't want the Court to be surprised by that.  I'm sure

18   you wouldn't be.  We think we have substantial challenges to

19   the pleading.

20           It may end up at the end of the day that something

21   is left.  If it is, then in the ordinary course, we will

22   have to answer, and we will either assert a defense of

23   advice of counsel, or we will think we can look at the

24   circumstances here and be willing to live with not having to

25   put poor Mr. Nolan or somebody else on the stand at trial.

```
 1              THE COURT:  We're not saying that that's going to
 2    occur.  We are only talking about how the Court proceeds
 3    today.
 4
 5
 6              MS. HURST:  We are not offering privileged
 7    information today on this RFA motion.  Respectfully, the
 8    right way to resolve the RFA motion is amend all of them to
 9    say "Excluding communications with attorneys," and we will
10    serve further answers.
11              THE COURT:  Mr. Quinn.
12              MR. QUINN:  Your Honor, as the Court knows, I was
13    at the Phase 1 trial.  This was not cumulative.  The
14    statement in there that "Bratz was born while a certain
15    person was at Mattel," that was dynamite.  That was a hotly
16    disputed issue.  Whether it was born, whether it was created
17    while he was employed by Mattel and hence under that
18    contract which said Mattel owned it, whether MGA was aware
19    of that fact, they denied that they knew he was under a
20    contract.  These were hotly disputed issues.  This isn't
21    cumulative.  This would have been the most compelling piece
22    of evidence in the case.
23              I don't think it's an accident that that didn't
24    turn up on a privilege log until years after -- two days
25    after -- it's the only change that is made -- it's the only
```

1    change that's made on a privilege log that's served years

2    after an order is granted -- made to produce responsive

3    documents.

4              This would have been the single most important

5    piece of evidence in the case, an admission from MGA that

6    this doll was designed while this man was under contract.

7    To the closing argument to the jury, MGA denied that, and we

8    didn't have this.  This would have put that court issue to

9    rest once and for all, but to say as Ms. Hurst does, the

10   fact that this was a document that produced after a motion

11   to compel was granted and that's par for the course in this

12   case, really misses the point altogether.

13             With respect to the RFAs, the notion that you

14   would amend the RFAs to say by implication except for any

15   input from lawyers, that's contrary to the everyday practice

16   with respect to RFAs.  One routinely sends RFAs asking for

17   what is your position as to a legal conclusion or a mixed

18   question of fact and law?  As the Court said in its

19   tentative order, admit that you were negligent.  Well,

20   nobody thinks to respond to that by saying, okay, excluding

21   advice from my attorneys, I'll give you my views.

22             THE COURT:  But here the argument from MGA may be

23   well taken.  There is a tremendous difference in an RFA

24   asking you about -- admit that you are negligent rather than

25   admit as to whether this is a privileged document or not

1    because there you are dealing with an admission that strikes

2    right at the attorney/client privilege.  That's what makes

3    it different than -- well, I'll let you continue.

4              MR. QUINN:  As I have always understood it, the

5    purpose of an RFA is to take issues out of the case, to

6    force the other side to take a position.  Okay, this is what

7    the position is.

8              THE COURT:  But not protected areas.

9              MR. QUINN:  I agree with that.  You couldn't send

10   an RFA to say admit that your attorney told you X, Y, Z.

11   That would be privilege.  It's not asking for privileged

12   information to say admit that you were negligent.  Admit

13   that all steps required by law were taken to effectuate the

14   merger as I indicated the other day.

15             Here, the whole question about whether this was

16   claimed to be privileged or not -- what exactly is your

17   position on that?  Given the flip-flopping back and forth

18   and the record on this, we are entitled to have them take a

19   position on each one of these issues.  The Court asked Ms.

20   Hurst directly is it your position that this document is

21   privileged?  I still don't hear her position on that.  Since

22   this goes to our RICO claim --

23             THE COURT:  No, the answer was are you asking me

24   about the word "product"?  In other words, it's a wonderful

25   question back to the Court that has no relevance -- well,

| | |
|---|---|
| 1 | Ms. Hurst has one more chance to answer that in her |
| 2 | rebuttal, or she claim that she has the work product |
| 3 | privilege, et ceter, but I will leave that to her. |
| 4 | MR. QUINN:  Where the circumstances under which a |
| 5 | document was concealed, produced, not produced, are directly |
| 6 | at issue as they are here, I believe we are entitled to |
| 7 | force them to take positions, and requiring them to do so |
| 8 | does not in and of itself require the disclosure of |
| 9 | privileged communications. |
| 10 | MS. HURST:  Your Honor, if I may, I think my |
| 11 | discussion on the e-mail point was not very clear.  If I |
| 12 | may, I would like to show the Court using my own computer, |
| 13 | and I would be happy to invite Mr. Quinn to look over our |
| 14 | shoulder as to what I'm talking about. |
| 15 | THE COURT:  Certainly.  I will come down there to |
| 16 | you, Counsel. |
| 17 | MS. HURST:  Your Honor, I have conveniently |
| 18 | selected a few of the e-mails that I have received from Mr. |
| 19 | Velamoor.  As the Court can see -- let's just take this |
| 20 | e-mail that I have highlighted here, Order Re Moore |
| 21 | Deposition. |
| 22 | THE COURT:  Do you mind if I take this computer as |
| 23 | an exhibit? |
| 24 | MS. HURST:  I do.  There is wealth of |
| 25 | attorney/client privileged communications on it. |

```
 1              THE COURT:  I was just joking.
 2              MS. HURST:  Initially Mr. Velamoor writes and
 3    provides some information about the Moore deposition.  At
 4    that point, that is one separate e-mail.  The Court can see
 5    it has got it's an own line item.  Then there is a further
 6    e-mail from Mr. Velamoor, and in between, there has been a
 7    response from Mr. Quinn.
 8              THE COURT:  What year is that?
 9              MS. HURST:  March 5, 2010.
10              THE COURT:  What happens when we have a whole
11    series of documents that come in --
12              MS. HURST:  They stay like this in the pst file
13    with separate -- to the extent they are not deleted, they
14    stay like this in the pst file, and then you turn over that
15    electronic media to your electronic document processor, and
16    they extract everything from the pst file, so each of those
17    three lines which is a separate e-mail in my inbox becomes a
18    separate document in the document database.
19              THE COURT:  Just nobody checked?  You got the
20    earlier e-mail string --
21              MS. HURST:  Well, Your Honor, the document was not
22    concealed.  It was listed on the privilege log.  It was
23    not -- I mean, the venal thing to do here would be to throw
24    it a circular file, and nobody would have ever found out.
25    My point is it was accounted for.
```

SHARON SEFFENS, U.S. COURT REPORTER

```
 1              THE COURT:  Okay.  Leave that on in case they want
 2    to look at your secret information.  That's just a joke,
 3    Counsel.
 4              MS. HURST:  Thank you, Your Honor.  I'm glad for
 5    that clarification.
 6              MS. HURST:  If I may for one moment, I would like
 7    to confer with a colleague.
 8              THE COURT:  Take your time.
 9              (Counsel conferring.)
10              THE COURT:  I'm just curious because we are
11    discussing something and so are you.  What happened in the
12    motion for a new trial?  There was a hearing.  This document
13    wasn't available for the motion for new trial was it?
14              MS. HURST:  I believe it was MGA's motion for a
15    new trial.
16              THE COURT:  That's correct.
17              Was this document available to Judge Larson?
18              MS. HURST:  This document was not produced --
19              THE COURT:  It was not produced at that time?
20              MS. HURST:  No, it wasn't.  Your Honor, I am not
21    trying to be cagey whether the document is privileged or
22    not.  This is a difficult situation.  I just don't want to
23    be in any kind of a waiver situation.
24              THE COURT:  I understand.
25              MS. HURST:  I could not sustain a claim of
```

SHARON SEFFENS, U.S. COURT REPORTER

```
 1    privilege when I looked at the document and investigated the

 2    situation in July.  The legal effect of that as we stand

 3    here today in court is that the document is not privileged,

 4    but I am not taking any theoretical abstract position on it.

 5    That's all.

 6             THE COURT:  I compliment you for it.  I think you

 7    have approached it with fresh eyes, and it's greatly

 8    appreciated.  The results could have been absolutely

 9    devastating.

10             MS. HURST:  Any other questions along the lines of

11    the ones Mr. Quinn answered that I could answer for the

12    Court in terms of the history here or anything unless?

13             THE COURT:  Unless you care to add to the history

14    or if he is incorrect -- I can go back through my own

15    documents and probably will just to verify it, but if you

16    have anything to add to that history or any other

17    statements, I'm glad to accept them.

18             MS. HURST:  No.  Thank you.

19             THE COURT:  Okay.  I'll do my own work and go

20    back.

21             Then we will recess temporarily.  I'll be back

22    between five minutes and five hours.

23             (Recess.)

24             THE COURT:  Counsel, this is the initial holding

25    of the Court.  There are two ways that the Court can -- two
```

1    ways privilege could be inquired of.  Of course, one is a

2    waiver, Ms. Hurst, as you have argued, and the other is

3    crime-fraud that Mattel has argued.  I think that the most

4    procedurally correct way to proceed is for this Court to

5    wait until the fourth amended is filed and see if advice of

6    counsel is put in issue.

7            If so, then it's not necessary that the Court

8    proceed by way of crime-fraud because waiver has satisfied

9    this issue, and, therefore, the discussion and the continued

10   deposition would take place, and the inquiry could be made

11   about the communication.  In other words, a waiver would

12   force the very communication sought under crime-fraud at the

13   present time.

14           I think the essence of this is whether Mattel can

15   inquire about this communication, and I want to proceed

16   cautiously because I don't want the Court's invention to

17   appear to a jury that there is a finding of crime-fraud if

18   in fact waiver leads to the same conclusion.  It has the

19   aspect of prejudice to a jury if those words come out.

20           I am going to apologize to Mr. Nolan for bringing

21   you down here this evening.  There is every possibility in

22   the future you will be on the stand.  If so, I apologize for

23   this late hour.

24           MR. NOLAN:  I am available at any time for this

25   inquiry if the Court comes to that conclusion.

```
 1              THE COURT:  Thank you very much.  We will be
 2    mindful of that, but we will also be respectful of your
 3    time.
 4              Now, we will simply wait because as we have had
 5    the discussion the ball is in your hand on the fourth
 6    amended.  We're within weeks or a month -- I say to you on
 7    Mattel's side that if there is advice of counsel you are
 8    going to have some latitude in terms of some of your
 9    depositions.  If not, Step 1 has been met, and we are going
10    to have a very interesting in-camera conversation, which you
11    will not be a part of, but I think with the length of time
12    and the Ninth Circuit having this now that's the wisest way
13    I could proceed at this moment.
14              So, Counsel, for this evening, is there anything
15    else that you would like to raise?
16              MR. ZELLER:  No, Your Honor.
17              THE COURT:  Would you like to spend Sunday with
18    me?  I think we have accomplished a lot.  All kidding aside,
19    I think we have got --
20              MS. HURST:  Your Honor, if the Court is making a
21    finding that Step 1 has already been met, we are prepared to
22    proceed and answer any questions the Court has in-camera
23    today.
24              THE COURT:  I know you're prepared to do that, but
25    you are the one that also argued that you wanted to wait on
```

| | |
|---|---|
| 1 | advice of counsel, so I'm simply going to wait because |
| 2 | that's your argument and see what your position is after the |
| 3 | filing.  I can do this quite frankly in two or three weeks |
| 4 | as opposed to tonight, so we will just wait.  I think after |
| 5 | listening to your argument it's probably the most cautious |
| 6 | and wise way to proceed. |
| 7 | Now, I want to compliment you for getting all of |
| 8 | the exhibit into court on both sides.  I know Tuesday you |
| 9 | will have the remainder of your exhibits in court, and we |
| 10 | will get you back to your respective families so you have a |
| 11 | little time.  I know it's been a pretty harsh schedule for |
| 12 | all of you, so I want you to get back to your family for |
| 13 | Sunday at least. |
| 14 | MS. HURST:  I understood the Monday hearing was |
| 15 | taken off calendar. |
| 16 | THE COURT:  I am intending to do that.  I don't |
| 17 | think I need to bother you with Monday's hearing.  I think I |
| 18 | would like to see you Tuesday and make certain that |
| 19 | everything is place because you know I'm not available for |
| 20 | the period of time I told you. |
| 21 | Now, when your client is here -- I know Mr. Larian |
| 22 | is here, and Mr. Eckhert is here. |
| 23 | Do you mind if I have a little conversation on the |
| 24 | record with them? |
| 25 | MR. QUINN:  We don't mind at all, Your Honor. |

1              THE COURT:  First of all, gentlemen, welcome.  I

2    think I met each of you on separate occasions.

3              Mr. Larian, I think I met you initially on the

4    first occasion.

5              Mr. Eckert, I met you on a Saturday.

6              I fully intended to try to get your matter to

7    trial as quickly as possible.  There has not only been a lot

8    of literature but a lot of expense involved in this.  I want

9    you to hear what I have been saying to your counsel because

10   I know that counsel are conveying back to each of you what I

11   am saying, but when that happened in my life, I would always

12   shoot the messenger frankly.  I'm just joking about that.

13             I don't believe that the interrogatories were

14   leading to a lot of good evidence for either one of you.

15   What was really happening was the interrogatories in the

16   past -- and I don't mean this facetiously -- was kind of a

17   paper shuffle.  The special master had a lot of say in this,

18   and when he made a ruling, it was then usually appealed,

19   which is entirely appropriate, but oftentimes that took a

20   lengthy period of time.  Judge Larson is a very competent --

21   one of our really best colleagues.  All of us are sorry he

22   left the bench, but it took an inordinate period of time.

23             I had the feeling looking at this record that

24   either consciously or unconsciously a lot of those orders

25   were really not obeyed, or not appealed in a timely fashion,

1    or just left to sit for a while, and then people would rush

2    back in on the moment to get back involved in a motion that

3    might been six months old.

4            The final thing that I was feeling –– and I would

5    never make a finding of this –– was that tit for tat was

6    being played.  Because one side didn't produce on occasion,

7    the other side apparently felt –– and it was back and

8    forth –– that because X order wasn't explicitly followed

9    that we could delay on a ruling on another order that might

10   be similar.  I don't know how strongly I feel about that,

11   but it was just an impression.

12           The third thing is that what seemed to be

13   occurring was a needless need for clarification.  When I

14   write a order, it doesn't need any clarifying.  I think I

15   just got another something from MGA.  If you notice how

16   quickly that was stamped, it was denied at 6:35 concerning

17   the rulings I made.

18           I'm personally examining –– a lot of my law

19   clerks –– in fact, two externs, two law clerks, and me ––

20   I'm personally examining almost every document, and how well

21   I understand those –– I hope I'm catching up because

22   remember that this case came to me as a transfer case.  I

23   didn't have it at the beginning.  I probably couldn't have

24   done half as good a job frankly, but I didn't have it at the

25   beginning.

1           You are going to be in trial in breathtaking speed

2    when the Ninth Circuit acts, breathtaking.  Counsel on both

3    sides have performed admirably, and I want to say that to

4    each of you as clients.  They have really been exhausting

5    themselves.  I think they were on the record until 12:00

6    Thursday night, and I left you out at 9:00 on whatever

7    night, but I have turned this into depositions even though

8    some of the informatin isn't as beneficial as each side

9    would like -- I have turned this into depositions because I

10   believe in the adversarial process.  I think we get more out

11   the time spent in depositions than we have this last

12   paperwork that's been going on and on, and I know that that

13   has been unsatisfactory to both sides.

14          Let me tell you my thought.  I originally hoped

15   naively to have you in trial in April, but that isn't going

16   to happen because -- I haven't set a trial date because I am

17   not certain what the Ninth Circuit does.  If the Ninth

18   Circuit upholds Judge Larson, then we still have what I call

19   this fourth amended, this RICO to deal with.  Maybe it goes

20   forward and maybe it doesn't, and that's subject to a whole

21   set of motions, but that means Mattel would have prevailed

22   on the initial Phase 1 with the $100 million, and that ends

23   the case.  If Judge Larson applied the correct standard and

24   the correct procedure was followed, that ends it.  We just

25   have the RICO to contend with.

1          But what happens if the Ninth Circuit sends back

2     Phase 1?  I would hate to proceed on Phase 2A or wherever we

3     are -- I would hate to proceed on Phase 2 because what

4     happens is you could have inconsistent verdicts.  You could

5     have a verdict on the RICO if we go forward, and you could

6     have an opposite verdict on Phase I.

7          So whatever wisdom I have says that we should wait

8     and see what the Ninth Circuit does and not give the Circuit

9     an impression that the trial court is pushing so hard and

10    putting the Circuit in a box because they are the ones who

11    are always right.  I really mean that respectfully.  They

12    get it right 100 percent of the time.  The trial courts

13    don't oftentimes, including this Court oftentimes.  So I

14    want to be mindful that I don't send an impression to the

15    Circuit that this Court is pushing so hard -- but I am

16    pushing hard.  I am pushing extremely hard to get this case

17    ready so that when the Ninth Circuit rules that is going to

18    be the end of a lot of this discovery.  That means your

19    costs are coming down unless counsel just decides to keep

20    filing motions.  It also means that we are prepared for

21    litigation.

22          Now, the critical dates are these from my

23    standpoint.  One, when does the Ninth Circuit rule and

24    either send this back, because if they send back the case

25    that Judge Larson has, it's gone to be one big trial.  If

| | |
|---|---|
| 1 | you can go forward, it's going to be the RICO, Phase 1, one |
| 2 | big trial, whether it's two weeks or three months, one big |
| 3 | trial. |
| 4 | No. 2, the ball is in Mattel's hands because I |
| 5 | think Ms. Hurst is correct.  Mattel has gotten some benefit |
| 6 | because of the number of depositions.  Oftentimes they file |
| 7 | a RICO claim, and you would have this RICO, and then we |
| 8 | would proceed from that, but because of the way the phases |
| 9 | took place, we have got RICO in Phase 2, so I have allowed |
| 10 | Mattel some latitude in developing, if you will, in Phase 2 |
| 11 | the depositional testimony, and whether that's been |
| 12 | beneficial or not, I don't know nor do I care, but I think |
| 13 | it's been a fair opportunity for you to file or not to file |
| 14 | the Fourth Amendment and see how wide a fraud this is. |
| 15 | By the way, they have all heard this a number of |
| 16 | times.  I am just speaking to Mr. Larian and Mr. Eckhert for |
| 17 | a moment. |
| 18 | What that means is that there are other entities |
| 19 | that Mattel may bring in, may not bring in.  The breadth or |
| 20 | depth of the RICO or how you channel that -- I have |
| 21 | basically told counsel informally one more opportunity. |
| 22 | This is the last filing in a sense, and that's why I wanted |
| 23 | a lot of discretion for Mattel to do their best, to put |
| 24 | their best case forward, but there probably will never be a |
| 25 | fifth amended. |

1           So, Mr. Larian, you can kind of rest easy with

2    that.  It's coming to an end.

3           Mr. Eckert, you have tremendous discretion with

4    Mattel in developing this fourth amended now with all of

5    these depositions that oftentimes wouldn't be given.  I

6    think that is a fair opportunity for both sides.

7           The question then becomes how does MGA respond?  I

8    mean, advice of counsel?  There is a whole series of things

9    that Ms. Hurst is going to have to be deciding with

10   Mr. Larian.

11          Then I am in a position of setting the summary

12   judgment date.  The really dispositive date on this case may

13   be the summary judgment date, and when I tell counsel we set

14   that date is critical.  After the fourth amended and the

15   answer and response, I may not set the summary judgment date

16   right away.  We may have a little hiatus in there where the

17   depositions calm down a little bit, and we simply wait to

18   see what the Ninth Circuit does.

19          If the Ninth Circuit does reverse Judge Larson, et

20   cetera, it's probably going to open up a little bit of

21   depositional testimony, and it's going to open the

22   depositions a little bit again, so you can expect a flurry

23   of activity.  First, Omni is on the line apparently.  They

24   may or may not be coming in.  If Omni comes in, depositions

25   flow.  How extensive?  I'm not sure because I think most of

1   the parties and persons from Omni have been deposed.

2           So what I am saying to you is if you see this gap

3   between the Court closing down the depositions for a period

4   of time and you see a little bit of activity, it doesn't

5   mean they are not going to be working.  They are getting

6   into trial posture.  As soon as the Ninth Circuit acts, this

7   Court will know what to do, one big trial or just proceed

8   with RICO, because the RICO is done basically.  The

9   depositions are done.  The discovery is really wrapping up.

10  There's a 30(b)(6) in Mexico, a 30(b)(6) decision we have to

11  make concerning Trueba, Machado, and Vargas, but I don't

12  think that that's necessary for the filing.

13          Once that decision is handed down, this case is

14  going to move very rapidly again.  I mean exhaustingly for

15  counsel.  I am going to expect, Counsel, that we are in

16  session -- you can expect to spend most of your Saturdays

17  with me, but I have got the latitude to send you home if we

18  are accomplishing things.

19          So I hope that as clients, Mr. Larian and

20  Mr. Eckert, kind of gives you an overview from the bench of

21  what is happening because I know your counsel have been

22  going back trying to communicate with you the various

23  conversations we have had, and I want to assure you that

24  they have both been working very, very hard for each of your

25  respective benefits and really have the Court's compliments

1    in that regard.

2            Finally, I am still catching up in your case.  You

3    have to understand since I wasn't the trial judge -- the

4    most difficult thing for a Court is to pick up another case

5    part way through and then try to figure it out along the

6    way.  It's one of the reasons you have seen me being

7    cautious this evening in terms of simply delaying a Step 1

8    finding -- I'm not going to let you reverse your position,

9    Ms. Hurst, in the flurry.  That was your position.  We'll

10   wait, and we will see.

11           So, Counsel, anything further this evening?

12           MR. ZELLER:  No.

13           MS. HURST:  We are off on Monday?

14           THE COURT:  Yes.  I want you to go home and spend

15   some time with your family.  You need a couple days just at

16   home.

17           I think that the two of you also can use a little

18   bit.  Go back to the firm for a while.

19           I would like to see you very briefly Tuesday

20   morning.  I am leaving for a couple of weeks.  I want to

21   make certain that you know that.  You know the dates.  If

22   there is anything that needs to be done, I sure would like

23   to know by Monday so I can work on them.  Don't catch me

24   going out the door, please.

25           Finally, the last thing is this.  Mr. Molinski,

  1    where are you, and where are some of your able associates
  2    for your firm, Mr. Quinn?
  3            For the respective principals, Mr. Larian and
  4    Mr. Eckhert, I am confining this to two lead counsel.  In
  5    other words, I have Mr. Zeller and Mr. Quinn, and they're
  6    the only counsel who really I speak to, although I have
  7    become acquainted with other counsel now, and Mr. McConville
  8    and Ms. Hurst.  There is a reason for that.
  9            My impression was that there was a disconnect
 10    before, that lead counsel even in the proceedings before me
 11    have so many associate counsel that it's difficult to
 12    marshal all this information, and I never know where to hold
 13    the collective responsibility.  I always think in fact it
 14    starts at the top.  If I have got a poorly run court, it's
 15    certainly my fault.  It's nobody else's.  If in your in
 16    Marine Corps and something goes wrong, it's the general's
 17    fault.  It isn't some lieutenant.  It starts at the top.
 18            The end result is that while the associate counsel
 19    may be busy with depositions, et cetera, there will only be
 20    four trial counsel involved.  There will only be Mr. Zeller
 21    and Mr. Quinn by choice and Ms. Hurst and Mr. McConville.
 22            THE COURT:  Now, I let you know that I have
 23    offered each of them one substitution.  In other words, last
 24    week they had their choice of bringing in somebody and
 25    substituting somebody else out.

1          The reason for that is on the Microsoft case I

2     think we had seven attorneys in court and five in the

3     hallway churning out paper.  Well, that's silly.  It's just

4     a paper shuffle, and I would to decrease it.

5          So I think you are getting a lot of information

6     the way we proceeding, and I am fairly pleased with the

7     structure.  I just want to say that publicly to all counsel.

8     I think you have done your best to set up a good structure

9     for us, as good as can be.  I know each of you are

10    frustrated with one another, but we are getting there.

11         I want to bid you a good evening, and I shall

12    leave my court now.  Good-night.

13                              -oOo-

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2

 3

 4                        CERTIFICATE

 5

 6          I hereby certify that pursuant to Section 753,

 7   Title 28, United States Code, the foregoing is a true and

 8   correct transcript of the stenographically reported

 9   proceedings held in the above-entitled matter and that the

10   transcript page format is in conformance with the

11   regulations of the Judicial Conference of the United States.

12

13   Date:  March 14, 2010

14

15
                         Sharon A. Seffens      3/14/10
16                       _____
                         SHARON A. SEFFENS, U.S. COURT REPORTER
17

18

19

20

21

22

23

24

25
```