1

1

2

3

4              UNITED STATES DISTRICT COURT

5              CENTRAL DISTRICT OF CALIFORNIA

6                   SOUTHERN DIVISION

7                       - - -

8      THE HONORABLE DAVID O. CARTER, JUDGE PRESIDING

9
        CARTER BRYANT,
10                      Plaintiff,
           vs.
11
                                    SACV-04-9049-DOC
12      MATTEL, INC.,               VOL. 3
                       Defendant.
13      ---------------------------

14

15                   (4:30 P.M.)

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17              Santa Ana, California

18                 May 28, 2010

19

20
                   SHARON A. SEFFENS, RPR
21                 United States Courthouse
                   411 West 4th Street, Suite 1-1053
22                 Santa Ana, CA  92701
                   (714) 543-0870
23

24

25

SHARON A. SEFFENS, U.S. COURT REPORTER

```
 1    APPEARANCES OF COUNSEL:

 2    For Defendant MATTEL, INC.:

 3    MICHAEL ZELLER
      SUSAN ESTRICH
 4    BRETT DYLAN PROCTOR
      QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
 5    865 Figueroa Street, 10th Floor
      Los Angeles, CA  90017
 6    (213) 443-3180

 7

 8    For the Intervenor, MGA ENTERTAINMENT, INC.:

 9    ANNETTE I. HURST
      WARRINGTON S. PARKER, III
10    ORRICK, HERRINGTON & SUTCLIFFE LLP
      The Orrick Building
11    405 Howard Street
      San Francisco, CA  94105
12    (415) 773-4585

13    THOMAS S. MCCONVILLE
      ORRICK, HERRINGTON & SUTCLIFFE, LLP
14    4 Park Plaza, Suite 1600
      Irvine, CA  92614
15    (949) 567-6700

16    For Defendant CARLOS GUSTAVO MACHADO GOMEZ:

17    MARK OVERLAND
      SCHEPER, KIM & HARRIS, LLP
18    601 West 5th Street, 12th Floor
      Los Angeles, CA  90071
19    (213) 613-4660

20    For the Movant, OMNI 808 INVESTORS, LLC, INC.:

21    TODD E. GORDINIER
      BINGHAM MCCUTCHEN, LLP
22    600 Anton Boulevard
      Plaza Tower, 18th Floor
23    Costa Mesa, CA  92626
      (714) 830-0622
24

25
```

SHARON A. SEFFENS, U.S. COURT REPORTER

```
 1   SANTA ANA, CALIFORNIA; FRIDAY, MAY 28, 2010; 4:30 P.M.
 2             THE COURT:  We are back on the record.
 3             Counsel, your thoughts concerning those issues
 4   that I have asked you about.  The first was the injury to
 5   business or property.
 6             MS. HURST:  Your Honor, I believe this Court's
 7   first question was:  Does each and every predicate act need
 8   to satisfy injury?  The answer to that is no.
 9             The Court's next question was:  Does each
10   defendant have to engage in an act causing injury?  The
11   answer to that is yes.  A lot of cases stand for that
12   proposition, but Beck versus Prupis is the most pertinent,
13   not to mention the statutory language.
14             THE COURT:  Okay.
15             MS. HURST:  I'll stop there unless Mattel wants to
16   add anything.
17             THE COURT:  Okay.  The last question I have,
18   though -- although I had another, but it doesn't matter --
19   and, that is -- no, let me turn to Mattel.
20             MS. ESTRICH:  Ms. Estrich on behalf of Mattel.
21             Does each predicate act have to cause injury?  No.
22             Does each defendant have to cause injury?  Only if
23   they are charged as a member of the enterprise.  The
24   distinction between Section C liability and Section D
25   liability is whether a defendant must commit any predicate
```

1   acts.   Under Section C, the answer is yes.   Under Section D,
2   the answer is no.
3           It then follows that if you need not commit any
4   overt acts or any predicate acts, by definition -- and
5   Courts have repeatedly held -- you need not cause injury.
6   Injury is required to confer standing to bring a RICO
7   action, but it is not required as a separate element of a
8   conspiracy.   That distinction would obviously be applicable
9   in this case to the Omni defendants who are named in the
10  conspiracy count under Section D but not in the enterprise
11  count.
12          THE COURT:   I would also ask Mattel about the
13  alleged direct injury.
14          MS. ESTRICH:   I read the Hemi case, Your Honor,
15  and Hemi makes clear that the existing common-law standards
16  for proximate cause do not allow injury which is so remote
17  and attenuated that it is not fairly connected to the
18  underlying conduct.   The example in Hemi, of course as the
19  Court is aware, is that they sued saying you didn't tell the
20  State about your cigarette sales to customers, so the State
21  couldn't tell the City about your cigarette sales to
22  customers, so the City couldn't go to the customers and get
23  proper taxes.
24          The Court clearly recognized consistent with
25  frankly well-established law that such an attenuated theory

1  where the defendants -- where we had not one but two or

2  perhaps three intervening acts and the taxpayers were to

3  quote the Court "the fourth party" here was too attenuated

4  to meet the standards.

5          In this case, Your Honor -- and I am happy to go

6  through the list -- we have alleged that Mr. Larian

7  created -- engaged in criminal copyright infringement, which

8  caused the direct injury of our loss of the exclusive rights

9  to our property, which is clearly direct injury as Judge

10  Larson recognized.  We have alleged that MGA and MGA Mexico

11  took our trade secrets and used them, that as a result of

12  their use of the trade secrets, they gained sales, and we

13  lost them.

14          I can go on --

15          THE COURT:  What about the purchase of the Wacovia

16  debt?

17          MS. ESTRICH:  The purchase of the Wacovia debt --

18  I think that we are happy to proffer if you would like

19  greater detail about how we were harmed, but the Wacovia

20  debt as far as Omni goes -- Omni is not named as a defendant

21  under Section C.  As Ms. Hurst has correctly recognized, the

22  Wacovia transaction even if it did not directly cause us

23  injury -- and I think it did -- not every predicate act need

24  cause injury, so the Wacovia debt transaction and the

25  related instances was obstruction, lying, falsification, et

1   cetera.

2           In addition, Your Honor, we still have this

3   unresolved issue related to the transfer of IP.  Obviously,

4   if they transferred IP to Omni -- and I have yet to hear

5   anybody say there is no transfer of IP -- that would

6   obviously cause us injury.  Similarly, we are beginning to

7   unravel some of these financial transactions in which

8   interest was paid through Omni going from MGA to Larian, and

9   there seems to be evidence that Omni may have actually kept

10  a piece or a point on that interest, which would be direct

11  injury to our rights as a creditor, so I do think -- I am

12  happy to offer the Court more detail as to that.

13          Finally, we raised the issue as to the forensic

14  auditor and pointed out correctly that we got the forensic

15  auditor because Judge Larson ordered him, but I would just

16  revisit the circumstances.  What actually happened was MGA

17  represented to the District Court and the Court of Appeals

18  in its stay application back in December that it had no

19  source of credit and if a stay wasn't granted by December 31

20  it would be destroyed.  It specifically said there is no --

21  we have no source of credit.  MGA then filed a correction

22  with the Court and said actually we do have a new source of

23  credit, and that's how we and the Court learned of Omni

24  808's existence as a creditor.

25          At that point, MGA invited the Court given its

1   confusion -- as Judge Larson said, MGA's finances are,
2   quote, "a mystery to me," and a forensic auditor was
3   appointed to uncover the mystery.  Although we're not
4   required to do so because Omni is not named as an enterprise
5   defendant -- the sequence of events related to the forensic
6   auditor unlike the sequence of events in the sales of
7   cigarettes where you didn't report it to the State and the
8   State didn't sell the City and then the City couldn't go
9   after the customers.  That's not too remote or attenuated to
10  satisfy a proximate cause requirement.  In any event, there
11  is no proximate cause requirement as to the Wacovia
12  transaction.
13          THE COURT:  Concerning the intent to defraud,
14  Justice Kennedy stated that intent cannot be considered and
15  was very forceful about that in the Hemi group oral
16  argument.  Do you agree with that on behalf of Mattel?
17          MS. ESTRICH:  Considered for what purpose?
18          THE COURT:  For a proximate causation analysis.
19          MS. ESTRICH:  Proximate cause and intent are
20  separate concepts, but they overlap.  I'm not sure how it's
21  relevant here, but they do overlap in the sense that -- the
22  test that in Hemi the Court made clear it was applying for
23  purposes of proximate cause uses almost identical language
24  to language one sees in terms of defining criminal mens rea.
25          THE COURT:  I am going to be prepared to find that

1   intent cannot be considered, but I want to give you the

2   opportunity to convince me that I am wrong reading the Hemi

3   group.  In other words, I'm following Justice Kennedy's

4   lead.  I think he is very explicit about that, but if you

5   have a disagreement, I want to hear about it.

6           MS. ESTRICH:  May I confer for a moment and see if

7   I understand?

8           THE COURT:  Sure.  In other words, I thought at

9   one time you were arguing that the defendant's intent to

10  defraud was relevent concerning the proximate cause

11  analysis.  In looking at what Justice Kennedy stated, that

12  is, that intent cannot be considered.

13          MS. ESTRICH:  I'm not sure I ever argued that

14  intent should be considered for proximate cause.  I think it

15  turns on the connection and the attenuation, although those

16  factors sometimes come in when Courts consider whether

17  somebody was reckless because recklessness, for instance, as

18  Your Honor knows, turns on what is foreseeable and what

19  isn't.

20          THE COURT:  Concerning the trade secret

21  misappropriation and the basis for mail and wire fraud, MGA.

22          MS. HURST:  Before we turn to that, may I respond

23  briefly on this last point?

24          THE COURT:  You may.

25          MS. HURST:  Beck versus Prupis does say that under

SHARON A. SEFFENS, U.S. COURT REPORTER

1    the RICO conspiracy claim it has to be an act -- quote, "act

2    and it's independently wrongful under RICO."  That's Beck

3    versus Prupis, 529 U.S. at 505 to 507.  That would mean that

4    Omni and IGWT would need to have engaged in independently

5    wrongful acts.

6              THE COURT:  Okay.

7              MS. HURST:  Your Honor, with respect to the issue

8    of has Mattel alleged injury adequately, the Court indicated

9    before the break that perhaps a theft of trade secrets could

10   cause direct injury, but that would only be in a situation

11   where the plaintiff is deprived of the property entirely.

12   That has not been alleged here, nor could it be frankly.

13   There is no allegation that anybody -- assuming that trade

14   secret misappropriation could be a scheme to defraud that

15   anybody made off with something that Mattel then no longer

16   possessed.

17             THE COURT:  Okay.

18             MS. HURST:  Those are my brief responses.

19             THE COURT:  Back to the trade secret

20   misappropriation, whether that can form the basis for mail

21   and wire fraud.

22             MS. HURST:  We are not arguing that 1832 overruled

23   Carpenter somehow.  Carpenter is just not a RICO case.  And

24   we are not saying that unless it's specifically enumerated

25   elsewhere that it can't be mail and wire fraud.  Here is the

1   test that we are proposing.  If there is a specific statute

2   that covers the conduct but has not been included in 1961,

3   then you can't circumvent that choice by Congress by

4   pleading it as mail and wire fraud.

5          We're not saying it can't be mail and wire fraud

6   for other purposes, which is why -- we are not saying

7   Carpenter is somehow overruled.  We are just saying for

8   purposes of RICO where 1961 is a legislative choice, if

9   there is another specific statute that covers it where

10  Congress has made a choice -- it's not included -- then you

11  can't circumvent that.  That is Smith versus Jackson.

12         I would also commend to the Court actually the

13  Evercreek case for its review.  The Evercreek case of all

14  the hundreds of case that have been cited by both sides in

15  this case is the most similar to this one.  There it was a

16  whole messed up situation about the title to a trademark and

17  an allegation of a scheme to defraud with respect to

18  acquiring the ownership of the trademark and then the

19  subsequent infringement of that trademark.  The Court said I

20  am not going to let you turn this dispute over trademark

21  ownership and infringement into a RICO case.

22         THE COURT:  Okay.

23         Counsel.

24         MS. ESTRICH:  I think you asked me, Your Honor,

25  how to deal with the disjunctive in Section 1832.  I believe

1    that was the question.

2              THE COURT:  The "or."

3              MS. ESTRICH:  I think it goes directly to Ms.

4    Hurst's argument.  The way I read the disjunctive if it

5    means something -- and we generally try to give words

6    meaning here -- is that not all trade secret

7    misappropriation is fraudulent, that there may well be

8    instances -- and I have not looked at congressional intent

9    here -- where, for instance, even the negligent

10   misappropriation of a trade secret would give rise to

11   liability under Section 1832 even though negligence as the

12   Court well knows would not be sufficient to turn that trade

13   secret misappropriation -- or to allow that trade secret

14   misappropriation to support a claim of wire or mail fraud.

15             There may be indeed more than one variety.  It may

16   well be that the Court in enacting this statute intended to

17   reach a broader scope of misappropriation than that which

18   would directly qualify as fraudulent under the mail and wire

19   fraud statute which requires criminal mens rea, but there

20   aren't two mail and wire frauds, one for purposes of

21   inclusion in RICO and one for other purposes.  There is just

22   mail and wire fraud.

23             If the fraudulent misappropriation of confidential

24   or trade secret information constitutes wire and mail fraud

25   for purposes of the wire and mail fraud statute as the Court

1    held in Carpenter, then that conduct is sufficient to

2    constitute a predicate act or to support a predicate act

3    under RICO.

4            THE COURT:  I'm thinking about drawing back and

5    waiting.  I just think that that's wise.  I don't see why

6    Courts write when they may have the answer from the

7    United States Supreme Court.  I expect it's going to be

8    handed down in June also, so if you don't get that portion

9    of the opinion, that's why.

10           MS. ESTRICH:  We agree.  We think on the current

11   law that we have fairly used the statute, but obviously

12   should the Court hold it unconstitutional, it would directly

13   relate.

14           MS. HURST:  Just briefly, under Bajonas

15   (phonetic}, respectfully, they haven't properly used even

16   the current statute assuming it's coming.

17           THE COURT:  They may not, but a couple weeks won't

18   be of great concern to me.  If this was on the eve of trial

19   and the Ninth Circuit had handed down their opinion on Phase

20   I, I would probably cast caution to the wind, but for a

21   couple of weeks, I think I will bow to the Supreme Court as

22   I should and wait for their wisdom.

23           Concerning the conspiracy claim and whether it has

24   been adequately pled as to Omni and IGWT, one of my fears

25   was that the argument on this motion might turn into a

1  dispute about discovery.  As required under Rule 12, I am

2  going to at least assume as true every fact alleged, so if

3  that's true, Larian was behind the whole transaction.

4          Now, Omni and all of its members allegedly intend

5  to frustrate Mattel's ability to obtain the verdict, and

6  Omni transferred a security interest in the property, but

7  even assuming that, that doesn't mean that it's legally

8  actionable, let alone a RICO violation.  So assuming all

9  those things under Rule 12, that doesn't mean that it falls

10 under RICO.

11         Let me talk for a moment about the standard to

12 plead a conspiracy.  Salinas rejected the theory that a

13 co-conspirator must commit or agree to commit two or more

14 predicate acts.  You can also be liable for conspiracy if

15 you adopt the goal of furthering or facilitating the

16 criminal endeavor.

17         Now, Mattel borrows the broad language from

18 another Circuit for the proposition that you only need to

19 know the contours of the enterprise and want to help it out.

20 I found contrary precedent in a case called Couch versus

21 Kate at 2010 WL 1936277 at Footnote 4.  It's a Ninth Circuit

22 May 14, 2010, which claims that the standard for conspiracy

23 is, quote, "To establish a violation of 1962(d), plaintiffs

24 must allege either an agreement that is a substantive

25 violation of RICO or that the defendants agreed to commit or

```
 1   participated in a violation of two predicate offenses."
 2            I want to toss out a hypothetical to you.  Let's
 3   say that -- let me take a gang again, and a gang's purpose
 4   is to exert dominion over some portion of a city, and the
 5   members of the enterprise engaged in acts of murder and
 6   extortion.  Then I or a member come along and I don't know
 7   about or even want to assist in any of those predicate acts.
 8   In other words, I am a want-a-be, but I do want to help the
 9   gang take over the city streets because I like their name,
10   and that's good enough for me.  In other words, I'm a young
11   kid of 17 or 18 and 19.  That's my neighborhood.  That's my
12   gang, whatever.  So I loan the gang some money so that they
13   have enough capital for their efforts.
14            I guess my question to Mattel is -- you seem to be
15   arguing that I am therefore a conspirator even though I had
16   no idea what the predicate acts were, and that I as a
17   want-a-be did not intend that those predicate acts be
18   committed whether by myself or anyone else, and that I did
19   not even intend to aid the commission of those acts.  Now,
20   please don't argue to me that your case is different.  I
21   just want you to take that hypothetical and talk to me a
22   little bit about that, and I want you to talk to each other
23   first.
24            (Plaintiff's counsel conferring.)
25            MR. ZELLER:  Your Honor, I haven't looked at this
```

1   case, so I do caviat it that way.  As the hypothetical was

2   posed by the Court where someone had no idea, I think it

3   would be very hard under most circumstances to make out a

4   conspiracy.  I mean, there has to be an agreement.

5   Obviously as the Court knows, it need not be explicit.  It

6   can certainly be implicit.  It can be inferred from conduct,

7   but there has to be an agreement.  It seems that the

8   hypothetical the Court has posed would preclude such a

9   circumstance.

10          In direct response to the standard that the

11  Court has articulated from the case that it cites, I would

12  point the Court to two other decisions.  One is Salinas, and

13  at page 65, it says in order to have the requisite knowledge

14  to have knowingly agreed to participate in a conspiracy a

15  defendant must have had, quote, "knowledge of the general

16  nature of the conspiracy and that the conspiracy extends

17  beyond his individual role."  So that's another fairly

18  expansive definition that we certainly think that we meet

19  here.

20          I would also follow up with a Ninth Circuit case

21  which is from 2004, United States versus Hernandez, which is

22  388 --

23          THE COURT:  It's my case, Counsel.

24          MR. ZELLER:  This language says -- it says, "The

25  conspirator must intend to further an endeavor which if

1    completed would satisfy all the elements of the substantive

2    criminal offense, but it suffices that he adopt the goal of

3    furthering or facilitating the criminal endeavor."

4              THE COURT:  Justice Fletcher writes the jury

5    opinion.

6              MS. HURST:  I think under these formulations what

7    we have is we certainly have a circumstance where the

8    allegations that we have made against Omni read as being

9    true as required and then drawing inferences in our favor

10   show that it was knowing.  We actually call out some

11   specific instances in our complaint that we think give rise

12   to that inference.

13             THE COURT:  Okay.  Let me hear from Omni.

14             MR. GORDINIER:  In fact, as I mentioned earlier,

15   the allegations in the complaint do not include an

16   allegation of either knowledge or an agreement.  In the

17   circumstances here, as the Courts in the Ninth Circuit have

18   said, where you have got an ordinary business transaction

19   that occurs all the time, there is particularity that they

20   have to make to get beyond -- to create an inference under

21   Twombly or Rickball (phonetic) that there was something

22   there.  Here the complaint simply does not allege either

23   knowledge or an agreement.  That's all I have.

24             THE COURT:  Thank you very much.

25             Ms. Hurst.

SHARON A. SEFFENS, U.S. COURT REPORTER

1          MS. HURST:  Your Honor, the test the Court quoted

2     from, Couch versus Kate, is also found in Howard versus

3     America On-Line requiring either the two predicate acts or

4     the substantive violation.

5          THE COURT:  Okay.

6          MS. HURST:  Your Honor, the hypothetical that the

7     Court gave illustrates a difference between aiding and

8     abetting and conspiracy.  Aiding and abetting is not a

9     theory under civil RICO.

10         Maybe just one more point briefly.  Whatever the

11    purpose is they are alleged to have joined to further, IGWT

12    and Omni funded a transaction that occurred after the

13    verdict found no willful infringement.

14         THE COURT:  Repeat that one more time.

15         MS. HURST:  If the purpose was to inject

16    capital -- I don't know what it was, but let's fantasize

17    that the purpose was to inject capital into MGA and enable

18    it to continue operating and infringing Bratz somehow.

19         THE COURT:  What happens if I am met with the

20    legal argument that it was simply to hide funds, to funnel

21    funds?  In other words, I would expect Mattel to come back

22    as they have been seeking from day one and give me the

23    opposite viewpoint.

24         MS. HURST:  Then this is the Stocastic (phonetic)

25    case.  I mean, it's just too indirect.  They have to get the

1   judgment.  They have to fail to enforce it.  I mean, there

2   is no actual injury at this time.  That's what Stocastic

3   said, and there were two other cases --

4           THE COURT:  Is the inability to recover funds or

5   to trace funds or to locate funds that might be forthcoming

6   in a judgment an injury?

7           MS. HURST:  Under Stocastic, I think it would be

8   if there is a judgment.

9           THE COURT:  I want to turn to the underlying issue

10  of whether the alleged transfer of the Bratz security

11  interest can form the basis for mail and wire fraud.  One

12  thing that concerned me about the briefing by Mattel was

13  that the authorities you cite it could be argued hurt you

14  more than help you.  That's just a tentative thought.  I

15  don't expect you to ever accept that thought.

16          For example, in Rothberg versus Chloe Foods Corp.,

17  2007 WL 2128376, Eastern District of New York -- it's a 2007

18  case -- the plaintiff obtained a judgment against a

19  corporation, which then granted a security interest in its

20  assets to a third party.  I'm sure the case has superficial

21  appeal to Mattel, but in Footnote 58, there were fraudulent

22  documents that included forged signatures.  The judge in

23  that case did not consider the fact of the transaction

24  fraudulent.  He considered the manner of its execution

25  fraudulent.

1           So how is that distinction not material eventually

2    to my analysis?  In other words, how do I deal with that?

3           MR. ZELLER:  I actually that think this

4    illustrates what it is we think was wrong here.  We have

5    never taken the position that somehow this could not have

6    been done properly.

7           THE COURT:  I didn't hear you.  Say that again.

8           MR. ZELLER:  We have never taken the position --

9    this goes back to one of Ms. Hurst's themes that somehow we

10   criticized them when they put money in, criticized them when

11   they would take money out.  That's not true.  What we

12   criticized them for and sued them for is the manner in which

13   it is being done.  It is being done to defraud.  It is being

14   done to hide.  That is in fact the very point.  Here we have

15   exactly -- and we have alleged -- that documents were

16   backdated in order to conceal the source of the funds.

17          Mr. Gordinier has said now a couple of different

18   times that we have never alleged -- there is none of this in

19   terms of agreement or other elements that we have alleged

20   with respect to the conspiracy.  It goes on at length in the

21   complaint.  Just to take an example, in paragraph 114, we

22   talk about how Larian asked Kadesha on behalf of Omni 808 to

23   prepare a letter for the purpose of frustrating the Court's

24   orders and Mattel's rights.  We talk about the letter as a

25   sham intended to mislead, and, in fact, we cite facts that

1    we believe support that.  We then go on to talk about other

2    mispresentations and false statements that were made with

3    respect to these transactions.  116 continues on.  We talk

4    about the backdating, fraudulent documents,

5    mispresentations, and the like.

6          So while I do think that there is a legitimate

7    point underlying at the end of the day perhaps, well, if

8    this were all done in a way that did not have these

9    fraudulent components we may have a different case -- but we

10   have that here.  We have to a great degree evidence, and it

11   is specifically alleged contrary to what Omni would say or

12   believe these particular fraudulent acts that were done to

13   accomplish this all -- ultimately with the purpose of, among

14   other things, being able to conceal the flow of funds

15   between Larian and MGA.  That also is part and parcel of

16   mispresentations made to the Court about MGA's and Larian's

17   financial condition.  I mean, this is talked about at some

18   length in our complaint.

19         So I understand the point that the Court is making

20   about Rothberg, but I do think that we actually have those

21   same circumstances with the fraudulent documentation.

22         THE COURT:  Any party can respond, Mr. Gordinier

23   if you like to, but if you don't want to, Ms. Hurst.

24         MS. HURST:  I think we cited a couple of cases in

25   our opening brief for the proposition that concealment is

1   not a new injury or harm for civil RICO purposes.  That's

2   what Mr. Zeller has just really relied on.

3          THE COURT:  I think your strongest argument is

4   always that this really isn't a RICO.  It's not a predicate

5   act.  It's almost an afterthought, and it could be

6   separately claimed or separately charged.

7          MS. HURST:  Right.

8          THE COURT:  By the same token, you have got

9   continuity -- you have a continuing effort here, but the

10  question really is when did that start?  Did it start with

11  the judgment, after the judgment, before the judgement?

12  What triggered it if it did occur?  Assuming it occurred for

13  a moment, I need to speak to that and sort that out.  I need

14  to let you know in the opinion what my thoughts are.  That

15  way you have a good record for appellate purposes whoever is

16  on the winning or losing side.

17         The one thing I am going to try to do is write a

18  decent enough opinion so that it is easy for the Circuit to

19  take ombrage or to reverse the Court if I am wrong.  The

20  Circuit needs to know what my thinking is.  You will get a

21  very thorough opinion by my standards anyway.

22         Let me ask the question that I have just been

23  waiting to ask for months and months to Mattel.  Where is

24  the fraud from Omni?  This is the question I just love.  Who

25  was instructed, chicaned, or duped?  Take your time with

```
 1    this one.

 2              (Plaintiff's counsel conferring.)

 3              MR. ZELLER:  Your Honor, I just want to ask for

 4    clarification --

 5              THE COURT:  No, no, no.  It's very clear.  It

 6    can't be more clear.  You don't even have to answer it.

 7    It's a clear question.  I am not going to clarify that.

 8              MR. ZELLER:  Maybe I shouldn't have used the word

 9    "clarification."  Could I have it repeated, please?

10              THE COURT:  Sure.  Who was tricked, chicaned, or

11    duped?

12              MR. ZELLER:  By Omni.

13              THE COURT:  Okay.  Where is the fraud, and who was

14    the perpetrator?

15              (Plaintiff's counsel conferring.)

16              THE COURT:  There might be another entity or

17    former entity that might be very interested, but --

18              MR. ZELLER:  I think in terms of just focusing on

19    the fraudulent aspect -- obviously there are other predicate

20    acts, but just focusing on Omni and focusing on the

21    fraudulent part, it is Mattel.  That's because Mattel has

22    rights as a creditor.  One proposition of law that certainly

23    MGA and Omni we think are dead wrong on is that somehow we

24    had to have had a reduced judgment, that we had to have had

25    a final judgment.  The law is very clear in California that
```

1   you can be a creditor under such circumstances even prior to

2   the time that the claim is brought, let alone after we have

3   a jury verdict of $100 million.

4          The rights as a creditor that we have had are --

5   we are the ones who have been lied to.  We are the ones who

6   have been the target of this scheme to lie about assets, to

7   lie about who it is that has rights to the very property

8   that is the subject of this litigation.  So focusing on that

9   particular question, we think it is Mattel.  Obviously the

10  Court has been misled.  There have been lies to the forensic

11  auditor.  There are others, but I think the short answer is

12  Mattel as a creditor.

13         THE COURT:  All right.

14         MR. GORDINIER:  Your Honor, I will be very brief.

15  Sometimes as they say actions speak louder than words.  You

16  sat here and watched four partners 18 months after they

17  started accusing my client of fraud caucusing, and they came

18  up with an argument they first raised in their opposition.

19  The fact is this was a business transaction that was

20  occasioned by Wacovia's business decision to foreclose on

21  the debt.

22         THE COURT:  Assuming it wasn't, assuming the worst

23  and there was fraud, who was it perpetrated on?

24         MR. GORDINIER:  Certainly not Mattel.  They

25  haven't alleged it.

```
 1              THE COURT:  Counsel.
 2              MS. HURST:  Assuming -- which we of course do not
 3    concede that they have pled a scheme to defraud -- Your
 4    Honor, Wacovia is the one that sold its debt for
 5    $200 million off the face price.  That's the definition of
 6    "indirect" under Hemi.
 7              MR. ZELLER:  If I may direct the Court's attention
 8    to paragraph 115 where we say specifically, "Omni 808 was
 9    formed to frustrate Mattel's ability to recover from MGA
10    money and property rightfully belonging to Mattel."
11              MS. HURST:  That's that an intent issue, the one
12    that Hemi says doesn't substitute for proximate cause.
13              MR. ZELLER:  I didn't think we were addressing
14    proximate cause.  I thought we were discussing what the
15    fraudulent act was.
16              THE COURT:  We were.
17              Ms. Hurst, you have argued that violation of a
18    California fraudulent transfer state law cause of action
19    cannot form the basis for mail fraud or wire fraud.  Under
20    the broad definition of property and fraud in Carpenter, how
21    is that argument sustainable?
22              MS. HURST:  Your Honor, I think that our point on
23    that is that it's not property for purposes of the mail and
24    wire fraud statute until it's a judgment.  That may be
25    different under state law, but in Carpenter, on that, it
```

| | |
|---|---|
| 1 | just says trade secrets.  Basically confidential economic |
| 2 | information can be property, so it's not really pertinent to |
| 3 | that point, Your Honor. |
| 4 | THE COURT:  I would just like to address two |
| 5 | questions concerning whether this conspiracy has been pled. |
| 6 | Mr. Gordinier, on behalf of Omni, let's assume I |
| 7 | find as a matter of law that the Wacovia debt purchase as it |
| 8 | is pled is a scheme or artifice to defraud.  If I make that |
| 9 | finding, what argument do you have left?  In other words, |
| 10 | construct the best out of the shambles that would be |
| 11 | presented to you. |
| 12 | MR. GORDINIER:  Your Honor, they still have to |
| 13 | allege -- and they have not -- that we had knowledge of the |
| 14 | criminal enterprise and that we agreed to participate, which |
| 15 | they have not.  It's not there, and the Court can't infer it |
| 16 | even if you accept the other allegations as true. |
| 17 | THE COURT:  Let me ask you two questions.  Let me |
| 18 | assume for a moment that Mattel argues that's a reasonable |
| 19 | inference because this group of people who are friends or |
| 20 | former partners of different ventures also had some amount |
| 21 | of money that came from Mr. Larian into this grouping, into |
| 22 | this sum of money for the purchase.  What do I do with that |
| 23 | argument? |
| 24 | MR. GORDINIER:  Simple association does not |
| 25 | suffice. |

```
 1              THE COURT:  Let's assume they can show money
 2   flowed from Mr. Larian, a substantial amount.
 3              MR. GORDINIER:  We know -- and they have alleged
 4   -- that Mr. Larian loaned $60 million.  That's not at issue.
 5              THE COURT:  That's what I am speaking to.
 6              MR. GORDINIER:  Right.  That does not in and of
 7   itself permit the inference that the Omni 808 members either
 8   have knowledge of the criminal enterprise defined as "trade
 9   secrets" in Mexico, Canada, employees -- there's a number of
10   things.  There is no inference connecting those two either
11   temporally or substantively.  Second, there is no allegation
12   that Omni 808 agreed.  Those two are just not there, and the
13   Ninth Circuit is clear they are required.
14              THE COURT:  At the low threshold of the
15   requirements of 12(b) for a moment, I expect to hear from
16   Mattel that I should draw a reasonable inference that one or
17   more persons in the Omni group were aware --
18              MR. GORDINIER:  They have argued that.  The fact
19   is they haven't alleged it.  It's required, and they can't
20   consistent with Rule 11.
21              THE COURT:  MGA, do you want to add anything?
22              MS. HURST:  I would just add under Twombly that
23   even at the low end of 12(b)(6) conspiracy is not a
24   conclusion that need just be accepted.  It sounds like again
25   this on that distinction between aiding and abetting and
```

```
 1   conspiracy.  The transaction allows MGA to continue to
 2   exist.  Whether or not any money ever gets paid as interest
 3   is a completely different question frankly.  If the interest
 4   payments are what's harmed somebody, which I wouldn't
 5   concede for a moment, then it's the interest payments that
 6   are the subject of the claim, not the transaction itself.
 7              THE COURT:  Mattel, what am I going to hear?
 8              MR. ZELLER:  Briefly, paragraph 113 of our
 9   complaint makes it very clear that -- it says, "The
10   parties" -- it's talking about IGWT, and it's talking Omni,
11   and so on -- "structure the transaction in that manner to
12   enable Larian through IGWT to obtain 'first position'
13   secured debt with respect to funds Larian loaned to MGA.
14   Thus, it's effectively converting the legal proceeds of
15   MGA's conduct into Larian's purportedly secured debt."
16              What I would submit is -- and this may lead into a
17   whole injury discussion as well, but fundamentally what
18   occurred here was that there was a scheme, a conspiracy,
19   that was furthered by Mr. Kadesha and the other Omni parties
20   in order to basically encumber, to thwart, Mattel's right as
21   a creditor, and it did so by purporting to put together this
22   structure that made Larian, who normally of course as a
23   shareholder for MGA would have been last in line, to now be
24   in fact superior to Mattel.
25              The timing of this I think frankly almost alone
```

1    allows the inference of intent, agreement, and the like.

2    This is being done during and in the aftermath of the Phase

3    1-A verdict and the Phase 1-B.  IGWT 826 is named after the

4    damages verdict date.  So this is something where I think

5    when one looks at the circumstances and the timing and that

6    this was being done in order to essentially thwart Mattel's

7    rights as a creditor, which were absolutely transparent by

8    mid July that Mattel had rights as a creditor by any

9    standard -- that that was the reason this was done.

10           I would also point out as part of this -- and we

11   still don't have an answer fully from today, but there are

12   certainly inferential -- inferences can be drawn that the

13   Bratz IP was encumbered in some way or at least they

14   intended to do so.  That would be in fact directly harmful

15   to Mattel.  That was the very property that was at issue in

16   the trial.

17           Omni cannot stand up and say with a straight face

18   that they did not know.  This was a widely publicized trial.

19   These are people who are friends of Isaac Larian.  These are

20   people who were involved.  There is no question that a

21   reasonable inference is that they knew full well what was at

22   stake in terms of the money that Mattel was potentially

23   going to get as well as the Bratz IP.

24           THE COURT:  Obviously you wouldn't take the same

25   position -- and maybe you would -- if these were unrelated

mt

1　persons, unrelated entities by friendship or past business
2　dealings.  What has caused the hackles in the filings is the
3　fact that this is not a closely knit group, but it certainly
4　knows Mr. Larian, has either invested or been a part of his
5　friendships for some period of time.  That's why you find
6　this so --
7　　　　MR. ZELLER:  That's certainly one reason why we
8　questioned this at the outset.  There were other
9　circumstances that were suspicious, namely, including the
10　timing.
11　　　　THE COURT:  Well, if you want to make an
12　investment -- and there was a private investment in a
13　sense -- I would think you would go to the very entity and
14　business people that you have past relationships with, so
15　the argument cuts both ways, and the question for the Court
16　is -- at summary judgment, if I let this go through, I might
17　see that entirely differently.
18　　　　I am just balancing both.  You know, private
19　investors go to good friends, people they have invested with
20　in the past, so I would take MGA's argument to heart.  By
21　the same token, from your position, it's a real curiosity at
22　this point -- more than that from your --
23　　　　All right, I have got one more question for you --
24　I think it's for Mr. Gordinier, though.  This is curiosity.
25　I want to clear the cobwebs.  You never want something

```
 1   working in a Court's mind even if it is not directly
 2   relevant.  Omni has constantly argued that Mattel does not
 3   have a security interest to MGA's property.  That may not be
 4   relevant eventually to any analysis I make in this case, but
 5   it's curious to me for you to take such a strong position in
 6   light of the fact that your entire case is predicated really
 7   on the defense that you have not interferred with the
 8   progress of the litigation.
 9            MR. GORDINIER:  Let me be clear.  Mattel -- I
10   don't even think Mattel would argue they have a senior
11   secured interest.  What the senior secured interest refers
12   to is what Wacovia had on the acquired.  The most that
13   Mattel can claim they have is a jury verdict for
14   $100 million, which is what it is.  That is entirely
15   unrelated to Wacovia deciding to foreclose and deciding to
16   sell its debt to whomever happened to be Omni.
17            I don't know whether I am clearing up the Court's
18   confusion, but there is really no doubt here that Omni
19   currently has the senior security interest that Wacovia had.
20   We sit in the same shoes that Wacovia sat in.  The question
21   ultimately will be how that sorts out, but it doesn't
22   involve IP first of all.  As I said before and as the
23   complaint says -- and, frankly, now you are bound by the
24   allegations of the complaint -- Wacovia's security interest
25   only involved receivables and inventory, and that's what
```

```
 1   Omni required.
 2           MR. ZELLER:  If I may make one quick point, Omni
 3   fundamentally -- and it's just reiterated here -- just
 4   paints Mr. Larian out of the picture as though somehow if
 5   you just focus on this transaction between Omni and Wacovia
 6   and you look at nothing else that that somehow is the intent
 7   of our claim, and that's just not true.
 8           The security interest that we are concerned about
 9   that I just recited and it's specified in the complaint was
10   the senior secured interest that Isaac Larian was seeking
11   that Omni has attempted to help him implement.  So it has
12   nothing to do with Omni stepping into the shoes of Wacovia
13   about security interest.  It's Isaac Larian, and Isaac
14   Larian manipulating this behind the scenes, and Omni and its
15   members and its agent participating in that conspiracy.
16           THE COURT:  I am going to ask you a question that
17   has nothing to do with this motion.  Why didn't Mattel buy
18   the debt?  Don't answer that.
19           MR. ZELLER:  I have a lot of answers.
20           THE COURT:  When I go back into chambers and start
21   writing -- I am just tossing out all my thoughts, so don't
22   feel like you have to answer that.
23           Concerning whether some of these predicate acts
24   are related -- my question is really concerning Omni and
25   Machado -- both of you have argued that the acts aren't
```

1    related, which is sort of the equivalent of a circular

2    firing squad.  If either of your alleged activities are

3    related to the other one, then you seem to argue somewhat an

4    end-run around the RICO liability.

5            More importantly, there is very sparce Ninth

6    Circuit precedent on the relatedness issue.  The Second

7    Circuit has done a lot of writing, and I'm referring

8    specifically to United States versus Daidone, 471 F.3d 371.

9    It's a Second Circuit case from 2006.  The Second Circuit

10   seems to be trying to deal with this more than most of the

11   Circuits.  It summarizes a vast body of case law.  In

12   Daidone, which you can review, the Second Circuit held that

13   the acts are related as long as they relate to the

14   enterprise.  That's it.

15           So, first of all, why shouldn't I at least

16   consider what the Second Circuit has to say on this issue?

17   The second question I have is if I do consider what the

18   Second Circuit has to say on this issue, then how can you

19   possibly argue that multiple acts aimed at depriving Mattel

20   of intellectual property are not related?  Take your time

21   with that.

22           MR. GORDINIER:  On behalf of Omni, I don't need

23   any more time because the facts as you have them alleged in

24   the complaint do not in fact assert a violation of any

25   transfer of intellectual property.  They just don't, so you

```
 1   don't need to -- I'm happy to have you consider any Court's
 2   opinion that you feel is helpful, but with respect to Omni,
 3   it doesn't relate.
 4             THE COURT:  Just so each of you know, I will
 5   always consider the Ninth Circuit first.  I mean, that's my
 6   Circuit.  The question is if the Ninth Circuit has answered
 7   this question.  The only difficulty District Courts will get
 8   into is if we think there is a better reasoned opinion in
 9   another Circuit.  I don't think that's necessarily going to
10   be the case, but the Second Circuit has done a lot of
11   writing in this area.
12             MR. GORDINIER:  I don't have anything else to add
13   other than what I have already said on the issue of
14   relatedness.
15             THE COURT:  Okay.  Thank you.
16             MS. HURST:  We are not going to add anything.
17             THE COURT:  Ms. Estrich.
18             MS. ESTRICH:  We would simply suggest that
19   relatedness has been broadly defined, and it's defined
20   according to the enterprise.  The enterprise we alleged here
21   for 12(b) purposes is not simply a mail fraud enterprise and
22   not simply a wire fraud enterprise.  I think it relates to
23   both Omni and Mr. Machado.
24             It's an enterprise that was all about taking
25   Mattel's property and using it against Mattel and unfairly
```

1    competing with Mattel, and then covering up and obstructing

2    justice and committing perjury and falsifying documents all

3    in an effort to ensure that Mattel would be unable to

4    recover what was rightfully its.

5              THE COURT:  I have 20 more pages of questions,

6    but -- I'm joking.

7              MS. HURST:  The 8:45 flight tonight is the last

8    one.

9              THE COURT:  I think I am satisfied.  I really did

10   have another couple pages, but you have answered them along

11   the way, so there is no reason to belabor it.  I can do two

12   things.  First of all, I want you to leave knowing that I

13   have absorbed as much as you want to give me.  I will either

14   end it here or take a recess and come back in some period of

15   time and you can argue whatever you want to for as long as

16   you want to.

17             As all counsel rise and consult with one another,

18   if you want to argue more, I'll come back in 15 minutes.

19             (Counsel conferring)

20             MR. GORDINIER:  We have met.  We have agreed that

21   you can end it right now.

22             THE COURT:  Okay.  Then let's do this.  You can

23   look for an opinion sometime the third week in June

24   realistically.  I don't want to rush it.  If I can found out

25   what the Supreme Court is doing on the one -- then I will be

1  able to do it all at once.

2          No. 2, I just have a lot more reading to do.  I

3  want this on the record.  I want to compliment all counsel

4  for both sides.  I think you have been extraordinarily

5  well-prepared.  I think your arguments have been exemplary,

6  and I think that you have done your best to educate this

7  Court.  Therefore, any mistakes from this point forward are

8  totally mine, not through any misargument by counsel.  There

9  has been a lot of hard effort.

10          Do not contact me.  By that I mean I don't need

11  additional briefing.  If I want briefing, I will ask for it,

12  so don't you dare gratuitously think that you forgotten

13  something out the door because if you have additional

14  arguments I am offering you until midnight.  I don't care.

15  Once we are done with this hearing, if I need something, I

16  will set up a briefing schedule.  I will notify you and tell

17  you what my concerns are.

18          MR. OVERLAND:  Is the Court willing to consider

19  another issue briefly?

20          THE COURT:  Sure.

21          MR. OVERLAND:  This relates to the deposition of

22  Mr. Vargas.  I don't know if the Court recalls --

23          THE COURT:  Isn't he being deposed down in Mexico

24  maybe?

25          MR. OVERLAND:  Maybe.  I think what happened was

1    there was a motion filed on May 20 by Mattel to have him

2    deposed in Mexico.  On May 21, before we had a chance to

3    respond, this Court issued an order, and --

4              THE COURT:  Pretty quick.

5              MR. OVERLAND:  Yes, pretty quick.  The order

6    stated that the deposition was not required to take place in

7    Mexico.

8              THE COURT:  It doesn't have to.

9              MR. OVERLAND:  I specifically objected to the

10   deposition taking place in Mexico.  It would really create a

11   hardship for me because of my condition to travel there.  I

12   think the basis of Mattel wanting it in Mexico was a

13   declaration by Mr. Vargas's attorney that he was afraid that

14   he was going to be sued or made a party here.

15             THE COURT:  You can work that out very easily.  We

16   considered that.  You can get him back to the United States

17   with a declaration very easily.

18             MR. OVERLAND:  The problem we have now is that

19   Mattel has now noticed the deposition in Mexico and said it

20   will go forward in Mexico even if we don't attend.

21             THE COURT:  Well, of course I want you to

22   participate.  I am aware that there may be some limitations

23   obviously.  Can you come up with a neutral site like Canada?

24             MR. OVERLAND:  Hawaii.

25             THE COURT:  Vancouver?  There are lots of ways to

1    work this out.  I have very creative attorneys.  Can I take

2    back all the prior comments I made?  I'm just joking with

3    you.

4              You don't want him here for jurisdictional

5    purposes or to be served?

6              MR. OVERLAND:  No, just the opposite.

7              MS. HURST:  We agreed months ago that nobody was

8    going to serve these expert witnesses if they came here for

9    a deposition in writing, e-mails between me and Mr. Zeller.

10   It already happened.

11             MR. OVERLAND:  Seriously, traveling is very

12   difficult for me.

13             THE COURT:  How are you going to work this out?

14   He is going to get deposed.

15             MR. ZELLER:  Right.

16             MR. OVERLAND:  Why can't he come here like

17   everybody else?  Everybody else has come here from Mexico.

18   The only reason he doesn't want to here is because his

19   lawyer think that he is going to get served.  MGA has said

20   they are not going to serve him.  There's no reason for him

21   not to come here.

22             THE COURT:  That representation is on the record.

23   Why can't he come here?

24             MR. ZELLER:  I am happy to argue this now.  We

25   would made a motion for a specific reason, which was that

1    indeed there was an agreement as we understood it with MGA

2    from months ago.  We asked them to confirm that when

3    Mr. Vargas here because of his concern that that agreement

4    would be binding.  What we received in response from MGA was

5    zilch.

6            When we made our motion making the same point,

7    inviting MGA to make the very statement that if I understand

8    what they are saying now to assure that in fact they would

9    not and were agreeing and never would attempt to serve him

10   with process here, that was the time to make it.  They

11   didn't do it.

12           THE COURT:  It sounds like we have a meeting of

13   the minds.

14           MS. HURST:  The Court issued an order before we

15   could respond.

16           THE COURT:  Can we reach an agreement today?

17           MR. ZELLER:  I don't know about today.  Obviously

18   we now to see what the situation is with Mr. Vargas.

19           THE COURT:  What time would you like to come back

20   tonight?

21           MR. ZELLER:  I will see what we can do about

22   reaching Mr. Vargas.  He needs to be consulted on this.

23           THE COURT:  One of the problems that we're having

24   as my clerk pointed out is that you have been filing a lot

25   of motions lately, and you haven't been meeting and

```
 1    conferring frankly.  Believe me, when you send us something,
 2    we are turning that around in 24 to 48 hours.  Meanwhile, we
 3    are going through all these privilege logs, et cetera.  I
 4    don't even want to get starting with that.
 5              I'm sitting here, and you tell me the time to come
 6    back, but nobody is going anyplace now.
 7              Mr. Zeller, walk over to counsel and work it out.
 8              MS. HURST:  I made the representation.  I don't
 9    what else to say.
10              THE COURT:  Ms. Hurst, you are taking a lot of
11    time.  You can work this out in two seconds.  Otherwise, I
12    will see you at midnight.
13              (Counsel conferring.)
14              THE COURT:  All I need is a representation on the
15    record, and it sounds like you have reached that.  This is
16    just fun and games time.  I think you have already got the
17    accommodation.
18              MR. ZELLER:  The accommodation is not something I
19    can speak to.  It is Mr. Vargas.  I don't control him.  I
20    will have to find him and consult with him which I will do
21    right now.
22              THE COURT:  Go call him.  I will wait.
23              MS. HURST:  Your Honor, if he won't come in light
24    of the representation --
25              THE COURT:  He is going to get deposed.  I want
```

```
1   counsel involved.  I don't want Mr. Overland to be in a
2   difficult position.  There are just some travel issues that
3   he is going to have, and I think --
4           MS. HURST:  Their agreement was that Mr. Vargas
5   would attend wherever the Court orders.  If the Court orders
6   him to come to Santa Ana, their agreement provides that he
7   will attend.  We have made the representation of nonservice.
8   I would ask the Court to order him to attend here.  They can
9   then invoke their agreement.
10          MR. ZELLER:  There is no question that the parties
11  appear to agree on this very point.  However, I cannot
12  obviously bind Mr. Vargas.  That's the short answer.  We
13  have to track him down, and I am doing that right now.
14          MS. HURST:  For purposes of resolving this today,
15  could that please be sufficient?  They have an agreement
16  with him to appear where the Court orders.
17          MR. ZELLER:  I don't know what the final agreement
18  looks like.
19          MS. HURST:  Well, it hasn't been produced.  If --
20          THE COURT:  I will order him to appear in
21  Santa Ana.  If that's inappropriate, you will come back to
22  me.  That way we can resolve it that evening.  You will have
23  time to check with him, but I can't imagine why he is not
24  coming to Santa Ana.
25          MS. HURST:  Thank you, Your Honor.
```

1            THE COURT:  So I will vacate the prior order at

2    this time and order Mr. Vargas to Santa Ana tomorrow -- just

3    joking, Counsel.  Have you reached Mr. Vargas?

4            MR. ZELLER:  Not yet.

5            THE COURT:  That way I can get you all on your

6    way.  I will order the deposition in Santa Ana, and we'll

7    get an agreed upon date when you have contacted Mr. Vargas

8    and see if he will come, but you have got to explain the

9    representation that is being made.  There is no filing on

10   this.  It can't have a chilling effect.

11           MR. ZELLER:  One administrative matter, we had a

12   filing that was due today on a protective order motion.  Can

13   we agree that it would be tomorrow --

14           THE COURT:  Make it Monday.

15           MS. HURST:  And then could we have a few extra

16   days on the back end to respond?

17           THE COURT:  How about Tuesday for them so they

18   have the weekend to relax a little bit, enjoy their

19   families, and how about Thursday or Friday for you?

20           MS. HURST:  Thank you so much.

21           MR. ZELLER:  Thank you.

22                           -oOo-

23

24

25

SHARON A. SEFFENS, U.S. COURT REPORTER

42

```
1

2

3

4

5                          CERTIFICATE

6

7          I hereby certify that pursuant to Section 753,

8    Title 28, United States Code, the foregoing is a true and

9    correct transcript of the stenographically reported

10   proceedings held in the above-entitled matter and that the

11   transcript page format is in conformance with the

12   regulations of the Judicial Conference of the United States.

13

14   Date:  June 5, 2010

15

16

17                         Sharon A. Seffens 6/5/10
                           _____
18                         SHARON A. SEFFENS, U.S. COURT REPORTER

19

20

21

22

23

24

25
```