JENNIFER L. KELLER (SBN 84412)
keller@krlawllp.com
KAY RACKAUCKAS (SBN 143480)
krack@krlawllp.com
ALLISON SHALINSKY (SBN 186975)
shalinsky@krlawllp.com
KELLER RACKAUCKAS LLP
18500 Von Karman Avenue, Suite 560
Irvine, CA 92612
Telephone: (949) 476-8700
Facsimile: (949) 476-0900

Attorneys for MGA Parties

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>v.<br><br>MATTEL, INC., a Delaware corporation,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS. | Case No. CV 04-9049 DOC (RNBx)<br><br>Consolidated with Case No. CV 04-9059 and Case No. CV 05-2727<br><br>**DECLARATION OF JENNIFER L. KELLER IN SUPPORT OF MGA PARTIES' MOTION FOR LEAVE TO AMEND *NUNC PRO TUNC***<br><br>Hearing Date: April 1, 2013<br>Time: 8:30 a.m.<br>Judge: Hon. David O. Carter |

I, Jennifer L. Keller, hereby declare as follows:

1.      I am an attorney at the law firm of Keller Rackauckas LLP, counsel of record for the MGA parties in the above-captioned matter, and admitted to practice before this Court.  I submit this Declaration in support of MGA Parties' Motion for Leave to Amend *Nunc Pro Tunc*.  I make this declaration on personal knowledge and, if called as a witness, could and would testify competently to such facts under oath.

2.      A true and correct copy of excerpts of the certified transcript of the December 10, 2012 oral argument before the Ninth Circuit is attached hereto as **Exhibit A**.

3.      A copy of the MGA parties' proposed amended complaint is attached hereto as **Exhibit B.**

4.      A redlined comparison of the proposed amended complaint and the original complaint is attached hereto as **Exhibit C.**

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on February 27, 2013 in Irvine, California.

KELLER RACKAUCKAS LLP

By:  /s/ Jennifer L. Keller
Jennifer L. Keller
Attorney for MGA Parties

1

2  UNITED STATES COURT OF APPEALS

3  FOR THE NINTH CIRCUIT

4  Case No. 11-56357

5  - - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7  MATTEL, INC., A DELAWARE CORPORATION; MATTEL

8  DE MEXICO S.A. DE C.V., et al.,

9             Plaintiffs-Appellants,

10

11  v.

12

13  MGA ENTERTAINMENT, INC. A CALIFORNIA

14  CORPORATION, et al.,

15             Defendants-Appellees.

16  - - - - - - - - - - - - - - - - - - - - - -x

17

18             Pasadena, California

19             December 10, 2012

20

21

22  B E F O R E:

23  CHIEF JUDGE ALEX KOZINSKI

24  CIRCUIT JUDGE STEPHEN S. TROTT

25  CIRCUIT JUDGE KIM MCLANE WARDLAW

Page 1

```
 1       it --
 2           JUDGE KOZINSKI:  It looks like a
 3       request for admissions, perhaps.
 4           MS. SULLIVAN:  Right, Your Honor.
 5       It's a discovery request and what I
 6       asked -- what I call to your attention
 7       there, the 1086 to 1090 is MGA's
 8       discovery request to Mattel.  And what --
 9       the reason we cite it to you is that it's
10       a pre-August 2007 indication that they
11       had reason to suspect the Toy Fair
12       conduct.  And the reason I call it to
13       your attention is it's extremely
14       detailed.  It talks about planograms and
15       the layout of Toy Fairs.  And the reason
16       we cite is that if MGA had enough
17       knowledge of Toy Fair to make that
18       discovery request, if its counsel is
19       speaking for the corporation, Judge,
20       that's additional reason.  But I'd like
21       to --
22           JUDGE KOZINSKI:  That's why --
23       you've reached my second question.  Why
24       isn't that a jury question whether they
25       satisfied the discovery rule?  Why isn't
```

Page 18

```
1            that a jury question?
2                MS. SULLIVAN:  Well, Your Honor, if
3       Judge Carter had thought there were
4       issues of fact as to their knowledge he
5       could have put that to the jury.
6       Obviously, you can do statute of
7       limitations factual questions before a
8       jury.  But he erred legally by taking the
9       whole question under the wrong standard.
10      He said, "Logical relationship was not
11      operative" --
12               JUDGE KOZINSKI:  Well, let's say we
13      accept that argument.  Why don't they --
14      the statute of limitations is the statute
15      of limitations.  You go back, what, three
16      years in California or whatever the
17      statute is but then there is the
18      discovery rule.
19               MS. SULLIVAN:  That's right.
20               JUDGE KOZINSKI:  And you can say
21      well, but we didn't have a reasonable
22      chance to discover until some point
23      within the statute of limitations or
24      within the time.  And isn't that the kind
25      of thing that gets decided by a jury?
```

Page 19

```
 1
 2                    C E R T I F I C A T I O N
 3
 4        I, Ellen S. Kolman, certify that the foregoing
 5        transcript is a true and accurate record of
 6        the proceedings.
 7
 8                  Ellen S Kolman
 9        Ellen S. Kolman (CET**D-568)
10        AAERT Certified Electronic Court Transcriber
11
12        Veritext
13        200 Old Country Road
14        Suite 580
15        Mineola, NY 11501
16
17        Date:   February 17, 2013
18
19
20
21
22
23
24
25
                                              Page 88
```

Exhibit A - 6

JENNIFER L. KELLER (SBN 84412)
keller@krlawllp.com
KAY RACKAUCKAS (SBN 143480)
krack@krlawllp.com
ALLISON SHALINSKY (SBN 186975)
shalinsky@krlawllp.com
KELLER RACKAUCKAS LLP
18500 Von Karman Avenue
Suite 560
Irvine, CA 92612
Telephone:   (949) 476-8700
Facsimile:   (949) 476-0900

Attorneys for MGA Parties

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| CARTER BRYANT, an individual,<br><br>Plaintiff,<br><br>v.<br><br>MATTEL, INC., a Delaware corporation,,<br><br>Defendant.<br><br>AND CONSOLIDATED ACTIONS | Case No. CV 04-9049 DOC (RNBx)<br>Consolidated with: Case No. CV 04-9059 and Case No. CV 05-2727<br><br>**Honorable David O. Carter**<br><br>**MGA ENTERTAINMENT, INC.'S AMENDED COMPLAINT FOR TRADE SECRET MISAPPROPRIATION**<br><br>**Trial Date: January 11, 2011** |

**INTRODUCTION**

1.      Beginning in at least 1992 and continuing through at least 2006, a series of Mattel employees in its "market intelligence" department, with the knowledge, approval, and financial support of their bosses and the executives of the company, willfully and deliberately misrepresented themselves to gain entry into the private showrooms of Mattel's competitors (including MGA) at numerous industry trade shows. Mattel employees went to Kinkos and printed up fake business cards so that they could lie their way into the private showrooms of their competitors. They bought small video recorders (paid for by Mattel) and brought cameras so they could photograph and videotape what they saw in those private showrooms. The showrooms were off-limits to competitors, and the toy manufacturers restricted access to retailers who agreed to maintain the information they received in confidence. Mattel lied about its employees' identities and pretended to be retailers, because it knew that they could not gain entry to these private showrooms unless it did so. Then, Mattel stole the trade secrets and other confidential information of its competitors including but not limited to the appearance, operation and intended play pattern of toys not yet on the market, price lists, and advertising plans and strategies. Mattel embarked on this scheme in order to acquire and maintain an unlawful competitive advantage, and it succeeded wildly.

2.      Over time and pursuant to this scheme, Mattel defrauded MGA of unreleased product information regarding at least the following products: Bratz Mobile, Bratz Styl' It Collection,  Bratz WinterWonderland Collection, Bratz Formal Funk Collection, Bratz Runway Formal Funk Collection, Bratz FM Limo, Bratz Motorcycle, Bratz Pet Assortment,  Lil' Bratz Vehicle Assortment, Lil' Bratz Deluxe Mall Playset, Bratz Petz,  Dazzlin' Disco Café, Sun Kissed Summer, Girls Nite Out, Wild Life Safari Collection, Bratz Diamondz, Bratz Virtual Buddiez Petz, Bratz Campfire, Wild Wild West, Bratz Rock Angelz, Monkey See Monkey Do, Lil' Bratz

1  Boyz,  Alien Racers, Bratz Kidz, and Passion for Fashion.   Some of these products
2  were never released to the market by MGA.

3     3.     Accordingly, and based upon the allegations set forth herein, MGA
4  hereby demands that the Court enter judgment on behalf of MGA on the claim set
5  forth herein.

6                    **BACKGROUND FACTS**

7     4.     As MGA has just discovered after the deposition testimony of Sal
8  Villasenor on July 12, 2010 and documents produced thereafter that should have
9  been produced many years before, for at least fifteen years from 1992 through 2006,
10  a series of Mattel employees in its "market intelligence" department, with the
11  knowledge, approval, and financial support of their bosses and the executives of the
12  company, willfully and deliberately misrepresented themselves to gain entry into the
13  private showrooms of Mattel's competitors at trade shows, armed with cameras and
14  video recorders.

15     5.     The Toy Industry Association ("TIA") was formed in or about 1916.
16  For decades since the formation of TIA, each year there has been a toy fair in New
17  York hosted by TIA where all of the major toy manufacturers come together on a
18  worldwide basis to meet with retailers in order to demonstrate their wares. The New
19  York Toy Fair ("NYTF) has been customarily held in or about February of each
20  year.

21     6.     During NYTF, it has been the practice of the many of the toy
22  manufacturers to have private showrooms. These private showrooms are set up for
23  the purpose of private meetings between the toy manufacturers and their customers,
24  the retailers. Entry to these showrooms is regulated. Only retailers or distributors are
25  permitted, often by appointment only; many manufacturers require the use of NDAs,
26  and post signs and other information advising the entrants to private showrooms that
27  they are obliged to hold in confidence the nonpublic information presented therein,
28  and not to take pictures or otherwise record what they see. Indeed, Mattel is well

- 2 -

1  aware of these practices because Mattel itself has engaged in such regulation of

2  admission to its private showrooms at the NYTF for many years. MGA has restricted

3  access to its showroom at least since 1998.

4        7.     In the private showrooms, toy manufacturers typically present to the

5  retailers and distributors their products that are not yet on the market. The

6  manufacturers will also periodically provide catalogs of their products to be

7  marketed for the upcoming year. Given the fast pace and highly competitive nature

8  of the retail toy industry, the appearance, operation and intended play pattern of an

9  as-yet unmarketed toy is one of the few true trade secrets that can exist. Other

10  confidential information presented in show rooms includes wholesale price lists of

11  products not yet on the market, the manufacturers' advertising and marketing plans,

12  and packaging concepts for the next season. Knowing in advance which products

13  will be advertised by the manufacturer is very important, because it enables retailers

14  to plan their likely purchases (advertised products sell more units), their own in-store

15  allocation of advertising support, and other important marketing elements such as the

16  content of advertising circulars and the like.

17        8.     As Mattel alleges in its own Counterclaims, for a toy company to

18  systematically find out in advance the nature of a competitor's as-yet unmarketed

19  products, the quoted prices, and the identification of which products will be

20  advertised would be the holy grail of competitive advantage. Such a practice would

21  enable the party stealing the information to adjust its own product, pricing and

22  advertising plans, to engage in comparative selling practices with retailers, and

23  generally to get a consistent and improper head start on its own competitive

24  products. It was not MGA, however, but Mattel who engaged in this consistent

25  pattern and practice of stealing confidential information from competitors.

26      **A.**    **The Market Intelligence Group.**

27        9.     Beginning at a time unknown to MGA but at least since February of

28  1992, a group of employees within Mattel known as the "market intelligence"

MGA'S AMENDED COMPLAINT
CV 04-9049 DOC (RNBX)

department systematically defrauded nearly every toy manufacturer in the business of their confidential information during NYTF. In advance of NYTF, these Mattel employees, who included at least Jeff Lange, Sal Villasenor, Carey Plunkett, Kelly Osier, Candace Chang and Tyler Snyder, went to Kinkos in advance of NYTF and printed up fake business cards identifying them as retail representatives and concealing their affiliation with Mattel and bought spy cameras—all paid for by Mattel. Using these falsified credentials, these Mattel employees misrepresented their identities, affiliations and purposes in order to gain entry to private showrooms of competitors (including MGA) at NYTF under false pretenses, and were successful in doing so year-after-year. Villasenor entered showrooms for multiple toy companies, including MGA,  from at least 1999 to 2006. Osier and Plunkett were generally responsible for girls products, so they entered showrooms for MGA and others at multiple toy fairs. Upon information and belief, each year during NYTF, in addition to using fake credentials, one or more of these identified Mattel employees also signed one or more confidentiality statements in order to gain entry to competitor showrooms. These were false promises of confidentiality, made without any intention to perform. Mattel knew that its employees would not be admitted access to private competitor showrooms unless they misrepresented themselves.

10.     This practice of sneaking into private showrooms was not limited to the NYTF. Instead, Mattel schemed to defraud its competitors at toy fairs worldwide, permitting Mattel to extend its dominance throughout the globe by gaining confidential information about its worldwide competitors' future plans. During the period from at least 2001 to 2006, Mattel sent its spies around the globe, where they lied their way into competitors' showrooms at the Hong Kong Toy Fair (occurring annually in January of each year), and Nuremberg Toy Fair (occurring annually in February of each year), as well as at the Tokyo Toy Fair. At these toy fairs, Mattel employed the same practices of using fake names, fake business cards and false

pretenses about their purposes to obtain confidential information about competitors' upcoming launches and product lines.

11.     These employees and contractors lied their way into the showrooms, stole catalogs, price lists and other information and took unauthorized pictures.

**B.     The Distribution And Presentation Of Spy Reports And The Library.**

12.     To complete the fraudulent scheme and enable Mattel's unfair competitive advantage based thereon, the Mattel thieves then assembled presentations of hundreds of pages to be copied and distributed on a worldwide basis. These massive presentation documents included page after page of unauthorized reproductions of photos and catalog pages depicting the competitor products. The written presentations were distributed to hundreds of employees through Mattel, including top executives as well as many employees outside of California and the United States. Ironically, at least one of the recipients of such presentations was Counter-Defendant Gustavo Machado, to whom one or more presentations were sent in Mexico while he was still employed by Mattel Servicios. Mattel's market intelligence group tailored the information, assembling design information for the design group, and marketing information for the marketing group.

13.     In fact, it became an annual right of passage and a hot ticket within Mattel to attend Mr. Villasenor's annual presentation after NYTF. In addition to distributing the report in written form, Mr. Villasenor, aided by one or more of his cohorts in crime, would publicly display the unauthorized photographs of unreleased competitor products to hundreds of Mattel employees. In March or April of each year, in the presentation theater at Mattel's headquarters in El Segundo, Villasenor and one or more of his cohorts would present their information to an auditorium packed to capacity with hundreds Mattel employees. Hundreds of employees attended year after year. Mattel executives all the way up to the CEO Bob Eckert received copies of the reports and/or attended reviews of all of the stolen NYTF

1   information. These reviews included the public display of unauthorized

2   reproductions of photographs and other images of the competitor products. Some of

3   these presentations by Mr. Villasenor were also videotaped.

4       14.    Remarkably, this euphemistically named "market intelligence" group

5   also maintained an extensive library of all of the information that they had stolen

6   over the years. This vast library housed on the Ninth Floor at Mattel in El Segundo

7   containing the fruits of Mattel's long term scheme to defraud its competitors of their

8   confidential information included at least the annual reports made after NYTF by the

9   market intelligence group, the competitor catalogs, price lists and other confidential

10  information they had stolen from the showrooms, and videotapes of the annual

11  presentations of the stolen information. Access to the library and its contents was

12  regulated; sign-in and sign-out sheets were used. Even Mattel's legal department

13  used the information.

14      15.    This library of stolen material was extremely valuable; it permitted

15  Mattel to gather in one place both information about its competitors' future plans as

16  well as a historical record of products in the industry, and to mine these future plans

17  and historical record for ideas for its own products. For MGA, some of the products

18  about which Mattel stole information were never released; upon information and

19  belief, that was true of others as well. Thus, Mattel had an unparalleled library not

20  only of information about products that had become public, but of information about

21  products that have never yet seen the light of day and might well be considered by

22  their originators for future seasons. The plans of its competitors for the upcoming

23  spring and fall seasons was information Mattel could not have obtained absent its use

24  of false pretenses; the historical record was one that it would have been nearly

25  impossible for Mattel to assemble from public sources at a reasonable cost. But by

26  lying and stealing every year in one place and at one time (and then expanding that

27  practice worldwide in this decade), Mattel was able to assemble an invaluable set of

28  materials and then reuse them for decades at its leisure.

16.     The methods of Mattel's spies were well known throughout the company, including by its top executives. The market intelligence group openly discussed its tactics. Some of the presentations indicated right on their face that they were based on information taken at NYTF. Because of the nature of the information and the fact that it had come from the NYTF, everyone who had attended a trade show knew that access to showrooms was restricted and there would be no legitimate way to get all of this information.

17.     Executives such as Matt Turetzky and Drew Vollero, who reported to Matt Bousquette (President first of the Boys Division, and later of Mattel Brands), supervised the group, approved its expenses, and gave it glowing performance reviews. Bousquette received the reports containing stolen information, as did CEO Eckert. Bousquette was friendly with Villasenor and knew what he was doing to get information. Other former senior executives who have been willing to admit that they were aware of the practices are Sujata Luther and Ron Brawer. The top marketing personnel, such as Tim Kilpin (head of all Girls Marketing) and Russell Arons (head of Barbie Marketing) all received copies of the reports and attended presentations every year, with full knowledge of the restrictive practices of Mattel and its competitors at toy fair showrooms. General Counsel Robert Normile was specifically apprised of the fraudulent practice of stealing information using false credentials by no later than the end of 2005, but the practice nonetheless continued. After the 2006 NYTF, Villasenor was instructed to keep getting the information but that Mattel didn't want to know how he was doing it.

18.     Over time and pursuant to this scheme, Mattel defrauded MGA of unreleased product information regarding at least the following products: Bratz Mobile, Bratz Styl' It Collection,  Bratz WinterWonderland Collection, Bratz Formal Funk Collection, Bratz Runway Formal Funk Collection, Bratz FM Limo, Bratz Motorcycle, Bratz Pet Assortment,  Lil' Bratz Vehicle Assortment, Lil' Bratz Deluxe Mall Playset, Bratz Petz,  Dazzlin' Disco Café, Sun Kissed Summer, Girls Nite Out,

1  Wild Life Safari Collection, Bratz Diamondz, Bratz Virtual Buddiez Petz, Bratz
2  Campfire, Wild Wild West, Bratz Rock Angelz, Monkey See Monkey Do, Lil' Bratz
3  Boyz,  Alien Racers, Bratz Kidz, and Passion for Fashion.  In fact, some of these
4  products were never released by MGA, and had Mattel not stolen the information
5  from MGA, Mattel would never have had any opportunity to view them. Upon
6  information and belief, the same is true of other companies from whom Mattel
7  defrauded nonpublic product information.

8  **C.  Mattel Expands And Extends Its Scheme Against MGA.**

9  19.   By at least 2004, Mattel had extended and expanded this fraudulent
10 scheme as it pertained to thefts of confidential information from MGA and
11 subsequent concealment of that scheme in order to continue stealing information
12 from MGA, and ultimately, to drive MGA out of business.

13 20.   Mattel hired an independent contractor whom it believed was likely to
14 be especially successful in spying on MGA. This woman, named Sharon Rahimi,
15 was engaged as a contractor specifically for the purpose of gaining entry to
16 showrooms, and in particular MGA's showroom, to steal confidential information
17 there. Rahimi had previously been an employee in Mattel's market intelligence
18 group and thus when she was engaged as a contractor, she knew exactly how the spy
19 operation was supposed to be conducted. Rahimi, a Persian American, appears to
20 have been hired to infiltrate the MGA showroom in particular because Isaac Larian
21 also is Persian American, and Mattel most likely believed that Ms. Rahimi would
22 therefore be less likely to arouse suspicion and more likely to succeed in her mission
23 to spy on MGA and steal its confidential information. Rahimi entered the MGA
24 showroom at NYTF in at least 2004 and 2005 under false pretenses and stole
25 confidential information.

26 21.   In 2005, MGA filed its Complaint in this litigation. Meanwhile, Mattel
27 had set out to conceal in this case Mattel's fifteen-year scheme to defraud the entire
28 toy industry out of its confidential information. By late 2005, Villasenor had

complained to Mattel General Counsel Robert Normile, asserting that he could no longer lie and steal to get information—especially in light of MGA's allegations. Villasenor told Normile that although his stealing competitors' information gave Mattel a competitive advantage, he believed his conduct was unlawful and exposed him to potential criminal liability. Several months later, and *after* NYTF 2006, Villasenor got a new boss, who told him he couldn't use the same methods but was expected to continue getting the same information. His new boss said Mattel "didn't want to know" how he got the information. After that, Villasenor cracked under the pressure, and increased the volume of his complaints.

22.     One of Quinn Emanuel's partners working on this case then met repeatedly in 2006 with Villasenor, the man who had for more than a decade been tasked with perpetrating and carrying out the program of Mattel's lies and thefts of confidential information. The Quinn Emanuel partner met with Villasenor, who by that point was about to resign because he could no longer perform his job without the use of false pretenses, and was concerned about exposure to MGA. This partner joined together with Mattel's in-house counsel, Jill Thomas (who was not Mattel's regular attorney for employment matters but rather is the Mattel litigation counsel assigned to the case against MGA), in Mattel's scheme to suppress and conceal the vast scheme to defraud by paying Villasenor hush money in the form of a lucrative severance package, and then deep-sixing all of the documents.

23.     They met at a mediation in order to cloak the whole negotiation in as much secrecy as possible. The settlement agreement had a confidentiality clause, and spread out the payments over time, so that Mattel had a tangible means of holding the confidentiality obligation over Villasenor's head. The potential whistleblower had been silenced. After these events, the attorneys at Quinn Emanuel had full knowledge of the depth and breadth of Mattel's spying on competitors. All of the top executives at Mattel had full knowledge, including Normile who, upon information and belief, reported the problem to his boss Eckert who was keenly interested in the

1    progress of this litigation and anything involving MGA. Mattel and Quinn Emanuel
2    then successfully concealed the existence of all documents pointing to Mattel's
3    massive scheme to defraud for succeeding four years of this litigation.

4           24.    There are literally thousands of pages of documents reflecting these bad
5    acts by Mattel: the presentations themselves (some of which were videotaped), the
6    expense reports for fake business cards and handheld video cameras, the
7    performance reviews where these "market intelligence" employees touted their
8    ability to "get competitor information at trade shows." Documents evidencing this
9    conduct were requested by MGA no later than the end of 2006, not long after the
10   meetings with Villasenor. But they were not produced by Mattel and its attorneys.

11          25.    One of the documents that Mattel and Quinn Emanuel had deliberately
12   concealed and deliberately altered was the 2001 NYTF Report. The largely
13   meaningless cover page of that document was produced in January 2008, but the
14   attachment (which mentioned MGA and depicted the original unreleased Bratz
15   product, giving the document all of its legal significance) was omitted from the
16   original production and was not produced until over 2 years later, on July 7, 2010—
17   when the jig was up because Villasenor was about to testify. A September 12, 2007
18   order had specifically compelled Mattel to produce all documents relevant to MGA's
19   statute of limitations defense, which the 2001 NYTF Report demonstrating that
20   Mattel knew about Bratz even before it came on the market surely was. Yet Mattel
21   did not produce the report.

22          26.    Instead, Mattel, with the knowledge and cooperation of its attorneys,
23   detached the report and produced only the cover page, in clear violation of the
24   Court's order and with the knowing intention to suppress relevant evidence
25   concerning MGA's statute of limitations and laches defenses.

26          27.    Additionally, each year's report from 2000 through at least 2004
27   contained references to MGA and/or Bratz. Despite numerous document requests
28   that would cover such documents, the aforementioned September 12, 2007 order

compelling production on many requests covering these documents, and Discovery Master Order No. 89 compelling production on numerous other requests covering these documents, they were never produced.

28.     In fact, after Order No. 89 was entered, Mattel's attorneys expressly promised the Court that Mattel would produce all responsive documents, which promise necessarily included the Villasenor documents referencing MGA (which Mattel had years earlier agreed to produce). But the Villasenor documents referencing MGA and the market intelligence library on MGA were not produced. They were not produced in March, in April, in May or in June. It was not until July 7, 2010, after Villasenor had already been subpoenaed and was just about to testify, that the first few documents finally began trickling in.

29.     Mattel and its attorneys had no intention of producing these documents until MGA found the witness who was the key to the entire scheme. By July, however, Mattel no longer had any choice because it was about to be found out. Had the Villasenor deposition not been subpoenaed for July 12, 2010, the documents never would have been produced. Mattel and Quinn Emanuel came just "that close" to concealing this damning evidence through a second discovery cutoff and another trial. Even now, however, Mattel and Quinn Emanuel continue to suppress documents related to this pattern and practice of theft, including refusing to product documents from Rahimi, Osier and others engaged in this practice, and refusing to produce reports and videos stored in the infamous Ninth Floor library.

30.     In order to suppress and conceal all of the evidence about a long¬term scheme to defraud, witnesses who knew what was going on also had to lie about it. It is reasonable to infer from the evidence produced to date that at least the following Mattel witnesses were aware of the tactics of the market intelligence group and gave misleading or untruthful testimony in order to suppress it and keep it from coming out in this litigation: Matt Bousquette, Tim Kilpin, Russell Arons, and Gene Murtha. Quinn Emanuel attorneys prepared and presented every single one of these witnesses

1    at their depositions while the firm had full knowledge of what the spy group had

2    been doing.

3        31.    In fact, the very Quinn Emanuel lawyer who met with Villasenor in

4    2005 and 2006 to hear his confessions of wrongdoing also represented Keith Storie

5    for six days of deposition as Mattel's 30(b)(6) witness. But then, in the one

6    deposition of Mr. Storie on the topic of Mattel's theft of MGA confidential

7    information, that attorney bowed out, so that a new lawyer could watch, with a

8    straight face, as Storie denied that Mattel employees had ever sneaked into

9    showrooms.

10                                **CLAIM**

11            (Trade Secret Misappropriation—Cal. Civ. Code §3426 *et seq.*)

12        32.    MGA repeats and realleges paragraphs 1 through 31 above as though set

13    forth herein.

14        33.    As used herein, "Trade Secret Materials" shall mean the documents,

15    photographs, catalogs, and other information stolen from MGA by Mattel, as well as

16    by Rahimi, including but not limited to the information concerning MGA in the

17    annual Mattel NYTF reports from 2000 through 2006, related to MGA's unreleased

18    products. MGA's trade secrets stolen by Mattel and Rahimi includes the information

19    concerning MGA products contained within at least the following documents (Mattel

20    has not yet produced all of the relevant documents concerning this theft, assuming

21    they still exist): Toy Fair 2000 Competitive Update, Toy Fair 2001 Competitive Toy

22    Review, 2001 New York Toy Fair Report, 2002 Competitive Toy Review, 2003 New

23    York Toy Fair Competitive Review and 2004 New York Toy Fair Trend and

24    Manufacturer Overview.

25        34.    MGA undertook reasonable efforts under the circumstances to maintain

26    the confidentiality of its Trade Secret Materials, including confidentiality agreements

27    with its employees and consultants, and otherwise limiting disclosure to those who

28

1  could view the information only upon condition that they not disclose it unless and
2  until it became public information through no fault of their own.

3      35.    MGA's Trade Secret Materials derive independent value from not being
4  generally known to the public or to other persons who can obtain economic benefit
5  from their disclosure.

6      36.    Mattel illegally obtained the Trade Secret Materials as set forth above.

7      37.    Mattel used and disclosed MGA's Trade Secret Materials without
8  MGA's consent and without regarding to MGA's rights, and for its own benefit.

9      38.    Mattel's conduct has caused, and unless enjoined by this Court, will
10  continue in the future to cause irreparable injury to MGA. MGA has no adequate
11  remedy at law for such wrongs and injuries. MGA is therefore entitled to a
12  permanent injunction restraining and enjoining Mattel as well as its agents, servants
13  and employees, and all persons acting in concert therewith, from further using in any
14  manner the MGA Trade Secret Materials.

15      39.    In addition, as a proximate result of Mattel's misconduct, MGA has
16  suffered actual damages, and Mattel has been unjustly enriched.

17      40.    The aforementioned acts of Mattel were willful and malicious, including
18  Mattel's use of deliberate acts of deception to acquire the type of information from
19  MGA that Mattel itself considered to be a trade secret. MGA is therefore entitled to
20  enhanced damages and reasonable attorneys' fees.

21

22                                    **PRAYER**

23  WHEREFORE, MGA prays for relief as follows:

24          a.    that judgment be entered in favor of MGA;

25          b.    that MGA recover its actual damages;

26          c.    that Mattel be ordered to pay double damages due to its
27  willful and malicious misappropriation of MGA's trade secrets with deliberate intent
28  to injure MGA's business and improve its own;

1                    d.      that Mattel be ordered to pay the full costs of this action,

2   including all fees paid to Court-ordered Monitors, Discovery Masters, and Rule 706

3   Experts;

4                    e.      That MGA be awarded such other and further relief as the

5   Court may deem just and proper.

6

7

8

9   DATED: _____

10                                          KELLER RACKAUCKAS LLP

11                                          By:  /s/ Jennifer L. Keller
                                                    Jennifer L. Keller
12                                                Attorney for MGA Parties

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2

MGA Entertainment, Inc. respectfully requests a jury trial on all issues triable

3

hereby.

4

DATED: _____

5

6

KELLER RACKAUCKAS LLP

7

By: /s/ Jennifer L. Keller _____
Jennifer L. Keller
Attorney for MGA Parties

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MGA'S AMENDED COMPLAINT
CV 04-9049 DOC (RNBX)

1

2  ~~ANNETTE~~JENNIFER L. ~~HURST (State Bar No. 148738~~KELLER (SBN 84412)
   ~~ahurst~~keller@~~orrick~~krlawllp.com

3  ~~WARRINGTON S. PARKER III (State Bar No. 148003)~~
   KAY RACKAUCKAS (SBN 143480)

4  ~~wparker~~krack@~~orrick~~krlawllp.com
   ~~ORRICK, HERRINGTON & SUTCLIFFE LLP~~

5  ~~405 Howard Street~~
   ~~San Francisco, CA 94105-2669~~

6  ~~Tel: (415) 773-5700/Fax:(415) 773-5759~~
   ALLISON SHALINSKY (SBN 186975)

7  ~~WILLIAM A. MOLINSKI (State Bar No. 145186)~~
   ~~wmolinski@orrick.com~~

8  ~~ORRICK, HERRINGTON & SUTCLIFFE LLP~~
   ~~777 South Figueroa Street, Suite 3200~~

9  ~~Los Angeles, CA 90017~~
   ~~Tel. (213) 629-2020/Fax: (213) 612-2499~~

10

11  ~~THOMAS S. MCCONVILLE (State Bar No. 155905)~~
    ~~tmcconville~~shalinsky@~~orrick~~krlawllp.com

12  ~~ORRICK, HERRINGTON & SUTCLIFFE~~KELLER RACKAUCKAS LLP
    18500 Von Karman Avenue

13  ~~4 Park Plaza,~~ Suite ~~1600~~560
    Irvine, CA ~~92614-2258~~92612

14  Telephone:   (949) 476-8700
    ~~Tel~~Facsimile:     (949) ~~567~~476-~~6700/Fax: (949) 567-6710~~0900

15

16  Attorneys for MGA Parties ~~and IGWT 826 Investments LLC~~

17

18                UNITED STATES DISTRICT COURT

19                CENTRAL DISTRICT OF CALIFORNIA

20                       SOUTHERN DIVISION

21  CARTER BRYANT, an individual,          Case No. CV 04-9049 ~~SGL~~DOC
                                           (RNBx) Consolidated with: Case No.
22                       Plaintiff,        CV 04- 9059 and Case No. CV 05-
                                           2727
23         v.                              **Honorable David O. Carter**

24  MATTEL, INC., a Delaware               **MGA ENTERTAINMENT, INC.'S**
    corporation,,                          **~~REPLY TO FOURTH~~ AMENDED**
25                                         **~~ANSWER AND~~**
                         Defendant.        **~~COUNTERCLAIMS, INCLUDING~~**
26                                         **~~AFFIRMATIVE DEFENSES AND~~**

27

28                                         MGA'S ~~REPLY TO COUNTERCLAIMS~~AMENDED
                          COMPLAINT
                                           CV 04-9049 DOC (RNBX)

AND CONSOLIDATED ACTIONS

~~COMPULSORY COUNTERCLAIMS IN REPLY~~COMPLAINT FOR ~~(1)~~ TRADE SECRET MISAPPROPRIATION~~, (2) VIOLATION OF THE RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT, AND (3) WRONGFUL INJUNCTION~~

**Trial Date: January 11, 2011**

**INTRODUCTION**

1.     Beginning in at least 1992 and continuing through at least 2006, a series of Mattel employees in its "market intelligence" department, with the knowledge, approval, and financial support of their bosses and the executives of the company, willfully and deliberately misrepresented themselves to gain entry into the private showrooms of Mattel's competitors (including MGA) at numerous industry trade shows. Mattel employees went to Kinkos and printed up fake business cards so that they could lie their way into the private showrooms of their competitors. They bought small video recorders (paid for by Mattel) and brought cameras so they could photograph and videotape what they saw in those private showrooms. The showrooms were off-limits to competitors, and the toy manufacturers restricted access to retailers who agreed to maintain the information they received in confidence. Mattel lied about its employees' identities and pretended to be retailers, because it knew that they could not gain entry to these private showrooms unless it did so. Then, Mattel stole the trade secrets and other confidential information of its competitors including but not limited to the appearance, operation and intended play pattern of toys not yet on the market, price lists, and advertising plans and strategies. Mattel embarked on this scheme in order to acquire and maintain an unlawful competitive advantage, and it succeeded wildly.

2. Mattel gained access using false pretenses to the private showrooms of practically every toy company in the business—not only MGA, but also Bandai, B-Bel, Inc., Binney & Smith, Blue Box, Cadaco, Ceaco, Chicco, Crayola, Creativity for Kids, Decipher, DSI, Empire, Endless Games, Equity Marketing, Famosa, Get Real Girl, Giochi Preziosi, Gund, Hamilton Toys, Hasbro, Irwin Toys, Jada Toys, Jakks Pacific, Justoys, Kessel, K'NEX, Leapfrog, Lego, Madam Alexander, Maisto, McFarlane, Mealgy, Megablocks, Miss Party Surprise, Nikko, NKOK, NSI, NZ

1   ~~Toys, Ohio Art, Playhut, Playmates, Pressman, Radica, Razor, Robert Anner,~~

2   ~~Schure, Simba, Sony, Spin Master, Sindy, Tacmay, Tecnitoys Juguetes, Thinkway,~~

3   ~~Tiger Electronics, Today's Kids, Tomy, Toy Biz, Toy Max, Trendmaster, Uncle~~

4   ~~Milton, V Tech, Wham-O, Wild Planet, Wizards of the Coast, Wow Wee Toys, X~~

5   ~~Concepts and Zapf Creation. Year after year after year, Mattel employees printed up~~

6   ~~fake credentials, and armed with cameras, entered under false pretenses a dozen or~~

7   ~~more competitor showrooms to steal confidential information.~~

8          <u>2.</u>     ~~3.~~ Over time and pursuant to this scheme, Mattel defrauded MGA of

9   unreleased product information regarding at least the following products: ~~Hopscotch~~

10  ~~Heather, Dream Baby, Bratz, Jumpin Jenny, Scooter Samantha, Hello Kitty Be~~

11  ~~Beautiful Matchmake Journal and Virtual Crush, iCandy, Liar Liar, Monkey See~~

12  ~~Monkey Do, A New Breed and Palm Puppies, Hello Kitty Scooter, Insecto Bots,~~

13  ~~Monster Surgery,~~ Bratz Mobile ~~My Beautiful Mermaid, Hulk Two-Way Radios~~,

14  Bratz Styl' It Collection,  Bratz ~~Boys, Bratz Winterwonderland~~<u>WinterWonderland</u>

15  Collection, Bratz Formal Funk Collection, Bratz Runway Formal Funk Collection,

16  Bratz FM Limo, Bratz Motorcycle, Bratz Pet Assortment, ~~Bratz City Playsets,~~

17  ~~Musikids, Lil' Bratz Boyz, Lil' Bratz Slumber Party, Lil' Bratz Spring Break, Lil'~~

18  ~~Bratz Loungin' Loft,~~ Lil' Bratz Vehicle Assortment, Lil' Bratz Deluxe Mall Playset,

19  ~~My Beautiful Ballerina, Pia Back to School, Jumpin' on the Bed Bouncin' Baby,~~

20  ~~Rachel Lul A Bye Baby, RC Street Flyer Samantha, Walk 'n Go Jo Jo, Bead Palace,~~

21  ~~Bratz Stylin' Dance Party, Alien Racers, Micro Blast Jet Skis,~~ Bratz Petz, ~~Lil' Bratz~~

22  ~~Dance Party~~,  Dazzlin' Disco Café, Sun Kissed Summer, Girls Nite Out, Wild Life

23  Safari Collection, Bratz ~~Lucious Lamp/Alarm Clocks, Flower Fairies, Bratz Internet~~

24  ~~Café Playset, Bratz Retro Café~~<u>Diamondz, Bratz Virtual Buddiez Petz, Bratz</u>

25  <u>Campfire, Wild Wild West, Bratz Rock Angelz, Monkey See Monkey Do</u>, Lil' Bratz

26  ~~Transforming Bedroom, Bratz Girls Nite Out~~<u>Boyz,  Alien Racers, Bratz Kidz, and</u>

27

28                    - <u>15</u> -      MGA'S ~~REPLY TO COUNTERCLAIMS~~<u>AMENDED</u>
                      <u>COMPLAINT</u>

                                          CV 04-9049 DOC (RNBX)

1  <u>Passion for Fashion</u>.    Some of these products were never released to the market by

2  MGA.

3  ~~4. Indeed, Mattel, in connection with a racketeering enterprise made up of Mattel~~

4  ~~(including various subsidiaries), its independent contractors including at least Sharon~~

5  ~~Rahimi and Bain & Company, and lawyers from at least two outside law firms the~~

6  ~~United States law firm Quinn Emanuel Urquhart & Sullivan LLP and the Mexican~~

7  ~~law firm Basham Ringe Y Correa (the "Mattel Racketeering Enterprise"), has used~~

8  ~~the wires in interstate commerce in this scheme to defraud confidential information~~

9  ~~from nearly every company in the toy business, to criminally infringe copyrights in~~

10  ~~the distribution of that stolen information on a worldwide basis throughout Mattel~~

11  ~~and its various foreign subsidiaries, and then to conceal, suppress and destroy~~

12  ~~evidence of that theft in this litigation through alteration and concealment of~~

13  ~~documents, tampering and obstruction of justice (including witnesses lying under~~

14  ~~oath). Mattel engaged in this pattern and practice of racketeering in order to maintain~~

15  ~~its unlawful competitive advantage in the toy industry, its vigorously promoted~~

16  ~~reputation as an ethical company, and most importantly of all from MGA's~~

17  ~~perspective, its ability to deceive a federal judge into believing that Mattel was good~~

18  ~~and MGA was evil, thus procuring a wrongful injunction against MGA that deprived~~

19  ~~MGA of the sales of numerous Bratz products, interfered with MGA's relationships~~

20  ~~with retailers, interfered with MGA's relationships with licensees, destroyed an~~

21  ~~estimated one billion dollars (1,000,000,000) in brand equity, and nearly drove MGA~~

22  ~~out of business.~~

23      <u>3.</u>    ~~5.~~Accordingly, and based upon the allegations set forth herein, MGA

24  hereby ~~replies to Mattel's Fourth Amended Answer and Counterclaims ("FAAC")~~

25  ~~with a complete denial that Mattel is entitled to any relief whatsoever, and interposes~~

26  ~~its own additional compulsory counterclaims-in-reply for Trade Secret~~

27  ~~Misappropriation, violation of the Racketeering Influenced and Corrupt~~

28                              - <u>15</u> -    MGA'S ~~REPLY TO COUNTERCLAIMS~~<u>AMENDED COMPLAINT</u>

1  ~~Organizations Act and Wrongful Injunction based upon this newly discovered~~
2  ~~evidence and other recent events including the July 22 Opinion of the Ninth Circuit~~
3  ~~Court of Appeals, as well as the law of this case as articulated by the Court in its~~
4  ~~August 2, 2010 Order on Motions to Dismiss. MGA hereby~~ demands that the Court
5  enter judgment on behalf of MGA on the ~~basis of MGA's original Complaint in this~~
6  ~~action and the denials, defenses, and allegations of the counterclaims-in-reply~~ claim
7  set forth herein.

8           **BACKGROUND FACTS** ~~**COMMON TO AFFIRMATIVE DEFENSES AND**~~
9           ~~**COMPULSORY COUNTERCLAIMS-IN-REPLY**~~

10          4.   ~~6.~~ As MGA has just discovered after the deposition testimony of Sal
11  Villasenor on July 12, 2010 and documents produced thereafter that should have
12  been produced many years before, for at least fifteen years from 1992 through 2006,
13  a series of Mattel employees in its "market intelligence" department, with the
14  knowledge, approval, and financial support of their bosses and the executives of the
15  company, willfully and deliberately misrepresented themselves to gain entry into the
16  private showrooms of Mattel's competitors at trade shows, armed with cameras and
17  video recorders.

18          5.   ~~7.~~ The Toy Industry Association ("TIA") was formed in or about 1916.
19  For decades since the formation of TIA, each year there has been a toy fair in New
20  York hosted by TIA where all of the major toy manufacturers come together on a
21  worldwide basis to meet with retailers in order to demonstrate their wares. The New
22  York Toy Fair ("NYTF) has been customarily held in or about February of each
23  year.

24          6.   ~~8.~~ During NYTF, it has been the practice of the many of the toy
25  manufacturers to have private showrooms. These private showrooms are set up for
26  the purpose of private meetings between the toy manufacturers and their customers,
27  the retailers. Entry to these showrooms is regulated. Only retailers or distributors are

28                              - 15 -   MGA'S ~~REPLY TO COUNTERCLAIMS~~ AMENDED
                                COMPLAINT
                                                CV 04-9049 DOC (RNBX)

1  permitted, often by appointment only; many manufacturers require the use of NDAs,

2  and post signs and other information advising the entrants to private showrooms that

3  they are obliged to hold in confidence the nonpublic information presented therein,

4  and not to take pictures or otherwise record what they see. Indeed, Mattel is well

5  aware of these practices because Mattel itself has engaged in such regulation of

6  admission to its private showrooms at the NYTF for many years. MGA has restricted

7  access to its showroom at least since 1998.

8      7. 9. In the private showrooms, toy manufacturers typically present to the

9  retailers and distributors their products that are not yet on the market. The

10  manufacturers will also periodically provide catalogs of their products to be

11  marketed for the upcoming year. Given the fast pace and highly competitive nature

12  of the retail toy industry, the appearance, operation and intended play pattern of an

13  as-yet unmarketed toy is one of the few true trade secrets that can exist. Other

14  confidential information presented in show rooms includes wholesale price lists of

15  products not yet on the market, the manufacturers' advertising and marketing plans,

16  and packaging concepts for the next season. Knowing in advance which products

17  will be advertised by the manufacturer is very important, because it enables retailers

18  to plan their likely purchases (advertised products sell more units), their own in-store

19  allocation of advertising support, and other important marketing elements such as the

20  content of advertising circulars and the like.

21      8. 10. As Mattel alleges in its own Counterclaims, for a toy company to

22  systematically find out in advance the nature of a competitor's as-yet unmarketed

23  products, the quoted prices, and the identification of which products will be

24  advertised would be the holy grail of competitive advantage. Such a practice would

25  enable the party stealing the information to adjust its own product, pricing and

26  advertising plans, to engage in comparative selling practices with retailers, and

27  generally to get a consistent and improper head start on its own competitive

28

- 15 -        MGA'S REPLY TO COUNTERCLAIMS AMENDED COMPLAINT

CV 04-9049 DOC (RNBX)

1 products. It was not MGA, however, but Mattel who engaged in this consistent

2 pattern and practice of stealing confidential information from competitors.

3      **A.**     **The Market Intelligence Group.**

4      9.    ~~11.~~ Beginning at a time unknown to MGA but at least since February of

5 1992, a group of employees within Mattel known as the "market intelligence"

6 department systematically defrauded nearly every toy manufacturer in the business

7 of their confidential information during NYTF. In advance of NYTF, these Mattel

8 employees, who included at least Jeff Lange, Sal Villasenor, Carey Plunkett, Kelly

9 Osier, Candace Chang and Tyler Snyder, went to Kinkos in advance of NYTF and

10 printed up fake business cards identifying them as retail representatives and

11 concealing their affiliation with Mattel and bought spy cameras—all paid for by

12 Mattel. Using these falsified credentials, these Mattel employees misrepresented

13 their identities, affiliations and purposes in order to gain entry to private showrooms

14 of competitors (including MGA) at NYTF under false pretenses, and were successful

15 in doing so year-after-year. Villasenor entered showrooms for multiple toy

16 companies, including MGA, ~~Hasbro, Lego, Bandai and others~~ from at least 1999 to

17 2006. Osier and Plunkett were generally responsible for girls products, so they

18 entered showrooms for MGA and others at multiple toy fairs. Upon information and

19 belief, each year during NYTF, in addition to using fake credentials, one or more of

20 these identified Mattel employees also signed one or more confidentiality statements

21 in order to gain entry to competitor showrooms. These were false promises of

22 confidentiality, made without any intention to perform. Mattel knew that its

23 employees would not be admitted access to private competitor showrooms unless

24 they misrepresented themselves.

25      10.    ~~12.~~ This practice of sneaking into private showrooms was not limited to

26 the NYTF. Instead, Mattel schemed to defraud its competitors at toy fairs worldwide,

27 permitting Mattel to extend its dominance throughout the globe by gaining

28

confidential information about its worldwide competitors' future plans. During the period from at least 2001 to 2006, Mattel sent its spies around the globe, where they lied their way into competitors' showrooms at the Hong Kong Toy Fair (occurring annually in January of each year), and Nuremberg Toy Fair (occurring annually in February of each year), as well as at the Tokyo Toy Fair. At these toy fairs, Mattel employed the same practices of using fake names, fake business cards and false pretenses about their purposes to obtain confidential information about competitors' upcoming launches and product lines.

11. 13. These employees and contractors lied their way into the showrooms, stole catalogs, price lists and other information and took unauthorized pictures.

**B. The Distribution And Presentation Of Spy Reports And The Library.**

12. 14. To complete the fraudulent scheme and enable Mattel's unfair competitive advantage based thereon, the Mattel thieves then assembled presentations of hundreds of pages to be copied and distributed on a worldwide basis. These massive presentation documents included page after page of unauthorized reproductions of photos and catalog pages depicting the competitor products. The written presentations were distributed to hundreds of employees through Mattel, including top executives as well as many employees outside of California and the United States. Ironically, at least one of the recipients of such presentations was Counter-Defendant Gustavo Machado, to whom one or more presentations were sent in Mexico while he was still employed by Mattel Servicios. Mattel's market intelligence group tailored the information, assembling design information for the design group, and marketing information for the marketing group.

13. 15. In fact, it became an annual right of passage and a hot ticket within Mattel to attend Mr. Villasenor's annual presentation after NYTF. In addition to

- 15 -    MGA'S REPLY TO COUNTERCLAIMS AMENDED COMPLAINT

CV 04-9049 DOC (RNBX)

1  distributing the report in written form, Mr. Villasenor, aided by one or more of his

2  cohorts in crime, would publicly display the unauthorized photographs of unreleased

3  competitor products to hundreds of Mattel employees. In March or April of each

4  year, in the presentation theater at Mattel's headquarters in El Segundo, Villasenor

5  and one or more of his cohorts would present their information to an auditorium

6  packed to capacity with hundreds Mattel employees. Hundreds of employees

7  attended year after year. Mattel executives all the way up to the CEO Bob Eckert

8  received copies of the reports and/or attended reviews of all of the stolen NYTF

9  information. These reviews included the public display of unauthorized

10  reproductions of photographs and other images of the competitor products. Some of

11  these presentations by Mr. Villasenor were also videotaped.

12  ~~16. Mattel took information at NYTF from nearly every toy company in the~~

13  ~~worldwide toy business over the years—not only MGA, but also Bandai, B-Bel, Inc.,~~

14  ~~Binney & Smith, Blue Box, Cadaco, Ceaco, Chicco, Crayola, Creativity for Kids,~~

15  ~~Decipher, DSI, Empire, Endless Games, Equity Marketing, Famosa, Get Real Girl,~~

16  ~~Giochi Preziosi, Gund, Hamilton Toys, Hasbro, Irwin Toys, Jada Toys, Jakks~~

17  ~~Pacific, Justoys, Kessel, K'NEX, Leapfrog, Lego, Madam Alexander, Maisto,~~

18  ~~McFarlane, Mealgy, Megablocks, Miss Party Surprise, Nikko, NKOK, NSI, NZ~~

19  ~~Toys, Ohio Art, Playhut, Playmates, Pressman, Radica, Razor, Robert Anner,~~

20  ~~Schure, Simba, Sony, Spin Master, Sindy, Tacmay, Tecnitoys Juguetes, Thinkway,~~

21  ~~Tiger Electronics, Today's Kids, Tomy, Toy Biz, Toy Max, Trendmaster, Uncle~~

22  ~~Milton, V Tech, Wham-O, Wild Planet, Wizards of the Coast, Wow Wee Toys, X~~

23  ~~Concepts and Zapf Creation.~~

24     14.   ~~17.~~ Remarkably, this euphemistically named "market intelligence"

25  group also maintained an extensive library of all of the information that they had

26  stolen over the years. This vast library housed on the Ninth Floor at Mattel in El

27  Segundo containing the fruits of Mattel's long term scheme to defraud its

28

competitors of their confidential information included at least the annual reports made after NYTF by the market intelligence group, the competitor catalogs, price lists and other confidential information they had stolen from the showrooms, and videotapes of the annual presentations of the stolen information. Access to the library and its contents was regulated; sign-in and sign-out sheets were used. Even Mattel's legal department used the information.

15.    18. This library of stolen material was extremely valuable; it permitted Mattel to gather in one place both information about its competitors' future plans as well as a historical record of products in the industry, and to mine these future plans and historical record for ideas for its own products. For MGA, some of the products about which Mattel stole information were never released; upon information and belief, that was true of others as well. Thus, Mattel had an unparalleled library not only of information about products that had become public, but of information about products that have never yet seen the light of day and might well be considered by their originators for future seasons. The plans of its competitors for the upcoming spring and fall seasons was information Mattel could not have obtained absent its use of false pretenses; the historical record was one that it would have been nearly impossible for Mattel to assemble from public sources at a reasonable cost. But by lying and stealing every year in one place and at one time (and then expanding that practice worldwide in this decade), Mattel was able to assemble an invaluable set of materials and then reuse them for decades at its leisure.

16.    19. The methods of Mattel's spies were well known throughout the company, including by its top executives. The market intelligence group openly discussed its tactics. Some of the presentations indicated right on their face that they were based on information taken at NYTF. Because of the nature of the information and the fact that it had come from the NYTF, everyone who had attended a trade

1 | show knew that access to showrooms was restricted and there would be no legitimate
2 | way to get all of this information.

3 |     17.    20. Executives such as Matt Turetzky and Drew Vollero, who reported
4 | to Matt Bousquette (President first of the Boys Division, and later of Mattel Brands),
5 | supervised the group, approved its expenses, and gave it glowing performance
6 | reviews. Bousquette received the reports containing stolen information, as did CEO
7 | Eckert. Bousquette was friendly with Villasenor and knew what he was doing to get
8 | information. Other former senior executives who have been willing to admit that
9 | they were aware of the practices are Sujata Luther and Ron Brawer. The top
10 | marketing personnel, such as Tim Kilpin (head of all Girls Marketing) and Russell
11 | Arons (head of Barbie Marketing) all received copies of the reports and attended
12 | presentations every year, with full knowledge of the restrictive practices of Mattel
13 | and its competitors at toy fair showrooms. General Counsel Robert Normile was
14 | specifically apprised of the fraudulent practice of stealing information using false
15 | credentials by no later than the end of 2005, but the practice nonetheless continued.
16 | After the 2006 NYTF, Villasenor was instructed to keep getting the information but
17 | that Mattel didn't want to know how he was doing it.

18 |     18.    21. Over time and pursuant to this scheme, Mattel defrauded MGA of
19 | unreleased product information regarding at least the following products: Hopscotch
20 | Heather, Dream Baby, Bratz, Jumpin Jenny, Scooter Samantha, Hello Kitty Be
21 | Beautiful Matchmake Journal and Virtual Crush, iCandy, Liar Liar, Monkey See
22 | Monkey Do, A New Breed and Palm Puppies, Hello Kitty Scooter, Insecto Bots,
23 | Monster Surgery, Bratz Mobile, My Beautiful Mermaid, Hulk Two-Way Radios,
24 | Bratz Styl' It Collection,  Bratz Boys, Bratz Winterwonderland WinterWonderland
25 | Collection, Bratz Formal Funk Collection, Bratz Runway Formal Funk Collection,
26 | Bratz FM limo Limo, Bratz Motorcycle, Bratz Pet Assortment, Bratz City Playsets,
27 | Musikids, Lil' Bratz Boyz, Lil' Bratz Slumber Party, Lil' Bratz Spring Break, Lil'

28 |     - 15 -    MGA'S REPLY TO COUNTERCLAIMS AMENDED COMPLAINT

1  ~~Bratz Loungin' Loft~~,  Lil' Bratz Vehicle Assortment, Lil' Bratz Deluxe Mall Playset,
2  ~~My Beautiful Ballerina, Pia Back to School, Jumpin' on the Bed Bouncin' Baby,~~
3  ~~Rachel Lul A Bye Baby, RC Street Flyer Samantha, Walk 'n Go Jo Jo, Bead Palace,~~
4  ~~Bratz Stylin' Dance Party, Alien Racers, Micro Blast Jet Skis,~~ Bratz Petz ~~, Lil' Bratz~~
5  ~~Dance Party~~,  Dazzlin' Disco Café, Sun Kissed Summer, Girls Nite Out, Wild Life
6  Safari Collection, Bratz ~~Lucious Lamp/Alarm Clocks, Flower Fairies, Bratz Internet~~
7  ~~Café Playset, Bratz Retro Café, Lil' Bratz Transforming Bedroom, and Bratz Girls~~
8  ~~Nite Out.~~
9  ~~22.~~ <u>Diamondz, Bratz Virtual Buddiez Petz, Bratz Campfire, Wild Wild West, Bratz</u>
10 <u>Rock Angelz, Monkey See Monkey Do, Lil' Bratz Boyz,  Alien Racers, Bratz Kidz,</u>
11 <u>and Passion for Fashion.</u>  In fact, some of these products were never released by
12 MGA, and had Mattel not stolen the information from MGA, Mattel would never
13 have had any opportunity to view them. Upon information and belief, the same is
14 true of other companies from whom Mattel defrauded nonpublic product
15 information.

16          **C.    Mattel Expands And Extends Its Scheme Against MGA.**

17          <u>19.</u> ~~23.~~ By at least 2004, Mattel had extended and expanded this fraudulent
18 scheme as it pertained to thefts of confidential information from MGA and
19 subsequent concealment of that scheme in order to continue stealing information
20 from MGA, and ultimately, to drive MGA out of business.

21          <u>20.</u> ~~24. First,~~ Mattel hired an independent contractor whom it believed was
22 likely to be especially successful in spying on MGA. This woman, named Sharon
23 Rahimi, was engaged as a contractor specifically for the purpose of gaining entry to
24 showrooms, and in particular MGA's showroom, to steal confidential information
25 there. Rahimi had previously been an employee in Mattel's market intelligence
26 group and thus when she was engaged as a contractor, she knew exactly how the spy
27 operation was supposed to be conducted. Rahimi, a Persian American, appears to

28

1  have been hired to infiltrate the MGA showroom in particular because Isaac Larian

2  also is Persian American, and Mattel most likely believed that Ms. Rahimi would

3  therefore be less likely to arouse suspicion and more likely to succeed in her mission

4  to spy on MGA and steal its confidential information. Rahimi entered the MGA

5  showroom at NYTF in at least 2004 and 2005 under false pretenses and stole

6  confidential information.

7  25. Additionally, Mattel hired another independent contractor named Bain &

8  Company to obtain other MGA confidential information. After Mattel agreed to pay

9  Bain several hundreds of thousands of dollars, Bain then contacted dozens of

10  companies and individuals associated with MGA, such as licensees, distributors, and

11  production companies, and upon information and belief, misled them in order to get

12  them to disclose confidential information about MGA. Had Bain disclosed that the

13  research was being conducted for Mattel, these MGA business partners would not

14  have disclosed MGA confidential information. Using these misleading tactics, Bain

15  built up a complete and detailed profile of MGA that included a significant amount

16  of MGA's then-confidential information that could not have been obtained with a

17  candid disclosure.

18  26. Then Mattel, including at least its in-house counsel Michael Moore, and Bain,

19  worked together to edit the Bain document to remove information deemed

20  potentially harmful to Mattel's position in this litigation. After the edits were made,

21  Bain, acting at Moore's behest, instructed Mattel employees who had received the

22  prior unsanitized draft to destroy them. Those documents were in fact destroyed, and

23  to this day have not been produced by Mattel in this case.

24  27. Indeed, Mattel suppressed even the final sanitized version of the Bain report in

25  this litigation for years. Despite being called for by numerous document requests and

26  prior court orders, Mattel suppressed and concealed the Bain Report containing

27  MGA confidential information until March 26, 2010. Mattel has not produced the

28
- 15 -   MGA'S REPLY TO COUNTERCLAIMS AMENDED
COMPLAINT

CV 04-9049 DOC (RNBX)

1   prior versions, emails, or any of the other hundreds of pages of documents that once

2   existed within Mattel related to this report, which were instead spoliated by Mattel

3   pursuant to its plan to sanitize its records of prior versions of the Bain report to avoid

4   potential adverse consequences in this litigation.

5   28. Bain was not the only perpetrator of schemes involving Mattel to suppress,

6   conceal and destroy relevant evidence or otherwise to obstruct justice in order to

7   avoid being found out in its fraudulent schemes, to maintain its unlawful competitive

8   advantage, and to use this litigation to drive MGA and Isaac Larian out of the toy

9   business. Rather, Mattel's attorneys also participated with it in these schemes.

10  29. Mattel first engaged Quinn Emanuel to investigate potential claims against MGA

11  related to Bratz no later than mid-2002. At that time, Mattel had already conducted

12  extensive market research to determine how much impact Bratz was having across

13  Mattel's product lines. (Mattel did not produce that market research report, dated

14  January 14, 2002 and highly relevant to the statute of limitations defense, until MGA

15  discovered it after the Sujata Luther deposition in July 2010.) In 2002, Rumors were

16  also rampant within the design community at Mattel that Carter Bryant was working

17  with MGA on Bratz, and there were multiple different theories of Bratz infringement

18  in play. Some thought Bratz was a knockoff of Diva Starz. Others thought Bratz was

19  a knockoff of Toon Teens.

20  30. Entries on Mattel's privilege log show that Quinn Emanuel worked with Mattel

21  on the Bratz problem and potential claims related to it beginning in mid-2002. In

22  August 2002, Mattel CEO Robert Eckert received an anonymous letter asserting that

23  Carter Bryant had worked on Bratz while at Mattel. Eckert requested an

24  investigation. Mattel continued to investigate, and Quinn Emanuel continued

25  working on the problem through the second half of 2002.

26  31. By July 10, 2003, Quinn Emanuel's investigation was in full swing, as Mattel

27  anticipated the publication of a Wall Street Journal article regarding Bratz, which

28  - 15 -   MGA'S REPLY TO COUNTERCLAIMS AMENDED
    COMPLAINT

    CV 04-9049 DOC (RNBX)

1   included a discussion of rumors regarding the disputed origins of Bratz. The article
2   was published on July 18, 2003. On July 22, 2003, Mattel's lawyers were examining
3   Carter Bryant's employment file and in particular his termination date. By July 24,
4   2003, the senior partner at Quinn Emanuel, as well at least one other firm had
5   become involved. The investigation continued in full force throughout August 2003,
6   when Mattel hired private investigators in addition to the two law firms already
7   working on it. By September, Quinn Emanuel attorneys were evaluating potential
8   claims and gathering potential evidence from CityWorld in Hong Kong. Mattel and
9   Quinn Emanuel were in constant communication throughout October 2003
10  concerning potential claims to be brought in this case.
11  32. At about that time, in October or November 2003, Mattel's CEO Bob Eckert
12  commissioned a study within Mattel regarding Barbie and Bratz. That case study
13  later became known as "The Bratz Brief." It was a unique document within Mattel; it
14  reads like a high level case study for an MBA course, and there was nothing else like
15  it. Commissioned by Eckert, The Bratz Brief was prepared by two high-ranking
16  Mattel executives with responsibility for strategic planning: Jerome Bossick and
17  Sujata Luther. Eckert received and edited a draft, altering key terminology and
18  purporting to correct Luther's British idiomatic use of the word "Learnt" (which was
19  in fact grammatically correct) to "Learned." The Bratz Brief explained the detailed
20  history of Barbie's economic importance to Mattel, why Barbie had failed, and the
21  report attributed that failure to factors existing well before Bratz ever entered the
22  market. Barbie's failure was caused by a number of factors that had nothing at all to
23  do with Bratz. At the same time, The Bratz Brief attributed MGA's success to factors
24  that had nothing to do with Carter Bryant or his drawings. In short, The Bratz Brief
25  was an explosive document by any measure, and it has had singular relevance to this
26  litigation.
27
28              - 15 -    MGA'S ~~REPLY TO COUNTERCLAIMS~~AMENDED COMPLAINT

CV 04-9049 DOC (RNBX)

33. Throughout late 2003 while The Bratz Brief was being written, delivered to and edited by Eckert, Mattel was considering whether to sue over Bratz. Eckert was involved. In January 2004, there were numerous presentations by Quinn Emanuel to Mattel. In March 2004, the Board of Directors authorized suit at CEO Eckert's request. Then, in April 2004 and with full authorization of Mattel's Board and CEO Eckert, Mattel initiated this lawsuit with its first set of claims against Carter Bryant. Despite having participated in the investigation that led to the decision to file suit, and despite having commissioned and worked on a document plainly relevant to any claim Mattel might make concerning Bratz, Eckert destroyed and suppressed relevant evidence by continuing to routinely delete his emails and all associated documents—as he has done to this day. He destroyed his documents concerning The Bratz Brief.

34. In addition, Eckert wrote an email entitled "What Happened to Barbie" in June 2004 while engaging in strategic planning for an upcoming Board meeting in September 2004. The email refers on its face to issues in this litigation, seeming to concede that Mattel does not have clear title to Bratz. Despite the obvious high degree of relevance in phase 1 proceedings, that email was not produced until March 8, 2010, and only after the Court granted an order to compel documents from custodian Matt Bousquette. It appears to have been recovered from a backup tape and was produced from the custody of Bousquette only after Mattel was ordered by the Court to search for Bousquette's documents. Eckert's copy of the document no longer exists. Eckert deleted this document discussing the ownership of Bratz *knowing that this litigation was pending*.

35. The points in the What Happened to Barbie email closely track the points of The Bratz Brief. It is apparent from the text that Eckert, the author of the e-mail, had access to The Bratz Brief—which MGA now knows is true because of testimony from other witnesses. But none of the few Eckert documents produced in the case

1  reflect the commissioning of The Bratz Brief, his receipt of any draft of it, his

2  creation of edits to it, his transmission of edits to it, or otherwise reflect in any way

3  his participation in the process of creating it. Rather, they were destroyed by Eckert,

4  and if any other copies of them are in existence, those have been concealed by Mattel

5  despite numerous document requests and several orders calling for the information.

6  No documents from Bossick reflecting his participation have been produced,

7  although he is still employed by Mattel. No documents from Luther reflecting her

8  participation have been produced.

9  36. The destruction and concealment of The Bratz Brief documents by Mattel, its

10  CEO and its attorneys accomplished much. By concealing Eckert's involvement in

11  The Bratz Brief, Mattel was able to litigate the entire Phase 1 case without a single

12  witness ever taking responsibility for the creation of that document. Despite the

13  unique nature of the document within Mattel, the fact that Eckert personally

14  commissioned it from two other high ranking executives and personally edited the

15  document, and the fact that he accepted the conclusions thereof and included them in

16  his own analysis of What Happened to Barbie in June 2004 while preparing for the

17  Corporate Strategic Plan to be presented at Mattel's September 2004 Board of

18  Directors Meeting, Eckert concealed his involvement by claiming in deposition that

19  he couldn't remember the circumstances of the document. Any reasonable juror

20  would have considered it significant to know in the phase 1 trial that The Bratz Brief

21  was a document emanating from the CEO of Mattel, and to consider the substance of

22  the What Happened to Barbie email.

23  21. 37. In 2005, MGA filed its Complaint in this litigation. Meanwhile,

24  Mattel had set out to conceal in this case Mattel's fifteen-year scheme to defraud the

25  entire toy industry out of its confidential information. By late 2005, Villasenor had

26  complained to Mattel General Counsel Robert Normile, asserting that he could no

27  longer lie and steal to get information—especially in light of MGA's allegations.

28

1 Villasenor told Normile that although his stealing competitors' information gave

2 Mattel a competitive advantage, he believed his conduct was unlawful and exposed

3 him to potential criminal liability. Several months later, and *after* NYTF 2006,

4 Villasenor got a new boss, who told him he couldn't use the same methods but was

5 expected to continue getting the same information. His new boss said Mattel "didn't

6 want to know" how he got the information. After that, Villasenor cracked under the

7 pressure, and increased the volume of his complaints.

8 22. 38. One of Quinn Emanuel's partners working on this case then met

9 repeatedly in 2006 with Villasenor, the man who had for more than a decade been

10 tasked with perpetrating and carrying out the program of Mattel's lies and thefts of

11 confidential information. The Quinn Emanuel partner met with Villasenor, who by

12 that point was about to resign because he could no longer perform his job without the

13 use of false pretenses, and was concerned about exposure to MGA. This partner

14 joined together with Mattel's in-house counsel, Jill Thomas (who was not Mattel's

15 regular attorney for employment matters but rather is the Mattel litigation counsel

16 assigned to the case against MGA), in Mattel's scheme to suppress and conceal the

17 vast scheme to defraud by paying Villasenor hush money in the form of a lucrative

18 severance package, and then deep-sixing all of the documents.

19 23. 39. They met at a mediation in order to cloak the whole negotiation in

20 as much secrecy as possible. The settlement agreement had a confidentiality clause,

21 and spread out the payments over time, so that Mattel had a tangible means of

22 holding the confidentiality obligation over Villasenor's head. The potential

23 whistleblower had been silenced. After these events, the attorneys at Quinn Emanuel

24 had full knowledge of the depth and breadth of Mattel's spying on competitors. All

25 of the top executives at Mattel had full knowledge, including Normile who, upon

26 information and belief, reported the problem to his boss Eckert who was keenly

27 interested in the progress of this litigation and anything involving MGA. Mattel and

28

1   Quinn Emanuel then successfully concealed the existence of all documents pointing

2   to Mattel's massive scheme to defraud for succeeding four years of this litigation.

3        24. 40. There are literally thousands of pages of documents reflecting these

4   bad acts by Mattel: the presentations themselves (some of which were videotaped),

5   the expense reports for fake business cards and handheld video cameras, the

6   performance reviews where these "market intelligence" employees touted their

7   ability to "get competitor information at trade shows." Documents evidencing this

8   conduct were requested by MGA no later than the end of 2006, not long after the

9   meetings with Villasenor. But they were not produced by Mattel and its attorneys.

10  41. Instead, Mattel and its attorneys embarked on a brilliant strategy to ensure that its

11  long term scheme to defraud either would never see the light of day, or when it did,

12  the impact would be severely diminished. The cornerstone of that strategy was the

13  filing of Mattel's counterclaims in this action.

14  42. Mattel had known for quite some time that certain employees departing for MGA

15  had, unbeknownst to MGA, removed information Mattel considered confidential.

16  These employees acted on their own, without MGA's knowledge or consent. In fact,

17  MGA made them all sign agreements saying they would not take from Mattel, or

18  bring to MGA, any Mattel confidential information. Mattel knew when Machado,

19  Vargas and Trueba left in March 2004 that they were going to work for MGA. A

20  short time later, Mattel knew that they had removed information it considered

21  confidential. The customary action under such circumstances is for a company to

22  immediately file suit and demand the return of the documents, seeking court orders

23  for the return of the information. But Mattel neither demanded the return of that

24  information nor sued MGA. Brawer left in the fall of 2004, and Mattel did not sue

25  MGA.

26  43. Nick Contreras left shortly after Brawer in October 2004, and Mattel believed

27  soon thereafter that he had supposedly printed an inordinate number of confidential

28        - 15 -   MGA'S REPLY TO COUNTERCLAIMSAMENDED COMPLAINT

CV 04-9049 DOC (RNBX)

1  documents shortly before he left. Additionally, using information captured by an

2  email spy filter that Mattel had implemented in late 2003 to spy on its employees,

3  Mattel found out that Nick Contreras supposedly had approached another employee

4  shortly after he left and asked her for documents. Again, Mattel did nothing.

5  44. During 2005, other former Mattel employees joined MGA. In May 2005, Mattel

6  answered MGA's complaint and did not plead any trade secret misappropriation

7  claim against MGA. Later, in September 2005 Mattel amended its answer, and again

8  did not plead any trade secret misappropriation claim or any other type of claim

9  against MGA related to Machado, Trueba, Vargas, Brawer or Contreras, all of whom

10 had by then left Mattel and come to MGA. Brisbois left Mattel Canada at almost the

11 same time. By early 2006, Mattel knew the essentials of any allegations it would

12 make against Brisbois based on a forensic analysis of her computer. Again, however,

13 Mattel took no action in this case.

14 45. In March 2006, when Jorge Castilla left, Mattel believed *before he left* that

15 Castilla had copied Mattel documents to take with him. Mattel did not demand the

16 return of the documents in his exit interview, or thereafter. Mattel did not contact

17 MGA and ask for its cooperation to ensure that no confidential information was

18 used. Instead, Mattel went to the FBI in the hopes that it could turn Castilla and get

19 him to spy on MGA. Castilla willingly turned over a PDA to the FBI when asked,

20 and well before he ever set foot on MGA's premises to start work. And again, Mattel

21 did not sue MGA. When Cooney left a short time later in May 2006, Mattel seized

22 his computer, performed a forensic analysis, and quickly became aware he had

23 removed certain documents. Again, Mattel neither demanded the return of the

24 information nor sued. Mattel could have brought any of these matters to the Court's

25 attention at any time.

26 46. In fact, it was not until November of 2006—in some cases nearly three years—

27 after these employees had left and allegedly taken with them Mattel trade secrets—

28
- 15 -   MGA'S ~~REPLY TO COUNTERCLAIMS~~ AMENDED COMPLAINT

1   that Mattel finally filed its trade secret misappropriation and RICO claims. No new

2   evidence had been uncovered in late 2006 to strengthen those claims. In fact, the

3   passage of time had weakened Mattel's claims as the information became stale.

4   Nothing had happened in the marketplace to signal to Mattel that any information

5   was being used by MGA, thus necessitating action where none had been taken

6   before. No new evidence had just been uncovered to establish MGA or Larian's

7   involvement in the removal of any information by these employees. Instead, the

8   counterclaims were motivated by the deterioration of the Villasenor situation.

9   47. It was a concededly brilliant strategy. Mattel and its lawyers figured out exactly

10   what Mattel could be accused of based on Mattel's own criminal conduct, then

11   turned those claims on MGA, while at the same time concealing all evidence of

12   Mattel's wrongdoing. This strategy had many benefits. If MGA took legal positions

13   attacking the claims, or got them dismissed, then those arguments could be turned

14   against MGA if and when it ever found out about Mattel's conduct. If the claims

15   succeeded to taint MGA, then once Mattel's conduct came out, the impact would be

16   substantially diminished. The claims were so vast that Mattel was able to distract and

17   tie-up the much smaller MGA in litigation for years. Mattel succeeded beyond its

18   wildest dreams in pursuing this strategy. Mattel successfully concealed the evidence

19   of its own criminal conduct for years, all the while claiming that MGA was evil

20   incarnate.

21        25.   48. Meanwhile, oneOne of the documents that Mattel and Quinn

22   Emanuel had deliberately concealed and deliberately altered was the 2001 NYTF

23   Report. The largely meaningless cover page of that document was produced in

24   January 2008, but the attachment (which mentioned MGA and depicted the original

25   unreleased Bratz product, giving the document all of its legal significance) was

26   omitted from the original production and was not produced until over 2 years later,

27   on July 7, 2010—when the jig was up because Villasenor was about to testify. A

28                                    - 15 -   MGA'S REPLY TO COUNTERCLAIMSAMENDED
                                    COMPLAINT

1  September 12, 2007 order had specifically compelled Mattel to produce all

2  documents relevant to MGA's statute of limitations defense, which the 2001 NYTF

3  Report demonstrating that Mattel knew about Bratz even before it came on the

4  market surely was. Yet Mattel did not produce the report.

5       26. 49. Instead, Mattel, with the knowledge and cooperation of its attorneys,

6  detached the report and produced only the cover page, in clear violation of the

7  Court's order and with the knowing intention to suppress relevant evidence

8  concerning MGA's statute of limitations and laches defenses.

9       27. 50. Additionally, each year's report from 2000 through at least 2004

10  contained references to MGA and/or Bratz. Despite numerous document requests

11  that would cover such documents, the aforementioned September 12, 2007 order

12  compelling production on many requests covering these documents, and Discovery

13  Master Order No. 89 compelling production on numerous other requests covering

14  these documents, they were never produced.

15       28. 51. In fact, after Order No. 89 was entered, Mattel's attorneys expressly

16  promised the Court that Mattel would produce all responsive documents, which

17  promise necessarily included the Villasenor documents referencing MGA (which

18  Mattel had years earlier agreed to produce). But the Villasenor documents

19  referencing MGA and the market intelligence library on MGA were not produced.

20  They were not produced in March, in April, in May or in June. It was not until July

21  7, 2010, after Villasenor had already been subpoenaed and was just about to testify,

22  that the first few documents finally began trickling in.

23       29. 52. Mattel and its attorneys had no intention of producing these

24  documents until MGA found the witness who was the key to the entire scheme. By

25  July, however, Mattel no longer had any choice because it was about to be found out.

26  Had the Villasenor deposition not been subpoenaed for July 12, 2010, the documents

27  never would have been produced. Mattel and Quinn Emanuel came just "that close"

28                    - 15 -      MGA'S REPLY TO COUNTERCLAIMSAMENDED
                              COMPLAINT

                                        CV 04-9049 DOC (RNBX)

1    to concealing this damning evidence through a second discovery cutoff and another

2    trial. Even now, however, Mattel and Quinn Emanuel continue to suppress

3    documents related to this pattern and practice of theft, including refusing to product

4    documents from Rahimi, Osier and others engaged in this practice, and refusing to

5    produce reports and videos stored in the infamous Ninth Floor library.

6        30. 53. In order to suppress and conceal all of the evidence about a

7    long¬term scheme to defraud, witnesses who knew what was going on also had to lie

8    about it. It is reasonable to infer from the evidence produced to date that at least the

9    following Mattel witnesses were aware of the tactics of the market intelligence group

10   and gave misleading or untruthful testimony in order to suppress it and keep it from

11   coming out in this litigation: Matt Bousquette, Tim Kilpin, Russell Arons, and Gene

12   Murtha. Quinn Emanuel attorneys prepared and presented every single one of these

13   witnesses at their depositions while the firm had full knowledge of what the spy

14   group had been doing.

15       31. 54. In fact, the very Quinn Emanuel lawyer who met with Villasenor in

16   2005 and 2006 to hear his confessions of wrongdoing also represented Keith Storie

17   for six days of deposition as Mattel's 30(b)(6) witness. But then, in the one

18   deposition of Mr. Storie on the topic of Mattel's theft of MGA confidential

19   information, that attorney bowed out, so that a new lawyer could watch, with a

20   straight face, as Storie denied that Mattel employees had ever sneaked into

21   showrooms.

22   55. The scheme to tamper with witnesses in this litigation extends to other attorneys

23   and witnesses as well. In-house counsel Thomas, together with the same Quinn

24   Emanuel partner who helped Mattel silence Villasenor, along with one of Mattel's

25   Mexican attorneys from the Basham, Ringe Y Correa law firm, also plotted together

26   to tamper with another witness in the case, Pablo Vargas. Vargas was the subject of

27   allegations of trade secret misappropriation by Mattel, as reflected in the

28                              - 15 -    MGA'S REPLY TO COUNTERCLAIMS AMENDED
                                COMPLAINT
                                                              CV 04-9049 DOC (RNBX)

1   Counterclaims. Mattel also was prosecuting these allegations as criminal claims in

2   Mexico. Vargas consistently denied all wrongdoing.

3   56. In order to turn Vargas and get him to testify for Mattel, Mattel entered into a

4   settlement agreement with him whereby it agreed to pardon him entirely for his

5   alleged wrongful acts, thus removing the potential threat of years in a Mexican

6   prison. Miraculously, just after agreeing to this settlement, Vargas suddenly found a

7   high ranking new job in the toy industry in Mexico after a lengthy period of

8   unemployment. But the settlement created by Mattel and its outside lawyers still had

9   a catch: Vargas would not be pardoned and thus gain certainty that he could avoid

10  years in a Mexican prison unless and until he testified in a fashion that was

11  acceptable to Mattel. Vargas showed up in California for deposition testimony, but

12  on the first day of his deposition, testified in a fashion that was largely unhelpful to

13  Mattel, and helpful to MGA and Counter-Defendant Machado. Then, Mattel's

14  Mexican attorney, with the full knowledge of Mattel's in-house counsel and Quinn

15  Emanuel partner, took Vargas's lawyer out to the woodshed and made it clear that

16  Mattel was not happy with Vargas's testimony, effectively threatening Vargas's

17  pardon. The second day of the deposition, Vargas changed the substance of his

18  testimony on specific points in several respects, and also changed the entire tenor of

19  his testimony to be far more favorable to Mattel.

20  57. By engaging in a long term scheme to defraud its competitors, including MGA,

21  of their confidential information, concealing the evidence of that fraud, tampering

22  with witnesses and obstructing justice in this case, the Mattel Racketeering

23  Enterprise has enjoyed numerous benefits: (1) Mattel created an unfair and unlawful

24  competitive advantage, and was enabled to continue exploiting the stolen fruits of its

25  thievery for unfair competitive advantage in the form of its stolen research library

26  and to continue with its scheme to defraud; (2) Mattel, with Quinn Emanuel's full

27  knowledge and cooperation, destroyed backup tapes for several years that should

28                          - 15 -    MGA'S REPLY TO COUNTERCLAIMS AMENDED
                          COMPLAINT

                                              CV 04-9049 DOC (RNBX)

1  have been preserved, and such backup tapes almost certainly contained email

2  evidence relevant to what Mattel employees knew and when they knew it; (3) Mattel

3  and Quinn Emanuel altered and suppressed Mattel's complete 2001 NYTF Report,

4  which is ironclad evidence that Mattel knew about Bratz before it ever came on the

5  market and is important evidence directly relevant to the statute of limitations and

6  laches defenses that were hotly litigated in the phase 1 case and which Quinn

7  Emanuel knew—because its own lawyers had performed the initial evaluation of

8  claims in 2002—presented serious problems to Mattel's claims; (4) numerous Mattel

9  employees, including Eckert, destroyed relevant emails and associated documents;

10 and (5) most important of all and to enormous injury to MGA, Mattel and Quinn

11 Emanuel's pattern of obstruction of justice through the concealment and suppression

12 of voluminous evidence of Mattel's own extensive fraudulent and criminal bad acts

13 enabled them to seize for Mattel the "white hat" in this litigation, convincing Judge

14 Larson to enter a permanent injunction whereby Mattel effectively stole Bratz from

15 MGA—an injunction now demonstrated to be wrongful (*see Nintendo of Am., Inc. v.*

16 *Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1036- 37 (9th Cir. 1994)) by virtue of its

17 reversal by the Ninth Circuit Court of Appeals even without benefit of this stunning,

18 recently-discovered evidence.

19 58. As the Ninth Circuit held, the jury's verdict in phase 1 did not support the

20 sweeping injunction by former District Judge Larson. In fact, the jury in phase 1

21 rejected Mattel's claim of willful infringement, rejected Mattel's demand for

22 punitive damages, and awarded Mattel damages in only a small fraction of the

23 amount demanded. In particular, the jury rejected the scope of Mattel's claimed

24 copyright infringement claim, awarding only ten million in the face of Mattel's

25 demand in excess of one billion. Unfortunately, there was no way to know exactly

26 what the jury thought infringed, because although MGA tried to find out by asking

27 Judge Larson to give the jury a list of products to check off, Mattel succeeded in

28                     - 15 -     MGA'S REPLY TO COUNTERCLAIMS AMENDED
                      COMPLAINT
                                  CV 04-9049 DOC (RNBX)

1  convincing Judge Larson not to use the list and instead to just look at the damages
2  number. During deliberations, the jury asked whether it could find that only the first
3  generation of Bratz dolls infringed, the Judge Larson correctly answered "yes." It
4  then awarded only a small fraction of the damages demanded by Mattel—but of
5  course Mattel then disavowed the obvious meaning in that result, expressly contrary
6  to its earlier position.

7  59. Even though the jury had rejected Mattel's overreaching demands and sent a
8  clear signal that it viewed only the first generation of MGA products to infringe,
9  Mattel's strategy to conceal the evidence of its own criminal wrongdoing while
10 relentlessly accusing MGA and Larian worked, because Judge Larson then had to
11 consider Mattel's motion for injunction. In that motion, Mattel sought to force MGA
12 to turn over its Bratz intellectual property to Mattel and stop using it. Ordinarily in
13 considering such a request, the Court would also be required to consider all equitable
14 defenses such as laches and unclean hands. Instead, Mattel and its attorneys had
15 succeeded in suppressing all of this critical evidence regarding unclean hands, and
16 several key pieces of evidence relevant to laches as well.

17 60. Had Judge Larson known that Mattel had engaged in a long term scheme to
18 defraud MGA and all of its other competitors out of confidential information using
19 false credentials and other false pretenses, Judge Larson surely would have felt
20 differently about entering sweeping injunctive relief, particularly when the jury had
21 already rejected sweeping liability. Any judicial officer would have been scandalized
22 by such evidence and would have found it a significant roadblock to entry of
23 injunctive relief. The scheme by Mattel and its attorneys to keep Mattel's image
24 clean, while demonizing MGA, succeeded wildly when Judge Larson, who did not
25 know about all of this suppressed evidence, entered sweeping injunctive relief on
26 December 3, 2008. The injunctive orders had the effect of nearly destroying MGA,
27 and destroyed most, if not all, of the brand equity in Bratz.

28

- 15 -   MGA'S REPLY TO COUNTERCLAIMS AMENDED COMPLAINT

CV 04-9049 DOC (RNBX)

1   **~~REPLY TO COUNTERCLAIMS~~**

2   ~~Mattel's Fourth Amended Answer and Counterclaims ("FAAC") contravenes~~

3   ~~Rule 8(a) of the Federal Rules of Civil Procedure in multiple respects. For example,~~

4   ~~in many places, the FAAC improperly mixes factual averments with argumentative~~

5   ~~rhetoric. The FAAC also includes a selective recitation of alleged historical facts and~~

6   ~~dozens of allegations improperly made "on information and belief" which are in fact~~

7   ~~pure speculation, much of which is both irrelevant and inflammatory in tone and~~

8   ~~content. In addition, many of the allegations of the FAAC are overly broad, vague or~~

9   ~~conclusory and include terms which are undefined and which are susceptible to~~

10  ~~different meanings. Accordingly, by way of a general response, all allegations are~~

11  ~~denied unless specifically admitted, and any factual averment admitted is admitted~~

12  ~~only as to the specific facts and not as to any conclusions, characterizations,~~

13  ~~implications or speculations which are contained in the averment or in the FAAC as~~

14  ~~a whole. These comments and objections are incorporated, to the extent appropriate,~~

15  ~~into each numbered paragraph of this Reply to Counterclaims.~~

16  ~~In addition, headings in pleadings are used by both parties for organizational~~

17  ~~purposes and ease of reading, and are not to be considered averments to which any~~

18  ~~response is required. If headings are to be considered allegations to which a response~~

19  ~~is required, MGA hereby denies all allegations contained in any of Mattel's~~

20  ~~headings.~~

21  ~~61. The allegations set forth in paragraph 1 are denied.~~

22  ~~62. The allegations set forth in paragraph 2 are denied.~~

23  ~~63. The allegations set forth in paragraph 3 are denied.~~

24  ~~64. The allegations set forth in paragraph 4 are denied.~~

25  ~~65. The allegations set forth in paragraph 5 are denied.~~

26  ~~66. The allegations set forth in paragraph 6 are denied.~~

27

28

1    67. MGA admits that the Court has federal question jurisdiction over this action, but

2    denies that any federal or state statute implicated by the Counterclaims applies to the

3    extraterritorial conduct alleged in the Counterclaims. MGA also denies supplemental

4    jurisdiction.

5    68. MGA admits that venue is proper in this District as to all parties other than

6    MGAE de Mexico. As to MGAE de Mexico, venue is improper because the Court

7    lacks personal jurisdiction.

8    69. The MGA Parties admit the allegations set forth in paragraph 9.

9    70. MGA admits that Mattel de Mexico, S.A. de C.V. is an entity existing under the

10   laws of Mexico with a principal place of business in Mexico City, Mexico. The

11   remaining allegations set forth in paragraph 10 are denied. And, MGA objects to

12   Mattel's practice of lumping Mattel and Mattel Mexico throughout the pleading

13   under the name "Mattel." Mattel's lumping makes it impossible to respond to the

14   allegations in any meaningful way. It was Mattel's burden to specify when it meant

15   Mattel Inc. and when it meant another legal entity. Having failed to do so, it is not

16   MGA's job to parse the pleading for it.

17   71. MGA admits the allegations contained in the first two sentences of paragraph 11

18   and denies the remaining allegations set forth in paragraph 11.

19   72. MGA is without sufficient knowledge to admit or deny that Bryant currently

20   resides in the State of Missouri and on that basis, denies that allegation. MGA denies

21   all of the remaining allegations set forth in paragraph 12 in part because of the

22   definition of "Mattel."

23   73. MGA admits the allegations set forth in the first sentence of paragraph 13 and

24   deny the remaining allegations set forth in paragraph 13.

25   74. MGA admits the allegations set forth in the first sentence of paragraph 14 and

26   deny the remaining allegations set forth in paragraph 14.

27   75. MGA admits the allegations set forth in paragraph 15.

28
- 15 -   MGA'S REPLY TO COUNTERCLAIMS AMENDED COMPLAINT

CV 04-9049 DOC (RNBX)

1    76. MGA admits the allegations set forth in paragraph 16.

2    77. MGA admits the allegations set forth in the first sentence of paragraph 17, and

3    denies the remainder.

4    78. MGA admits that IGWT 826 is a limited liability company organized and

5    existing under the laws of the State of California formed on August 27, 2008, and

6    denies the remainder of the allegations set forth in paragraph 18.

7    79. MGA denies the allegations set forth in paragraph 19.

8    80. Paragraph 20 is a statement of Mattel's legal position, to which no response is

9    necessary. To the extent that a response is required, MGA denies the allegations set

10   forth in paragraph 20.

11   81. MGA denies the allegations of paragraph 21, in part because of the definition of

12   Mattel.

13   82. MGA denies the allegations of paragraph 22.

14   83. MGA admits the allegations of the first sentence of paragraph 23 and denies the

15   remainder, in part because of the definition of Mattel.

16   84. MGA denies the allegations of paragraph 24, in part because of the definition of

17   Mattel.

18   85. MGA denies the allegations of paragraph 25.

19   86. MGA denies the allegations set forth in paragraph 26.

20   87. MGA denies the allegations set forth in paragraph 31.

21   88. MGA denies the allegations set forth in paragraph 28.

22   89. MGA denies the allegations set forth in paragraph 29.

23   90. MGA denies the allegations set forth in paragraph 30.

24   91. MGA denies the allegations set forth in paragraph 31.

25   92. MGA admits the allegations set forth in paragraph 32.

26   93. MGA denies the allegations set forth in paragraph 33.

27   94. MGA denies the allegations set forth in paragraph 34.

28

1   95. MGA denies the allegations set forth in paragraph 35.

2   96. MGA admits that in or about early 2004, it decided to form a new corporation,

3   MGAE de Mexico, S.R.L. de C.V., to conduct business in Mexico, admits that

4   MGAE de Mexico hired three employees who had worked for Mattel subsidiary

5   Mattel Servicios located in Mexico, and denies the remaining allegations set forth in

6   paragraph 36.

7   97. MGA denies the allegations of paragraph 37.

8   98. MGA denies the allegations of paragraph 38.

9   99. MGA denies the allegations of paragraph 39.

10  100. MGA denies the allegations of paragraph 40.

11  101. MGA denies the allegations of paragraph 41.

12  102. MGA denies the allegations of paragraph 42.

13  103. MGA denies the allegations of paragraph 43.

14  104. MGA denies the allegations of paragraph 44.

15  105. MGA denies the allegations of paragraph 45.

16  106. MGA denies the allegations of paragraph 46.

17  107. MGA denies the allegations of paragraph 47.

18  108. MGA denies the allegations of paragraph 48.

19  109. MGA denies the allegations of paragraph 49.

20  110. MGA denies the allegations of paragraph 50.

21  111. MGA denies the allegations of paragraph 51.

22  112. MGA denies the allegations of paragraph 52.

23  113. MGA denies the allegations of paragraph 53.

24  114. MGA denies the allegations of paragraph 54.

25  115. MGA denies the allegations of paragraph 55.

26  116. MGA denies the allegations of paragraph 56.

27  117. MGA denies the allegations of paragraph 57.

28

1   118. MGA denies the allegations of paragraph 58.

2   119. MGA denies the allegations of paragraph 59.

3   120. MGA admits that on September 26, 2005, Janine Brisbois ("Brisbois") resigned

4   from Mattel Canada, that she took a position as Vice President of National Accounts

5   at MGAE Canada, and denies the remaining allegations set forth in the first sentence

6   and the remainder of paragraph 60.

7   121. MGA admits that Brisbois spoke with Larian by telephone on or about the

8   evening of September 22, 2005 and denies the remainder of paragraph 61.

9   122. MGA denies the allegations of paragraph 62.

10   123. MGA denies the allegations of paragraph 63.

11   124. MGA admits that Ron Brawer ("Brawer") resigned from Mattel, and that after

12   the period of his notice, came to work for MGA. MGA admits that Tyco Toys hired

13   Brawer on April 22, 1996, and denies the remaining allegations set forth in

14   paragraph 64, in part because of the definition of Mattel.

15   125. MGA denies the allegations of paragraph 65, in part because of the definition of

16   Mattel.

17   126. MGA admits that Brawer became MGA's Executive Vice President of Sales

18   and Marketing, admits that Brawer was responsible for sales worldwide, admits that

19   Brawer had responsibility for MGA's accounts with some of the same retailers that

20   Brawer worked with while at Mattel, and denies the remaining allegations of

21   paragraph 66.

22   127. MGA admits that Brawer stated during his exit interview that he had returned

23   all confidential proprietary information to Mattel and denies the remaining

24   allegations of paragraph 67.

25   128. MGA admits that it hired Jorge Castilla ("Castilla") on or around March 13,

26   2006. MGA denies the remaining allegations of paragraph 68, in part because of the

27   definition of Mattel.

28                    - 15 -   MGA'S REPLY TO COUNTERCLAIMS AMENDED
                    COMPLAINT
                                                    CV 04-9049 DOC (RNBX)

1   129. MGA denies the allegations of paragraph 69.

2   130. MGA denies the allegations of paragraph 70.

3   131. MGA denies the allegations of paragraph 71.

4   132. MGA denies the allegations of paragraph 72.

5   133. MGA denies the allegations of paragraph 73.

6   134. MGA denies the allegations of paragraph 74.

7   135. MGA denies the allegations of paragraph 75.

8   136. MGA admits that Castilla, before came to work at MGA, turned over to FBI

9   agents a storage media from his personal digital device. MGA denies the remaining

10  allegations set forth in paragraph 76.

11  137. MGA denies the allegations of paragraph 77.

12  138. MGA denies the allegations of paragraph 78.

13  139. MGA denies the allegations of paragraph 79.

14  140. MGA denies the allegations of paragraph 80.

15  141. MGA denies the allegations of paragraph 81.

16  142. MGA denies the allegations of paragraph 82.

17  143. MGA denies the allegations of paragraph 83.

18  144. MGA denies the allegations of paragraph 84.

19  145. MGA denies the allegations of paragraph 85.

20  146. MGA denies the allegations of paragraph 86.

21  147. MGA denies the allegations of paragraph 87.

22  148. MGA denies the allegations of paragraph 88.

23  149. MGA denies the allegations of paragraph 89.

24  150. MGA denies the allegations of paragraph 90.

25  151. MGA denies the allegations of paragraph 91.

26  152. MGA denies the allegations of paragraph 92.

27  153. MGA denies the allegations of paragraph 93.

28

1   154. MGA denies the allegations of paragraph 94.

2   155. MGA denies the allegations of paragraph 95.

3   156. MGA denies the allegations of paragraph 96.

4   157. MGA admits the allegations of paragraph 97 with the exception of the word

5   "purported" in the last sentence, which is denied.

6   158. MGA denies the allegations of paragraph 98.

7   159. MGA denies the allegations of paragraph 99.

8   160. MGA denies the allegations of paragraph 100.

9   161. MGA admits that Leon Neman is Larian's brother-in-law and a former director

10  of MGA. MGA admits that Larian and Neil Kadisha, and their respective wives, are

11  social friends. MGA admits that Joseph Moinian could be considered a friend of

12  Larian by virtue of his participation in Omni 808's rescue of MGA from Wachovia's

13  foreclosure. Other than as expressly admitted, the allegations of paragraph 101 are

14  denied.

15  162. MGA is without sufficient information to admit or deny the allegations of

16  paragraph 102, and on that basis denies them.

17  163. MGA is without sufficient information to admit or deny the allegations of

18  paragraph 103, and on that basis denies them.

19  164. MGA denies the allegations of paragraph 104.

20  165. MGA denies the allegations of the first sentence of paragraph 105. MGA admits

21  that IGWT 826 loaned approximately sixty million dollars to Omni 808 for the

22  purchase of the Wachovia debt, and that the funds for such loan by IGWT 826 were

23  supplied by members of the Larian and Makabi families and their respective family

24  trusts. MGA admits that IGWT 826 was formed on August 27, 2008 at the behest of

25  Isaac Larian. Except as expressly admitted herein, the allegations of paragraph 105

26  are denied.

27

28

- 15 -   MGA'S REPLY TO COUNTERCLAIMSAMENDED COMPLAINT

CV 04-9049 DOC (RNBX)

1    166. MGA admits the allegations of the first sentence of paragraph 106. MGA is

2    without sufficient basis to admit or deny the allegations of the second and third

3    sentences, and on that basis, denies them.

4    167. MGA denies the allegations of paragraph 107.

5    168. MGA denies the allegations of paragraph 108.

6    169. MGA denies the allegations of paragraph 109.

7    170. MGA is without sufficient basis to admit or deny the allegations of paragraph

8    110, and on that basis, denies them.

9    171. MGA is without sufficient basis to admit or deny the allegations of paragraph

10    111, and on that basis, denies them.

11    172. MGA denies the first sentence of paragraph 112, and the succeeding

12    characterizations implied by the use of the words "first," "second," and "third."

13    MGA admits that MGA and Omni 808 executed a Secured Delayed Demand Draw

14    Note for loans of up to $40 million subject to certain conditions, through which

15    Omni 808 agreed to loan funds to MGA. MGA is without sufficient basis to admit or

16    deny the remaining allegations of paragraph 112, and on that basis, denies them.

17    173. MGA admits that the Draw Demand Note provided for a potential additional

18    $40 million in credit for MGA, subject to conditions. MGA admits that on or about

19    October 17, 2008, MGA made a request, and Omni loaned MGA $6 million pursuant

20    to the terms of the draw demand note. Except as expressly admitted herein, MGA

21    denies the allegations of paragraph 113.

22    174. MGA denies the allegations of paragraph 114.

23    175. MGA admits that Omni 808 sent a letter to the Court, and that the contents of

24    the letter are as set forth therein. MGA denies the remaining allegations of paragraph

25    115.

26    176. MGA denies the allegations of paragraph 116.

27    177. MGA denies the allegations of paragraph 117.

28                              - 15 -    MGA'S ~~REPLY TO COUNTERCLAIMS~~ AMENDED COMPLAINT

                                                    CV 04-9049 DOC (RNBX)

1   178. MGA denies the allegations of paragraph 118.

2   179. MGA denies the allegations of paragraph 119.

3   180. MGA denies the allegations of paragraph 120.

4   181. MGA denies the allegations of paragraph 121.

5   182. MGA incorporates its responses to paragraphs 1 through 121.

6   183. MGA denies the allegations of paragraph 123.

7   184. MGA denies the allegations of paragraph 124.

8   185. MGA denies the allegations of paragraph 125.

9   186. MGA denies the allegations of paragraph 126.

10  187. MGA denies the allegations of paragraph 127.

11  188. MGA incorporates its responses to paragraphs 1 through 127.

12  189. MGA denies the allegations of paragraph 129.

13  190. MGA denies the allegations of paragraph 130.

14  191. MGA denies the allegations of paragraph 131.

15  192. MGA denies the allegations of paragraph 132.

16  193. MGA incorporates its responses to paragraphs 1 through 132.

17  194. MGA denies the allegations of paragraph 134.

18  195. MGA denies the allegations of paragraph 135.

19  196. MGA denies the allegations of paragraph 136.

20  197. MGA denies the allegations of paragraph 137.

21  198. MGA denies the allegations of paragraph 138.

22  199. MGA denies the allegations of paragraph 139.

23  200. MGA denies the allegations of paragraph 140.

24  201. MGA denies the allegations of paragraph 141.

25  202. MGA denies the allegations of paragraph 142.

26  203. MGA incorporates its responses to paragraphs 1 through 143.

27  204. MGA denies the allegations of paragraph 144.

28  - 15 -   MGA'S REPLY TO COUNTERCLAIMS AMENDED COMPLAINT

CV 04-9049 DOC (RNBX)

1    205. MGA denies the allegations of paragraph 145.

2    206. MGA denies the allegations of paragraph 146.

3    207. MGA denies the allegations of paragraph 147.

4    208. MGA denies the allegations of paragraph 148.

5    209. MGA incorporates its responses to paragraphs 1 through 148.

6    210. MGA denies the allegations of paragraph 150.

7    211. MGA denies the allegations of paragraph 151.

8    212. MGA denies the allegations of paragraph 152.

9    213. MGA denies the allegations of paragraph 153.

10   214. MGA denies the allegations of paragraph 154.

11   215. MGA denies the allegations of paragraph 155.

12   216. MGA denies the allegations of paragraph 156.

13   217. MGA denies the allegations of paragraph 157.

14   218. MGA denies the allegations of paragraph 158.

15   219. MGA incorporates its responses to paragraphs 1 through 158 by reference.

16   MGA further notes that the Court has already held this claim at least partially

17   preempted by Mattel's trade secret misappropriation claim.

18   220. MGA denies the allegations of paragraph 160.

19   221. MGA denies the allegations of paragraph 161.

20   222. MGA denies the allegations of paragraph 162.

21   223. MGA denies the allegations of paragraph 163.

22   224. MGA denies the allegations of paragraph 164.

23   225. MGA denies the allegations of paragraph 165.

24   226. MGA incorporates its responses to paragraphs 1 through 165 by reference.

25   227. MGA denies the allegations of paragraph 167.

26   228. MGA denies the allegations of paragraph 168.

27   229. MGA denies the allegations of paragraph 169.

28

1   230. MGA denies the allegations of paragraph 170.

2   231. MGA denies the allegations of paragraph 171.

3   232. MGA denies the allegations of paragraph 172.

4   233. MGA incorporates its responses to paragraphs 1 through 172 by reference.

5   234. MGA denies the allegations of paragraph 174.

6   235. MGA denies the allegations of paragraph 175.

7   236. MGA denies the allegations of paragraph 176.

8   237. MGA denies the allegations of paragraph 177.

9   238. MGA denies the allegations of paragraph 178.

10   239. MGA incorporates its responses to paragraphs 1 through 178 by reference.

11   240. MGA denies the allegations of paragraph 180.

12   241. MGA denies the allegations of paragraph 181.

13   242. MGA denies the allegations of paragraph 182.

14   243. MGA denies the allegations of paragraph 183.

15   244. MGA denies the allegations of paragraph 184.

16   245. MGA denies the allegations of paragraph 185.

17   246. MGA incorporates its responses to paragraphs 1 through 185 by reference.

18   247. MGA denies the allegations of paragraph 187.

19   248. MGA denies the allegations of paragraph 188.

20   249. MGA denies the allegations of paragraph 189.

21   250. MGA denies the allegations of paragraph 190.

22   251. MGA denies the allegations of paragraph 191.

23   252. MGA incorporates its responses to paragraphs 1 through 191 by reference.

24   253. MGA denies the allegations of paragraph 193.

25   254. MGA denies the allegations of paragraph 194.

26   255. MGA denies the allegations of paragraph 195.

27   256. MGA denies the allegations of paragraph 196.

28

MGA'S REPLY TO COUNTERCLAIMS AMENDED COMPLAINT

CV 04-9049 DOC (RNBX)

1   257. MGA denies the allegations of paragraph 197.

2   258. MGA denies the allegations of paragraph 198.

3   259. MGA denies the allegations of paragraph 199..

4   260. MGA denies the allegations of paragraph 200.

5   261. MGA incorporates its responses to paragraphs 1 through 200 by reference.

6   262. MGA denies the allegations of paragraph 202.

7   263. MGA denies the allegations of paragraph 203.

8   264. MGA denies the allegations of paragraph 204.

9   265. MGA notes that this claim has been dismissed without leave to amend and

10  therefore no response is required. To the extent any response is required, MGA

11  incorporates its responses to paragraphs 1 through 204 by reference.

12  266. To the extent any response is required to this dismissed claim, MGA denies the

13  allegations of paragraph 206.

14  267. To the extent any response is required to this dismissed claim, MGA denies the

15  allegations of paragraph 207.

16  268. To the extent any response is required to this dismissed claim, MGA denies the

17  allegations of paragraph 208.

18  269. To the extent any response is required to this dismissed claim, MGA denies the

19  allegations of paragraph 209.

20  270. To the extent any response is required to this dismissed claim, MGA denies the

21  allegations of paragraph 210.

22  271. To the extent any response is required to this dismissed claim, MGA denies the

23  allegations of paragraph 211.

24  272. To the extent any response is required to this dismissed claim, MGA denies the

25  allegations of paragraph 212.

26  273. To the extent any response is required to this dismissed claim, MGA denies the

27  allegations of paragraph 213.

28

1   274. MGA notes that this claim has been dismissed without leave to amend and

2   therefore no response is required. To the extent any response is required, MGA

3   incorporates its responses to paragraphs 1 through 213 by reference.

4   275. To the extent any response is required to this dismissed claim, MGA denies the

5   allegations of paragraph 215.

6   276. To the extent any response is required to this dismissed claim, MGA denies the

7   allegations of paragraph 216.

8   277. To the extent any response is required to this dismissed claim, MGA denies the

9   allegations of paragraph 217.

10  278. To the extent any response is required to this dismissed claim, MGA denies the

11  allegations of paragraph 218.

12  279. To the extent any response is required to this dismissed claim, MGA denies the

13  allegations of paragraph 219.

14  280. To the extent any response is required to this dismissed claim, MGA denies the

15  allegations of paragraph 220.

16  281. To the extent any response is required to this dismissed claim, MGA denies the

17  allegations of paragraph 221.

18  282. To the extent any response is required to this dismissed claim, MGA denies the

19  allegations of paragraph 222.

20  283. To the extent any response is required to this dismissed claim, MGA denies the

21  allegations of paragraph 223.

22  284. MGA notes that this claim has been dismissed without leave to amend and

23  therefore no response is required. To the extent any response is required, MGA

24  incorporates its responses to paragraphs 1 through 223 by reference.

25  285. To the extent any response is required to this dismissed claim, MGA denies the

26  allegations of paragraph 225.

27

28                      - 15 -        MGA'S ~~REPLY TO COUNTERCLAIMS~~AMENDED
                    COMPLAINT
                                     CV 04-9049 DOC (RNBX)

1   286. To the extent any response is required to this dismissed claim, MGA denies the

2   allegations of paragraph 226.

3   287. To the extent any response is required to this dismissed claim, MGA denies the

4   allegations of paragraph 227.

5   288. To the extent any response is required to this dismissed claim, MGA denies the

6   allegations of paragraph 228.

7   289. To the extent any response is required to this dismissed claim, MGA denies the

8   allegations of paragraph 229.

9   290. To the extent any response is required to this dismissed claim, MGA denies the

10   allegations of paragraph 230.

11   291. MGA notes that this claim has been dismissed without leave to amend and

12   therefore no response is required. To the extent any response is required, MGA

13   incorporates its responses to paragraphs 1 through 230 by reference.

14   292. To the extent any response is required to this dismissed claim, MGA denies the

15   allegations of paragraph 232.

16   293. To the extent any response is required to this dismissed claim, MGA denies the

17   allegations of paragraph 233.

18   294. To the extent any response is required to this dismissed claim, MGA denies the

19   allegations of paragraph 234.

20   295. To the extent any response is required to this dismissed claim, MGA denies the

21   allegations of paragraph 235.

22   296. To the extent any response is required to this dismissed claim, MGA denies the

23   allegations of paragraph 236.

24   297. To the extent any response is required to this dismissed claim, MGA denies the

25   allegations of paragraph 237.

26   298. MGA incorporates its responses to paragraphs 1 through 237 by reference.

27

28                  - 15 -        MGA'S REPLY TO COUNTERCLAIMSAMENDED
                  COMPLAINT
                                          CV 04-9049 DOC (RNBX)

1   299. MGA admits that there is an actual controversy created by Mattel's claim to

2   ownership of Bratz. Otherwise, the allegations of paragraph 239 are denied.

3   300. MGA agrees that the Court should make a declaration as to the true owner of

4   Bratz—MGA. Otherwise, the allegations of paragraph 240 are denied.

5   301. MGA agrees that the Court should make a declaration as to the true owner of

6   Bratz—MGA. Otherwise, the allegations of paragraph 241 are denied to the extent

7   any further response is required.

8   302. MGA denies that Mattel has any rights as a creditor, or otherwise, and denies

9   the allegations of paragraph 242 to the extent any further response is required.

10   303. MGA agrees that the Court should make a declaration as to the true owner of

11   the trademark Moxie Girlz—MGA. Otherwise, the allegations of paragraph 243 are

12   denied to the extent any further response is required.

13   **AFFIRMATIVE DEFENSES**

14   Without admitting any wrongful conduct on the part of MGA or any other

15   Counter-Defendant, and without admitting that Mattel suffered any loss, damage, or

16   injury, MGA hereby alleges the following affirmative defenses to the remaining

17   Counterclaims that have not already been dismissed by the Court. By designating the

18   following as affirmative defenses, MGA does not in any way waive or limit any

19   defenses which are or may be raised by their denials, allegations, and averments set

20   forth herein. MGA also does not, by alleging any affirmative defense, admit that

21   Mattel does not have the burden of proof for any or all facts and/or legal conclusions

22   underlying any of those defenses. These defenses are pled in the alternative, and are

23   raised to preserve the rights of MGA to assert such defenses, and are raised without

24   prejudice to their ability to raise other and further defenses.

25   Additionally, as noted above, MGA has objected to Mattel's definition of

26   Mattel throughout its counterclaims to include Mattel Mexico. The only claim

27   reasonably pled by Mattel Mexico as a plaintiff, as opposed to by Mattel Inc., is the

28

1  trade secret misappropriation claim. These affirmative defenses are pled accordingly.

2  If, however, Mattel intended to plead more than the trade secret claim on behalf of

3  Mattel Mexico, then MGA hereby asserts all such additional defenses against any

4  other claim of Mattel Mexico as may be applicable at law or in equity.

5  **FIRST AFFIRMATIVE DEFENSE**

6  (Failure to State a Claim)

7  Mattel and Mattel Mexico's counterclaims fail to state a claim against MGA

8  upon which relief can be granted.

9  **SECOND AFFIRMATIVE DEFENSE**

10  (Unclean Hands)

11  Mattel and Mattel Mexico's counterclaims are barred in whole or in part by

12  Mattel and Mattel Mexico's unclean hands and wrongful acts.

13  **THIRD AFFIRMATIVE DEFENSE**

14  (Laches)

15  Mattel and Mattel Mexico's counterclaims are barred by the doctrine of

16  laches.

17  **FOURTH AFFIRMATIVE DEFENSE**

18  (Statute of Limitations)

19  Mattel and Mattel Mexico's counterclaims are barred by the applicable

20  statutes of limitations, including but not limited to, 17 U.S.C. § 507(b), and Code of

21  Civil Procedure §§ 337, 339, 343 and 338(c).

22  **FIFTH AFFIRMATIVE DEFENSE**

23  (Common Law Bona Fide Purchaser for Value

24  Mattel cannot recover either equitable relief or damages herein from MGA

25  because MGA paid valuable consideration for Bryant's assignment of his rights in

26  the original Bratz drawings to MGA, and MGA's CEO, Isaac Larian, made the

27  decision to proceed with the transaction on behalf of MGA acting with a good faith

28

1   belief that Bryant owned the rights to his original Bratz drawings and that his

2   assignment of such rights to MGA was valid and permissible.

3                                **CLAIM**

4                          **SIXTH AFFIRMATIVE DEFENSE**

5           (Priority Between Conflicting Transfers—17 U.S.C. §205(d))

6        Even if Bryant agreed to assign his Bratz copyrights to Mattel under Mattel's

7   Inventions Agreement (which MGA denies), Mattel cannot recover either equitable

8   relief or damages herein because MGA's later transfer was taken in good faith based

9   upon the good faith belief of MGA's CEO, Isaac Larian, to proceed with the

10   transaction on behalf of MGA in the belief that Bryant owned the rights to his

11   original Bratz drawings, without notice of the earlier transfer, and where the terms of

12   that later transfer included valuable consideration in the form of a promise to pay

13   royalties.

14                        **SEVENTH AFFIRMATIVE DEFENSE**

15                   (Information Readily Ascertainable)

16        MGA cannot be liable for misappropriation of information that was readily

17   ascertainable by proper means at the time of the alleged acquisition or use.

18                       **EIGHTH AFFIRMATIVE DEFENSE**

19                    (Acts or Omissions of Others)

20        Mattel and Mattel Mexico's damages, if any, were not caused by MGA and

21   are not attributable to any unlawful acts or omissions of MGA.

22                        **NINTH AFFIRMATIVE DEFENSE**

23                          (Estoppel)

24        Mattel's counterclaims are barred in whole or in part by the doctrine of

25   estoppel.

26

27

28                - 15 -     MGA'S ~~REPLY TO COUNTERCLAIMS~~ AMENDED
                     COMPLAINT

1      TENTH AFFIRMATIVE DEFENSE

2      (Acquiescence)

3      Mattel's counterclaims are barred in whole or in part by its own acquiescence.

4      ELEVENTH AFFIRMATIVE DEFENSE

5      (Failure to Mitigate)

6      MGA denies that Mattel or Mattel Mexico suffered any damages, but even if

7      they did, then they also failed to take reasonable steps to mitigate those purported

8      damages.

9      TWELFTH AFFIRMATIVE DEFENSE

10     (Comparative Fault)

11     MGA denies that Mattel or Mattel Mexico suffered any damages, but even if

12     they did, any recovery by Mattel or Mattel Mexico is barred or must be reduced as a

13     result of their comparative fault.

14     THIRTEENTH AFFIRMATIVE DEFENSE

15     (Good Faith Improver)

16     MGA denies that Mattel is entitled to any equitable relief or profits, but even

17     if it is, MGA is a good faith improver to any idea or property conveyed to Mattel and

18     is entitled to be compensated for the value of that improvement as a condition of any

19     transfer.

20     FOURTEENTH AFFIRMATIVE DEFENSE

21     (Setoff)

22     To the extent that MGA is a good faith improver, and to the extent that MGA

23     has been harmed by Mattel's wrongful injunction, MGA is entitled to a setoff of any

24     damages or other monetary relief awarded to Mattel.

25

26

27

28                          - 15 -     MGA'S REPLY TO COUNTERCLAIMSAMENDED
                            COMPLAINT

                                       CV 04-9049 DOC (RNBX)

1    **FIFTEENTH AFFIRMATIVE DEFENSE**

2    (Duplicative Recovery)

3    If the Court does not vacate the Phase 1 verdicts in their entirety as MGA

4    believes is required by the July 22 Ninth Circuit Opinion, then any monetary

5    recovery by Mattel on the counterclaims in Phase 2 is barred as duplicative of the

6    Phase 1 verdicts, and must be setoff against them.

7    **SIXTEENTH AFFIRMATIVE DEFENSE**

8    (Waiver)

9    Mattel's counterclaims are barred in whole or in part by waiver.

10    **SEVENTEENTH AFFIRMATIVE DEFENSE**

11    (Joint Authorship)

12    MGA denies that Mattel owns any copyright interest in any of the sculptural

13    works or dolls, but even if it did, such ownership is joint with MGA by virtue of

14    MGA's contribution to those works.

15    **EIGHTEENTH AFFIRMATIVE DEFENSE**

16    (Spoliation of Evidence and Obstruction of Justice)

17    Mattel's claims are barred in whole or in part by Mattel's spoliation of

18    evidence and obstruction of justice.

19    **NINETEENTH AFFIRMATIVE DEFENSE**

20    (Illegal Conduct/Fraud)

21    Mattel's claims are barred in whole or in part by Mattel's own illegal conduct

22    and/or fraud.

23    **TWENTIETH AFFIRMATIVE DEFENSE**

24    (Competition Privilege/Justification)

25    Mattel's counterclaims are barred in whole or in part on the grounds that the

26    acts of MGA were lawful competition or justified.

27

28

1   **TWENTY-FIRST AFFIRMATIVE DEFENSE**

2   (Employee Right Of Mobility)

3   In violation of California law and public policy, as reflected, e.g., in California

4   Business & Professions Code section 16600, Mattel is seeking, through its claims

5   and its interpretations of employee contracts to unlawfully restrain employee

6   mobility.

7   Mattel's interpretation of its Inventions Agreement and its attempt to obtain

8   specific relief based upon that Agreement violates Business and Professions Code

9   §16600.

10   **TWENTY-SECOND AFFIRMATIVE DEFENSE**

11   (Mattel's Bad Faith Claim Of Misappropriation)

12   Mattel's claims of misappropriation of trade secrets are brought and have been

13   maintained in bad faith.

14   **TWENTY-THIRD AFFIRMATIVE DEFENSE**

15   (Good Faith)

16   Mattel's counterclaims are barred in whole or in part because the MGA Parties

17   acted in good faith.

18   **TWENTY-FOURTH AFFIRMATIVE DEFENSE**

19   (Lack of Authority)

20   Mattel's counterclaims are barred in whole or in part on the grounds that to the

21   extent any person committed an unlawful or tortious act, the person lacked authority

22   to commit such act on behalf of MGA.

23   **TWENTY-FIFTH AFFIRMATIVE DEFENSE**

24   (Lack of Standing)

25   Mattel's counterclaims are barred in whole or impart by its lack of standing.

26

27

28

1    **TWENTY-SIXTH AFFIRMATIVE DEFENSE**

2    (Joinder in Defenses of Co-Defendants)

3    The MGA Parties hereby adopt and incorporate by reference any and all other

4    affirmative defenses that have been or will be asserted by any other defendant or

5    counter-defendant (including Bryant) in this litigation to the extent that defendants

6    may share in such affirmative defenses.

7    **TWENTY-SEVENTH AFFIRMATIVE DEFENSE**

8    (Preemption by California Uniform Trade Secrets Act)

9    Mattel's state law counterclaims are preempted by the California Uniform

10   Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426 *et seq.*, because they are based

11   on the same nucleus of facts as Mattel's Fourth Counterclaim for Misappropriation

12   of Trade Secrets under the CUTSA.

13   **TWENTY-EIGHTH AFFIRMATIVE DEFENSE**

14   (Preemption by Copyright Act)

15   Some or all of Mattel's claims are preempted by the Copyright Act, 17 U.S.C.

16   §§ 101 *et seq*.

17   **TWENTY-NINTH AFFIRMATIVE DEFENSE**

18   (Res Judicata and Collateral Estoppel (Fed. R. Civ. Proc. 8(c)(1))

19   If the Court does not vacate the Phase 1 verdicts in their entirety as MGA

20   believes is required by the July 22 Ninth Circuit Opinion, then Mattel's Phase 2

21   counterclaims are barred in whole or in part by the doctrines of res judicata and

22   collateral estoppel as a result of the Phase 1 proceedings.

23   **THIRTIETH AFFIRMATIVE DEFENSE**

24   (Lack of Jurisdiction)

25   Mattel's claims, including without limitation its claims based upon alleged

26   extra-territorial acts, are barred in whole or in part by lack of subject matter

27   jurisdiction.

28

- 15 -
COMPLAINT

MGA'S REPLY TO COUNTERCLAIMSAMENDED

CV 04-9049 DOC (RNBX)

1    **THIRTY-FIRST AFFIRMATIVE DEFENSE**

2    (Undiscovered Defenses)

3    The MGA Parties have insufficient knowledge or information upon which to

4    form a belief as to whether additional defenses are available. The MGA Parties

5    reserve the right to assert any further or additional defenses upon receiving more

6    complete information regarding the matters alleged in the Counterclaims, through

7    discovery or otherwise.

8    **COMPULSORY COUNTERCLAIMS-IN-REPLY**

9    Pursuant to Federal Rule of Civil Procedure 13(a) and *Davis & Cox v. Summa*

10   *Corp.*, 751 F.2d 1507 (9th Cir. 1985), Counterclaimant-in-Reply MGA

11   Entertainment, Inc. ("MGA") hereby pleads its counterclaims-in-reply against

12   Counter-Defendant-in-Reply Mattel, Inc., as set forth herein.

13   **FIRST COUNTERCLAIM-IN-REPLY**

14   (Trade Secret Misappropriation—Cal. Civ. Code §3426 *et seq.*)

15   32. 304. MGA repeats and realleges paragraphs 1 through 6031 above as

16   though set forth herein.

17   33. 305. As used herein, "Trade Secret Materials" shall mean the

18   documents, photographs, catalogs, and other information stolen from MGA by

19   Mattel, as well as by Rahimi, including but not limited to the information concerning

20   MGA in the annual Mattel NYTF reports from 2000 through 2006, related to MGA's

21   unreleased products. MGA's trade secrets stolen by Mattel and Rahimi includes the

22   information concerning MGA products contained within at least the following

23   documents (Mattel has not yet produced all of the relevant documents concerning

24   this theft, assuming they still exist): Toy Fair 2000 Competitive Update, Toy Fair

25   2001 Competitive Toy Review, 2001 New York Toy Fair Report, 2002 Competitive

26   Toy Review, 2003 New York Toy Fair Competitive Review and 2004 New York

27   Toy Fair Trend and Manufacturer Overview.

28

1    34.  306. MGA undertook reasonable efforts under the circumstances to

2    maintain the confidentiality of its Trade Secret Materials, including confidentiality

3    agreements with its employees and consultants, and otherwise limiting disclosure to

4    those who could view the information only upon condition that they not disclose it

5    unless and until it became public information through no fault of their own.

6    35.  307. MGA's Trade Secret Materials derive independent value from not

7    being generally known to the public or to other persons who can obtain economic

8    benefit from their disclosure.

9    36.  308. Mattel illegally obtained the Trade Secret Materials as set forth

10   above.

11   37.  309. Mattel used and disclosed MGA's Trade Secret Materials without

12   MGA's consent and without regarding to MGA's rights, and for its own benefit.

13   38.  310. Mattel's conduct has caused, and unless enjoined by this Court,

14   will continue in the future to cause irreparable injury to MGA. MGA has no adequate

15   remedy at law for such wrongs and injuries. MGA is therefore entitled to a

16   permanent injunction restraining and enjoining Mattel as well as its agents, servants

17   and employees, and all persons acting in concert therewith, from further using in any

18   manner the MGA Trade Secret Materials.

19   39.  311. In addition, as a proximate result of Mattel's misconduct, MGA

20   has suffered actual damages, and Mattel has been unjustly enriched.

21   40.  312. The aforementioned acts of Mattel were willful and malicious,

22   including Mattel's use of deliberate acts of deception to acquire the type of

23   information from MGA that Mattel itself considered to be a trade secret. MGA is

24   therefore entitled to enhanced damages and reasonable attorneys' fees.

25   SECOND COUNTERCLAIM-IN-REPLY

26

27

28                         - 15 -   MGA'S REPLY TO COUNTERCLAIMS AMENDED
                         COMPLAINT

                                          CV 04-9049 DOC (RNBX)

1        (Civil RICO—18 U.S.C. §1962(c))

2   313. MGA repeats and realleges paragraphs 1 through 60 above as though set forth

3   herein.

4   314. Beginning at various times from 1992 through the filing of these

5   Counterclaims-in-Reply, in the Central District of California and elsewhere,

6   Counter-defendant Mattel, Inc. was and is associated-in-fact in, and with, the Mattel

7   Racketeering Enterprise which has conducted its affairs through a pattern of

8   racketeering activity, and whose conduct and activities affect interstate or foreign

9   commerce. Counter-defendant Mattel knowingly engaged in numerous criminal acts

10   in connection with this enterprise, and in so doing, injured MGA in its business or

11   property in the fashion required by 18 U.S.C. 1964. Mattel's actions include

12   multiple, related acts in violation of: 18 U.S.C. §1343 (wire fraud), 18 U.S.C. §1503

13   (influencing or injuring officer or juror generally), 18 U.S.C. §1512 (tampering with

14   a witness, victim or informant), 18 U.S.C. §1952 (interstate and foreign travel to aid

15   racketeering), and 18 U.S.C. §2319(a) and 17 U.S.C. §506(a)(1)(A) (criminal

16   copyright infringement).

17   315. The predicate acts alleged herein occurred after the effective date of 18 U.S.C.

18   §1961 *et seq*., and the last such act occurred within ten years after the commission of

19   a prior act of racketeering activity. These racketeering activities include repeated acts

20   of:

21   a. Wire Fraud: As alleged with particularity in paragraphs 1-4, 6-25, Mattel, having

22   devised a scheme or artifice to defraud MGA (and others) from their trade secrets

23   and other confidential information in order to acquire and maintain an unlawful

24   competitive advantage, did for the purpose of furthering and executing this scheme,

25   transmit and cause to be transmitted by means of wire communications in interstate

26   and foreign commerce, writing, signs, signals, pictures and sound, in violation of 18

27   U.S.C. §1343;

28
                    - 15 -   MGA'S REPLY TO COUNTERCLAIMSAMENDED
                    COMPLAINT
                                      CV 04-9049 DOC (RNBX)

b. Spoliation and Concealment of Evidence: As alleged in paragraphs 26-52, Mattel did corruptly alter, destroy and conceal many documents, and attempted to do so with respect to many more, with the intent to impair their availability for use in an official proceeding, in violation of 18 U.S.C. §1512 and 18 U.S.C. §2;

c. Obstruction of Justice/Influencing or Injuring Officer or Juror Generally. As alleged in paragraphs 1-60, Mattel did seek to corruptly impede, obstruct or influence the due administration of justice, including by lying under oath and by corruptly inducing the Court to enter a wrongful injunction through concealment of evidence that would have brought about a contrary result, all in violation of 18 U.S.C. §1503 and 18 U.S.C. §2.

d. Criminal Copyright Infringement. As alleged in paragraphs 13-18, Mattel willfully infringed the copyrights of MGA (and numerous others) through knowing violations of the Copyright Act in the deliberately unauthorized reproduction, distribution and public display of photographs and other depictions of its competitors' products for purposes of commercial advantage and private financial gain, all in violation of 18 U.S.C. §2319(a) and 17 U.S.C. §506(a)(1)(A).

316. Mattel had a role in the racketeering activity distinct from the undertaking of those acting on its behalf in the larger Mattel Racketeering Enterprise. Mattel also attempted to benefit, and did benefit, from the activities of its employees and agents alleged herein, and thus was not a passive victim of racketeering activity, but an active perpetrator.

317. MGA has been injured in its business or property as a direct and proximate result of Mattel's violations of 18 U.S.C. §1962(c), including injury by reason of predicate acts constituting the pattern of racketeering activity, particularly (though without limitation) the scheme to defraud MGA of confidential information, as well as the concealment of evidence and obstruction of justice resulting in a wrongful injunction in this action depriving MGA of sales of numerous Bratz products,

1    interfering with MGA's relationships with retailers, interfering with MGA's

2    relationships with licensees, and destroying an estimated one billion dollars in brand

3    equity.

4    318. MGA is therefore entitled to recover its substantial damages in an amount to be

5    proven at trial, and pursuant to 18 U.S.C. §1964(c), is entitled to recover treble its

6    damages, plus interest, costs and attorneys fees, incurred by reason of Mattel's

7    violation of 18 U.S.C. §1962(c).

8                          **THIRD COUNTERCLAIM-IN-REPLY**

9                                (Wrongful Injunction)

10   319. At the behest of Mattel, on December 3, 2008, the Court entered a sweeping set

11   of equitable orders against MGA that had the effect of destroying all or a substantial

12   part of MGA's value in the BRATZ brand.

13   320. On July 22, 2010, the Ninth Circuit Court of Appeals held that the December 3,

14   2008 equitable orders should not have been entered. Without regard to Mattel's

15   intent, wrongful acts, or otherwise, this reversal demonstrated that the December 3,

16   2008 orders were wrongful. *See Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16

17   F.3d 1032, 1036-37 (9th Cir. 1994).

18   321. Accordingly, MGA is entitled to have from Mattel the damages caused by these

19   wrongful equitable orders, and to have restored to it the benefits it lost as a result of

20   these wrongful equitable orders, and to have disgorged from Mattel the benefits it

21   received from these wrongful equitable orders, in an amount subject to proof at trial.

22                                     **PRAYER**

23        WHEREFORE, MGA prays for relief as follows:

24             a.   ~~On the Reply,~~ that judgment be entered in favor of MGA

25   ~~and against Counterclaimants Mattel and Mattel Mexico on the FAAC and that the~~

26   ~~FAAC be dismissed with prejudice;~~

27             b. On the Reply, that MGA recover its costs of suit; and

28                          - 15 -    MGA'S ~~REPLY TO COUNTERCLAIMS~~ AMENDED
                                   COMPLAINT

                                   CV 04-9049 DOC (RNBX)

1  c. On the Reply, that MGA recover its attorneys fees pursuant to

2  statute under 17 U.S.C. 505 and Cal. Civ. Code 3426.4;

3  d. On the Reply, a declaration that MGA is the true owner of the

4  Bratz intellectual property and Moxie Girlz trademarks;

5  b.  e. On the Counterclaims-in-Reply, that MGA recover its

6  actual damages;

7  c.  f. On the Counterclaims-in-Reply, that Mattel be ordered to

8  pay double damages due to its willful and malicious misappropriation of MGA's

9  trade secrets with deliberate intent to injure MGA's business and improve its own;

10  g. On the Counterclaims-in-Reply, that Mattel be ordered to pay

11  treble MGA's damages, plus interest, costs and attorneys' fees incurred by reason of

12  Mattel's violation of 18 U.S.C. §1962(c);

13  h. On the Counterclaims-in-Reply, that Mattel be ordered to pay

14  damages, to restore to MGA what it has lost, and to disgorge all benefits that it has

15  received as a result of wrongful injunction;

16  d.  i. On all pleadings in these consolidated actions, that Mattel

17  be ordered to pay the full costs of this action, including all fees paid to Court-ordered

18  Monitors, Discovery Masters, and Rule 706 Experts;

19  e.  j. That MGA be awarded such other and further relief as

20  the Court may deem just and proper.

21

22

23

24  DATED: _____

25  ANNETTE L. HURST
    Orrick, Herrington & Sutcliffe KELLER

26  RACKAUCKAS LLP

27  By: /s/ Jennifer L. Keller _____

28  - 15 -  MGA'S REPLY TO COUNTERCLAIMS AMENDED
    COMPLAINT

    CV 04-9049 DOC (RNBX)

1

~~ANNET~~Jennifer L. ~~HURST~~Keller
~~Attorneys for~~
2

Attorney for MGA ~~Entertainment, Inc.~~Parties

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 15 -
COMPLAINT

MGA'S ~~REPLY TO COUNTERCLAIMS~~AMENDED

CV 04-9049 DOC (RNBX)

1

2

3

**DEMAND FOR JURY TRIAL**

MGA Entertainment, Inc. respectfully requests a jury trial on all issues triable hereby.

4

5

DATED: _____

6

7

8

9

10

ANNETTE L. HURST
Orrick, Herrington & Sutcliffe KELLER RACKAUCKAS LLP

By: /s/ Jennifer L. Keller
    ANNET Jennifer L. HURST Keller
    Attorneys for
Attorney for MGA Entertainment, Inc. Parties

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 15 - MGA'S REPLY TO COUNTERCLAIMS AMENDED COMPLAINT

CV 04-9049 DOC (RNBX)

PROOF OF SERVICE
§ 1013A(3) C.C.P.


**STATE OF CALIFORNIA COUNTY OF ORANGE**

I am employed in the County of Orange, State of California. I am over the age of 18 years and am not a party to the within action; my business address is 18500 Von Karman Avenue, Suite 560, Irvine, California 92612.

On February 27, 2013, I served the foregoing documents described as follows: **MGA PARTIES' MOTION FOR LEAVE TO AMEND COMPLAINT** *NUNC PRO TUNC and* **DECLARATION OF JENNIFER L. KELLER IN SUPPORT OF MGA PARTIES' MOTION FOR LEAVE TO AMEND** *NUNC PRO TUNC* on all parties in this matter listed below as follows:

**Cheryl Plambeck**
**Davis & Gilbert LLP**
**1740 Broadway**
**New York, NY 10019**

**J. Christopher Jennings**
**Gibson Dunn & Crutcher**
**333 S. Grand Ave., 45th Floor**
**Los Angeles, CA 90071**

**Kevin E. Dennihan**
**Klee Tuchin Bogdanoff & Stern**
**1999 Avenue of the Stars**
**Los Angeles, CA 90067**

**Peter H. Bonis**
**Peter H. Bonis Law Offices**
**1990 North California Blvd., 8th Floor**
**Walnut Creek, CA 94596**

[X]    **BY MAIL:**   I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service the same day with postage thereon fully prepaid at Irvine, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postage cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on February 27, 2013, at Irvine, California.


/s/ Danielle Frederick
Danielle Frederick