# EXHIBIT C

*MGA Entm't, Inc. v. The Hartford Ins. Group et al., Ninth Cir. 12-56072*

**Transcript of Oral Argument: "Equitable Contribution" Appeal**

| Speaker | Discussion |
|---|---|
| Sean Hanifin | Good afternoon, Your Honors, may it please the court. Sean Hanifin, on behalf of Evanston Insurance Company. I respectfully reserve two minutes for rebuttal. |
| Judge Kozinski | Okay. |
| Sean Hanifin | Your Honors, in cases involving equitable contribution with respect to defense costs paid by multiple insurers on behalf of their common insured, California law provides that the purpose of the equitable contribution claim is to allocate the funds paid in a fashion that each insurer pays its fair share and no insurer profits at the expense of the others. And that's articulated in detail in the 1998 *Fireman's Fund* decision which is probably the lengthiest discussion of California law on the topic.<br><br>California law also provides that there is no set method for allocation but the most commonly employed method is time on the risk, and that indeed is the method that Judge Carter indicated he was applying here. Notwithstanding his application of his time on the risk, we ended up with a result where Evanston, on the risk for two years, paid $67 million, more than twice as much as Lexington, also on the risk for two years. |
| Judge Trott | Why? |
| Sean Hanifin | Well, Your Honor, I think it's because Judge Carter misunderstood the meaning of equitable contribution. And I think that's best exemplified in ER 40 in his April 18, 2012 order, in which he essentially expresses his perception of the relative equities between Evanston, on the one hand, and Lexington and Crum & Forster, on the other. |
| Judge Trott | Because Evanston . . . . |
| Judge Wardlaw | I was just going to say the same thing you were going to say . . . . |
| Judge Trott | Go ahead. |
| Judge Wardlaw | This happened because Lexington stood up and defended under a reservation of rights and so was able to limit its payment to reasonable fees under California State law. |
| Judge Trott | 2860. |
| Sean Hanifin | Yeah, I think it's not 2860, Your Honor, but let me first address Justice Wardlaw's question. It is because Crum & Forster and AIG or Lexington |

1

| Speaker | Discussion |
|---|---|
| | settled first and Evanston settled last.  But that was inevitable, Your Honor.  In late 2007 . . . . |
| Judge Wardlaw | Isn't it a fact that Lexington and the two secondary insurers defended, paid the defense costs, under their duty to defend MGA and Evanston did not. |
| Sean Hanifin | They did not, Your Honor. |
| Judge Wardlaw | And what is the implication of that under California law? |
| Sean Hanifin | Your Honor, that's not what occurred.  The tenders for all four insurers to place in late October or early November in 2007.  Three insurers including Evanston declined coverage.  Lexington merely acknowledged receipt of the Complaint and took no steps to undertake defense until after MGA sued it in April 2008, some six months later.  It was only after a suit was filed against it that Lexington made any payments with respect to a defense that it concededly owed here. |
| Judge Trott | Did it do anything? |
| Sean Hanifin | It did nothing between November 1, 2007, the time of tender, and May 5, 2008, subsequent to being sued by MGA. |
| Judge Trott | What did it say at the time of tender? |
| Sean Hanifin | It acknowledged receipt, indicated that it would monitor the case, and made some reference to clarifying that a $25,000 self insured retention had been exhausted. |
| | When MGA filed suit in April 2008, it filed suit against Hartford, Crum & Forster, and Lexington.  It never filed suit against Evanston.  Evanston declined coverage in 2007 and as far as Evanston knew MGA wasn't challenging its coverage position.  It wasn't until after MGA settled with each of Hartford, Crum & Forster, and Lexington – garnering an approximately $52 million war chest in the process – that they turned to Hartford, excuse me, that they turned to Evanston and filed suit against Evanston in January of 2009.  So while Judge Carter repeatedly excoriates Evanston to being last to come to the party, Evanston didn't even know the party was going until after the litigation against the other three insurers had not only commenced, but had been resolved in favor of MGA. |
| Judge Wardlaw | So you're saying you have to, there's a requirement that you sue your insurance company before the insurance company has a duty to defend under its policy? |
| Sean Hanifin | I'm not suggesting that at all, Your Honor.  But I am suggesting that with |

2

| Speaker | Discussion |
|---|---|
| | respect to the four insurers who were involved here, as a practical matter their conduct was the same.  Three denied coverage, one while not denying coverage did not undertake the defense, which was what led to the litigation.  And I suggest that at least with respect to Evanston, Your Honor, we declined coverage because we had a good faith belief that our coverage did not apply.  I will leave to Lexington's counsel to explain why Lexington did not undertake the defense when it wasn't disputing it had a defense obligation. |
| Judge Wardlaw | Okay, let me just ask you a question.  What happens to this litigation if we decide that Lexington's policy did not provide coverage? |
| Sean Hanifin | Your Honor, I think what should happen is that the Court would resolve this allocation, this equitable contribution issue to divide the fees appropriately and in accordance with California law, and then if you decide in favor of Lexington with respect to the advertising injury issue that was just argued, I think Lexington is entitled to get a refund back from MGA with respect to the portion of the fees that were paid subsequent to the date of the filing of the Fourth Amended Answer and Counterclaim.<br><br>With respect to Judge Carter's perception of Evanston's conduct, where I think the Court got it sideways was equitable contribution among insurers doesn't involve any concepts of comparative fault, it's been the law in California for more than 30 years that it's an equitable allocation of contractual obligations, and there's an uninterrupted string of cases from 1982 to the present, four of which are cited and relied upon in the *Fireman's Fund* decision, that say that this doesn't involve the relative equities among the insurers, this is simply an allocation of their contractual obligations. |
| Judge Trott | So what is the word equitable add?  If it's just an allocation of contractual obligations, what does equitable mean? |
| Sean Hanifin | I think it's equitable in the sense, Your Honor, that if one insurer has born more than its fair share of its contractual obligations that the Court should adjust them so that each insurer bears its appropriate . . . . |
| Judge Trott | And how do you determine that?  Since somebody has paid more than . . . . |
| Sean Hanifin | Well, Your Honor, it depends upon the allocation method chosen.  In the time on the risk method where all the insurers have the same policy limit, we'd suggest that it's divided equally by the number of years of coverage, and I think that's the method most commonly employed by the California courts.  The *Centennial* decision and *Fireman's Fund* and the *Scottsdale* decisions that we cite. lay out alternate schemes that are sometimes employed in circumstances where for example the insurers have different |

3

| Speaker | Discussion |
|---|---|
| | policy limits.  If one insurer's primary policy is $1 million and another's is $2 million you might do a 2/3-1/3 allocation and the like.  But in circumstances such as are present here where all the primary insurers had single year policies with the same $1 million policy limit, the allocation is simple a time on the risk . . . . |
| Judge Trott | That washes out.  I see. |
| Sean Hanifin | So I think Judge Carter approached the remaining issues from this inappropriate framework that he thought he was there to make an assessment of the relative conduct of the insurers and punish some and reward others. |
| Judge Trott | It seems to come through.  He thought Evanston was the bad guy. |
| Sean Hanifin | Absolutely, Your Honor.  And, Your Honor, in the *Scottsdale* decision which the Court of Appeal handed down in 2010, the court says "equitable contribution does not depend upon fault, it's based upon an equitable apportionment of contractual undertakings," and the court further says "punishment is not a proper consideration in equitable contribution."<br><br>In Judge Carter's zeal to drive toward this allocation, we think he made substantial errors in California law in at least three respects.<br><br>The first is the *Essex v. Hecht* issued that we raised with respect to the unallocated settlement agreement.  AIG and MGA entered into a settlement agreement which essentially a lump sum of $33 million is paid.  That agreement doesn't allocate that consideration between the release of the defense claims with respect to which AIG could seek contribution and release of the bad faith claims which they can't . . . . |
| Judge Trott | Well of course the other side says sure it does, if you read it. it spells out in grotesque detail what it was all about and had nothing to do with bad faith.  It all related to the other. |
| Sean Hanifin | Your Honor, that's because they're reading the wrong portion of it.  There's no doubt that the agreement contains extensive provisions with respect to calculation.  But what the real place to look is paragraph 13 at ER 497.  And that's a paragraph that says "in consideration of the payments provided for herein," and goes on to say MGA and Larian and release the AIG companies for claims of bad faith.  In other words, the agreement expressly says in consideration of the payments provided for here, we release the bad faith claim.  So Judge Carter's interpretation is not only unsupported by the agreement, it's directly contrary to what the agreement says.<br><br>What AIG wishes the agreement said is here's $33 million for defense costs |

4

| **Speaker** | **Discussion** |
|---|---|
| | and $0 for bad faith or $1 for bad faith and they could have said that. |
| Judge Trott | Why isn't the language that you just read the equivalent of that, though? |
| Sean Hanifin | Your Honor, in consideration for the payments made herein, we release bad faith claims. |
| Judge Trott | Right. You're using consideration in the legal contractual sense. |
| Sean Hanifin | Well, consideration and payments, Your Honor. Which are, of course, it is . . . . |
| Judge Trott | In consideration of your apology, I won't sue you. |
| Sean Hanifin | Your Honor? |
| Judge Trott | There are different ways that's used then I think it might be used in that way here. But anyway, I get your argument. |
| Sean Hanifin | But, Your Honor, the other thing to bear in mind here is . . . . |
| Judge Kozinski | You're over your time. So finish your answer. |
| Sean Hanifin | Is that the problem that the *Essex v. Hecht* decision contemplates is what occurred here. AIG files suit against us and says we get credit for every single dollar paid in the settlement agreement. MGA files suit against us and says you don't get credit for every dollar paid in that settlement agreement because the dollars paid in that settlement agreement also released our bad faith claim. |
| Judge Trott | In 10 seconds what are you asking us to do? |
| Sean Hanifin | Asking you to reverse with instructions with respect . . . . |
| Judge Trott | What are the instructions? |
| Sean Hanifin | Instruct Judge Carter that the unallocated settlement agreement cannot be used as a basis for pursuit of a contribution claim, Your Honor. |
| Judge Kozinski | Thank you. |
| Sean Hanifin | Thank you, Your Honor. |
| Mark Sheridan | May it please the court, Mark Sheridan on behalf of the AIG entities, Lexington, National Union and Charter Specialty. Your Honors, I'll try to be brief. Ms. Kokes and I are going to split our time. She is here on behalf of Crum & Forster . We just heard to be summarized in one simple |

5

| Speaker | Discussion |
|---|---|
|  | sentence: "No good deed goes unpunished." National Union, Charter Specialty . . . . |
| Judge Kozinski | That's pretty much life, isn't it? |
| Mark Sheridan | That is true, Your Honor. |
| Judge Trott | The other side says there was no good deed. But the other side sat on its hands and didn't do anything. |
| Mark Sheridan | Your Honor, what I can tell you is that Evanston breached its contract. That has been found. There is no appeal on that issue. My clients stepped up and defended their insured. What Evanston asks for here today is a dangerous precedent. They seek to punish a carrier that provided a defense by refusing to allow them to . . . . |
| Judge Kozinski | They say you really couldn't step up until you were sued. |
| Judge Trott | Right. |
| Mark Sheridan | Your Honor, that's not . . . . |
| Judge Kozinski | That's not stepping up, that's really more like being driven. |
| Mark Sheridan | That's actually not an accurate statement, Your Honor. Lexington has a retention, has self-insured retention. It asks for evidence proving that the self-insured retention was exhausted. It has no obligation to defend until that is demonstrated. MGA did not provide proof of that until after the lawsuit was filed. At which point in time . . . . |
| Judge Kozinski | So it is true, it is true, that you didn't do it until you were sued? |
| Mark Sheridan | No, No . . . . |
| Judge Wardlaw | Well, it is accurate as a time line, but you're saying that you had no obligation even though they sued you at that time. |
| Mark Sheridan | Correct, Your Honor. |
| Judge Wardlaw | So you should answer Judge Kozinski's question. |
| Judge Kozinski | So where, why not, it is true, then, so I don't know why you are arguing it is not true, when in fact it is true. It didn't happen until after you were sued. Now there may be reasons for it, which you can talk about, but fighting the proposition just looses your credibility. It makes you seem dishonest. |

6

| **Speaker** | **Discussion** |
|---|---|
| Judge Trott | Where's the good deed? |
| Judge Kozinski | Yeah. |
| Mark Sheridan | The good deed, Your Honor, is several. First, once it was proven that the self-insured retention had been exhausted, Lexington not only agreed to defend, it advanced $20 million. |
| Judge Wardlaw | What did MGA have to do to show you that the self-retained insurance limit, whatever, had been used up? |
| Mark Sheridan | The S.I.R., Your Honor, had been exhausted. They had to provide copies of the bills. That's all it was. |
| Judge Wardlaw | They had to do that. They had to bring you the bills? |
| Mark Sheridan | Yes. |
| Judge Wardlaw | From their litigation with Mattel? |
| Mark Sheridan | Yes, Your Honor. And so once they did that, Lexington acknowledged the duty to defend and it advanced money. Then a tender was made to the umbrella carriers by MGA. And they agreed to defend. And at that point in time there was a dispute about the rate. What was the rate that the insurance carriers were going to defend. We asserted our rights to 2860. |
| Judge Trott | That's where 2860 comes in. |
| Mark Sheridan | And MGA said we can go to arbitration or we can resolve the issue. And as Your Honor has seen in grotesque detail, Your Honor, we detailed exactly what we paid and what we paid for and at rates that we agreed to in lieu of a 2860 arbitration. It wasn't that we settled the lawsuit by itself. We settled the 2860 dispute as well. |
| Judge Trott | And the language to which the other side refers "in consideration of"? |
| Mark Sheridan | Your Honor, again there is grotesque detail about what we paid for. To quote, Your Honor, "we identified every penny we paid and why we paid it." |
| Judge Trott | I read every number. |
| Mark Sheridan | Unfortunately I had to draft every bit of that, Your Honor. So, at the end of the day, what Evanston is seeking here is punish my clients for having in the first to step up. Having been the first to defend, while they were in breach. And what they ask is not only should those carriers that defended while Evanston was in breach not be entitled to reimbursement, but that |

7

| Speaker | Discussion |
|---|---|
| | those carriers should bear the expense that Evanston incurred because it breached. So not only do we not get our money back that we paid while Evanston was in breach, but because Evanston was obligated to pay more money as a result of its breach, my clients should bear some portion of that. Your Honor, that is a dangerous precedent for this Court to set. It encourages carriers not to defend. If you are in no worse place having not defended, in fact, you might be in a better place than the defending carrier, then that's what they are urging here today. And this court should have none of it. This court has gone a long way to encourage . . . . |
| Judge Kozinski | Well, they said they have a good faith argument that there was no coverage. What do you do in that circumstance? |
| Mark Sheridan | Your Honor, that simply gets them out of their bad faith claim. It doesn't mean that they didn't breach their contract. And if they believed they had such a good faith argument, they have an obligation to – reservation of rights and file a lawsuit saying we don't have the duty to defend. |
| Judge Wardlaw | Did Lexington defend under reservation of rights? |
| Mark Sheridan | It did, Your Honor. |
| Judge Wardlaw | Okay. |
| Mark Sheridan | And so did the umbrella carriers, as well, Your Honor. So, I have nothing else at this point in time. I would like to save some time for Ms. Kokes, unless the court has more questions for me? |
| Judge Kozinski | Okay. Just the bottom line is we affirm, right? |
| Mark Sheridan | I'm sorry? |
| Judge Kozinski | Your bottom line, is you we affirm, right? |
| Mark Sheridan | Yes, Your Honor. |
| Judge Wardlaw | Well, what if we decide that your endorsement means you had no duty to defend? |
| Mark Sheridan | Well, two issues, Your Honor. First, we needed affirmance with regard to the umbrella carriers. They should get their money back. And with respect to Lexington, if Lexington is out and had no duty to defend with respect to the Fourth Amended Answer and Counter Claim, it is entitled to reimbursement either from the other carriers or from MGA. Perhaps it is easier to get it from the other carriers, but either way, it is entitled to its money back. |

8

| Speaker | Discussion |
|---|---|
| Judge Trott | And will that be able to be resolved without more lawsuits being filed? |
| Mark Sheridan | Your Honor, I doubt it. |
| Judge Trott | I do too. |
| Mark Sheridan | Thank you. |
| Judge Trott | The unemployment rate might be no good in the rest of the economy, but it is pretty good around here. |
| Jennifer Kokes | May it please the court, Jennifer Kokes, on behalf of Crum & Forster Insurance Company.  Your Honor, Evanston's entire argument that it paid more than anybody else is predicated on its inclusion of its $39 million settlement payment to MGA.  But that settlement payment was not part of the contribution case.  That settlement agreement was not entered into until March of 2012, on the eve of trial in the contribution case.  Evanston attempted to amend its counterclaim and cross-claim to include the $39 million claim and the court properly was within its discretion and denied that motion to amend on the grounds that it would result in prejudice to my client because the discovery cut-off date had passed, the motion cut-off date would passed.  So we would have not been permitted to do any discovery with respect to this new claim. |
| Judge Trott | And our standing of review on that is for abuse of discretion? |
| Jennifer Kokes | That's correct, Your Honor.  And even Evanston itself has acknowledged that this would have been a new claim.  If you compare its operative pleading, which you can find the excerpts of record beginning on page 327, and compare that with its proposed Second Amended Counter Claim, which begins in C&F's excerpts of record at page ER36, you will find that they were attempting to assert two additional causes of action and multiple additional factual allegations predicated on that settlement.  Again, the court properly denied.<br><br>The other issue I would like to address briefly, Your Honors, is the court's *sua sponte* granting summary judgment on Evanston's counter-claim.  Again, the court reviewed the allegations of the operative pleading and correctly concluded that it related solely to the payments made by the Chartis Member Companies and Evanston's requirement that they contribute to those payments.  And in connection with that, the court also correctly concluded that the settlement payment was not part of our case.  So . . . . |
| Judge Trott | And there were no disputed facts. |

9

| **Speaker** | **Discussion** |
|---|---|
| Jennifer Kokes | No, there were no disputed facts. It was a *sua sponte* summary judgment, based upon the fact that all of the issues that were the subject of the counterclaim were fully resolved by the member companies summary judgment ruling. Your Honors don't have any questions? I don't have anything further. |
| Judge Kozinski | Thank you. |
| Jennifer Kokes | Thank you. |
| Judge Kozinski | I think you are out of time, but we will give you a minute for rebuttal if you wish to take it. |
| Sean Hanifin | Thank you, Your Honor. Your Honor, I would just like to speak to the last point Mr. Sheridan made, his warning to the court that this would be a dangerous precedent. And I think he is wrong, because what he is suggesting to the court is that the court endorse a race to settlement. In other words, AIG and Crum & Forster settle first, and they get treated better. They get an advantage over the insureds who sign a waiver. When they settled, as I mentioned earlier, that left MGA with approximately $50 million with which to wage battle with Evanston. We paid a very substantial sum. We paid, I expect, far more than we would have paid if we had been one of the litigants back in 2008. So essentially, what they are saying is, the first party to settle gets cut the best deal. And there are some states in which that is the law. For example, that's the law in Ohio, we cite one such case in our brief. But that's not the law in California. That's why California has equitable contribution among insurers. If it was a race to settle, the first insurer could cut its deal and pay a dollar and it would cost the second insurer $10 million he would say to him, "tough luck, it's a race to settle." And that is what equitable contribution among insurers is designed to avoid. But that's the opposite of what they are asking you to do here today. |
| Judge Kozinski | Thank you. |
| Sean Hanifin | Thank you, Your Honor. |
| Judge Kozinski | These are immensely complicated cases, including the one that is still pending. Has there been any effort to mediate or settle globally? |
| Unknown Speaker | There has, Your Honor, but they have all been unsuccessful. |
| Judge Trott | I'm shocked. |
| Judge Kozinski | This happened in district court. |

10

Case 2:04-cv-09049-DOC-RNB   Document 10900-4   Filed 08/12/13   Page 12 of 12   Page ID #:330104

| Speaker | Discussion |
|---|---|
| Unknown Speaker | Yes, Your Honor, and private mediation as well. |
| Judge Kozinski | Private mediation as well.  Okay, well that's certainly not news in these cases, I just thought I'd ask the question.  Alright.  Case will stand submitted.  Thank you counsel. |

**END OF RECORDING**